FILED BY FAX
PURSUANT TO LOCAL RULES

1  LIONEL Z. GLANCY (#134180)
   MICHAEL GOLDBERG (#188669)
2  GLANCY BINKOW & GOLDBERG LLP
   1801 Avenue of the Stars, Suite 311
3  Los Angeles, California 90067
   Telephone:      (310) 201-9150
4  Facsimile:      (310) 201-9160
   E-mail:      info@glancylaw.com
5
6  [Additional Counsel on Signature Page]
7
   Attorneys for Plaintiff Robert Curry
8

ORIGINAL FILED

OCT 2 3 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12

13  ROBERT CURRY, Individually and on Behalf of   )   C09   05094
    All Others Similarly Situated,                )
14                                                )   CLASS ACTION
                                                  )
15                  Plaintiff,                    )   COMPLAINT FOR VIOLATIONS
                                                  )   OF THE FEDERAL SECURITIES
16            v.                                  )   LAWS
                                                  )
17  HANSEN MEDICAL, INC., FREDERIC H.             )
    MOLL, AND STEVEN M. VAN DICK,                 )
18                                                )
                                                  )
19                  Defendants.                   )
                                                  )
20                                                )
                                                  )   DEMAND FOR JURY TRIAL
21

22

23

24

25

26

27

28
   ─────────────────────────────────────────────
   CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    Plaintiff Robert Curry, by and through his attorneys, alleges the following upon information

2    and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal

3    knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's

4    investigation, which includes without limitation: (a) review and analysis of regulatory filings made

5    by Hansen Medical, Inc. ("Hansen" or the "Company"), with the United States Securities and

6    Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued

7    by and disseminated by Hansen; and (c) review of other publicly available information concerning

8    Hansen.

### NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of purchasers of Hansen's securities

between May 1, 2008 and October 18, 2009, inclusive (the "Class Period"), seeking to pursue

remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Hansen develops products and technology using robotics for the accurate positioning,

manipulation and control of catheters and catheter-based technologies. Its first product, the Sensei®

Robotic Catheter system, is a robotic navigation system that enables clinicians to place mapping

catheters in hard-to-reach anatomical locations within the heart easily, accurately and with stability

during complex cardiac arrhythmia procedures.

3.    On October 19, 2009, Hansen shocked investors when it revealed that the audit

committee of Hansen's board of directors, upon the recommendation of management, concluded that

the previously issued financial statements contained in the Company's annual report on Form 10-K

for the year ended December 31, 2008, and the Company's quarterly reports on Form 10-Q for the

quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009 and June 30,

2009, should no longer be relied upon because of errors in those financial statements, arising from

"potential irregularities outside of the accounting department." In addition, Hansen indicated that the related press releases, reports and stockholder communications describing the Company's financial statements for the identified periods and the report of Hansen's independent registered accounting firm, PricewaterhouseCoopers LLP, related to the year ended December 31, 2008, should also no longer be relied upon. According to the Company, Hansen identified systems for which revenue should have been recognized in a later period than the period in which it was recognized and revenue on systems that should have been reflected as deferred revenue on our balance sheet as of June 30, 2009.

4.     On this news, shares of Hansen declined $0.31 per share, more than 9%, to close on October 19, 2009, at $3.12 per share, on unusually heavy volume.

5.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company improperly recognized revenue; (2) that, as a result, the Company's revenue and financial results were overstated during the Class Period; (3) that the Company's financial results were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## JURISDICTION AND VENUE

2

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act

3

(15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §

4

240.10b-5).

5

6

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28

7

U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8

9.     Venue is proper in this Judicial District pursuant to §28 U.S.C. §1391(b),  §27 of

9

the Exchange Act (15 U.S.C. §78aa(c)).

10

11

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section

12

27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud

13

or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein,

14

including the preparation and dissemination of materially false and/or misleading information,

15

occurred in substantial part in this District. Additionally, Hansen maintains its principal executive

16

offices within this Judicial District.

17

18

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants

19

directly and indirectly used the means and instrumentalities of interstate commerce, including the

20

United States mail, interstate telephone communications, and the facilities of a national securities

21

exchange.

22

## PARTIES

23

12.     Plaintiff Robert Curry, as set forth in the accompanying certification, incorporated

24

25

by reference herein, purchased Hansen common stock during the Class Period, and suffered damages

26

as a result of the federal securities law violations and false and/or misleading statements and/or

27

28

1 | material omissions alleged herein.

13. Defendant Hansen is a Delaware corporation with its principal executive offices located at 800 East Middlefield Road, Mountain View, California, 94043.

14. Defendant Frederic H. Moll ("Moll") was, at all relevant times, Chief Executive Officer ("CEO") and a director of Hansen, and was, at all relevant times, President of Hansen since March 2009.

15. Defendant Steven M. Van Dick ("Van Dick") was, at all relevant times, Chief Financial Officer ("CFO") and Vice President, Finance and Administration, of Hansen.

16. Defendants Moll and Van Dick are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Hansen's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Hansen develops products and technology using robotics for the accurate positioning, manipulation and control of catheters and catheter-based technologies. Its first product, the Sensei® Robotic Catheter system, is a robotic navigation system that enables clinicians to place mapping catheters in hard-to-reach anatomical locations within the heart easily, accurately and with stability during complex cardiac arrhythmia procedures.

### Materially False and Misleading
### Statements Issued During the Class Period

18.     The Class Period begins on May 1, 2008.  On this day, Hansen issued a press release entitled, "HANSEN MEDICAL REPORTS 2008 FIRST QUARTER RESULTS."  Therein, the Company, in relevant part, stated:

**Robotic System Installed Base Increases by More Than 50%; Catheter Shipments Nearly Double Compared to Prior Quarter**

MOUNTAIN VIEW, Calif., May 1, 2008 – Hansen Medical, Inc. (Nasdaq: HNSN), a developer of new generation robotic technology for accurate and stable control of catheter movement in 3D during cardiac procedures, today reported its business highlights and financial results for the first quarter ended March 31, 2008.

**Recent Business Highlights**

- System Sales: The company recognized revenue on eight SenseiTM Robotic Catheter Systems sold during the first quarter, which brings the total worldwide system placements to 23, including 14 in the United States and nine in Europe.

- Catheter Sales: 401 ArtisanTM Control Catheters were shipped in the first quarter, which exceeds the number of catheters shipped during all of 2007.

- Collaboration with St. Jude Medical: The company's CoHesionTM

3D Visualization Module—a module integrating the 3D movement of the Sensei system with the 3D visualization of the EnsiteTM system from St. Jude Medical—has been configured in six systems in Europe. Clearance for the integrated system by the U.S. Food & Drug Administration (FDA) is expected by mid-2008.

- Enhanced Manufacturing Capabilities: Previous and ongoing investments made to improve the company's manufacturing capabilities are proving to be effective as the manufacturing capacity of the Sensei system increased to an average of three systems per month during the first quarter, and manufacturing yields of the Artisan control catheter were approximately 90% at the end of the period.

- Secondary Financing: In April 2008, the company completed a successful secondary public offering of common stock, selling three million shares with net proceeds to the company of approximately $39.4 million.

"I am pleased to report that since commercialization, we have achieved four consecutive quarters of increases in the number of systems placed," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. "In this past quarter, we recorded revenue on eight Sensei Robotic Catheter Systems, bringing the number of units we have recognized revenue on - which we refer to as our installed base - to 23 systems in our first 10 months of commercialization. First quarter shipments represent more than a 50% increase in our installed base, which now includes 14 systems in the United States and nine in Europe. Additionally, the 401 catheters sold in the first quarter exceeded the number shipped during all of 2007 and is nearly double the prior quarter's catheter shipments.

"As the demand for our platform continues to grow, the investments we have made to increase manufacturing capacity and improve catheter yields will allow us to meet customer expectations and expand our worldwide market presence more efficiently," concluded Dr. Moll.

**2008 First Quarter Financial Results**
Total revenue for the three months ended March 31, 2008 was $6.2 million. During the quarter, the company recorded revenue on the sale of eight Sensei systems (including five in the United States and three Sensei systems in Europe), shipments of 401 Artisan control catheters and one CoHesion module. No revenues were recorded in the same period in 2007.

Cost of goods sold for the three months ended March 31, 2008 was $4.9 million and

included non-cash stock compensation expense of $161,000. Gross profit for the quarter was $1.3 million yielding in a gross margin of 21%. There were no costs of goods sold, gross profit or gross margin recorded in the same period in 2007. The company expects that cost of goods sold, both as a percentage of revenue and on a dollar basis for the remainder of 2008, will continue to fluctuate from quarter to quarter as revenue grows, manufacturing levels change, scale up of both in-house and contract manufacturing processes to full commercial levels is achieved, and as the company transitions into a new manufacturing facility.

Research and development expenses for the three months ended March 31, 2008, including non-cash stock compensation expense of $570,000, were $5.2 million, compared to $5.1 million for the same period in 2007, which included non-cash stock compensation expense of $720,000. Prior to the second quarter of 2007, the company was in the development stage and all manufacturing expenses, including provisions for inventory valuation, were included in research and development expenses. Beginning with commercialization in the second quarter of 2007, the company's manufacturing expenses were included in cost of goods sold. Research and development expenses for the three months ended March 31, 2007 included development-stage manufacturing expenses of $1.0 million. The remaining change in research and development expenses was due primarily to increased compensation expenses related to higher headcount necessary for the development of our Sensei system and the disposable Artisan catheters for the EP market, percutaneous valve replacement application and other future applications.

Selling, general and administrative expenses for the three months ended March 31, 2008, including non-cash stock compensation expense of $1.3 million, were $8.1 million, compared to $4.5 million for the same period in 2007, which included non-cash stock compensation expense of $1.1 million. The increase in selling, general and administrative expenses was due primarily to increased compensation expenses related to higher headcount necessary to support continued growth, legal costs for the development of the company's intellectual property portfolio and other IP and litigation-related legal costs, lease costs for the new facility and increased non-cash stock compensation expenses. The company expects selling, general and administrative expenses to increase during the remainder of this year due to the continued growth of its sales and clinical support groups and the expansion of its intellectual property portfolio.

Other income, net, for the three months ended March 31, 2008 was $352,000, compared to $982,000 for the same period in 2007. The decrease was primarily due to lower interest income related to lower average cash, cash equivalents and short-term investments as a result of cash used in operations and the acquisition of AorTx.

> Net loss for the three months ended March 31, 2008, including non-cash stock compensation expense of $2.0 million, was $11.6 million, or $(0.53) per basic and diluted share, based on an average basic and diluted shares outstanding of 21.8 million. This compares to a net loss of $8.6 million, or $(0.40) per basic and diluted share, based on an average basic and diluted shares outstanding of 21.4 million, for the same period in 2007, which included non-cash stock compensation expense of $1.8 million.
>
> Cash, cash equivalents and short-term investments as of March 31, 2008 were $32.8 million, compared to $48.6 million as of December 31, 2007. The decrease is due mainly to the company's normal operating expenses and $2.3 million in capital expenditures primarily related to the build out of the new facility. Subsequent to the end of the first quarter, in April 2008, the company successfully completed a secondary public offering of common stock, selling three million shares with net proceeds to the company of approximately $39.4 million.

(Emphasis in original).

19.     On May 12, 2008, Hansen filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal first quarter. The Company's Form 10-Q was signed by Defendant Moll and reaffirmed the Company's financial results previously announced on May 1, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Moll and Van Dick, who certified:

> 1.     I have reviewed this Quarterly Report on Form 10-Q of Hansen Medical, Inc.;
>
> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial

---

reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

---

20.     On July 31, 2008, Hansen issued a press release entitled, "HANSEN MEDICAL REPORTS 2008 SECOND QUARTER RESULTS." Therein, the Company, in relevant part, stated:

**Company Recognizes Revenue on Eight Systems and Ships Two Additional Systems**

MOUNTAIN VIEW, CA, Jul 31, 2008 -- Hansen Medical, Inc. (NASDAQ: HNSN), a developer of new generation flexible robotic technology, today reported its business highlights and financial results for the second quarter ended June 30, 2008.

**Recent Business Highlights**

- Systems: The company recognized revenue on eight Sensei Robotic Systems and shipped two additional systems for which revenue is expected to be recognized in the third quarter. Through June 30, 2008, the company has recognized revenue on a total of 31 systems (which we refer to as our installed base), including 21 in the United States and 10 in Europe.
- Catheter Sales: 279 Artisan(TM) Control Catheters were shipped in the second quarter.
- Regulatory Milestones: The company's CoHesion(TM) 3D Visualization Module -- a module integrating the 3D movement of the Sensei system with the Ensite(TM) 3D visualization system of St. Jude Medical -- received 510(k) clearance from the U.S. Food & Drug Administration (FDA) at the end of the second quarter. As part of this 510(k) clearance, the FDA also completed its review of the company's IntelliSense technology.
- Enhanced Manufacturing Capabilities: As a result of ongoing investments made to improve its manufacturing capabilities, the company has increased Sensei System manufacturing capacity to five systems per month and has exceeded a four-week inventory of Artisan Control Catheters.
- Secondary Financing: During the second quarter, the company successfully completed a secondary public offering of common stock, selling three million shares with net proceeds to the company of approximately $39.5 million.

"I am very pleased with what we have accomplished during our first full year of commercialization," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. "During this past quarter, we achieved a number of important milestones that give us a high level of confidence in our ability to execute our business plan as we continue to build momentum. This includes the successful

1

2    completion of a secondary offering of common stock, regulatory clearance for the
     CoHesion 3D Visualization Module which included a review of our IntelliSense
3    feature, and significant improvements in our manufacturing capacity to help meet the
     demand for our technology going forward," concluded Dr. Moll.

4    **2008 Second Quarter Financial Results**

5    Total revenue for the three months ended June 30, 2008 was $5.8 million compared
6    to revenue of $2.4 million in the same period in 2007, equating to a 139% increase
     over the same period in 2007. The company recognized revenue on eight Sensei
7    Robotic Systems, as well as on shipments of 279 Artisan control catheters and one
8    stand-alone CoHesion module.

9    Cost of goods sold for the three months ended June 30, 2008 was $4.7 million and
     included non-cash stock compensation expense of $171,000. Gross profit for the
10   quarter was $1.1 million, yielding a gross margin of 18.5%. This compares to gross
     profit of $781,000 and gross margin of 32.1% for the same period in 2007, which
11   included non-cash stock compensation expense of $87,000. During the second
12   quarter last year, gross profit benefited from the sale of inventory totaling $478,000,
     which had been previously written down. The company expects that cost of goods
13   sold for the remainder of 2008, both as a percentage of revenue and on a dollar basis,
     will continue to fluctuate from quarter to quarter as revenues change, manufacturing
14   levels change, scale-up of contract manufacturing processes continues, and the
15   company transitions into its new manufacturing facility.

16   Research and development expenses for the three months ended June 30, 2008,
     including non-cash stock compensation expense of $763,000, were $6.3 million,
17   compared to $4.4 million for the same period in 2007, which included non-cash stock
18   compensation expense of $566,000. The increase in research and development
     expenses was primarily due to increased employee-related expenses due to higher
19   headcount, increased outside services, materials and overhead expenses, along with
     higher non-cash stock compensation expenses. The company anticipates research and
20   development expenses will continue to increase moderately during the remainder of
21   2008 as the company continues development activities for the electrophysiology
     market, continues its development of its percutaneous aortic valve technology and
22   explores other future potential applications.

23   Selling, general and administrative expenses for the three months ended June 30,
     2008, including non-cash stock compensation expense of $2.0 million, were $10.0
24   million, compared to $5.2 million for the same period in 2007, which included
25   non-cash stock compensation expense of $1.0 million. The increase in selling,
     general and administrative expenses was primarily due to increased employee-related
26   expenses related to higher headcount necessary to support continued growth, legal

27
     CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
28
                                                                                    12

costs related to procuring and protecting the company's intellectual property, lease costs for the new facility and increased non-cash stock compensation expenses. The company expects selling, general and administrative expenses to increase moderately during the remainder of this year as it continues to expand its sales and clinical support groups.

Other income, net, for the three months ended June 30, 2008 was $323,000, compared to $853,000 for the same period in 2007. The decrease was primarily due to lower interest income related to lower balances of average cash, cash equivalents and short-term investments. These lower balances resulted primarily from cash used in operations and the Company's 2007 acquisition of AorTx, Inc., partially offset by cash received from the company's equity offering in April 2008.

Net loss for the three months ended June 30, 2008, including total non-cash stock compensation expense of $2.9 million, was $14.9 million, or $(0.61) per basic and diluted share, based on average basic and diluted shares outstanding of 24.6 million shares. Net loss for the second quarter of 2007, including non-cash stock compensation expense of $1.7 million, was $7.9 million, or $(0.37) per basic and diluted share, based on average basic and diluted shares outstanding of 21.5 million shares, for the same period in 2007.

Cash, cash equivalents and short-term investments as of June 30, 2008 were $54.6 million, compared to $48.6 million as of December 31, 2007. The increase is due mainly to the company's April 2008 secondary public offering, in which the company sold three million shares of common stock with net proceeds of approximately $39.5 million. This was partially offset by normal operating expenses and $9.5 million in capital expenditures during the first six months of 2008 primarily related to the build-out of the new facility.

(Emphasis in original).

21.     On August 5, 2008, Hansen filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal second quarter.  The Company's Form 10-Q was signed by Defendant Moll and Van Dick, and reaffirmed the Company's financial results previously announced on July 31, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Moll and Van Dick, substantially similar to the certifications contained in ¶19, *supra*.

22.     On October 23, 2008, Hansen issued a press release entitled, "HANSEN MEDICAL

REPORTS 2008 THIRD QUARTER RESULTS." Therein, the Company, in relevant part, stated:

**Company Achieves Record Quarterly Revenues, System Sales and Catheter Shipments**

MOUNTAIN VIEW, CA, Oct 23, 2008 -- Hansen Medical, Inc. (NASDAQ: HNSN), the global leader in flexible robotics and the developer of robotic technology for accurate 3D control of catheter movement, today reported its business highlights and financial results for the third quarter ended September 30, 2008.

**Recent Business Highlights for Third Quarter 2008**

- System Sales: The company recognized revenue on a single-quarter record of 14 Sensei(TM) Robotic Catheter Systems, which brings the total worldwide number of systems on which the company has recognized revenue (which the company refers to as its installed base) to 45, including 30 in the United States and 15 in Europe.
- Catheter Sales: The company shipped and recognized revenue on 423 Artisan(TM) Control Catheters, also a record for a single quarter.
- Revenue Growth: The company generated revenues of $10.9 million, a 214% year-over-year increase and the highest quarterly result in the company's history.
- Clinical Case Utilization: Clinicians continue to embrace the company's robotic technology. To date, well over 1,000 clinical cases have been performed using the Sensei system.
- Additional Applications: Excellent recent progress made in investigating the use of the Sensei system outside of electrophysiology, including applications in vascular surgery and structural heart disease.
- Financing Activities: During the third quarter, the company successfully completed a $25 million debt facility comprised of a $15 million equipment line of credit and a $10 million asset-backed revolver.

"The third quarter was our most successful commercial quarter to date and I am very pleased with our accomplishments," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. "During this record-breaking quarter, we achieved the highest quarterly level of revenues, system sales and catheter shipments in the history of our company. I continue to be impressed with the enthusiasm expressed for our technology by customers in a variety of different hospital settings. While we continue to build a strong position in the electrophysiology market, we also have exciting longer-term opportunities in applications for vascular surgery and structural heart disease, and I am pleased with recent progress made in expanding the

utility of our platform," concluded Dr. Moll.

**2008 Third Quarter Financial Results**

Total revenue for the three months ended September 30, 2008 was $10.9 million, a 214% increase compared to revenue of $3.5 million in the same period in 2007. The company recognized revenue on 14 Sensei Robotic Systems, including nine systems configured with the CoHesion(TM) module, as well as on shipments of 423 Artisan control catheters.

Cost of goods sold for the three months ended September 30, 2008 was $6.6 million and included non-cash stock compensation expense of $168,000. Gross profit for the quarter was $4.2 million, yielding a gross margin of 38.9%. This compares to gross profit of $189,000 and gross margin of 5.5% for the same period in 2007, which included non-cash stock compensation expense of $153,000. During the most recent quarter, the company experienced an increase in the overhead applied to its inventory, primarily due to the company's move into a new facility. This increase was fully realized once the preexisting inventory had been sold. Had the company experienced those higher inventory costs for the entire quarter, cost of goods sold and gross profit would have been negatively impacted by approximately $900,000. The company expects that cost of goods sold for the remainder of 2008 and 2009, both as a percentage of revenue and on a dollar basis, will continue to fluctuate from quarter to quarter as revenues change, manufacturing levels increase to utilize more of the existing capacity at our new facility and as the scale-up of contract manufacturing processes continue.

Research and development expenses for the three months ended September 30, 2008, including non-cash stock compensation expense of $668,000, were $7.2 million, compared to $4.5 million for the same period in 2007, which included non-cash stock compensation expense of $590,000. The increase in research and development expenses was primarily due to increased employee-related expenses due primarily to higher headcount, increased outside services, materials and overhead expenses, along with higher non-cash stock compensation expenses. The company anticipates research and development expenses will continue to increase moderately during the remainder of 2008 as the company continues development activities for the electrophysiology market and explores other future potential applications.

Selling, general and administrative expenses for the three months ended September 30, 2008, including non-cash stock compensation expense of $1.9 million, were $8.9 million, compared to $6.5 million for the same period in 2007, which included non-cash stock compensation expense of $1.8 million. The increase in selling, general and administrative expenses was primarily due to increased employee-related expenses related to higher headcount necessary to support continued growth, legal

costs related to procuring and protecting the company's intellectual property and increased non-cash stock compensation expenses. The company expects selling, general and administrative expenses to increase moderately during the remainder of this year as it continues to expand its sales and clinical support groups.

Other loss, net, for the three months ended September 30, 2008 was $28,000, compared to other income, net, of $801,000 for the same period in 2007. The change was primarily due to higher interest expense due to the company's borrowings under its new equipment line of credit, in addition to lower interest income related to lower balances of average cash, cash equivalents and short-term investments.

Net loss for the three months ended September 30, 2008, including total non-cash stock compensation expense of $2.7 million, was $12.0 million, or $(0.48) per basic and diluted share, based on average basic and diluted shares outstanding of 25.1 million shares. Net loss for the third quarter of 2007, including non-cash stock compensation expense of $2.5 million, was $10.0 million, or $(0.46) per basic and diluted share, based on average basic and diluted shares outstanding of 21.6 million shares.

Cash, cash equivalents and short-term investments as of September 30, 2008 were $45.6 million, compared to $48.6 million as of December 31, 2007. The lower cash balance is due to the company's operating expenses and $17.2 million in capital expenditures during the first nine months of 2008 primarily related to the build-out of the company's new facility, partially offset by capital raised from financing activities during the year.

**2008 Nine-Month Financial Results**

Total revenue for the nine months ended September 30, 2008 was $22.9 million, compared to $5.9 million for the same period last year. The company's net loss for the nine months ended September 30, 2008, including non-cash stock compensation expense of $7.6 million, was $38.5 million, or $(1.61) per basic and diluted share, based on an average basic and diluted shares outstanding of 23.9 million. This compares to a net loss of $26.5 million, or $(1.23) per basic and diluted share, based on an average basic and diluted shares outstanding of 21.5 million, for the same period last year, which included non-cash stock compensation expense of $6.0 million.

(Emphasis in original).

23.    On November 5, 2008, Hansen filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal third quarter. The Company's Form 10-Q was signed by Defendant Moll

---

and Van Dick, and reaffirmed the Company's financial results previously announced on October 23, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Moll and Van Dick, substantially similar to the certifications contained in ¶19, *supra*.

24. On February 12, 2009, Hansen issued a press release entitled, "HANSEN MEDICAL REPORTS 2008 FOURTH QUARTER AND YEAR-END RESULTS." Therein, the Company, in relevant part, stated:

**40 Sensei(TM) Robotic Catheter Systems Placed During 2008 Bringing Worldwide Installed Base to 55 Systems After 20 Months of Commercialization**

MOUNTAIN VIEW, CA, Feb 12, 2009 -- Hansen Medical, Inc. (NASDAQ: HNSN), the global leader in flexible robotics and the developer of robotic technology for accurate 3D control of catheter movement, today reported its business highlights and financial results for the fourth quarter and full-year ended December 31, 2008.

**Recent Business Highlights**

- System Sales: During the fourth quarter, the company recognized revenue on 10 Sensei Robotic Systems and shipped one additional system for which revenue is expected to be recognized in the first quarter of 2009. For the full year of 2008, the company recognized revenue on 40 systems. Through December 31, 2008, the company has recognized revenue on a total of 55 systems (which the company refers to as its installed base), including 36 in the United States and 19 in Europe.
- Catheter Sales: The company shipped and recognized revenue on 520 ArtisanTM Control Catheters in the fourth quarter, a record for a single quarter.
- Revenue Growth: The company generated fourth quarter revenues of $7.3 million, a 74% year-over-year increase. Full-year 2008 revenues are $30.2 million.
- CoHesion Adoption: Of the 10 systems sold in the fourth quarter, seven were configured with CoHesion modules, and two additional CoHesion modules were sold to the existing installed base.
- Philips Partnership: The company recently announced joint development and cooperation agreements with Royal Philips Electronics to co-develop integrated products for the electrophysiology (EP) market targeting applications to enhance

visualization capabilities.

"I am pleased with our progress and accomplishments during this past year," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. "Adoption rates for our technology have been strong, with an installed base of 55 systems worldwide since we began commercial shipments in May 2007. In addition, we made important investments in our business and established partnerships that we believe put us in a position to significantly expand our technology in the years ahead. We are also encouraged by the progress we are making in markets outside EP and believe that this success provides evidence of the opportunity to leverage the Sensei platform into a variety of other interventional applications," concluded Dr. Moll.

**2008 Fourth Quarter Financial Results**

Total revenue for the three months ended December 31, 2008 was $7.3 million, a 74% increase compared to revenue of $4.2 million in the same period in 2007. The company recognized revenue on 10 Sensei Robotic Systems, including seven systems configured with the CoHesionTM module, as well as on shipments of 520 Artisan control catheters.

Cost of goods sold for the three months ended December 31, 2008 was $5.2 million and included non-cash stock compensation expense of $210,000. Gross profit for the quarter was $2.1 million, yielding a gross margin of 28.7%. This compares to gross profit of negative $23,000 and negative gross margin of 0.5% for the same period in 2007, which included non-cash stock compensation expense of $139,000. The company expects that cost of goods sold for 2009, both as a percentage of revenue and on a dollar basis, will continue to vary from quarter to quarter as manufacturing levels fluctuate and as revenues fluctuate due to changes in system sales volumes, product mix and average sales prices per system.

Research and development expenses for the three months ended December 31, 2008, including non-cash stock compensation expense of $741,000, were $6.8 million, compared to $5.1 million for the same period in 2007, which included non-cash stock compensation expense of $494,000. The increase in research and development expenses was primarily due to increased employee-related expenses due primarily to higher average headcount, increased outside services, materials and overhead expenses, along with higher non-cash stock compensation expenses. In 2009, the company expects research and development expenses to decline modestly from levels in 2008 as it carefully manages expenses related to development efforts for the EP market and other applications and realizes savings from the company's recently completed reduction in force.

Selling, general and administrative expenses for the three months ended December

31, 2008, including non-cash stock compensation expense of $2.7 million, were $10.1 million, compared to $7.9 million for the same period in 2007, which included non-cash stock compensation expense of $1.4 million. The increase in selling, general and administrative expenses was primarily due to increased employee-related expenses related to higher average headcount necessary to support continued growth, legal costs related to procuring and protecting the company's intellectual property, separation costs for two executives and increased non-cash stock compensation expenses. In 2009, the company expects selling, general and administrative expenses to decline slightly from 2008 levels as a result of careful expense management and savings realized from the recently completed reduction in force.

Other loss, net, for the three months ended December 31, 2008 was $102,000, compared to other income, net, of $545,000 for the same period in 2007. The change was primarily due to higher interest expense due to the company's borrowings under its new equipment line of credit, in addition to lower interest income related to lower balances of average cash, cash equivalents and short-term investments.

Net loss for the three months ended December 31, 2008, including total non-cash stock compensation expense of $3.6 million, was $14.9 million, or $(0.59) per basic and diluted share, based on average basic and diluted shares outstanding of 25.2 million shares. Net loss for the fourth quarter of 2007, including non-cash stock compensation expense of $2.0 million, was $23.9 million, or $(1.10) per basic and diluted share, based on average basic and diluted shares outstanding of 21.7 million shares.

Cash, cash equivalents and short-term investments as of December 31, 2008 were $35.2 million, compared to $48.6 million as of December 31, 2007. The lower cash balance is due to the company's operating expenses and $18.4 million in capital expenditures during 2008, primarily related to the build-out of the company's new facility, partially offset by capital raised from financing activities during the year.

**2008 Full-Year Financial Results**

Total revenue for the year ended December 31, 2008 was $30.2 million, compared to $10.1 million for the same period last year. The company's net loss for 2008, including non-cash stock compensation expense of $11.2 million, was $53.4 million, or $(2.21) per basic and diluted share, based on an average basic and diluted shares outstanding of 24.2 million. This compares to a net loss of $50.4 million, or $(2.33) per basic and diluted share, based on an average basic and diluted shares outstanding of 21.6 million, for 2007, which included non-cash stock compensation expense of $8.0 million.

(Emphasis in original).

25. On March 16, 2009, Hansen filed its Annual Report with the SEC on Form 10-K for the 2008 fiscal year. The Company's Form 10-K was signed by Defendant Moll and reaffirmed the Company's financial results previously announced on February 12, 2009. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Moll and Van Dick, substantially similar to the certifications contained in ¶19, *supra*.

26. On May 5, 2009, Hansen issued a press release entitled, "HANSEN MEDICAL REPORTS 2009 FIRST QUARTER RESULTS ." Therein, the Company, in relevant part, stated:

**10 Sensei® Robotic Catheter Systems Sold During Quarter**

MOUNTAIN VIEW, CA, May 05, 2009 -- Hansen Medical, Inc. (NASDAQ: HNSN), the global leader in flexible medical robotics and the developer of robotic technology for accurate 3D control of catheter movement, today reported its business highlights and financial results for the first quarter ended March 31, 2009.

**Recent Business Highlights**

- System Sales: During the first quarter, the company recognized revenue on 10 Sensei Robotic Systems. Through March 31, 2009, the company has recognized revenue on a total of 65 systems (which the company refers to as its installed base), including 43 in the United States and 22 in international markets.
- Catheter Sales: The company shipped approximately 600 Artisan(R) Control Catheters in the first quarter, a record for a single quarter.
- Equity Financing: In April 2009, the company completed a successful public offering of common stock, selling approximately 11.7 million shares with net proceeds to the company of approximately $35.1 million.
- Luna Litigation: Also in April 2009, a jury awarded the company approximately $36.3 million in damages, finding in favor of the company on its breach of contract, breach of the covenant of good faith and fair dealing, and misappropriation of trade secrets claims against Luna Innovations Incorporated. The jury verdict and recovery of damages remain subject to post-trial motions and appeals, as well as collection risks.
- Clinical Findings: Clinical study results published in Pacing and Clinical Electrophysiology demonstrate reduced procedure time,

radiation exposure and RF energy and improved efficacy when comparing procedures performed with Sensei systems with manual procedures for ablation of paroxysmal atrial fibrillation.

- Advanced Cardiac Therapeutics Relationship: The company recently announced an equity investment in privately-held Advanced Cardiac Therapeutics, Inc. and secured the exclusive rights to certain intellectual property for robotic applications.

"Sensei system sales are off to a good start in 2009 and I continue to be pleased with the rate of adoption of our technology," said Frederic Moll, M.D., president and chief executive officer of Hansen Medical. "While our pipeline of potential customers remains solid, the sluggish global economy has extended the length of the average sales cycle for Sensei systems and resulted in some price elasticity of demand. However, based on the enthusiasm expressed for our technology by a growing group of clinicians and what we believe is a superior value proposition versus the competition, I remain confident in our ability to expand our business in 2009," said Dr. Moll.

**2009 First Quarter Financial Results**

Total revenue for the three months ended March 31, 2009 was $7.1 million, a 14% increase compared to revenue of $6.2 million in the same period in 2008. The company recognized revenue on 10 Sensei Robotic Systems, including seven systems configured with the CoHesion(R) module, as well as on shipments of approximately 600 Artisan control catheters.

Cost of goods sold for the three months ended March 31, 2009 was $5.2 million and included non-cash stock compensation expense of $223,000. Gross profit for the quarter was $1.9 million, yielding a gross margin of 26.4%. This compares to gross profit of $1.3 million and gross margin of 20.9% for the same period in 2008, which included non-cash stock compensation expense of $161,000. The company expects that cost of goods sold for 2009, both as a percentage of revenue and on a dollar basis, will continue to vary from quarter to quarter as manufacturing levels fluctuate and as revenues fluctuate due to changes in system and catheter sales volumes, product mix and average sales prices per system and per catheter.

Research and development expenses for the three months ended March 31, 2009, including non-cash stock compensation expense of $620,000, were $5.7 million, compared to $5.2 million for the same period in 2008, which included non-cash stock compensation expense of $570,000. The increase in research and development expenses was primarily due to increased outside services, materials and overhead expenses, partially offset by decreases in employee-related expenses due primarily to lower average headcount and a one week furlough. In 2009, the company expects

research and development expenses to decline modestly from levels in 2008 as it carefully manages expenses related to development efforts for the EP market and other applications and realizes savings from the company's recently completed reduction in force and the one week per quarter furlough.

Selling, general and administrative expenses for the three months ended March 31, 2009, including non-cash stock compensation expense of $1.8 million, were $10.1 million, compared to $8.1 million for the same period in 2008, which included non-cash stock compensation expense of $1.3 million. The increase in selling, general and administrative expenses was primarily due to increased litigation costs, executive severance costs and commissions, partially offset by decreased employee-related expenses related to lower average headcount and one week furlough. In 2009, the company expects selling, general and administrative expenses to decline slightly from 2008 levels as a result of careful expense management and savings realized from the recently completed reduction in force and a one week per quarter furlough.

Other expense, net, for the three months ended March 31, 2009 was $445,000, compared to other income, net, of $352,000 for the same period in 2008. The change was primarily due to higher interest expense due to the company's borrowings under its equipment line of credit, in addition to lower interest income related to lower balances of average cash, cash equivalents and short-term investments.

Net loss for the three months ended March 31, 2009, including total non-cash stock compensation expense of $2.6 million, was $14.3 million, or $(0.57) per basic and diluted share, based on average basic and diluted shares outstanding of 25.3 million shares. Net loss for the first quarter of 2008, including non-cash stock compensation expense of $2.0 million, was $11.6 million, or $(0.53) per basic and diluted share, based on average basic and diluted shares outstanding of 21.8 million shares.

Cash, cash equivalents and short-term investments as of March 31, 2009 were $29.3 million, compared to $35.2 million as of December 31, 2008. The lower cash balance is primarily due to the company's normal operating expenses. Subsequent to the end of the first quarter, in April 2009, the company successfully completed a secondary public offering of common stock, selling approximately 11.7 million shares with net proceeds to the company, after estimated expenses, of approximately $35.1 million.

(Emphasis in original).

27.     On May 8, 2009, Hansen filed its Quarterly Report with the SEC on Form 10-Q for the 2009 fiscal first quarter. The Company's Form 10-Q was signed by Defendant Moll and Van

---

Dick, and reaffirmed the Company's financial results previously announced on May 5, 2009.  The

Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants

Moll and Van Dick, substantially similar to the certifications contained in ¶19, *supra.*

28.    On August 4, 2009, Hansen issued a press release entitled, "HANSEN MEDICAL

REPORTS 2009 SECOND QUARTER RESULTS." Therein, the Company, in relevant part, stated:

> MOUNTAIN VIEW, CA, Aug 04, 2009 -- Hansen Medical, Inc. (NASDAQ: HNSN), the global leader in flexible medical robotics and the developer of robotic technology for accurate 3D control of catheter movement, today reported its recent business highlights and financial results for the second quarter ended June 30, 2009.
>
> **Recent Business Highlights**
>
> - System Sales: During the second quarter, the company recognized revenue on three Sensei(TM) Robotic Systems and shipped three additional systems. From commercial launch through June 30, 2009, the company has recognized revenue on a total of 68 systems (which the company refers to as its installed base), including 43 in the United States and 25 in international markets.
> - Catheter Sales: The company shipped 626 Artisan(TM) Control Catheters in the second quarter, approximately 100 of which were sold to a single international medical center.
> - Selected Product Development Initiatives: The company is currently developing a next-generation Sensei platform and Artisan catheter that will extend the procedural capabilities of robotic catheter control by providing advanced levels of instinctive control, accuracy, reach and ease of use. The company expects to receive Food & Drug Administration (FDA) clearance for these new products by the end of the third quarter of 2009.
> - Equity Financing: In April 2009, the company completed a public offering of common stock, selling approximately 11.7 million shares with net proceeds to the company of approximately $35.3 million.
>
> "I believe that we are taking the right steps to weather the current macroeconomic challenges and to put ourselves in a position to expand our business as market conditions improve," said Frederic Moll, M.D., president and chief executive officer of Hansen Medical. "Despite lower than expected Sensei system sales in the second quarter, our pipeline of potential customers is healthy and catheter sales were at a new quarterly high. In addition, I am excited about the progress we are making in

enhancing our current platform and developing new capabilities for our technology. I am also encouraged by the progress we have made to reduce spending and improve our cost structure during these challenging times," said Dr. Moll.

**2009 Second Quarter Financial Results**

Total revenue for the three months ended June 30, 2009 was $3.3 million, a 43% decrease compared to revenue of $5.8 million in the same period in 2008. The company recognized revenue on three Sensei Robotic Systems, including one system configured with the CoHesion(R) module, as well as on shipments of 626 Artisan control catheters.

Cost of goods sold for the three months ended June 30, 2009 was $2.9 million and included non-cash stock compensation expense of $214,000. As a result, gross profit for the quarter was $0.4 million and a gross margin of 10.9%. This compares to gross profit of $1.1 million and gross margin of 18.5% for the same period in 2008, which included non-cash stock compensation expense of $171,000. The company expects that cost of goods sold for 2009, both as a percentage of revenue and on a dollar basis, will continue to vary from quarter to quarter as manufacturing levels fluctuate and as revenues fluctuate due to changes in system and catheter sales volumes, product mix and average sales prices per system and per catheter.

Research and development expenses for the three months ended June 30, 2009, including non-cash stock compensation expense of $688,000, were $5.0 million, compared to $6.3 million for the same period in 2008, which included non-cash stock compensation expense of $763,000. The decrease in research and development expenses was primarily the result of decreases in employee-related expenses due primarily to lower average headcount and a one week furlough in the 2009 period. In 2009, the company expects research and development expenses to decline modestly from levels in 2008 as it carefully manages expenses related to development efforts for the electrophysiology (EP) market and other applications and realizes savings from the company's reduction in force and other cost reduction efforts.

Selling, general and administrative expenses for the three months ended June 30, 2009, including non-cash stock compensation expense of $1.0 million, were $9.9 million, compared to $10.0 million for the same period in 2008, which included non-cash stock compensation expense of $2.0 million. The decrease in selling, general and administrative expenses was primarily due to decreased employee-related expenses, related to lower average headcount and a one week furlough, and a decrease in non-cash stock compensation expense, partially offset by increased litigation costs and a $1.1 million charge for the impairment of certain assets related to the company's decision to terminate its relationship with its European

subcontractor for the manufacture of catheters. In 2009, the company expects selling, general and administrative expenses to decline slightly from 2008 levels as a result of careful expense management and savings realized from the reduction in force and other cost reduction efforts.

Other expense, net, for the three months ended June 30, 2009 was $115,000, compared to other income, net, of $323,000 for the same period in 2008. The change was primarily due to higher interest expense due to the company's borrowings under its equipment line of credit, in addition to lower interest income related to lower interest rate returns earned on the Company's balances of cash, cash equivalents and short-term investments.

Net loss for the three months ended June 30, 2009, including total non-cash stock compensation expense of $1.9 million, was $14.6 million, or $(0.42) per basic and diluted share, based on average basic and diluted shares outstanding of 35.2 million shares. Net loss for the second quarter of 2008, including non-cash stock compensation expense of $2.9 million, was $14.9 million, or $(0.60) per basic and diluted share, based on average basic and diluted shares outstanding of 24.7 million shares.

Cash, cash equivalents and short-term investments as of June 30, 2009 were $51.4 million, compared to $35.2 million as of December 31, 2008. The higher cash, cash equivalents and short-term investments balance is primarily due to the successful completion a secondary public offering of common stock in the second quarter of 2009, which included the sale of approximately 11.7 million shares with net proceeds to the company, after expenses, of approximately $35.3 million.

(Emphasis in original).

29.    On August 6, 2009, Hansen filed its Quarterly Report with the SEC on Form 10-Q for the 2009 fiscal second quarter.  The Company's Form 10-Q was signed by Defendant Moll and Van Dick, and reaffirmed the Company's financial results previously announced on August 4, 2009. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Moll and Van Dick, substantially similar to the certifications contained in ¶19, *supra*.

30.    The statements contained in ¶¶18-29, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company

improperly recognized revenue; (2) that, as a result, the Company's revenue and financial results were overstated during the Class Period; (3) that the Company's financial results were not prepared in accordance with GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

### The Truth Begins To Emerge

31.    On October 19, 2009, Hansen issued a press release entitled, "HANSEN MEDICAL ANNOUNCES NEED TO RESTATE PRIOR FINANCIAL RESULTS." Therein, the Company, in relevant part, stated:

> MOUNTAIN VIEW, Calif., October 19, 2009 – Hansen Medical, Inc. (Nasdaq: HNSN) today announced that it plans to restate its financial statements for the year ended December 31, 2008 and for the quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009 and June 30, 2009 in order to correct certain errors, some of which arose from potential irregularities occurring outside of the accounting department, regarding the timing of revenue recognition on the sale of some of its Sensei® Robotic Catheter Systems. Through June 30, 2009 Hansen shipped 68 systems based on valid customer purchase orders for which revenue was recognized. Hansen has received full payment for all but two of these systems. Of these two systems, Hansen has not been paid for one system on which it recognized revenue in the quarter ended June 30, 2009 and to date has received partial payment of $320,000 on the sale of a system to a distributor on which it recognized revenue in the quarter ended March 31, 2009. An investigation by Hansen's audit committee, with the assistance of independent outside counsel, has identified systems for which revenue should have been recognized in a later period than the period in which it was recognized and revenue on a smaller number of systems that should have been reflected as deferred revenue on Hansen's balance sheet as of June 30, 2009. As software is more than incidental to the functioning of the Sensei system, Hansen's revenue recognition policy is based on American Institute of Certified Public Accountants, Statement of Position 97-2, Software Revenue Recognition.
>
> Hansen's review is ongoing so it is not yet able to estimate the extent and timing of adjustments that will be required to its financial statements. The ultimate findings of Hansen's ongoing review and the impact of these matters on Hansen's results of operations as previously reported is not yet known. Hansen is working diligently

---

towards completing the restatement and filing its quarterly report on Form 10-Q for the period ended September 30, 2009.

Hansen is filing with the Securities and Exchange Commission a Current Report on Form 8-K with further information on these matters.

32.    On October 19, 2009, Hansen filed a Current Report with the SEC on Form 8-K. Therein, the Company, in relevant part, stated:

**ITEM 4.02.   NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW.**

(a) On October 15, 2009, the audit committee of our board of directors, upon the recommendation of management, concluded that the previously issued financial statements contained in our annual report on Form 10-K for the year ended December 31, 2008, and our quarterly reports on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009 and June 30, 2009 (collectively, the "Prior Periods") should no longer be relied upon because of errors in those financial statements, some of which arose from potential irregularities outside of the accounting department. Through June 30, 2009, we shipped 68 Sensei Robotic Catheter Systems based on valid customer purchase orders for which revenue was recognized. We have received full payment for all but two of these systems. Of these two systems, we have not been paid for one system on which we recognized revenue in the quarter ended June 30, 2009 and to date have received partial payment of $320,000 on the sale of system to a distributor on which we recognized revenue in the quarter ended March 31, 2009. We have identified systems for which revenue should have been recognized in a later period than the period in which it was recognized and revenue on a smaller number of systems that should have been reflected as deferred revenue on our balance sheet as of June 30, 2009.

In addition to the financial statements for the Prior Periods referenced above, related press releases, reports and stockholder communications describing our financial statements for the Prior Periods and the report of our independent registered accounting firm, PricewaterhouseCoopers LLP, related to the year ended December 31, 2008, should no longer be relied upon.

Our revenues are primarily derived from the sale of our Sensei system. As software is more than incidental to the functioning of our Sensei system, our revenue recognition policy is based on American Institute of Certified Public Accountants, Statement of Position 97-2, Software Revenue Recognition, or SOP 97-2. Under our policy, revenues are recognized when, among other conditions, delivery to the

customer has occurred and our services have been fully rendered. Since most of our sales contracts for systems include installation and training services and because we do not have vendor-specific objective evidence of the fair value of these services, we are required by SOP 97-2 to defer all such system revenues until training and installation is completed. We also sell systems to independent distributors, and have recognized revenue upon shipment of systems to those distributors that we believed were independently capable of performing required installation and training.

The disclosures in this Form 8-K are the result of an investigation by our audit committee, with the assistance of independent outside counsel, that commenced following our receipt in August 2009 of an anonymous "whistleblower" report alleging a single irregularity that resulted in improper revenue recognition in the quarter ended December 31, 2008. As a result of the investigation, the audit committee and management have determined that there are instances where revenue recognition occurred prior to the completion of all our obligations to customers. In addition, the investigation may result in a determination that one or more distributors were not independently capable of installing systems at the time we first recognized revenue of systems purchased by such distributor(s).

(Emphasis in original).

33.    On this news, shares of Hansen declined $0.31 per share, or 9.04%, to close on October 19, 2009, at $3.12 per share, on heavy volume.

## HANSEN'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## FILED WITH THE SEC

34.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

35.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC

which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

36.     The fact that Hansen expects to restate its financial statements, and informed investors that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, 7-13; SFAS No. 154, 25).

37.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, 10);

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, 34);

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, 40);

(d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, 42);

(e)    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, 50);

(f)    The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, 58-59);

(g)    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, 79); and

(h)    The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, 95).

38.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Hansen's securities between May 1, 2008 and October 18, 2009, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Hansen's securities were actively traded on National Association of Securities Dealers Automated Quotations Market ("NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Hansen shares were traded publicly during the Class Period on the NASDAQ and as of July 31, 2009, Hansen had 37,420,821 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Hansen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and

prospects of Hansen; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

45.     The market for Hansen's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Hansen's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Hansen's securities relying upon the integrity of the market price of the Company's securities and market information relating to Hansen, and have been damaged thereby.

46.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Hansen's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Hansen's business, operations, and prospects as alleged herein.

47.     At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Hansen's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

48. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49. During the Class Period, Plaintiff and the Class purchased Hansen's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors's losses.

## SCIENTER ALLEGATIONS

50. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Hansen, his/her control over, and/or receipt and/or modification of Hansen's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hansen, participated in the fraudulent scheme alleged herein.

51. Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, on or around April 22, 2009, the Company completed a public offering of more than 11,690,000 shares of Hanson's common stock at a price of $3.25 per share, for net proceeds to the Company of more than $35 million.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

52. The market for Hansen's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Hansen's securities traded at artificially inflated prices during the Class Period. On May 13, 2008, the price of the Company's common stock reached a Class Period high of $19.57 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Hansen's securities and market information relating to Hansen, and have been damaged thereby.

53. During the Class Period, the artificial inflation of Hansen's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the

damages sustained by Plaintiff and other members of the Class.  As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about Hansen's business, prospects, and operations.  These material misstatements and/or

omissions created an unrealistically positive assessment of Hansen and its business, operations, and

prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant

times, and when disclosed, negatively affected the value of the Company stock.  Defendants'

materially false and/or misleading statements during the Class Period resulted in Plaintiff and other

members of the Class purchasing the Company's securities at such artificially inflated prices, and

each of them has been damaged as a result.

54.    At all relevant times, the market for Hansen's securities was an efficient market

for  the following reasons, among others:

(a)    Hansen stock met the requirements for listing, and was listed and actively

traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Hansen filed periodic public reports with the SEC

and the NASDAQ;

(c)    Hansen regularly communicated with public investors *via* established

market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and

(d)    Hansen was followed by securities analysts employed by major brokerage

firms who wrote reports about the Company, and these reports were distributed to the sales force and

certain customers of their respective brokerage firms.  Each of these reports was publicly available

and entered the public marketplace.

55.     As a result of the foregoing, the market for Hansen's securities promptly digested current information regarding Hansen from all publicly available sources and reflected such information in Hansen's stock price. Under these circumstances, all purchasers of Hansen's securities during the Class Period suffered similar injury through their purchase of Hansen's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

56.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Hansen who knew that the statement was false when made.

1
2
3

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

4       57.     Plaintiff repeats and realleges each and every allegation contained above as if fully

5   set forth herein.

6
        58.     During the Class Period, Defendants carried out a plan, scheme and course of

7
    conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

8
    public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

9
    other members of the Class to purchase Hansen's securities at artificially inflated prices.  In

10
    furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took

11
    the actions set forth herein.

12

13
        59.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

14
    statements of material fact and/or omitted to state material facts necessary to make the statements

15
    not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a

16

17  fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially

18  high market prices for Hansen's securities in violation of Section 10(b) of the Exchange Act and

19
    Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal

20
    conduct charged herein or as controlling persons as alleged below.

21

22      60.     Defendants, individually and in concert, directly and indirectly, by the use, means or

23  instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

24
    continuous course of conduct to conceal adverse material information about Hansen's financial

25
    well-being and prospects, as specified herein.

26

27

28

61.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hansen's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hansen and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

62.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

63.     The defendants had actual knowledge of the misrepresentations and/or omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Hansen's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Hansen's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Hansen's securities during the Class Period at artificially high prices and were damaged thereby.

65. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Hansen was

1    experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class

2    would not have purchased or otherwise acquired their Hansen securities, or, if they had acquired such

3    securities during the Class Period, they would not have done so at the artificially inflated prices

4    which they paid.

5

6          66.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange

7    Act and Rule 10b-5 promulgated thereunder.

8          67.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

9    other members of the Class suffered damages in connection with their respective purchases and sales

10   of the Company's securities during the Class Period.

11

12                              **SECOND CLAIM**
                            **Violation of Section 20(a) of**
13               **The Exchange Act Against the Individual Defendants**

14         68.    Plaintiff repeats and realleges each and every allegation contained above as if fully

15   set forth herein.

16
         69.    The Individual Defendants acted as controlling persons of Hansen within the
17
     meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level
18
     positions, and their ownership and contractual rights, participation in and/or awareness of the
19
20   Company's operations and/or intimate knowledge of the false financial statements filed by the

21   Company with the SEC and disseminated to the investing public, the Individual Defendants had the

22   power to influence and control and did influence and control, directly or indirectly, the
23
     decision-making of the Company, including the content and dissemination of the various statements
24
     which Plaintiff contends are false and misleading.  The Individual Defendants were provided with
25
26   or had unlimited access to copies of the Company's reports, press releases, public filings and other

27

28

statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, Hansen and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

1    (d)    Such other and further relief as the Court may deem just and proper.

2                              **JURY TRIAL DEMANDED**

3    Plaintiff hereby demands a trial by jury.

4

5    DATED: October 23, 2009          **GLANCY BINKOW & GOLDBERG LLP**

6                                     By: _____
                                          Lionel Z. Glancy
7                                         Michael Goldberg
                                     1801 Avenue of the Stars, Suite 311
8                                     Los Angeles, California 90067
                                     Telephone: (310) 201-9150
9                                     Facsimile: (310) 201-9160

10

11                                   **LAW OFFICES OF HOWARD G. SMITH**
                                     Howard G. Smith
12                                   3070 Bristol Pike, Suite 112
                                     Bensalem, PA 19020
13                                   Telephone: (215) 638-4847
                                     Facsimile: (215) 638-4867
14

15                                   ***Attorneys for Plaintiff Robert Curry***

16

17

18

19

20

21

22

23

24

25

26

27    ———————————————————————————————————————————
      CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
28                                                                          42

## SWORN CERTIFICATION OF PLAINTIFF

Hansen Medical, Inc., **SECURITIES LITIGATION**

I, Robert Curry, certify that:

1.  I have reviewed the complaint and authorized its filing.

2.  I did not purchase Hansen Medical, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Hansen Medical, Inc. during the class period set forth in the Complaint are as follows:

    I bought _200_ shares on _9_/_22_/_2009_ at $ _3.80_ per share.
    I bought _100_ shares on _9_/_24_/_2009_ at $ _3.58_ per share.
    I bought _100_ shares on _9_/_24_/_2009_ at $ _3.58_ per share.
    I bought _200_ shares on _10_/_19_/_2009_ at $ _3.15_ per share.
    I bought _____ shares on ___/___/___ at $ _____ per share.

    I sold _____ shares on ___/___/___ at $ _____ per share.
    I sold _____ shares on ___/___/___ at $ _____ per share.
    I sold _____ shares on ___/___/___ at $ _____ per share.
    I sold _____ shares on ___/___/___ at $ _____ per share.
    I sold _____ shares on ___/___/___ at $ _____ per share.

    (List Additional Transactions on a Separate Page if Necessary)

5.  I have not served as a representative party on behalf of a class under this title during the last three years except as stated.

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ____ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _10/23/2009_

_____
(Please Sign Your Name Above)