LIONEL Z. GLANCY (#134180)
PETER A. BINKOW (#173848)
MICHAEL GOLDBERG (#188669)
EX KANO S. SAMS II (#192936)
ROBERT V. PRONGAY (#270796)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:      (310) 201-9150
Facsimile:      (310) 201-9160
E-mail:        info@glancylaw.com

*Lead Counsel for Plaintiffs*
*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| ROBERT CURRY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HANSEN MEDICAL, INC., FREDERIC H. MOLL, STEVEN M. VAN DICK, and GARY C. RESTANI,<br><br>Defendants.<br><br>AND RELATED ACTIONS | ) Lead Case No. 5:09-cv-05094-JF<br>)<br>) <u>CLASS ACTION</u><br>)<br>) **SECOND CONSOLIDATED**<br>) **AMENDED COMPLAINT FOR**<br>) **VIOLATIONS OF THE FEDERAL**<br>) **SECURITIES LAWS**<br>)<br>)<br>)<br>) <u>DEMAND FOR JURY TRIAL</u><br>)<br>) |

1

<u>**TABLE OF CONTENTS**</u>

2

3   NATURE OF THE ACTION AND OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4   JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6

7   CONFIDENTIAL WITNESSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8   SUBSTANTIVE ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

9
        Background Concerning Hansen's Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
10

11      Overview of Hansen's Customers and Reported Installed Base
        (as Originally Reported) During the Class Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
12

13      Defendants' Materially False and/or Misleading Statements During the Class Period . . 31

14              2007 Fiscal Fourth Quarter Ending December 31, 2007 . . . . . . . . . . . . 31

15              2008 Fiscal First Quarter Ending March 31, 2008 . . . . . . . . . . . . . . . . . 54
16
                2008 Fiscal Second Quarter Ending June 30, 2008 . . . . . . . . . . . . . . . . 68
17

18              2008 Fiscal Third Quarter Ending September 30, 2008 . . . . . . . . . . . . . 91

19
                2008 Fiscal Fourth Quarter Ending December 31, 2008 . . . . . . . . . . . . 109
20

21              2009 Fiscal First Quarter Ending March 31, 2009 . . . . . . . . . . . . . . . . 132

22              2009 Fiscal Second Quarter Ending June 30, 2009 . . . . . . . . . . . . . . . 148

23      Disclosures at the End and After the Class Period . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

24   ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

25
        Core Business/Operations Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195
26

27      Hansen's Equity Offerings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HANSEN'S VIOLATION OF GAAP RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

All or Portions of Products and Services Bundled in Sales Transactions Had
Not Been Delivered or Performed in the Quarter Revenue Was Recognized . . . . . . . . 196

Hansen's Additional Violation of GAAP Rules In
Its Financial Statements Filed WithThe SEC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

UNDISCLOSED ADVERSE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS . . . . . . . . . . 202

APPLICABILITY OF PRESUMPTION OF RELIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

(FRAUD-ON-THE MARKET DOCTRINE) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

NO SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

FIRST CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

SECOND CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Violation of Section 20(a) of
The Exchange Act Against the Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . 211

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Lead Plaintiffs Mina Farr and Nader Farr ("Lead Plaintiffs"), Plaintiff Robert Curry, Plaintiff Kim M. Prenter, Plaintiff Muthusamy Sivanantham, Plaintiff Jean Cawood, and Plaintiff Gary Cawood (collectively, "Plaintiffs"), by and through their attorneys ("Lead Counsel"), allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, Lead Counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Hansen Medical, Inc. ("Hansen" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Hansen; (c) review and analysis of other publicly available information concerning Hansen; (d) interviews with persons (including former Hansen employees) with information relevant hereto; and (e) review and analysis of a number of internal documents (attached hereto as Exhibits ("Ex.") A-K and AA-KK) from times relevant hereto.[1]

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action for violations of the federal securities laws on behalf of all persons or entities other than defendants who purchased or otherwise acquired the common stock of Hansen between February 19, 2008 and October 18, 2009, inclusive (the "Class Period"), and who were damaged thereby, against the Company, its co-founder and former Chief Executive Officer ("CEO") Frederic H. Moll ("Moll"), the Company's former Chief Financial Officer ("CFO") Steven M. Van Dick ("Van Dick"), and Hansen's former Chief Operating Officer ("COO") Gary Restani ("Restani") (along with Defendants Moll and Van Dick, the "Individual Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). As a result of Hansen's fraudulent accounting and defendants materially false and/or misleading statements about Hansen's revenue recognition, operations, and internal controls, in press releases, conference calls, presentations, and filings with SEC, Hansen's stock traded at artificially inflated prices during the Class Period.

---

[1]As various exhibits exist as electronic data and, when printed, are difficult to view, Plaintiffs have attached two sets. The first set (Exs. A-K) is printed as is, and the second set (Exs. AA-KK) has been reformatted in a manner that allows the information to be viewed more easily.

2.     Hansen develops, manufactures, and sells medical robotics designed for positioning, manipulation, and stable control of catheters and catheter-based technologies.  Domestically, Hansen employs a direct sales force of regional sales executives, as well as clinical account managers who provide training, clinical support, and other services to its customers.  Abroad, Hansen primarily uses distributors to sell and support its products, but also employs a direct sales force in the United Kingdom and Germany to market, sell, and support its products in those countries.

3.     Although Hansen became a public company in November 2006, the Company did not recognize its first revenues until the second quarter of 2007 ("Q207") when it commercially launched its first and primary product, the Sensei Robotic Catheter System (the "Sensei System" or "Hansen System" or "System").  The System, which on average, sells for around $650,000 to $750,000, is a robotic navigation system that enables clinicians to place mapping catheters in anatomical locations within the heart that are difficult to reach during complex cardiac procedures for the diagnosis and treatment of patients who suffer from abnormal heart rhythms, or arrhythmia. Hansen also sells disposable Artisan Control Catheters ("catheters") that are used in procedures conducted with the Sensei System and are sold, on average, for approximately $1,600 per catheter.

4.     Hansen's business model is premised on the sale of capital equipment (*i.e.*, Sensei Systems) that generates recurring revenues from disposable products (*i.e.*, Artisan Catheters) used with the equipment.  Indeed, on its website, Hansen has stated that its business model is essentially a "razor/razor blade" model.  Each System sale and installation during the Class Period was, therefore, extremely important and key for the Company's revenues and future success.[2]  For this reason, the primary metric the Company reported to the public during the Class Period was the Company's "***Installed Base***," which was the cumulative number of Systems the Company had sold and recognized as revenue from inception (*i.e.*, since Q207).  Also important to Hansen's business model was the promise of future recurring revenue streams from selling disposable Artisan Catheter

_____

[2]Throughout the Class Period, almost all of the Company's quarterly revenues came from the sale of only a few Systems.  For example, at the start of the Class Period, when the Company originally reported its financial results for the fiscal fourth quarter and year ending December 31, 2007 (respectively, "Q407" and "FY07"), approximately ***90.66% of the Company's total revenues for Q407 came from the sale of only 6 Systems***.

units to the Installed Base.  For this reason, the market was acutely concerned with "*utilization*" rates, *i.e.*, the volume of procedural cases conducted among Hansen's Installed Base.  The idea was simple - as the Installed Base grew with more and more Systems being sold, catheter sales would generate increasing recurring revenue, which down the road, would eventually enable Hansen to generate positive cash flow and eventually become profitable.

5.     While simultaneously  raising millions of dollars through public equity offerings, to create the appearance that Hansen's revenue and sales were exhibiting (and/or would once again continue to exhibit) steady "stair-step" growth, defendants falsely portrayed Hansen's growth and financial condition in connection with the commercial launch of its Sensei System.[3]   In reality, to achieve its purported "stair-step" growth and later to create the appearance that demand was not diminishing, defendants embarked on a brazen scheme, spanning *at least seven quarters*, whereby Hansen routinely violated its revenue recognition policy by improperly and prematurely recognizing revenue on System sales to inflate both the Company's financial results and reported "Installed Base."  Defendants deliberately engaged in earnings management by taking revenue designated for later periods in order to maintain their touted growth for current periods.  Combined, over the course of the Class Period, the Company originally reported recognizing revenues on only 59 Systems of which the Company later admitted at least 24 Systems had been improperly recognized as revenue in the quarter for which the Systems were originally recognized  as revenue.  In essence, *more than 40% of the Systems recognized as revenue during the Class Period had been improperly recorded as revenue in violation of Hansen's revenue recognition policy,* a truly unbelievable percentage considering that shortly before the end of the Class Period Defendant Moll publicly proclaimed that Hansen had "*a very strict revenue recognition policy*."

6.     Throughout the Class Period, defendants knew and/or were deliberately reckless as to adverse information that directly contradicted the positive statements they provided to the public

---

[3]At the outset of the Class Period, Hansen touted the steady "stair-step" growth of its revenue/sales ramp during the initial 3 quarters of sales (*i.e.*, 4 Systems in Q207, 5 Systems in Q307, and 6 Systems in Q407), which the Company represented would continue throughout 2008 with demand increasing in the second half of 2008.

about Hansen's business, operations, and prospects, including, *inter alia*:

a. As later admitted, Hansen was improperly recognizing revenue throughout the Class Period upon shipment of Systems to distributors despite the fact that the distributors were not capable of independently installing Hansen's Systems and training end-user physicians to use the Systems, and in fact, Hansen personnel would later be onsite at the end users' facilities to assist with installation and training. Hansen has acknowledged that going forward, it will now recognize revenue on distributor sales on a sell-through basis (*i.e.*, once the System has been resold, installed, and the end user has been trained).

b. Numerous Systems "sold" to distributors and improperly recognized as revenue during the Class Period were still in the distributors' possession after the Class Period and were unable to be sold to an end user, including at least 3 Systems sold to Hansen's Italian Distributor which were in an Italian warehouse.

c. Hansen cannibalized its future sales pipeline by incentivizing customers to accept Systems earlier than needed by offering end-of-the-quarter discounts to temporarily install Systems before the end of the quarter and include the Systems in the publicly reported Installed Base despite the fact that the Systems would thereafter be uninstalled and/or remain at the site inactive.

d. Hansen also cannibalized future catheter sales by offering discounts at the end of the quarter or on bulk catheter sales in excess of customers' needs.

e. A significant number of Systems in the Installed Base were essentially inactive, for a variety of reasons, including Systems that customers/physicians stopped using.

7. At the start of the Class Period, on February 19, 2008, the Company reported overstated financial results for Q407. Defendants assured the public that the demand for the Sensei System was increasing and reported recognizing revenue on the sale of 6 Systems during Q407 (bringing its Installed Base to 15 Systems), and provided guidance for the sale of 44 to 50 Systems for the 2008 fiscal year ("FY08"). Defendants also represented that Hansen was adhering to its revenue recognition policy, which required that the Company first ship the System, install the System, and train the customer to use the System before the Company could recognize revenue on

a System sale. As revealed after the Class Period, at least 1 System recognized as revenue in Q407 had been improperly recognized as revenue in violation of the Company's revenue recognition policy. Coinciding with defendants' materially false and/or misleading statements at the outset of the Class Period, on or around April 1, 2008, the Company raised a much needed $39.4 million by offering Hansen stock to the unsuspecting public.

8.      Defendants continued their false positive statements to the public on May 1, 2008, and announced overstated financial results for the Company's fiscal first quarter of 2008 ("Q108"). Hansen reported it recognized revenue on the sale of 401 catheters and 8 Systems (increasing its Installed Base to 23 Systems).[4]  The false statements had their intended effect, pushing Hansen's stock to close at a Class Period high of $19.57 per share on May 13, 2008.

9.      On July 31, 2008, Hansen announced overstated financial results for the fiscal second quarter of 2008 ("Q208"). Hansen stated that it sold 279 catheters during the quarter, recognized revenue on 8 Systems (bringing its Installed Base to 31 Systems), and shipped an additional 2 Systems for which revenue was expected to be recognized in the following quarter. While Hansen acknowledged that it encountered some difficulty with delayed revenue recognition on 2 Systems and a decrease in catheters sales, defendants nevertheless conveyed a positive future outlook for Hansen.  In reality, as alleged below, at least 3 Systems were improperly recognized as revenue during the quarter that had been temporarily installed to circumvent Hansen's revenue recognition criteria.

10.     Defendants' positive representations continued on October 23, 2008, when Hansen announced overstated financial results for the fiscal third quarter of 2008 ("Q308"). Hansen announced that it recognized revenue on a single-quarter record of 14 Systems (bringing its Installed Base to 45 Systems).[5]  The Company also reported that it sold a quarterly-record 423 catheters, fine

---

[4]As alleged below, Hansen improperly recognized revenue on at least 2 Systems sold internationally to distributors in Q108, ***both ordered and shipped on March 31, 2008, the last day of Q108***. Moreover, defendants later admitted that Q108 catheter sales had been inflated due to "stocking" by approximately 3 customers who placed large orders at the end of the quarter.

[5]As alleged below, at least 2 Systems sold in Q308 to Hansen's Italian distributor were improperly recognized as revenue. Defendant Moll later admitted that, as of Q309, the distributor

1   tuned its guidance range to between 45 and 48 System sales for FY08, and repeatedly assured

2   investors that its business was not being impacted by economic pressures.

3          11.     On January 8, 2009, Hansen announced its preliminary financial results for the fiscal

4   fourth quarter and year 2008 (respectively, "Q408" and "FY08").  Hansen announced that while it

5   shipped 11 Systems during Q408, the Company only expected to recognize revenue on 10 Systems

6   in Q408 and thus, only a total of 40 Systems for FY08.[6]  The Company blamed the economic

7   environment for its inability to achieve its recently reiterated guidance of 45 to 48 System sales.  For

8   the 2009 fiscal year ("FY09"), the Company provided guidance of 53 to 65 System sales, which

9   Defendant Moll claimed, "takes into account the uncertainty around the length and severity of the

10  current economic recession and the impact it will have on our potential customers."  Days later,

11  Defendant Moll confidently described the FY09 guidance as "conservative" and cavalierly claimed

12  that Hansen's sales people said that they were "100% certain we can do, you know, at least 53

13  Systems" and that they could achieve the FY09 guidance "in their sleep."

14         12.     On April 16, 2009, the Company announced its preliminary financial results for the

15  fiscal first quarter of 2009 ("Q109").  The Company announced that it expected to recognize revenue

16  on the sale of 10 Systems and shipment of approximately 600 catheters.[7]  The same day, the

17  Company announced another public stock offering which reaped Hansen more than $35 million.

18         13.     Eventually, defendants' scheme could not be sustained.  After Defendant Moll

19  essentially affirmed the Company's FY09 guidance on June 10, 2009, and suggested that the

20  economic environment had not changed significantly since the end of FY08 and had even eased

21  _____

22  was still in possession of the Systems and unable to find customers to purchase the Systems.

23         [6]As alleged below, Hansen improperly recognized revenue on at least 1 System sold
    domestically to Yale-New Haven Hospital, which was installed the last day of Q408 and uninstalled
24  a few days later.  Hansen also improperly recognized revenue on at least 3 Systems sold
    internationally, including 1 System sold to the Company's Canadian distributor that did not (and as
25  of November 2009 still did not) have regulatory approval to sell the System.

26
           [7]Despite the fact that the Italian distributor still had at least 2 Systems from Q308, as alleged
27  below, Hansen improperly recognized revenue on at least 1 further System sold to this distributor
    in Q109.  Defendant Moll later admitted that as of Q309, the distributor had been unable to sell all
28  3 Systems.

1    slightly, less than a month later, on July 6, 2009, the Company announced disastrous preliminary

2    financial results for the fiscal second quarter of 2009 ("Q209") and withdrew its FY2009 guidance,

3    once again blaming the economy.  Hansen announced that while it had shipped 6 Systems during

4    the quarter, the Company only expected to recognize revenue on 3 Systems (at least 2 of these 3

5    Systems were improperly recognized as revenue).  Hansen assured investors that the Company's

6    prospects remained strong and that "there was no big event" to blame for Company's Q209

7    performance.  While Hansen tried to blame the economy, as alleged below, the Q209 results were

8    effectively impacted the by its unsustainable practice during the Class Period of cannibalizing its

9    future sales.

10           14.    At the end of the Class Period, on October 19, 2009, Hansen revealed that the

11   Company's audit committee, upon the recommendation of management, concluded that the

12   previously issued financial statements contained in the Company's annual report on Form 10-K for

13   FY08, and the Company's quarterly reports on Form 10-Q for Q108, Q208, Q308, Q109, and Q209,

14   should no longer be relied upon because of errors in those financial statements due to the Company's

15   improper revenue recognition on System sales.  Thereafter, Hansen indicated that its financial

16   statements for Q407 and FY07 should also no longer be relied upon.

17           15.    In addition to defendants' own admissions, the complaint relies upon the accounts

18   of a substantial number of the Company's former employees who corroborate the alleged accounting

19   improprieties, as well as each others' accounts.  For example, numerous witnesses confirm that

20   Hansen employees "installed" a System at Yale-New Haven Hospital on December 31, 2008 – the

21   last day of Q408 – and that the System was uninstalled within a week.  Additionally, one witness

22   attended weekly sales meetings and installation meetings with the Individual Defendants.  During

23   the installation meetings, the Company's potential customers and deliveries would be reviewed to

24   determine how to pull in sales and there would be discussion about the numerous unsold Systems

25   sitting with Hansen's distributors.  For example, a frequently discussed topic was the status of the

26   inactive Systems warehoused in Italy (at one point a total of 5).

27           16.    Hansen has conceded that the restatement affected the revenue recognition of at least

28   24 Systems between Q407 and the Q209.  Of these, Hansen should have deferred revenue on 13

Systems and recognized such revenue in a later period than that in which it was originally recognized. A total of 10 Systems remained as deferred revenue on the Company's balance sheet as of September 30, 2009, and 1 System was reversed pending clarification and quantification of the Company's obligations under a letter of intent regarding a potential research study.

| HANSEN'S "INSTALLED BASE" (*Reported v. Restated*) | | | |
|---|---|---|---|
| Quarter | As Reported | As Restated | Overstatement (%) |
| Q407 | 15 | 14 | *7.14%* |
| Q108 | 23 | 20 | *15.00%* |
| Q208 | 31 | 25 | *24.00%* |
| Q308 | 45 | 37 | *21.62%* |
| Q408 | 55 | 43 | *27.91%* |
| Q109 | 65 | 53 | *22.64%* |
| Q209 | 68 | 55 | *23.64%* |

17.     The impact of the restatement on Hansen's previously reported revenues and gross profit was massive. For example, the Company's revenues for FY08 had been overstated by nearly 30% and gross profit overstated by a staggering 103.34%.

| HANSEN'S REVENUES FOR 2008 (*Reported v. Restated*) | | | | |
|---|---|---|---|---|
| Period | As Reported | As Restated | Overstatement | Overstated (%) |
| 1Q08 | $6,244,000 | $4,623,000 | $1,621,000 | 35.06% |
| 2Q08 | $5,813,000 | $3,888,000 | $1,925,000 | 49.51% |
| 3Q08 | $10,864,000 | $9,573,000 | $1,291,000 | 13.49% |
| 4Q08 | $7,312,000 | $5,362,000 | $1,950,000 | 36.37% |
| FY08 | $30,233,000 | $23,446,000 | $6,787,000 | 28.95% |

| HANSEN'S GROSS PROFIT (LOSS) FOR 2008 (*Reported v. Restated*) | | | | |
|---|---|---|---|---|
| Period | As Reported | As Restated | Overstatement | Overstated (%) |
| 1Q08 | $1,307,000 | $86,000 | $1,221,000 | 1,419.77% |

| 2Q08 | $1,078,000 | ($293,000) | $1,371,000 | 467.92% |
|------|-----------|-----------|-----------|---------|
| 3Q08 | $4,221,000 | $3,351,000 | $870,000 | 25.96% |
| 4Q08 | $2,099,000 | $1,137,000 | $962,000 | 84.61% |
| FY08 | $8,705,000 | $4,281,000 | $4,424,000 | 103.34% |

18.     The magnitude of the restatement is even more remarkable considering that Defendant Van Dick would frequently discuss the Company's revenue recognition requirements. For example, despite the fact that over a period of seven quarters spanning from Q407 to Q209, Hansen improperly recognized revenue on numerous Systems sold to distributors – because the distributors were not capable of independently installing the Systems and training end users to use the Systems – in August 2009, Defendant Van Dick nevertheless publicly represented: "And based off of our revenue recognition rules, we can't take revenue on a system placed even with a distributor until we've completed our obligations to train that distributor."

19.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

22.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District. Additionally, Hansen maintains its principal executive offices within this Judicial District.

23.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

24.     Lead Plaintiffs Mina Farr and Nader Farr purchased Hansen common stock during the Class Period as set forth in their certifications previously filed with the Court in connection with their motion to be appointed lead plaintiff (Doc. #7, at Ex. B), incorporated by reference herein, and suffered damages as a result of the federal securities law violations and materially false and/or misleading statements and/or omissions alleged herein.

25.     Plaintiff Robert Curry purchased Hansen common stock during the Class Period as set forth in the certification contained in the initial complaint filed with the Court (Doc. #1) in this action, incorporated by reference herein, and suffered damages as a result of the federal securities law violations and materially false and/or misleading statements and/or omissions alleged herein.

26.     Plaintiff Kim M. Prenter purchased Hansen common stock during the Class Period as set forth in the certification filed with the Court in connection with her complaint filed in the consolidated action, *Prenter v. Hansen Medical, et al.*, No. 3:09-cv-05367-CRB (Doc. #1), incorporated by reference herein, and suffered damages as a result of the federal securities law violations and materially false and/or misleading statements and/or omissions alleged herein.

27.     Plaintiff Muthusamy Sivanantham purchased Hansen common stock during the Class Period as set forth in the certification previously filed with the Court as Ex. A (Doc. #24) to the Corrected Consolidated Amended Complaint (the "CCAC"), incorporated by reference herein, and suffered damages as a result of the federal securities law violations and materially false and/or misleading statements and/or omissions alleged herein.

28.     Plaintiffs Jean and Gary Cawood purchased Hansen common stock during the Class Period as set forth in the certifications previously filed with the Court as Ex. A (Doc. #24) to the CCAC, incorporated by reference herein, and suffered damages as a result of the federal securities

law violations and materially false and/or misleading statements and/or omissions alleged herein.

29. Defendant Hansen is a Delaware corporation with its principal executive offices located at 800 East Middlefield Road, Mountain View, California, 94043. Hansen (formerly Autocath, Inc.) was incorporated in the state of Delaware on September 23, 2002, and has been a publicly traded company on the National Association of Securities Dealers Automated Quotations Market ("NASDAQ") since the Company completed its initial public offering in November 2006.

30. Defendant Moll co-founded Hansen, and was, at all relevant times, CEO and Director of Hansen since its inception in September 2002. Additionally, Defendant Moll was, at all relevant times, President of Hansen since March 3, 2009. As set forth below, during the Class Period, Defendant Moll: (a) signed documents filed with the SEC; (b) signed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), 15 U.S.C. §7241 and 18 U.S.C §1350; (c) was quoted in press releases issued by the Company, including press releases announcing the Company's quarterly and annual earnings; and (d) presented at, and participated in, investment conferences and quarterly conference calls.

31. Defendant Van Dick was, at all relevant times, CFO and Vice President, Finance and Administration, of Hansen since December 2005 until he resigned on February 22, 2010, effective as of February 24, 2010. As set forth below, during the Class Period, Defendant Van Dick: (a) signed documents filed with the SEC; (b) signed certifications pursuant to Sections 302 and 906 of SOX, 15 U.S.C. §7241 and 18 U.S.C §1350; and (c) presented at, and participated in, investment conferences and quarterly conference calls.

32. Defendant Restani was, at all relevant times, President and COO of Hansen from October 2006 until March 1, 2009, as well as, a Director of the Company from September 2006 until the expiration of his term on or around June 17, 2009. After the Company entered into a retention agreement with Defendant Restani on October 28, 2008, the Company and Defendant Restani agreed on February 8, 2009, that his employment with Hansen would end on March 1, 2009. On February 19, 2009, the Company and Defendant Restani further agreed that Defendant Restani would not seek re-election to the Company's Board of Directors at the end his term, which expired on the date of the Company's annual meeting of stockholders in June 2009. As set forth below, during the Class

1    Period, Defendant Restani: (a) signed documents filed with the SEC; and (b) presented at, and

2    participated in, investment conferences and quarterly conference calls.

3        33.    The Individual Defendants, because of their positions with the Company, possessed

4    the power and authority to control the contents of Hansen's reports to the SEC, press releases and

5    presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*,

6    the market.  Each defendant was provided with copies of the Company's reports and press releases

7    alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and

8    opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and

9    access to material non-public information available to them, each knew that the adverse facts

10   specified herein had not been disclosed to, and were being concealed from, the public, and that the

11   positive representations which were being made were then materially false and/or misleading.

12                          **CONFIDENTIAL WITNESSES**

13       34.    CW1 was the Director of Customer Support for Hansen from approximately April

14   2006 to approximately November 2009.  Initially, CW1 completed installations in Europe and later

15   primarily managed all of Hansen's people installing Systems.  CW1 later reported to Alay Yajnik.

16           a.    CW1 indicated that Hansen held three important meetings each week,

17   including, an installation meeting, a sales meeting, and a clinical sales meeting.  According to CW1:

18               i.    In 2008 and 2009, CW1 attended installation meetings that occurred

19   nearly every week and twice a week near the end of each quarter.  CW1 attended the meetings along

20   with Defendant Van Dick, Chris Sells (Hansen's former Senior Vice President of Operations),Tim

21   Murawski (Vice President of Sales), Steve Ware, and Karl Firth (who ran the Company's operations

22   in the United Kingdom).  CW1 stated that Defendant Moll would attend the installation meetings

23   at the end of the quarter. According to CW1, during the meetings, purchase orders would be

24   reviewed to see if the purchase orders were acceptable, whether manufacturing was ready to ship

25   the particular Systems, whether the installation team was ready to install the Systems, *etc.*.  CW1

26   stated that during the meetings, the participants discussed the Company's Systems that were

27   delivered worldwide, including in Russia, Spain, and Italy.  CW1 explained that the installation

28   meeting was centered around a report that showed customers line-by-line with columns for the

purchase order, the installation dates, and the training dates.  CW1 also indicated that the report's purpose was more operational and showed Systems, whether the purchase order was acceptable to the finance department, whether the System was ready to ship, whether the System installed, whether the customer had signed-off, and whether the physician had been trained.  CW1 indicated that the report would be modified on a daily or weekly basis and at the end of the quarter the report would be archived and a new report would be started for the next quarter.  CW1 also indicated that the final version of the quarterly report would be used to derive the numbers for revenue recognition and would go to Defendant Moll and Van Dick.  According to CW1 the installation reports would be emailed daily to Defendants Moll, Van Dick, and Restani.

        ii.    CW1 also indicated that he/she would usually participate in weekly sales meetings.  According to CW1, on Monday mornings at approximately 8:00 a.m. PST, a conference call would be held amongst sales people to discuss the status of sales, which included all sales people (unless a particular sales person was meeting with a customer) and Defendants Moll, Van Dick, and Restani.  CW1 also indicated that the Company's potential customers and deliveries would be reviewed to determine how to pull in sales.  During the sales meeting, CW1 indicated that there was a report that would be updated by each of the sales people.  CW1 indicated that the report showed customers on a line-by-line basis, with the steps toward receiving a purchase order on a column-by-column basis, and that the sales report would be updated during the week and distributed *via* e-mail to every manager.  CW1 further indicated that Defendants Moll, Van Dick, and Restani received the sales reports daily *via* e-mail.

        iii.    CW1 indicated that the clinical sales people had a conference call every Friday morning and would discuss catheter sales.  CW1 indicated that the call was managed by Jess Ayars and attended by at least one of the sales vice presidents.

        b.    According to CW1, the Company commissioned Cardion AG ("Cardion") only to sell Hansen equipment, not to install or repair it, because Cardion never agreed to provide a service organization.  According to CW1, the situation in Russia, Italy, Spain, and Portugal was different because the Company's distributors in these countries took on the responsibility to install and repair the Systems.  With respect to Hansen's distributors, CW1 indicated that Defendants Moll

1  and Van Dick were familiar with the contract terms and conditions and would have to review and

2  approve the Company's agreements with its distributors.

3          c.    According to CW1, the Company trained its distributors, such as AB Medica

4  and Palex, in Mountain View, California, to install and repair Systems.  CW1 was unaware of any

5  distributor installing a Hansen System without on-site help by Hansen's employees.  According to

6  CW1, the installation training that the Company provided to distributors was not comprehensive

7  enough to enable distributors to conduct installations independently.  CW1 indicated that it was

8  common knowledge within Hansen that the training Hansen's distributors received consisted of

9  merely two days of training, whereas the training that the Company's personnel received entailed

10  two weeks of training in Mountain View followed by three to six months of training in the field

11  under the supervision of a senior employee.  CW1 stated that for every installation of the Company's

12  Systems, Hansen employees were on-site during the installation.

13          d.    CW1 was unaware of any situation in which physicians were trained solely

14  by the Company's distributors without the assistance of Hansen's employees.

15          e.    CW1 also stated that Warren Cunningham, who worked for CW1, was the

16  Hansen employee who installed the Company's System at Yale on December 31, 2008.  According

17  to CW1, Chris Sell's sales representatives were very involved in the Company's account with Yale,

18  including CW7 and Chris Fong, who were interacting with the customer.  CW1 confirmed that the

19  Company's System at Yale was uninstalled within one week of installation.  According to CW1, in

20  2008, the customer had to issue a purchase order that was acceptable to Hansen's finance

21  department.  CW1 stated that Hansen then had to deliver the System, install it, and obtain the

22  customer's acceptance through a signature.  According to CW1, training the physicians was always

23  part of the process and Jess Ayars had to obtain a training certificate reflecting that the physicians

24  were trained to use the Company's Systems.  CW1 stated that with respect to the Company's System

25  sold to Yale, the training certificate was generated in late December and that he/she heard that the

26  document was manufactured in order for the Company to recognize revenue from the sale.

27          f.    CW1 also heard that Jess Ayars had been pressured to sign documents that

28  stated that doctors had been trained when they had not been.

1      g.   CW1 also stated that at one point, AB Medica (Hansen's Italian distributor)

2  had at least 5 Systems that were placed in a warehouse.  CW1 noted that as late as October or

3  November 2009, the participants at the installation meetings were still talking about getting Systems

4  still being held by AB Medica installed.

5      h.   CW1 was aware of the specific details related to several of the Company's

6  System installations: (i) the System sold to Loyola University Hospital in Illinois was purchased in

7  June 2008, installed the last week of the quarter, uninstalled within two days after the quarter ended

8  and placed in a closet; (ii) the Company's System sold to Scottsdale Healthcare Osborn in Arizona

9  was installed, but the hospital stopped using the System after a doctor perforated the hearts of two

10  patients; (iii) the Company's System sold to Sequoia Hospital in California was installed, but the

11  hospital stopped using it after one month and the System ended up in mothballs; (iv) the Company's

12  System sold to Massachusetts General Hospital remained unused after the doctor performing the

13  procedures moved; (v) the Company's System sold to Riverside Hospital in Ohio was used for a

14  while but then went unused; (vi) the Company's System sold to VA Brecksville Hospital in Ohio

15  was installed, but was unused for months; (vii) the Company's System sold to VA Cincinnati, Ohio

16  was installed and not used for months, and the System was uninstalled and later reinstalled; (viii)

17  the Company's System sold to Midwest Regional Medical Center in Oklahoma was installed, but

18  the doctor who was to use the System left the hospital and the System was never used; (ix) according

19  to CW1, the System sold to the University of Miami hospital in Florida was repeatedly installed and

20  uninstalled and, to CW1's knowledge, the System was never used.  CW1 indicated that the System

21  was installed in early or mid-2008 by Warren Cunningham, was later uninstalled, and then

22  reinstalled in the Spring of 2009.  CW1 stated that the System was in "good working order on the

23  day it was installed" and also "in good working order the day it was removed from the room and put

24  in storage."  CW1 recalls that the System was eventually installed in a different room to be used for

25  the first time.  CW1 explained, however, that "prior to first use the Setup Joint [w]as damaged from

26  leaking saline that made it way into the subSystem.  The Setup Joint was replaced along with the

27  RCM (Remote Catheter Manipulator).  Both had been damaged by the saline that they needed to be

28  returned to Hansen to be repaired in the factory."  As a result, CW1 indicated that the University of

1   Miami was given a concession that the warranty period would not start to run until the first case was

2   performed, however, the System was never used making the point moot; and (x) the Company's

3   System at St. Joseph's in Atlanta, Georgia was actually sold to a leasing company and leased to the

4   hospital. "Hansen allowed the leasing company to give the customer a '6 month right to return.'

5   St. Joseph's exercised this right in June and the System was return[ed] to the leasing company."

6   According to CW1, the System was placed in a warehouse and it was an embarrassment to Hansen.

7          i.     CW1 also stated that Hansen sold a System in Canada in December 2008 and

8   recognized revenue on the System although the System was never installed. CW1 stated that a

9   distributor was involved in the sale and that the distributor (Minogue Medical Inc.) never succeeded

10  in obtaining approval from the Canadian government to use the equipment. CW1 indicated that this

11  information was known by Defendants Moll and Van Dick. According to CW1, the System had

12  been placed in a warehouse and as of November 2009, the System had never been installed.

13          j.     CW1 indicated that Hansen shipped 1 System to AB Medica in Q407, shipped

14  1 System in Q108, another 2 Systems in Q308, and an additional 1 System in Q109.

15          k.     CW1 indicated that Hansen recognized revenue in Q308 on Systems sold to

16  the following customers: St. Luke's Cedar Rapids in Iowa; St. Jude Fullerton in California; St.

17  Luke's San Antonio in Texas; Giesen in Germany; S. Arizona VA in Arizona; Villingen in

18  Germany; Scottsdale/Osborn in Arizona; Cardion in the Czech Republic; University Medical Center

19  in Arizona; VA Pittsburgh in Pennsylvania; Cincinnati VA in Ohio; and Aurrora St. Luke's.

20          l.     CW1 indicated that in Q408, Hansen recognized revenue on the Systems sold

21  to: Yale-New Haven Hospital in Connecticut; St. Joseph's Atlanta in Georgia; Our Lady of Lourdes

22  in Lousiana; Memorial Hermann Southwest in Texas; University of California San Diego in

23  California; the University of Mississippi in Mississippi; and Palex International (Hansen's

24  distributor in Spain and Portugal). CW1 indicated that Hansen also shipped but deferred revenue

25  on 1 System to Stony Brook Hospital in New York.

26          m.     CW1 stated that a System was installed for St. Jude in France in 2Q 2009,

27  which was set up as a demonstration unit only and was not installed at a customer site. According

28  to CW1, while the System was fully functional, there was no X-ray machine in the room and it could

1   never have  been used on a patient.  CW1 stated that Chris Young was the installer and that

2   Defendant Van Dick was fully aware of all details regarding this installation.

3           n.      According to CW1, in connection with the distributors' arrangements with

4   St. Jude in France and Australia, the Systems that were sold were demo units that were meant to be

5   sold through to hospitals and not permanent demo units.

6           o.      CW1 indicated that Adrienne Cox (who entered the orders for catheter sales)

7   would keep track of actual catheter orders and maintained a detailed reported with separate tabs that

8   contained, for example, customers on a line-by-line basis listing how many catheters each customer

9   had purchased during the quarter (which would be updated on a daily basis), as well as a similar tab

10  listing physicians and cases per physician.  CW1 indicated that there was at least 6 physicians who

11  had never bought a catheter.  CW1 indicated that everyone in management saw these reports,

12  including Defendants Moll, Van Dick, and Restani.  CW1 confirmed that it was easy for anyone

13  looking at the reports to see that a particular site was not buying catheters.  With regard to inactive

14  Systems, CW1 indicated that once a System was installed, it was clear after a few weeks if the

15  System was not being used because the site would not purchase any catheters.  CW1 cited Yale as

16  one such example, and noted that the System was signed off, the revenue was recognized, the

17  System was put in a closet on January 3 or 5, 2009, and that two weeks later, everyone knew the

18  System was not being used because there was a lack of catheter sales.  Similarly, CW1 indicated that

19  the System sold to Loyola in Chicago was "literally put in a closet for a year" and it was obvious

20  that no catheters were being sold to Loyola.

21          p.      CW1 indicated that it was clear that the Company was focused on earnings

22  management and wanted to show increasing quarterly revenues.  CW1 indicated that with respect

23  to catheters, the Company was "stuffing the channels" increasing numbers over previous quarters

24  was important.

25          q.      CW1 indicated that with respect to catheter sales Defendants Moll and Van

26  Dick would know about any sale of at least 5 to 10 catheters to a single customer, as this would be

27  a big sale for the Company and that any catheter order over 5 was "celebrated."  CW1confirmed that

28  catheter sales were closely followed at the end of the quarter as catheter sales generally would be

1  talked about as much as System sales in the installation and sales meetings.

2          r.      CW1 further indicated that in the third month of the quarter, Defendants Moll
3  and Van Dick would become very active. CW1 recalled that Defendant Moll would fly out to sites
4  and twist arms to get a sale if a customer was on the fence.

5          s.      CW1 also indicated that during installation and/or sales meetings, the sales
6  people would coerce Defendant Van Dick into authorizing a System to be shipped without a
7  purchase order and temporarily stored close enough to the customer so that if the purchase order was
8  returned in time the Company could complete the sale before the end of the quarter.

9          t.      With respect to the single customer that Hansen reported as having purchased
10  100 catheters in Q209, CW1 indicated that this purchase was an abnormal bulk order for that
11  customer. CW1 recalled that this particular customer would normally buy approximately 10 and 15
12  catheters at a time. CW1 recalled that everyone at the Company cheered when hearing about the
13  sale. CW1 indicated that it would take at least a few months for this particular customer to work
14  through the inventory of catheters from the bulk purchase in Q209. CW1 further indicated that the
15  customer received a significant discount that was generally better than any other discounts Hansen
16  would provide to customers.

17          u.      CW1 indicated that Hansen had two clinical account managers in Europe and
18  that after a distributor sold a System and the System was installed at the end-user's site, one of the
19  two clinical account managers would train the end user.

20          v.      CW 1 stated that the guidance Hansen provided to the public in 2008 and
21  2009 for System sales was produced using a "top-down" approach. CW 1 stated that the numbers
22  represented management's goal, but that these numbers were not based on any historical numbers
23  that were contained in installation or sales reports. CW 1 stated that the System sales goals did not
24  change until later in each year when it was blatantly obvious to management that the original goals
25  were impossible to make. While CW1 recalls the sales force being optimistic for 2009, CW1 did
26  not recall anyone expressing that selling 53 Systems in 2009 would be easy. Rather, CW1 indicated
27  that the sales people would often express to him that it was tough to say no to Chris Sells with
28  respect to sales estimates.

35.     CW2 was a Clinical Sales Specialist at Hansen from approximately July 2007 to approximately June 2009, and reported to the Manager of Clinical Education and Training.  CW2's territory was in the Northeast United States.

a.      CW2 knew that Hansen installed a System at Yale in the last week of December 2008, and that the System was uninstalled approximately one week later.  CW2 was told that the official reason had to do with a room placement issue.  According to CW2, Hansen conducted temporary installations when CW2 started working at the Company.  CW2 provided an example of a particular temporary installation in Boston where the machine was installed even though it was going to be eventually installed in another environment.  It was CW2's understanding that a similar temporary installation occurred at Yale because Yale was in the process of building a new laboratory.  CW2 also heard that Hansen made the sale and recognized revenue for the System without the physicians being trained.

b.      According to CW2, pursuant to a FDA requirement, Hansen had a rule that at least one physician from a  customer (*i.e.*, the hospital), had to go through "Level 2 Training," in California or later in Cleveland.  Level 2 Training consisted of training with a live Canine or Pig model.

c.      According to CW2, Hansen held a "round table" meeting in Boston in February 2008.  In attendance were Defendant Moll, the Manager of Clinical Education and Training, and selected physicians using Systems.  CW2 indicated that Hansen wanted to determine when the customers had begun to start using the Company's Systems and to ask the physicians to discuss their best and worst cases.  After the meeting, CW2 indicated that it was decided that the Company needed to provide more training.

36.     CW3 was employed as a Clinical Application Manager from approximately March 2007 to approximately July 2009.

a.      While working for Hansen, CW3 recommended that the Company increase the price of its catheters because he/she knew that the Company was selling catheters at prices where the Company was losing money.

1    b.    While CW3 encouraged his/her customers to only order eight (8) catheters

2  at a time, CW3 said that the Company created pressure to force customers to buy additional

3  catheters.  CW3 told the Senior Vice President of Global Operations that CW3 refused to force

4  customers to buy additional catheters.  CW3 said that when the Senior Vice President of Global

5  Operations arrived, the Company changed the criteria for establishing bonuses so that they became

6  based, in part, upon the number of catheters sold.

7    37.    CW4 was employed by Hansen as a Clinical Account Manager from approximately

8  April 2007 to approximately July 2009.  CW4, like CW2, reported to the Manager of Clinical

9  Education and Training.  CW4 trained electrophysiologists to be able to operate the Hansen

10  equipment independently. CW4 also made sure that CW4's clients had enough inventory of catheters

11  and sterile shields (for the machine).  CW4 sold these supplies while regional sales people sold the

12  robotic equipment.

13    a.    CW4 said that clinics and hospitals (the customers) had to have their

14  physicians go to training in California or Cleveland.  As a Clinical Account Manager, CW4 stated

15  that his/her primary job was to train new customers/users to use the System until they could use the

16  System independently. CW4 said that it should have taken 5 to 25 cases, but some physicians did

17  not obtain sufficient training to become independent and gave up the training process.  For example,

18  CW4 recalled that one doctor from a hospital in Iowa gave up the training in March 2009.  CW4 said

19  that the doctor had done approximately 25 cases with the equipment and did not want to use the

20  equipment anymore.  CW4 said that in his/her area, no one ever became "independent" and that as

21  such, CW4 was physically present each time a Hansen catheter was used in his/her area.

22    b.    CW4 stated that the sales forces of Hansen and St. Jude would work together

23  if there were a leveraged position regarding a client. CW4 indicated that sales were being done to

24  entice customers to use the robotic System, and that a typical deal would result in the client agreeing

25  to buy approximately $40,000 of St. Jude's pacemakers in exchange for a discount. CW4 said that

26  he/she had to refer clients to sales people for details of discounts or prices.

27    c.    CW4 said that upon and after the arrival of the SVP of Global Operations in

28  June 2008, CW4 was required to physically count all the catheters at client sites and had to send the

number of catheters to a secretary at the main office.  CW4 said that counts were typically done at the end of every month at each site.

d.    According to CW4, at the direction of Chris Sells, at the end of every quarter, CW4, other clinicians, and salespeople would make lofty promises to entice customers to buy more catheters.  CW4 said that the sales people would convince users to buy in bulk by giving them discounts of about $50 a catheter.  CW4 said that the problem was that the next quarter there was inventory and it was more difficult to entice the customer buy in bulk again.

e.    CW4 stated there were a few customers who bought a lot of catheters. CW4 stated that Andreas Ramöller would sell catheters at a bulk rate.  CW4 said that bulk buyers in the United States included the University of Virginia, St. David's in Austin, Texas, and the Cleveland Clinic.

f.    CW4 said that at the end of the quarter, the SVP of Global Operations was obsessed to make his numbers.  In one such occasion, CW4 was part of a conference call where the SVP of Global Operations asked CW4 to see if CW4 could sell just one single catheter to a particular customer.  CW4 understood that Hansen was taking a loss on every catheter during CW4's entire tenure with the Company.

g.    CW4 was told by his/her boss that Hansen had recorded revenue on a System installed at Yale that eventually was taken out, which had been installed to make the revenue numbers for the quarter look good.

38.    CW5 was employed by Hansen as a Clinical Account Manager from approximately September 2007 to approximately September 2009.  CW5 reported to the Manager of Clinical Education and Training.

a.    CW5 said that Hansen did a relatively large bulk sale of catheters prior to the arrival of the SVP of Global Operations [*i.e.*, prior to June 2008].

b.    CW5 said that Hansen completed a bulk order to both Duke and UVA. According to CW5, Hansen then completed a second smaller bulk order, followed by a third even smaller order.  CW5 said that hospitals did not want to have all their shelf space used.  CW5 said

that the first order was above 70 for the two accounts combined; that the order was at least a quarter's worth and that the hospitals got a good price for the bulk order. CW5 recalled that the discount was approximately $50 per catheter.  CW5 also believes that the second order was approximately 25 for UVA and 25 for Duke.  CW5 recalls that after the three orders each, CW5 had a disagreement with the SVP of Global Operations because UVA and Duke already had products on the shelves and did not need any more.

39.    CW6 was the senior director of the Company's Structural Heart Division from approximately December 2007 to approximately September 2008.

a.    According to CW6, while being recruited, Defendant Moll told CW6 that Hansen's stock would be $200 a share and Defendant Restani told CW6 that the Company had endless funds.

b.    In June 2008, CW6 attended the Company's offsite strategy meeting in Carmel Valley, which was held in a country club setting with bungalows and attended by approximately 50 people, including departmental managers.  CW6 indicated that the purpose of the meeting was for team-building, but that the real work was for determining how the Company would be managed.  During the meeting, CW6 sat next to a Hansen employee involved with the parts for the catheters who explained that the cost of the catheters exceeded the selling price.

40.    CW7 was a Hansen sales person in the Northeast United States from approximately March 2006 to approximately July 2009.  CW7 reported to Jed Palmacci (Hansen's former Vice President of Global Sales) and later Chris Sells.

a.    CW7 confirmed that a Hansen System was installed at Yale in the last week of December 2008 and removed one week later.

b.    CW7 indicated that Hansen had very specific rules for revenue recognition, but that Chris Sells and Tim Murawski did not comply with the rules for proper revenue recognition and did things that were "down right wrong."

c.    According to CW7, Hansen's revenue recognition rules required that physicians be trained and approved by the Company's training department.  CW7 indicated that

physicians had to go offsite to participate in an animal laboratory and had to observe one case conducted by a certified doctor.  CW7 also stated that doctors had to then personally work in the animal laboratory.  Nevertheless, CW7 indicated that, in some cases, the Company recognized revenue without physicians being trained as required by Hansen's own policies.

41.    CW8 was in Clinical Affairs at Hansen from approximately July 2008 to approximately January 2009.

a.    With regard to training, CW8 indicated that training consisted of dry runs and active runs using different animal models and was later upgraded and called "Level 2," which simply replaced the old training. CW8 indicated that Hansen's clinicians would fly all over the world to assist doctors at their own hospitals until the doctors became independent. CW8 also indicated that when Hansen came out with new techniques, doctors who were already trained would visit and learn them.

b.    With regard to distributors, CW8 stated that in certain countries, distributors were required to track products by law.  CW8 said that this requirement was especially true with experimental equipment.

c.    With regard to installations in Europe, CW8 said that Erik Taylor was employed by Hansen as a Service Operations Manager and that he was one of the people who ensured that Systems in Europe were installed correctly.

d.    CW8 described the Company's distributors as being more like figureheads. CW8 stated that distributors had to receive the product, bring it into the country, track the serial number, bring it to the hospital and then Hansen would bring someone in to install it.

42.    CW9 was a Manager of Financial Planning and Analysis for Hansen from approximately June 2007 to approximately May 2008.  CW9 reported to Defendant Van Dick and worked closely with Defendant Restani.  According to CW9, CW9 was Restani's right-hand person and CW9 frequently spoke with Restani about revenue recognition.  CW9's first day at the Company was the first day of shipment of Hansen's first product.

a.    One of CW9's responsibilities at Hansen included reviewing the costs of

goods sold ("COGS") for Hansen's catheters. Because CW9 served as Hansen's first Manager of Financial Planning and Analysis, CW9 first worked on establishing budgets and other controls. In January 2008, CW9 reviewed COGS and held a meeting with the Vice President of Engineering, Sean Murphy, and with Defendants Restani and Van Dick. During this meeting, CW9 explained that the fully burdened cost of one catheter was $3,200, and that the actual material cost was approximately $1,600. According to CW9, everyone in attendance at the meeting was aware of a serious problem with COGS; namely, that there was no way for the Company to use its in-house staff to reduce the cost. CW9 explained that because there was such a low volume and since it took so long to manufacture each catheter, it was impossible to reduce the cost to $1,600.

b. CW9 also stated that Hansen was always in a rush to recognize revenue on the Systems the Company sold. According to CW9, there was always a push at the end of each month to recognize revenue. CW9 was concerned about whether the doctors were actually trained before the Company recognized revenue on the Systems it sold and CW9 was unsure whether there was enough time to install the Company's Systems prior to the recognition of revenue.

43. CW10 was a Regional Sales Director for the Company from approximately September 2006 to approximately July 2008.

a. CW10 stated that he/she never heard of any distributor installing Hansen's Systems without representatives from the Company being present to oversee the installation process. CW10 confirmed that Erik Taylor, the technical service manager, Matthew Domagala, the senior field engineer, and the director of customer support would go to Europe for long periods of time to install Systems.

44. CW11 was a Hansen sales employee based in Europe from approximately July 2008 to approximately April 2009.

a. CW11 observed that Hansen's European operations were not entirely independent from the Company's operations in the United States. According to CW11, the markets in the United States and Europe were very different. CW11 stated that although it was impossible to make his/her numbers, Chris Sells made effectively impossible demands that CW11 press the Company's customers for unrealistic sales.

b.      CW11 indicated that there were two people who covered the Company's operations in Germany, one of whom was Andreas Ramöller.  With regard to bulk sales of catheters, CW11 indicated that Andreas Ramöller bragged about selling more catheters than any hospital could use.

c.      According to CW11, there were also only a handful of people that worked for the Company's operations in the United Kingdom, which was run by Karl Firth.  CW11 indicated that Karl Firth worked directly with Hansen's Senior Vice President of Global Operations.  CW11 stated that Italy, Spain, Portugal, France, Asia, and South Africa were managed out of the UK.

45.      CW12 was a Senior Field Service Engineer at Hansen from approximately January 2006 to approximately July 2009.  CW12 performed numerous System installations for Hansen, including the System installation at Stony Brook Hospital in New York on December 31, 2008 (where CW12 worked until 11:00 p.m. on New Years' Eve at the same time as the System installation at Yale performed by Warren Cunningham and Keith O'Malley), an installation at IKEM in Prague, an installation at Homolca in Prague, and an installation at St. David's in London.  CW12 was responsible for the hiring of Chris Young, who then performed installations for the Company in Europe.

a.      According to CW12, it was common for Hansen to install Systems and later uninstall the Systems.  CW12 stated that there was a definite pattern at the end of the Company's quarters to install Systems, only to have the Systems uninstalled later.  CW12 stated that the Company's Systems were installed at the end of quarters and uninstalled later because salespeople were giving special prices to customers to buy the Systems earlier than the customers needed them.  According to CW12, examples of this practice included the Company's Systems at Yale and the VA Brecksville Hospital in Ohio.

b.      According to CW12, Cardion was a dealer that would buy the Company's Systems and then lease them to various entities.

## SUBSTANTIVE ALLEGATIONS

### Background Concerning Hansen's Business

46.     Domestically, Hansen markets and sells its products through a direct sales force of regional sales executives (or "RSE"), supported by clinical account managers (or "CAM") who provide  training, clinical support, and other services to Hansen's customers.  Internationally, the Company primarily uses distributors to sell and support its products, but employs a direct sales force to market, sell, and support, its products in the United Kingdom and Germany through wholly-owned sales-subsidiaries.  During the Class Period, Hansen had distribution agreements with distributors in, among others, Canada, the Czech Republic, France, Italy, Portugal, Russia, and Spain.

47.     Hansen's first/primary product, the Sensei System, was cleared by the FDA in May 2007 for manipulation and control of certain mapping catheters in EP procedures.  The System, which is principally comprised of two portable modules – a physician control console and a patient-side module that can be connected to most procedure tables[8] – is designed to allow physicians to instinctively navigate flexible catheters with greater stability and control in EP procedures.  On June 30, 2008, Hansen announced that it received 510(k) clearance from the FDA to market and commercially distribute the CoHesion 3D Visualization Module for use in complex EP mapping procedures, which provides a software interface between the Sensei System and the EnSite System advanced mapping software from St. Jude Medical, Inc.

### Overview of Hansen's Customers and Reported Installed Base
### (as Originally Reported) During the Class Period[9]

48.     Given that Hansen is essentially a one-trick pony (*i.e.*, the Company's entire business

___

[8]The control console, which can either be located inside the EP laboratory and close to the patient or outside the EP laboratory in a separate location shielded from radiation, features an instinctive motion controller, which robotically controls the patient-side module to accurately move the catheter within the patient's anatomy.

[9]Because Hansen only identified a limited number of the customers/Systems that comprised its Installed Base and the relative importance of individual transactions to Plaintiffs' allegations, Plaintiffs have endeavored to reconstruct the customers/Systems that Hansen originally sold and recognized as revenue between Q207 and Q209.  Utilizing a combination of information provided by the Company, confidential witnesses, and a limited number of internal documents, Plaintiffs have been able to identify nearly all of the customers/Systems compromising Hansen's originally reported Installed Base of 68 Systems at the end of Q209.  The information set forth in the this section is for ease of reference and as a supplement to Plaintiffs' allegations.

is centered upon the sale of its flagship product the Sensei System), during the Class Period the primary metric Hansen reported to the public was its "Installed Base," or the cumulative number of Systems Hansen had sold and recognized as revenue since receiving FDA approval in Q207.

49.    Before the Class Period, the Company had only reported revenues for two quarters of Sensei Sales.  For Q207, the initial quarter of sales, Hansen recognized revenue on *4 Systems* (1 domestically and 3 internationally), which Defendant Restani identified during a conference call to discuss the Company's Q207 results as having been sold to the following customers:

| DOMESTIC | INTERNATIONAL (Distributor / Direct) |
|---|---|
| *The Cleveland Clinic*, Ohio | *Institute for Clinical and Experimental Medicine*, Prague (sold to this customer *via* a distributor) |
|  | *Na Homolce*, Prague (sold to this customer *via* a distributor) |
|  | St. Mary's Hospital in London (direct sale) |

50.    Immediately prior to the Class Period, after only two quarters of marketing and selling its System, the Company's Installed Base stood at *9 Systems* (5 domestically and 4 internationally) at the end of Q307.  For Q307, Hansen recognized revenue on the sale of 5 Systems (4 domestically and 1 internationally), which Defendant Restani identified as having been sold to the following customers:

| DOMESTIC | INTERNATIONAL (Distributor / Direct) |
|---|---|
| *Brigham and Women's Hospital*, Massachusetts | *University Hospital in Hamburg*, Germany (Direct Sale) |
| *St. David's Hospital*, Texas |  |
| *Riverside Methodist Hospital*, Ohio |  |
| *Sequoia Hopital*, California |  |

51.    At the start of the Class Period, for Q407, Hansen recognized revenue on 6 Systems (4 domestically and 2 internationally), bringing its Installed Base to *15 Systems* (9 domestically and 6 internationally).   During a conference call on February 19, 2008 (the "Q407 conference call"), Defendant Restani indicated that the 6 Systems recognized as revenue during Q407 were sold to the following customers:

| DOMESTIC | INTERNATIONAL (Distributor / Direct) |
|---|---|
| *Massachusetts General Hospital*, Massachusetts | *Saint Georges Hospital*, Germany (Specifically identified as a "direct sale") |
| *The Lahey Clinic*, Massachusetts | *AB Medica,* Italy (Specifically identified as a distributor sale) |
| *University of Maryland*, Maryland | |
| *Mount Sinai Hospital*, New York | |

52.     For Q108, the Company recognized revenue on 8 Systems (5 domestically and 3 internationally), bringing Hansen's Installed Base to **23 Systems** (14 domestically and 9 internationally).  The Systems 8 Systems – identified by Defendant Restani during a May 1, 2008 conference call (the "Q108 conference call") and by a Hansen document attached hereto as Ex. A – were sold to the following customers:

| DOMESTIC | INTERNATIONAL (Distributor / Direct) |
|---|---|
| *The University of Virginia Medical Center*, Virginia | *St. Mary's Hospital,* London (Direct sale) |
| *Methodist Hospital*, Texas | *AB Medica*, Italy (Distributor sale) |
| *Oklahoma Heart Hospital*, Oklahoma | *Palex International Medical Devices*, Spain/Portugal (Distributor sale) |
| *Midwest Regional Medical Center*, Oklahoma | |
| *Emory Crawford Long Hospital*, Georgia | |

53.     For Q208, the Company recognized revenue 8 Systems (7 domestically and 1 internationally) bringing its Installed Base to **31 Systems** (21 domestically and 10 internationally). Additionally, Hansen reported that it had shipped an additional 2 Systems that it  was unable to recognize as revenue in Q208 and instead recorded as deferred revenue.  These 8 Systems recognized as revenue – identified by Defendant Restani during a conference call on July 31, 2008, to discuss the Q208 results (the "Q208 conference call") and an internal document attached hereto as Ex. B – were sold to the following customers:

| DOMESTIC | INTERNATIONAL (Distributor / Direct) |
|---|---|
| *Duke University Medical Center*, North Carolina | *Rosslyn*, Russia (Distributor) |

| | |
|---|---|
| *VA Breksville*, Ohio | |
| *Methodist Hospital*, Texas | |
| *Englewood Hospital*, New Jersey | |
| *Loyola University*, Illinois | |
| *Scripps Medical Clinic*, California | |
| *Miller School of Medicine at the University of Miami*, Florida | |

As identified in Ex. B, the additional 2 Systems for which Hansen shipped during the quarter but recorded as deferred revenue were shipped to: (1) *Schwarzwald-Baar Klinikum Villingen-Schwenningen GmbH* ("Villingen"), Germany (Direct); and (2) *St. Jude Medical Center*, California (Fullerton).

54.    For Q308, the Company recognized revenue on 14 Systems (9 domestically and 5 internationally), bringing its Installed Base to **45 Systems** (30 domestically and 15 internationally). These 14 Systems – identified by CW1 (*see* ¶34(k))[10] – were sold to the following customers:

| DOMESTIC | INTERNATIONAL (Distributor / Direct) |
|---|---|
| *St. Luke's Hospital of Cedar Rapids*, Iowa | *AB Medica*, Italy (Distributor) |
| *Aurora St. Luke's Medical Center*, Wisconsin | *AB Medica*, Italy (Distributor) |
| *St. Luke's Baptist Hospital*, Texas (San Antonio) | *Cardion*, Czech Republic (Distributor) |
| *St. Jude Medical Center*, California (Fullerton) | *Villingen*, Germany (Direct) |
| *Scottsdale Healthcare Osborn Medical Center*, Arizona | *Giessen*, Germany (Direct) |
| *University Medical Center*, Arizona | |
| *Southern Arizona VA Healthcare System*, Arizona | |
| *VA Pittsburgh Healthcare System*, Pennsylvania | |
| *Cincinnati VA Medical Center*, Ohio | |

---

[10]CW1's account is corroborated in part by Defendant Restani's statements about these Systems during a conference call to discuss the Q308 results on October 23, 2008, (the "Q308 conference call"), indicating that 9 Systems were sold domestically, including 3 Systems sold to the VA, and that the 5 international sales were in Europe.

55.     For Q408, the Company recognized revenue on 10 Systems (6 domestically and 4 internationally), bringing its Installed Base to *55 Systems* (36 domestically and 19 internationally). Additionally, Hansen reported that it had shipped an additional 1 System that it  was unable to recognize as revenue in Q408 but was recorded as deferred revenue.  The 10 Systems recognized as revenue – identified by Defendant Restani during a conference call on February 12, 2009, to discuss the Q408 results (the "Q408 conference call") and by CW1 (*see* ¶34(l)) – were sold to the following customers:

| DOMESTIC | INTERNATIONAL (Distributor / Direct) |
|---|---|
| *Our Lady of Lourdes Regional Medical Center*, Lousiana | *Minogue Medical*, Canada (Distributor) |
| *University of Mississippi*, Mississippi | *St. Jude*, France (Distributor) |
| *University of California San Diego* ("UCSD"), California | *Palex*, Spain (Distributor) |
| *Memorial Hermann Southwest Hospital*, Texas | *London Bridge Hospital*, England (Direct)[11] |
| *St. Joseph's Hospital of Atlanta*, Georgia | |
| *Yale-New Haven Hospital*, Connecticut | |

Additionally, CW1 (*see* ¶34(l)) identified the 1 System the Company "shipped" in Q408 but reported as deferred revenue as being shipped to Stony Brook Hospital in New York.

56.     For Q109, the Company recognized revenue on 10 Systems (7 domestically and 3 internationally), bringing the Company's Installed Base to *65 Systems* (43 domestically and 22 internationally).  The 10 Systems – identified by either Defendant Moll during a conference call to discuss the Company's Q109 results on May 5, 2009 (the "Q109 conference call"), and/or by Ex. C – were sold to the following customers:

---

[11] CW1 (*see* ¶34(l)) identified 9 of the 10 Systems recognized as revenue in Q408.  Based on analysis of the serial numbers listed in Exs. A-K, for each System in Hansen's Installed Base and the timing of when each System was sold, Plaintiffs are informed and believe that the 1 System not identified by CW1 was a direct sale to London Bridge Hospital in England.  Plaintiffs' information and belief is corroborated by Defendant Restani's statements during the Q408 conference call indicating that the Company sold 4 Systems internationally, including 3 to distributors and 1 direct sale, and by the fact that Hansen's international sales were conducted directly in the United Kingdom and Germany.

| DOMESTIC | INTERNATIONAL (Distributor / Direct) |
|---|---|
| *Stony Brook*, New York | *AB Medica*, Italy (Distributor) |
| *Jersey Shore Medical Center*, New Jersey | *Rosslyn*, Russia (Distributor) |
| *Scripps La Jolla Hospital*, California | *St. Jude Austrialia* (Distributor) |
| *Memorial Herman TMC*, Texas | |
| *St. Barnabas*, New Jersey | |
| *St. David's Hospital*, Texas | |
| *Stanford*, California | |

57.     Finally, for Q209, the Company recognized revenue on 3 Systems (all international), bringing the Company's Installed Base to ***68 Systems*** (43 domestically and 25 internationally).  The 3 Systems – identified by Defendant Moll during a conference call on August 4, 2009, and/or by Ex. C – were sold to the following customers:

| INTERNATIONAL (Distributor / Direct) |
|---|
| *Palex*, Spain/Portugal (Distributor) |
| *Amayeza Abantu Bio Medical*, South Africa (Distributor) |
| *St. Thomas*, London (Direct) |

**Defendants' Materially False and/or Misleading
Statements During the Class Period**

58.     Defendants artificially inflated the price of Hansen common stock by issuing materially false and/or misleading statements during the Class Period, including press releases, Form 10-Q quarterly reports and Form 10-K annual reports filed with the SEC, statements of compliance with SOX filed with the SEC, and conference calls with investors, securities analysts, and other market participants, as set forth below.

**2007 Fiscal Fourth Quarter Ending December 31, 2007**

59.     The Class Period begins on February 19, 2008.  On this day, Hansen issued a press release entitled, "Hansen Medical Reports 2007 Fourth Quarter and Year-End Results."  At the top, Hansen touted "***Six Sensei Robotic Catheter Systems Placed During the Fourth Quarter Bringing Worldwide Installed Base to Fifteen***; Investments Initiated in 2007 Expected to Enable Transition

to Full Commercial Release During 2008," and therein, the Company, in relevant part, stated:

> *-- System Sales: Recognized revenue on six Sensei(TM) Robotic Catheter Systems sold during the fourth quarter, bringing total worldwide system placements to fifteen, including nine in the United States and six in Europe.*

\* \* \*

> "I am pleased with our performance in the fourth quarter and throughout all of 2007," said Frederic Moll, M.D., founder and chief executive officer of Hansen Medical. "Since receiving regulatory approval for the Sensei system in May of 2007, I have been encouraged by the demand for our technology . . . We believe the investments initiated during this past year to expand our manufacturing capabilities will enable us to transition to a full-scale commercial release and to expand our market presence in 2008 and beyond," concluded Dr. Moll.

\* \* \*

> *Total revenue for the three months ended December 31, 2007 was $4.2 million. During the quarter, the company recorded revenue on the sale of four Sensei systems in the United States and two Sensei systems in Europe in addition to shipments of Artisan control catheters.*

> . . . *Gross profit for the quarter was nearly break-even* . . . The company expects gross profit to improve significantly during 2008 as revenue grows and the company realizes improvements in operating efficiencies.

\* \* \*

> *Net loss for the three months ended December 31, 2007, . . .was $23.9 million, or $(1.10) per basic and diluted share* . . .

\* \* \*

> *Total revenue for the year ended December 31, 2007 was $10.1 million. The company's net loss for the year ended December 31, 2007, . . .was $50.4 million, or $(2.33) per basic and diluted share* . . .

(Emphasis added). Additionally, in the financial statements appended to the press release, the Company reported "Gross (loss) profit" of ($23,000) for Q407 and $947,000 for FY07.

60. The statements referenced in ¶59 were materially false and/or misleading when made because:

a. The Company later admitted the falsity of its financial reporting and the statements when it disclosed on October 19, 2009, that it would have to restate its financial statements for FY08, Q108, Q208, Q308, Q109, and Q209, "to correct certain errors, some of which

arose from potential irregularities occurring outside of the accounting department, regarding the timing of revenue recognition on the sale of some of its Sensei Robotic Catheter Systems." Additionally, the Company admitted that "an investigation by Hansen's audit committee, with the assistance of independent outside counsel, has identified systems for which revenue should have been recognized in a later period than the period in which it was recognized and revenue on a smaller number of systems that should have been reflected as deferred revenue on Hansen's balance sheet as of June 30, 2009." Additionally, on October 19, 2009, Hansen stated that it was continuing to review whether it would have to adjust or restate its financial statements for FY07. Thereafter, on November 10, 2009, the Company admitted that "on November 9, 2009, the audit committee of [the] board of directors, upon recommendation of management, concluded that the previously issued financial statements contained in [the] annual report on Form 10-K for the year ended December 31, 2007 (the "2007 Period") should also no longer be relied upon because of an error in those financial statements regarding the recognition of revenue on one Sensei Robotic Catheter System sold to a distributor in the quarter ending December 31, 2007."  Further, Hansen admitted that:

> **[*I*]n addition to the financial statements for the Prior Periods and the 2007 Period referenced above, related press releases, reports and stockholder communications describing our financial statements for the Prior Periods** [contained in the annual report on Form 10-K for the year ended December 31, 2008, and the quarterly reports on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009 and June 30, 2009] and the 2007 Period and the reports of our independent registered accounting firm, PricewaterhouseCoopers LLP, related to the years ended December 31, 2008 and December 31, 2007 **should no longer be relied upon.**

(Emphasis added).

   b.   Hansen further admitted on November 16, 2009, upon filing its restated financial statements that the statements concerning Hansen's financial results were each materially false and/or misleading when made and did not fairly present the financial condition of the Company for Q407 and FY07 because:  (i) Hansen's Installed Base at the end of Q407 of 14 was misrepresented as 15, which constitutes an overstatement of 1, or 7.14%; (ii) the Company's international Installed Base at the end of Q407 of 5 was misrepresented as 6, which constitutes an overstatement of 1, or 20%; (iii) the total number of Systems the Company should have recognized as revenue was 5 in Q407 and 14 for FY07, but was misrepresented as 6 and 15, respectively, which

1  constitutes overstatements of 1, or 20%, for Q407 and 1, or 7.14%, for FY07; (iv) the total number

2  of Systems sold internationally that Hansen should have recognized as revenue was 1 in Q407 and

3  6 for FY07, but was misrepresented as 2 and 6, respectively, which constitutes overstatements of

4  1, or 50%, for Q407 and 1, or 20%, for FY07; (v) Revenue of $3,575,000 for Q407 and $9,464,000

5  for FY07 was misrepresented as $4,196,000, and $10,085,000, respectively, which constitutes

6  overstatements of the Company's revenues by $621,000, or 17.37%, for Q407, and by $621,000, or

7  6.56%, for FY07; (vi) "Gross profit (loss)" of ($461,000) for Q407 was misrepresented as ($23,000),

8  constituting an overstatement of $438,000, or 95.01%, and "Gross profit (loss)" of $509,000 for

9  FY07 was misrepresented as $947,000, constituting an overstatement of $438,000, or 86.05%; (vii)

10  "Net loss" of ($24,338,000) for Q407 and ($50,859,000) for FY07, was misrepresented as

11  ($23,900,000) for Q407 and ($50,421,000) for FY07, constituting overstatements of $438,000, or

12  1.8% and 0.86%, respectively; and (viii) "Basic and diluted net loss per share" of ($1.12) for 4Q

13  2007 and of ($2.35) for FY07, was misrepresented as ($1.10) for Q407 and ($2.33) for FY07,

14  constituting overstatements of $0.02, or 1.79% and 0.85%, respectively.

15          c.      Hansen admitted on November 10, 2009, that the Company improperly

16  recognized revenue on 1 System "sold to a distributor" in Q407, which was sold to AB Medica, the

17  only distributor sale in Q407. The Company conceded the reason why revenue recognition had been

18  improper – i.e., AB Medica was not capable of independently installing Systems and training end

19  users – by admitting the following while discussing the restatement during a conference call on

20  November 17, 2009: (1) that for Systems sold to distributors, Hansen had improperly recognized

21  revenues upon shipment because the distributors were not independently capable of installing

22  Systems and training end users; (2) that as of Q309, at least 3 of the 5 Systems Hansen sold to AB

23  Medica during the Class Period were improperly recognized as revenue, were still in the

24  distributor's possession, had been reclassified to deferred revenue (along with other improperly

25  recognized systems revenue), and remained as deferred revenue as of the end of Q309; and (3) that

26  going forward, Hansen would recognize revenue on Systems sold to distributors on a sell-through

27  basis (i.e., once the System was installed at the end-user's sites and the end-user physicians were

28  trained), including the 3 Systems held by AB Medica which remained in deferred revenue. Thus,

1   by admitting that as of Q309, AB Medica was not capable of independently installing Systems and

2   training end users, defendants conceded that AB Medica could not have been capable of installing

3   Systems and training end users in Q407.

4          d.      The improper revenue recognition on the 1 System sale to AB Medica in

5   Q407, created the materially false and/or misleading trend that Hansen's System sales were

6   increasing (*i.e.*, 4 Systems in Q207, 5 Systems in Q307, and 6 Systems in Q407), when in fact sales

7   would have been flat between Q307 and Q4 20007 (*i.e.*, 5 System in each quarter).  Improperly

8   recognizing revenue on 1 System in Q407, further created the materially false and/or misleading

9   impression that the demand for the System was greater than true demand for the product.

10         e.      Hansen failed to disclose that it was improperly recognizing revenue on

11  Systems to create the appearance of increasing quarterly System sales.

12         61.     The materially false and/or misleading statements in ¶59 were made with scienter as

13  defendants knew and/or were deliberately reckless in not knowing the following:

14         a.      **Hansen was the only party capable of installing its Systems and training**

15  **physicians to use its Systems.**  While Defendant Moll asserted during a conference call on

16  November 17, 2009 (discussing the Company's restatement) (*see infra* ¶300), that "we recognized

17  revenue upon shipment of systems to the distributors based on our belief, at the time, that the

18  distributors were independently capable of installing the systems and training end users," any such

19  purported "belief" is directly belied by a contradictory statement contained in the Company's

20  Annual Report on Form 10-K for FY07, filed with the SEC on February 28, 2008, and signed on

21  behalf of Hansen by Defendant Moll, which expressly states: "We are ***currently*** the ***only party***

22  capable of installing our Sensei system and training doctors as to its proper use." (Emphasis added).

23         b.      **The mere 2 days of training Hansen provided to its distributors was**

24  **grossly insufficient for the distributors to be capable of independently installing Hansen's**

25  **Systems.**  According to CW1, as set forth in ¶34(c), while the Company trained its distributors, such

26  as AB Medica and Palex, in Mountain View, California, to install and repair systems, CW1 was

27  unaware of any distributor installing a System without on-site help by Hansen's employees. This

28  was because the level of training was insufficient for the distributors to be capable of independently

1   installing Systems.  As explained by CW1, the installation training that the Company provided to

2   distributors was not comprehensive enough for distributors to independently conduct installations.

3   CW1 indicated that Hansen's distributors received merely 2 days of installation training, whereas

4   the Company's personnel received 2 weeks of training in Mountain View, followed by 3 to 6 months

5   of training in the field under the supervision of a senior employee.  CW1 stated that for every

6   installation, Hansen employees were on-site during the installation.  CW10, as set forth in ¶43(a),

7   also never heard of a distributor installing Systems without representatives from the Company being

8   present to oversee the installation process.  CW8, who was later employed with the Company,

9   described Hansen's distributors as being more like figureheads.  As set forth in ¶41(c), CW8 stated

10  that distributors had to receive the product, bring it into the country, track the serial number, bring

11  it to the hospital and then Hansen would bring someone in to install it.

12          c.      **Defendants Moll, Van Dick, and Restani, would receive a copy of a**

13  **quarterly installation report on a daily basis and Defendants Moll and Van Dick would attend**

14  **installation meetings where the status of orders and installations were discussed, including**

15  **orders to Spain, Italy, and Russia.**  CW1 stated, as set forth in ¶34(a), that in 2008 and 2009,

16  Defendant Van Dick attended installation meetings that occurred every week and were held twice

17  a week near the end of each quarter.  CW1 also indicated that Defendant Moll would attend the

18  meetings at the end of the quarter.  CW1 stated that during the meetings, the participants discussed

19  the Company's Systems that were delivered worldwide, including in Russia, Spain, and Italy.  CW1

20  indicated that during the meetings, purchase orders would be reviewed to see if the purchase orders

21  were acceptable, whether manufacturing was ready to ship the particular Systems, whether the

22  installation team was ready to install the Systems, *etc.*.  CW1 explained that the installation meeting

23  was centered around a report that showed customers line-by-line with columns for the purchase

24  order, the installation dates, and the training dates.  CW1 also indicated that the report's purpose was

25  more operational and showed Systems, whether the purchase order was acceptable to the finance

26  department, whether the System was ready to ship, whether the System installed, whether the

27  customer signed-off, and whether the physician had been trained.  CW1 indicated that the report

28  would be modified on a daily or weekly basis and at the end of the quarter, the final version of the

1   report would be archived and a new report would be started for the next quarter.  CW1 also indicated

2   that the final version of the quarterly report would be used to derive the numbers for revenue

3   recognition and would go to Defendant Moll and Van Dick.  According to CW1, the installation

4   report would be emailed daily to Defendants Moll, Van Dick, and Restani.

5         d.   **As indicated by CW11, see ¶44(c), Italy, along with Spain, Portugal,**

6   **France, Asia, and South Africa, were managed out of Hansen's subsidiary in the UK.**

7         e.   **Sensei System sales were the core of the Hansen's business/operations.**

8   At the time Hansen originally reported its Q407 financial results, almost all of the Company's

9   quarterly revenues came from recognizing revenue on the sale of only 6 Systems, of which the 1

10   System sold AB Medica was improperly recognized as revenue in violation of the Company's

11   revenue recognition policy.

12         f.   **The Individual Defendants were familiar with Hansen's revenue**

13   **recognition criteria.**  During the Q407 conference call, the Individual Defendants demonstrated

14   their knowledge of the Company's revenue recognition criteria for sales in both the US and Europe

15   by specifically discussing the required installation and training obligations necessary for proper

16   revenue recognition.  *See infra* ¶72.

17         g.   **Defendant Restani was familiar with the transaction improperly**

18   **recognized as revenue.**  During the Q407 conference call, Defendant Restani demonstrated his

19   familiarity and knowledge of the details of the shipment to the Italian distributor that was improperly

20   recognized as revenue.  Defendant Restani expressly stated, "[t]his unit is already designated for a

21   key Italian hospital."  Moreover, Defendant Restani was familiar with the timing of the various

22   shipments throughout the quarter.  *See infra* ¶¶63, 75.

23         h.   **The Individual Defendants indicated that they monitored and were**

24   **familiar with Hansen's customers and sales pipeline.**  During the Q407 conference call, the

25   Individual Defendants repeatedly indicated that they were monitoring the Company's sales pipeline

26   and were familiar with the customers purchasing Hansen's systems.  *See infra* ¶¶63, 70-71, 75.

27         i.   **The Individual Defendants were familiar with the agreements and/or the**

28

**contract terms and conditions with Hansen's distributors.** As set forth in ¶34(b), with respect to the Company's distributors, CW1 indicated that Defendants Moll and Van Dick were familiar with the contract terms and conditions and would have to review and approve the Company's agreements with its distributors. CW1's account is corroborated by defendants' own statements (which demonstrate their involvement with and/or familiarity with such agreements), including:

> i.    Hansen had recently announced in a November 1, 2007, press release, that, "[t]he company has expanded its hybrid distribution model with the appointment of two new distributors for the European Union. A.B. Medica will be the exclusive distributor in Italy and Palex International Medical Devices will be the exclusive distributor for Spain and Portugal." The announcement followed comments from Defendant Restani during an August 14, 2007, conference call with investors, wherein Defendant Restani stated that "we are actively working on distributor agreements in five major markets" and "[w]e will have more information about these agreements in future announcements."

> ii.   Defendant Van Dick later admitted during a July 6, 2009, conference call (*see infra* ¶252): "[M]any distributors want our obligations spelled out pretty specifically in the distributor arrangement to train them. And since it is spelled out pretty specifically, we have to complete that obligation under our current rev-rec rules before we can take revenue on them."

> j.    **The defendants, including Defendant Moll, were aware that it required a significant amount of time and was very difficult for Hansen's clinical specialists to train physicians to be able to independently use the Sensei System, and thus also knew that it would take equal, if not more, time and effort to be able to train someone else (*i.e.*, a distributor) to train an end-user physician to use a Hansen system to the point where the end-user could use the system independently.** As alleged in ¶37(a), after a System was installed at a domestic site and the physician had already gone through the initial training, CW4 would attempt to train physicians to use the Hansen System to the point where the physician could use the System independently. According to CW4, while it should have taken 5 to 25 cases, some doctors did not get sufficient training to become independent and gave up. No doctor in CW4's territory was ever able to become "independent" and as a result, CW4 was physically present at each procedure in his/her area.

1  Similarly, according to CW2, *see* ¶35(c), following a February 2008 "round table" meeting with

2  users of the system (*i.e.*, Hansen customers), which was attended by Defendant Moll, it was decided

3  that more training was needed. Given the level of difficulty in training physicians to independently

4  use a Hansen System, it is not surprising that, as set forth in ¶34(d), CW1 was unaware of any

5  situation in which physicians were trained solely by the Company's distributors. Indeed, a "risk

6  warning" contained in Hansen's Form 10-K for FY07 acknowledges the complexity of training a

7  physician to independently use the System and warns:

8  ***The training required for physicians to use our Sensei system could reduce the
   market acceptance of our system and reduce our revenue.***

9

10  Physicians must be trained to use our Sensei system proficiently. It is critical to the
    success of our sales efforts to ensure that there are a sufficient number of physicians

11  familiar with, trained on and proficient in the use of our Sensei system. Convincing
    physicians to dedicate the time and energy necessary for adequate training in the use

12  of our system is challenging, and we cannot assure you that we will be successful in
    these efforts.

13  (Emphasis in original).[12]

14          k.      **Defendants Moll and Van Dick falsely certified the veracity of Hansen's**

15  **financial statements and effectiveness of Hansen's internal controls.**  As alleged in ¶¶85-86,

16  *infra*, Defendants Moll and Van Dick nevertheless signed materially false and misleading SOX

17  required certifications attesting to the accuracy of Hansen's financial results and effectiveness of the

18  Company's internal controls for FY07.

19          62.     Also on February 19, 2008, Hansen held the Q407 conference call in connection with

20

21

22          [12]The risk warning further states, "If physicians are not properly trained, they may misuse
    or ineffectively use our products" and that "[t]his may result in unsatisfactory outcomes, patient

23  injury, negative publicity or lawsuits against us, any of which could negatively affect our reputation
    and sales of our products." Given the potentially grave implications of insufficient training for both

24  patients and the future sales of the Company's primary product, it would be reckless for defendants
    to assume that distributors could independently train end users to use a System without verifying

25  whether the distributors could actually independently train end users. Indeed, during the Q407
    conference call, Defendant Restani stated that Hansen's strategy was to "ensure the highest possible

26  customer satisfaction by managing the important elements of physician training, clinical case
    support, installation, and field service" as "[i]t is our belief that achieving excellence in these areas

27  will lead to enhanced customer confidence in the Sensei system, also better procedure, outcomes for
    patients, and ***maximization of our long-term market opportunity***." (Emphasis added).

28

the press release announcing the Company's financial results for Q407 and FY07.  Defendants Moll,

Van Dick, and Restani, were present.

63.   During the Q407 conference call, the Individual Defendants repeatedly touted the

materially false and/or misleading information regarding the Company's financial results for Q407

and FY07, including, among others, the Company's Installed  Base and revenues.  Therein, in

relevant part, the Individual Defendants stated:

> [*Defendant Moll:*] I continue to be pleased with our efforts in bringing the Sensei robotic catheter system to market in both the U.S. and Europe. We're encouraged by the demand for our system, and our expanding list of customer installations, we're equally pleased with the level of usage from the systems we've installed to date. Our clinical experience is ramping quickly as more physicians are trained and become experienced with the benefits of the Sensei system. ***During the fourth quarter, we installed and recorded revenue on six Sensei robotic catheter systems, bringing our worldwide install base to 15 systems in just seven months, including nine in the U.S. and six in Europe. We're very pleased with our 2,000 (sic) system shipments and that it exceeded the high end of the range we communicated to you during previous calls.*** Installation sites including both large university medical centers and community hospitals as well, which we believe highlights the broad appeal of our technology.

> \*          \*          \*

> [*Defendant Restani:*] . . .***[D]uring the fourth quarter, we recognize revenue on the sale of six systems, including four delivered to sites in the U.S. and two systems to Europe.*** In the United States our Sensei system installations included: Massachusetts General Hospital, the [Leahy] Clinic, both in the greater Boston area, University of Maryland and Mount Sinai Hospital in New York. ***Our European shipments during the fourth quarter consisted of a direct sale to Saint [George's] Hospital in Germany and system sale to our Italian distributor, AB Medica. This unit is already designated for a key Italian hospital . . .***

> \*          \*          \*

> . . . [W]e continue to increase our presence outside of the United States through expanding our distribution network with opportunities in central eastern Europe, France and Canada, to name a few . . .

> \*          \*          \*

> [*Defendant Van Dick:*] . . .***During the fourth quarter of 2007, we recorded revenue of $4.2 million on the sale of six systems and shipments of Artisan control catheters. . . This resulted in no gross profit for the period. But the company fully expects gross profit to improve significantly during 2008 as revenues grow and we realize improvements in operating efficiencies.***

> \*          \*          \*

*. . . the net loss for the fourth quarter was $1.10 for basic and diluted share . . .*

(Emphasis added).

64.     The statements in ¶63, which were not corrected by any of the other Individual Defendants present, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶60-61.

65.     Also, during the Q407 conference call, Defendant Van Dick provided System placement guidance for FY08, *i.e.*, the number of Systems the Company would add to its Installed Base during FY08.  Defendant Van Dick noted that "[g]oing into 2008, we see continued momentum in the demand for the Sensei system globally" and that "[i]n 2008 we are targeting annual system placements of 44 to 50 systems."

66.     For the same reasons set forth above in ¶¶60-61, Defendant Van Dick's statements in ¶65 about the FY08 guidance, which were not corrected by Defendants Moll or Restani, were knowingly false and lacking any reasonable basis, because:

        a.     Hansen was improperly/prematurely recognizing revenue on sales to distributers that were incapable of installing Systems and training end-users.

        b.     As a result, the Company was prematurely including Systems in its "Installed Base" that, in reality, were essentially inactive and being held until a purchaser could be found to purchase the Systems, at which time the distributor would have the System delivered to the end user's facility and Hansen personnel would assist with the installation and training.

        c.     As set forth in ¶34(v), CW 1 stated that the guidance Hansen provided to the public in 2008 and 2009 for system sales was produced using a "top-down" approach. CW 1 stated that the numbers represented management's goal, but that these numbers were not based on any historical numbers that were contained in installation or sales reports.  CW 1 stated that the System sales goals did not change until later in each year when it was blatantly obvious to management that the original goals were impossible to make.

67.     By prematurely recognizing revenue on 1 System in Q407, defendants were able to create the artificial appearance that the early stages of Hansen's revenue/sales ramp were on course.

This 1 System enabled defendants to falsely portray "stair-step" growth (*i.e.*, 4 Systems in Q207, 5 Systems in Q307, and 6 Systems in Q407), which the defendants claimed would continue throughout FY08 as demand picked up in the second half of 2008.  During the Q407 conference call, Defendant Moll proudly touted the Company's early success, citing a practically text-book growth curve:

> [*Defendant Moll*:] I think we're still in the early stages of our commercial launch. We've been active here, this is our basically our second full quarter of activity, **and we've been able to move from four units in the second quarter to five in the third and sixth -- six units in our fourth quarter. I think we're going to continue, we would continue to expect to see a stair-step approach going into '08**, and as a natural consequence of a stair step, you're going to see obviously more units in the back half of the year than the front half.

 (Emphasis added).

68.     Defendant Moll's statement in ¶67, which was not corrected by Defendants Van Dick or Restani, was materially false and/or misleading and made with scienter for the reasons set forth in ¶¶60-61, because the Company's sales did not reflect a trend of "stair-step" growth as the defendants improperly recognized revenue on 1 System in Q407, and in reality sales were flat between Q307 and Q407 (*i.e.*, with 5 Systems recognized as revenue in both Q307 and Q407).

69.     During the Q407 conference call, the defendants attempted to ease any potential concerns about the lumpiness of capital equipment sales.  The defendants assured the public that Hansen was going to provide exactly what the market wanted during FY08 – a steady "gradual increase" in System installations along with resulting recurring revenues.  The defendants made it perfectly clear what "stair-step" meant:

> [*Analyst*:] Okay. I just don't understand what stair step means? Everything's stair step. Does that mean steady, does that mean -- I don't quite understand what that means.
>
> [*Defendant Moll*:] **I would interpret it as a gradual increase**.
>
> [*Analyst*:] Okay. And pretty straight line? Similar slope as the year progresses? . . . That's what a stair is, right? It's sort of a similar slope.
>
> [*Defendant Restani*:] You have two factors, you have the fact that we are still an early stage company that is on a ramp. Also, the nature of capital equipment which I think you're all very familiar with has a lumpiness to it. **Our ability to -- our ramp, I guess, stage now may take some of that lumpiness out, but it will be a progression front to back**.

[*Defendant Van Dick*:] And ***I think, we feel very comfortable which is why we provide guidance to 44 to 50 systems for '08***. But we're not prepared to do right now is to provide a specific quarter by quarter blow of how we think they're going to break out. And --

(Emphasis added).

70.     When questioned about Hansen's visibility on system placements for the first half of the year, Defendant Moll indicated that the Company had "pretty good clarity" and demonstrated his familiarity with the Company's sales pipeline and potential customers:

[*Defendant Moll*:] . . . As I've said, we're experiencing strong demand that we have obviously a long list of potential customers, that are in various stages of the order process, some of them are just interested in the technology and some are obviously a lot further down the line. And so we -- although we got a -- we haven't been selling systems all that long, we have been out there for a significant period of time talking about the technology, and so we feel like we have pretty good clarity on where we are and what -- how to execute to get to our goals in 2008.

71.     Indeed, on the Q407 conference call, Defendant Restani noted that the defendants "mind constantly every day" Hansen's "pipeline of opportunity:"

[*Defendant Restani*:] . . . Well, early on, obviously, before we had FDA approval, we were on an awareness campaign. Then as we started to be able to demonstrate the system more and actually once we got approval promote the fact that we are approved for mapping, etc., and ablation in Europe. That allowed us to step up the intensity if you will of the selling process. What has changed? The demand to Fred's point. ***We have not seen a diminishing in demand. We have seen that continues to be strong. Our ability -- our goal is to get out in front of the selling cycle. We have a pipeline of opportunity that is we mind constantly every day, that go out well into the 12 to 18 month cycle. The closer they are to the current quarter, that's where the focus is put on closing that sale, getting all the financial terms in place, and getting done.*** So the process has not changed quite frankly. We believe we have more opportunities than we had seven months ago, and that's great. That just intensifies our ability to get out there and close that -- or improve that close ratio.

(Emphasis added).

72.     Also on the Q407 conference call, the Individual Defendants demonstrated their familiarity with Hansen's revenue recognition requirements, including installation and training obligations that needed to be met before the Company could recognize revenue on the sale of its Systems or catheters:

[*Analyst*:] . . . Is there also an amount of time required for patient to -- I'm sorry, the center to actually accept the machine, or -- and is it different in the U.S. and Europe in terms of accounting?

[*Defendant Restani*:] ***It's not so much an accounting issue quite frankly, Jason, of***

1  ***accepting. Once the order is it's not so much an accounting, it's availability of***
2  ***their staff to be trained and properly -- and when to do the actual installation, even***
   ***though our installation is a three to four hour installation, it still is more of a***
3  ***logistics issue, more so than a financing or accounting area.***

4  [*Analyst*:] Well, do we assume that a center needs to be trained on -- do at least eight
   or 10 of these, before they accept the system?

5
6  [*Defendant Moll*:] ***No, they're trained usually before we ship the system***.

7  [*Defendant Van Dick*:] . . . ***In terms of the -- in terms of the revenue recognition***
   ***requirements for us, it's the same whether it's in Europe or the U.S., which is that***
8  ***we have to ship and install the system, and then customer has to be trained in***
   ***terms of how to use the system. And training is something that's normally done***
9  ***before the system's actually installed they get to the place where they can drive the***
   ***system, because we send them to either a center of excellence or they go through***
10 ***a process which includes animal labs and watching someone do cases. And once***
   ***they get trained in that way, because even under our FDA constraints, we -- to ship***
11 ***them an Artisan catheter they have to be trained in the use of the system to be able***
   ***to do that.***

12 (Emphasis added).

13      73.     Defendants Moll and Restani went to great lengths during the Q407 conference call

14 to explain that the "clinical support" differed from the training provided to customers:

15      [*Analyst*:] Okay. And then you mentioned the training aspect, which I hadn't thought
        about. Are there people actually at the account, is it full time or can one person kind
16      of bounce around different accounts when the procedure's scheduled to help them
        with the initial 10 or 15 procedures?
17
18      [*Defendant Restani*:] ***It's not a training. It is a clinical support, because the***
        ***training would have been completed once the system was installed***. So what
19      happens is -- you're right, it could be one person may be there for that first week of
        cases, it could be another person there the other week. We do have regional now as
20      our clinical specialists are building up, we have more regional focus by certain
        clinical specialists, so they become more familiar with one site versus another. But
21      it's not one person dedicated to only one site. ***So we provide this clinical support in***
        ***order to allow them to get that learning curve and ramp of learning faster, but they***
22      ***would have already have been -- they would have fulfilled their training obligation***
        ***before they even got the shipment. It's just to help them through the learning***
23      ***curve.***

24      [*Analyst*:] Yes, but -- I guess the -- is that the same thing as the clinical sales force
        that you talked about earlier on?
25
26      [*Defendant Restani*:] Yes, it's the clinical support sales force, that's correct.

27      [Analyst:] So going from 11 to 15 sales people is going to be able to support that
        training, even though you're going from 15 to 60 systems?
28
        [Defendant Moll:] ***You forget that once we're -- we train the customer and once we***

1    ***train them, we're done.***

2    (Emphasis added).

3         74.    Also on the Q407 conference call, Defendant Moll announced that, since several sites

4    were independent and no longer required the presence of a clinical support specialist, Hansen "no

5    longer ha[s] complete visibility into the number of procedures performed" and thus "in future

6    earning calls we will transition from reporting clinical cases to reporting the number of Artisan

7    catheters sold" as the metric for the public to gauge the utilization among the Company's Installed

8    Base and recurring revenue streams from catheter sales.

9         75.    During the Q407 conference call, defendants demonstrated that they were actively

10   monitoring utilization, and adamantly asserted that it was increasing:

11        [*Analyst*:] Hey, guys. I just wanted to clarify something on the procedures per
         system, I think. Someone says there's 30 per quarter, but it seems closer to 10, does
12       that sound closer to right, or 11 maybe per quarter?

13        [*Defendant Van Dick*:] Well, we –

14
          [*Defendant Restani*:] Here's the problem. I'm sorry if I -- Here's the issue why.
15       We're not trying to be -- we're not trying to avoid the issue, the concern is, at this
         early stage with 15 systems, based on how many of them have been out for a long
16       period -- for a reasonable periods of time to get that statistical value. For example,
         of the 15 we've shipped, of the six that we've shipped in the last quarter, three of
17       them were shipped in the mid-December time frame. If you do the math, you're
         going to get a wrong utilization of this case, but once they're in an account for a
18       reasonable period of time, then you can start getting good utilization numbers. So
         that's the concern. We're not trying to avoid the answer, ***we're just trying to get***
19       ***some good data and at the right time help you with the right utilization data. In***
         ***areas where we've seen systems in place, our utilization is consistent and trending***
20       ***upward is the best way we can tell you now.***

21        [*Analyst*:] . . . I mean, I guess I understand that. I actually, that's the same question
         last quarter, and you said most of the five in the third quarter were shipped toward
22       the end of the quarter then too, which I would imagine is just kind of the way things
         go. Are you saying the usage per -- as you said procedures quarter over quarter went
23       up 50%, and I would say your average machines went over -- went up and it's got
         to be closer to 100%. So my assumption would have been that the procedure volume
24       went down, and maybe there's some seasonality associated with that. But is that not
         the case, is it actually in the machines that were in the –
25
          [*Defendant Moll*:] -- math is very difficult to do. ***We're seeing a trend upwards in***
26       ***procedures, we're also shipping new systems, and for that exact reason, we've told***
         ***you how many procedures we've done. We've told you how many systems we've***
27       ***shipped.*** What we can't correlate very well is usage per system because they're being
         -- because we're growing the business and shipping new systems. So we're not going
28       to get into a prediction of how many catheters are used per system per week or

month or quarter, until we have better data.

[*Analyst*:] Okay. Now, is that a change? I mean, I guess it seems like a change on the face of it. It seems like utilization is lower. Just generally –

[*Defendant Moll*:] It's not a true statement. It's just not a true statement.

(Emphasis added).

76.     With regard to catheter sales, defendants further explained during the Q407 conference call that "there's not a lot of stocking going on currently."   Rather, Defendant Restani explained that catheter sales were "currently quite a just in time type of shipment:"

[*Analyst*:] One point of clarification, you may have said, but it wasn't clear to me. The Artisan catheters can they be stocked or -- I mean, bought in bulk, or are they sort of -- are they put on consignment and you get revenue every time if one's used?

[*Defendant Restani*:] ***We don't consign. We ship -- they are bought and every center will buy the required amount based on their anticipated caseload, and it's currently quite a just in time type of shipment, so there's not a lot of stocking going on currently.***

[*Analyst*:] Right.

[*Defendant Restani*:] ***There may be some as hospitals get to learn their utilization curves and maybe go through different holiday periods, they'll stock some, but there's not a lot of stocking built into our number at this point.***

[*Analyst*:] Can we assume once you get supply issues under control that people will stock, so potentially in the second half we will see some stocking of your accounts?

[*Defendant Van Dick*:] ***I think you'll always see a little bit. But not a lot, because the current shelf life on a catheter is not that long, so there's not going to be a lot of*** --

[*Analyst*:] Could you remind us again what that shelf life is?

[*Defendant Van Dick*:] The shelf life right now is six months, going to go to a year some time in the second half of '08.

(Emphasis in original).

77.     Defendant Moll represented during the Q407 conference call that reporting the number of catheter sales per quarter was a "more accurate" metric for the market to rely on as a proxy for the utilization of the Company's disposable units because there was not a lot of "stocking:"

[*Analyst*:] Okay. Okay. And so the idea -- the corporate philosophy to change the catheters shipped, is that going to give a better idea of utilization than procedure volume? What's the difference between those two?

[Defendant Moll:] Okay, because we're not aware of all procedures, we don't have visibility on every procedure that is done. So we're not going to be able to accurate -- we're always going to be low in reporting the procedures that we actually knew occurred. ***So a more accurate, we believe, because we don't believe there's a big stocking component to it, the more accurate way to report disposable units is to tell you exactly how many we sold. And that's going to be more accurate than trying to estimate a procedure number that is -- the further we go, the less accurate that's going to be.***

(Emphasis added).

78.     The statements in ¶¶74-77, which were not corrected by the other Individual Defendants present, were materially false and/or misleading, and made with scienter, because the Individual Defendants knew, and/or were deliberately reckless in not knowing, that catheter sales were not a more accurate proxy for utilization because customers were stocking catheters. While the Individual Defendants represented that they were actively reviewing and analyzing utilization rates and other related data – *i.e.*, information related to the number of catheters purchased by their relatively small Installed Base and the number of procedures being performed at the limited number of sites – as later admitted during a July 31, 2008, conference call discussing Hansen's Q208 financial results, several customers did in fact stock inventory and catheter sales were not an accurate proxy for utilization because of stocking.

79.     Analysts were pleased with Hansen's reported Q407 and FY07 financial results and the Company's guidance for FY08.  By purportedly exceeding its own guidance for Q407 and providing an upbeat outlook, the Company was able to portray to analysts that after only three quarters, Hansen's revenue/sales ramp appeared to be more successful than the market had been expecting.  Analysts took note of Hansen's relatively quick sales cycle and the promising implications for future recurring revenue from the rapidly growing Installed Base.  On February 20, 2008, ThinkEquity Partners LLC issued an analyst report entitled, "HNSN: Setting Up A Promising 2008," which highlighted that Hansen's sales/revenue ramp appeared as though it were ramping at a faster pace than Hansen's main competitor had previously accomplished:

**THINK ACTION:**

***4Q system installations were six, ahead of our estimate of five. 2008 guidance was 44-50 and we are, accordingly, raising our estimates.*** HNSN is quickly increasing production capacity and training sales and support staff. ***We believe the quick sales cycles and recurring revenue streams give HNSN the potential for robust growth and that the company is executing its plan well.*** We reiterate our Buy rating and maintain our $45 price target.

**KEY POINTS:**
**Good (If Not Very Good) Guidance**
44-50 system sales guidance for 2008 makes us raise our estimates to 48 system sales. By 3Q08, we anticipate that manufacturing capacity will be at least 15 systems per quarter. Hence, we are forecasting 2008 sales to be heavily weighted in the back half of the year. ***For a matter of perspective, the competition installed 66 systems by the end of 2006, which was 15 quarters after launch. If Hansen reaches the high end of guidance, it could match that installation base in seven quarters, and five of the seven will have been supply-constrained. We think that this business model has the potential for significant growth.***

(Emphasis added).

80.     Other analysts were also impressed with the Company's strong FY08 guidance, and Hansen's apparent ability to exceed its previously communicated Q407 guidance (of 4 to 5 Systems) by selling 6 Systems in Q407.  On February 20, 2008, Merriman Curhan & Ford Co., issued an analyst report entitled, "Hansen Medical Beats Expectations and Guides Above the Consensus Expectation for FY08; Reiterate Buy," which noted:

**Hansen Medical ends a strong 2007.** Hansen Medical reported 4Q07 results ahead of expectations. ***Revenues of $4.2 million were higher than our $3.5 million estimate for the quarter. A total of six systems were placed in the quarter, higher than the original 4-5 that management had guided to for the quarter***. Of the six systems, four were placed in the U.S., and two were placed overseas. The company placed a total of 15 systems in FY07, 9 in the US and 6 overseas. This is a far cry from management's original guidance several quarters ago that the company would only expect to place five systems in all of 2007. Of the 15 Sensei units, three were placed in hospitals with less than 300 beds, a contrast to a prevalent assumption that only large research hospitals would adopt the technology. Artisan catheter sales continued to show a strong sequential uptick, driven by a 50% sequential growth in procedures in 4Q07 vs. 3Q07. A total of 350 procedures were performed in 2007 using the Sensei, which translates into roughly 23-28 procedures per machine per quarter.

*           *           *

**Management guides above the street.** ***Management stated that the company expects to place between 44 and 50 units in FY08. We think there is ample demand for the company's products. Therefore, we are maintaining our unit sales estimate of 52 Sensei robots for FY08.*** This company's guidance was higher than the consensus of 43 units and towards the higher end of the range of expectations. Gross margin improvements should continue on a sequential basis; management sees gross margins reaching 50% by YE08 and potentially mid-60s by late 2009.

> **Reiterating Buy.** *The company continues to outperform its own guidance and provide an upbeat outlook on demand for its Sensei and Artisan products. While the company is still very much in the earliest stages of its commercial life, we continue to believe that the Sensei offers hospitals a potentially broad platform upon which to monetize procedure flow in interventional cardiology, interventional radiology, electrophysiology and a few other key indications. The breadth of the platform's potential and management's strong execution keep us fans of Hansen's technology, thus we continue to recommend shares of Hansen Medical on the belief that shares should trade towards the $27-31 level based on an EV/S multiple of 8-9x our FY09 revenue estimate of $69.2M.*

(Emphasis added).

81.     Analysts were thrilled about the Company's business model, which was essentially the same business model employed by Intuitive Surgical (a successful public medical device company that was also founded by Defendant Moll).  Another report from that day, issued by Needham & Co., LLC, entitled "HNSN: 4Q07 Beats Revs Expectations; Strong 2008 Systems Placement Guidance; Reiterate Buy Rating," noted that Hansen's early success made it look as promising, if not more promising, than Intuitive Surgical had been:

> **We encourage investors to initiate positions in Hansen Medical based on the strength of the company's business model.** Hansen expects to follow a similar business model as Intuitive Surgical (ISRG). Like Intuitive, Hansen expects to sell capital equipment and disposable products for use in hospital surgical suites. The company also expects to receive an annual service and/or software revenues from most centers. In observing Intuitive's success, investors recall the strength of this business model.
>
> Hansen has two distinct benefits that Intuitive did not have on market launch. First, Hansen's disposable products are single-use only, whereas Intuitive struggled with more uses of the disposables than were intended. Even today Intuitive limits disposables to 10 uses. Second, Hansen has established a strong momentum at market launch as EPs are largely aware and excited to begin using robotic technologies. By comparison, Intuitive struggled early on to determine which procedures would benefit the most from robotic surgery. By 2012 we believe disposables will represent nearly 70% of Hansen revenues resulting in impressive positive cash flows.

82.     Analysts also took note of the fact that, starting in Q108, Hansen would stop reporting the number of procedures conducted during the quarter, instead opting to report catheter sales as the appropriate metric for the market to gauge utilization rates.  An analyst from Morgan Stanley, in a report entitled, "4Q07: Upping the Stakes," noted that "[n]ow that there are three centers that no longer require the presence of Hansen's clinical support staff, management indicated

1   that the company will report catheter units sold rather than procedures performed on a go-forward

2   basis."  While the analyst suggested that catheter sales might exceed actual utilization for the near

3   future due to the initial inventory that accompanies newly purchased Systems, the analyst did not

4   voice concern about the reliability of catheter sales as a proxy for utilization due to customers

5   stocking inventory:

> Disposable sales totaled $392K, $105K above our estimates, as approximately 165
> catheters were sold in the quarter. In Q4, physicians performed around 150
> procedures globally, bringing the cumulative number of procedures to about 350.
> Our model has been tracking catheter utilization; however, shipments will front-run
> procedures for the time being, as initial inventory accompanies console shipments.
> Going forward, the company will report catheter sales rather than procedure
> volumes.

10   83.    On February 28, 2008, Hansen filed its Annual Report with the SEC on Form 10-K

11   for FY07.  The Company's Form 10-K was signed by Defendant Moll and substantially incorporated

12   the same materially false and/or misleading financial results, as set forth above in ¶59 which were

13   announced on February 19, 2008.  The Company's 10-K also stated that Hansen's accompanying

14   financial statements were prepared "in accordance with accounting principles generally accepted

15   in the United States."

16   84.    The statements referenced in ¶83 were materially false and/or misleading when made,

17   and made with scienter for the same reasons above in ¶¶60-61, and because defendants knew and/or

18   were deliberately reckless in not knowing that, as admitted by the Company's restatement, the

19   Company's financial statements were not prepared in accordance/conformity with GAAP.

20   85.    Along with the  Company's Annual Report on Form 10-K filed with the SEC on

21   February 28, 2008, pursuant to Section 302 of SOX, Defendants Moll and Van Dick signed SOX

22   required certifications attesting to the accuracy of the financial results and effectiveness of the

23   Company's internal controls.  Defendants Moll and Van Dick both "certified" that the Annual

24   Report on Form 10-K for FY07, did not contain "any untrue statement of a material fact or omit to

25   state a material fact" and that Defendants Moll and Van Dick had disclosed "[a]ll significant

26   deficiencies and material weaknesses in the design or operation of internal control over financial

27   reporting," as well as "[a]ny fraud, whether or not material, that involves management or other

28   employees who have a significant role in the registrant's internal control over financial reporting"

as follows:

1.   I have reviewed this Annual Report on Form 10-K of Hansen Medical, Inc.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f)) and 15d-15(f)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer ***and I have disclosed***, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)   ***All significant deficiencies and material weaknesses in the design***

*or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

    *(b)*    *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

(Emphasis added).

86.    Defendants Moll's and Van Dick's SOX Certifications referenced in ¶85, were materially false and/or misleading and made with scienter because they knew and/or were deliberately reckless in not knowing, the following:

    a.    As the Company later admitted in its Amended Annual Report for the 2008 fiscal year on Form 10-K/A (the "10-K/A") and Amended Quarterly Reports for the first three fiscal quarters of 2008 and the first two fiscal quarters of 2009 on Form 10-Q/A (the "Form 10-Q/As"), all of which were filed with the SEC on November 16, 2009, during each of the periods covered by those reports, as well as at all relevant times during the Class Period, the Company's internal controls over financial reporting were not effective because of at least two material weaknesses over Hansen's control environment and revenue recognition process. (*See infra* ¶297). As the Company admitted in the 10-K/A, "[t]hese control deficiencies resulted in material errors and the restatement of our annual statements for 2007, annual and interim financial statements for 2008 and interim financial statements for the first and second quarters of 2009, impacting revenue, cost of goods sold, accounts receivable, inventory, deferred cost of goods sold, and deferred revenue accounts" and that "management has determined that these control deficiencies constitute material weaknesses." Specifically, the Company's internal controls over financial reporting were not effective because of the following deficiencies:

    i.    As admitted by the Company in the 10-K/A and 10-Q/As, the Company "did not maintain an effective control environment, which is the foundation upon which all other components of internal controls are based." Specifically: (i) the Company "did not maintain effective controls related to the process for ensuring completeness and accuracy of our accounting for revenue to provide reasonable assurance that all significant details of agreements

with [the Company's] distributors and customers were provided to those making revenue recognition decisions and that all appropriate personnel received sufficient training on revenue recognition;" (ii) the Company "did not maintain sufficient safeguards to provide reasonable assurance that controls could not be circumvented or overridden by commercial operations management or to prevent or detect possible misconduct by members of [the Company's] commercial operations organization with respect to certain revenue transactions" as "[The Company's] commercial operations organization was structured such that the sales, clinical and field service departments all reported to the executive in charge of [Hansen's] commercial operations, leading to a conflict of oversight and incentives, such as the desire to meet quarterly sales goals;" (iii) the Company "did not maintain effective procedures for communicating to all relevant personnel [Hansen's] accounting policies, the importance of consistent application of our accounting policies, and essential data required to properly apply GAAP to [the Company's] transactions;" (iv) the Company "did not effectively communicate the process of reporting unusual or uncertain circumstances" and "[a]s a result, [the Company] did not detect deficiencies in compliance with [the Company's] accounting policies on a timely basis;" and (v) the Company's "control deficiency led to errors and irregularities that in turn resulted in errors in the preparation of our financial statements" and "also contributed to the existence of the control deficiency" over its revenue recognition process."

        ii.     As admitted by the Company in its 10-K/A and 10-Q/As, the Company "did not maintain effective controls related to the process for ensuring completeness and accuracy of [the Company's] accounting for revenue to provide reasonable assurance that all significant details of agreements with [Hansen's] distributors and customers were provided to those making revenue recognition decisions and that all appropriate personnel received sufficient training on revenue recognition." Specifically: (i) "[c]ertain employees were able to withhold information from accounting personnel or falsify documentation related to certain revenue transactions without discovery, which resulted in improper recognition of revenue;" and (ii) "[a]ccounting personnel were not provided the necessary information to determine the financial reporting consequences of certain revenue transactions" and "[s]pecifically, this led to incomplete information regarding temporary installations, unfulfilled training obligations, the inability of distributors to independently install

1 systems and train end users and undisclosed side arrangements."

2         b.     Additionally, the Company later admitted in its Annual Report for the 2009

3 fiscal year filed with the SEC on Form 10-K ("the 2009 10-K"), during the Class Period, the

4 Company's internal controls over financial reporting were not effective because of the two material

5 weaknesses over Hansen's control environment and revenue recognition process cited in the 10-K/A

6 and the 10-Q/As, as well as two additional material weaknesses over complex arrangements and

7 information and communication. As the Company admitted in the 2009 10-K, these weaknesses

8 "resulted in material errors and the restatement of our financial statements for the year ended

9 December 31, 2007, annual and interim financial statements for the year ended December 31, 2008

10 and interim financial statements for the first and second quarters during the year ended December

11 31, 2009, ***and resulted in audit adjustments to our financial statements for the year ended***

12 ***December 31, 2009***, impacting revenue, cost of goods sold, other income, accounts receivable,

13 deferred cost of goods sold and deferred revenue accounts." (Emphasis added). Specifically, the

14 Company's internal controls over financial reporting were not effective because of the following two

15 deficiencies: (i) [a]s admitted by the Company in the 2009 10-K, the Company "did not maintain

16 effective controls over complex arrangements. Specifically, we did not maintain effective controls

17 over the evaluation of a joint development arrangement to ensure complete and accurate accounting

18 in accordance with GAAP;" and (ii) [a]s admitted by the Company in the 2009 10-K, the Company

19 "did not maintain effective information and communication" because the Company "did not

20 maintain effective procedures for communicating to all relevant personnel our accounting policies,

21 the importance of consistent application of our accounting policies, and essential data required to

22 properly apply GAAP to our transactions" and "did not effectively communicate the process of

23 reporting unusual or uncertain circumstances."

24 **2008 Fiscal First Quarter Ending March 31, 2008**

25        87.    On May 1, 2008, Hansen issued a press release entitled, "HANSEN MEDICAL

26 REPORTS 2008 FIRST QUARTER RESULTS." At the top of the press release, Hansen proudly

27 announced, "***Robotic System Installed Base Increases by More Than 50%; Catheter Shipments***

28 ***Nearly Double Compared to Prior Quarter***," and therein, the Company, in relevant part, stated:

- *System Sales: The company recognized revenue on eight SenseiTM Robotic Catheter Systems sold during the first quarter, which brings the total worldwide system placements to 23, including 14 in the United States and nine in Europe.*

- *Catheter Sales: 401 ArtisanTM Control Catheters were shipped in the first quarter, which exceeds the number of catheters shipped during all of 2007.*

\* \* \*

"I am pleased to report that since commercialization, *we have achieved four consecutive quarters of increases in the number of systems placed*," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. "*In this past quarter, we recorded revenue on eight Sensei Robotic Catheter Systems, bringing the number of units we have recognized revenue on - which we refer to as our installed base - to 23 systems in our first 10 months of commercialization. First quarter shipments represent more than a 50% increase in our installed base, which now includes 14 systems in the United States and nine in Europe. Additionally, the 401 catheters sold in the first quarter exceeded the number shipped during all of 2007 and is nearly double the prior quarter's catheter shipments.*

"*As the demand for our platform continues to grow*, the investments we have made to increase manufacturing capacity and improve catheter yields will allow us to meet customer expectations and expand our worldwide market presence more efficiently," concluded Dr. Moll.

\* \* \*

*Total revenue for the three months ended March 31, 2008 was $6.2 million. During the quarter, the company recorded revenue on the sale of eight Sensei systems (including five in the United States and three Sensei systems in Europe), shipments of 401 Artisan control catheters and one CoHesion module. No revenues were recorded in the same period in 2007.*

*. . . Gross profit for the quarter was $1.3 million . . .*

\* \* \*

*Net loss for the three months ended March 31, 2008, . . . was $11.6 million, or $(0.53) per basic and diluted share, . . .*

(Emphasis added).

88. The statements referenced in ¶87 were materially false and/or misleading when made for the reasons set forth in ¶60(a), above, and because:

a. As reflected by the Company's restatement: (i) the Company's Installed Base at the end of Q108 of 20 was misrepresented as 23, which constitutes an overstatement of 3, or 15%;

1   (ii) the Company's international Installed Base at the end of Q108 of 6 was misrepresented as 9,

2   which constitutes an overstatement of 3, or 50%; (iii) the total number of Systems sold for which

3   the Company should have recognized as revenue was 6 in Q108, but was misrepresented as 8,

4   constituting an overstatement of 2, or 33.33%; (iv) revenue of $4,623,000 for Q108 was

5   misrepresented as $6,244,000, which constitutes an overstatement of the Company's revenues by

6   $1,621,000, or 35.06%; (v) "Gross profit (loss)" of $86,000 for Q108 was misrepresented as

7   $1,307,000, constituting an   overstatement of $1,221,000, or 1419.77%; (vi) "Net loss" of

8   ($12,853,000) for Q108 was misrepresented as ($11,632,000), constituting an overstatement of

9   $1,221,000, or 9.5%; and (vii) "Basic and diluted net loss per share" of ($0.53) was misrepresented

10   as ($0.59), constituting an overstatement of $0.06, or 10.17%.

11           b.      As reflected by Hansen's restatement, of the 3 Systems sold internationally

12   that Hansen originally recognized as revenue in Q108, at least 2 of the Systems were improperly

13   recognized as revenue.  For the reasons set forth in ¶61(a)-(b), Plaintiffs are informed and believe

14   that the 2 Systems improperly recognized as revenue were the Systems sold and recognized as

15   revenue to AB Medica (the Company's Italian distributor) and Palex International Medical Devices

16   (Company's distributor for Spain and Portugal), both of which, as indicated in Ex. A, were ordered

17   and shipped on March 31, 2008 (*i.e.*, **the last day of the quarter**), and could not have been sold

18   through by the distributor during Q108.

19           c.      Improperly recognizing revenue on 2 Systems in Q108 further created the

20   materially false and/or misleading trend that Hansen's System quarterly sales were increasing (*i.e.*,

21   4 Systems in Q207, 5 Systems in Q307, 6 Systems in Q407 (as originally reported), and 8 Systems

22   in Q108), when System sales were actually flat between Q407 and Q108 (*i.e.*, 6 Systems (as

23   originally reported) in Q407 and 6 Systems in Q108).  This further created the materially false

24   and/or misleading impression that the demand for the System was greater than true demand for the

25   product.

26           d.      Hansen failed to disclose that it was improperly recognizing revenue on

27   Systems to create the appearance that the Company's quarterly System sales were increasing.

28           89.     The materially false and/or misleading statements in ¶87 were made with scienter for

the reasons set forth above in ¶61, because defendants knew and/or were deliberately reckless in not knowing, among others, the following:

a. **For the same reasons alleged in ¶61(a), Hansen conceded that it was the only party capable of installing its Systems and training physicians.**

b. **For the same reasons alleged ¶61(b), the mere 2 days of training Hansen provided to its distributors was grossly insufficient for the distributors to be capable of independently installing Systems.**

c. **For the same reasons alleged in ¶61(c), the Individual Defendants would receive a copy of a quarterly installation report on a daily basis and Defendants Moll and Van Dick would attend installation meetings where the status of orders and installations were discussed, including orders to Spain, Italy, and Russia.**

d. **For the same reasons alleged in ¶61(d), Italy, along with Spain, Portugal, France, Asia, and South Africa, were managed out of Hansen's subsidiary in the UK.**

e. **For the same reasons alleged in ¶61(e), Sensei System sales were the core of Hansen's business/operations.** At the time Hansen originally reported its Q108 financial results, almost all of the Company's quarterly revenues came from the recognition of revenue on the sale of only 8 Systems, of which at least 2 Systems, an astounding 25%, were improperly recognized as revenue in violation of the Company's revenue recognition policy.

f. **As alleged in ¶61(f), the Individual Defendants demonstrated that they were knowledgeable and familiar with the Company's revenue recognition criteria** for sales in both the US and Europe, including installation and training obligations.

g. **During the Q108 conference call, Defendant Restani demonstrated his familiarity and knowledge of the details of quarterly domestic and international sales by identifying each customer.** *See infra* ¶92. Of the three international sales, Defendant Restani identified the precise customer of the direct sale and was able to indicate that it was the 2nd System that St. Mary's had acquired. He also identified the other two international sales as Hansen's 2nd System Sale to AB Medica and the 1st System sale to Hansen's distributor for Spain and Portugal.

Moreover, Dendant Restani was familiar enough with the transactions to know that the Systems sold to the two distributors were equipped with the Cohesion Module.

h. **As alleged in ¶61(h), the Individual Defendants indicated that they monitored Hansen's sales pipeline and were familiar with the customers purchasing Systems.**

i. **For the same reasons alleged in ¶61(i), the defendants were familiar with the agreements and/or the contract terms and conditions with Hansen's distributors.**

j. **For the same reasons alleged in ¶61(j), the defendants, including Defendant Moll, were aware that it required a significant amount of time and was very difficult for Hansen's clinical specialists to train physicians to be able to independently use the System, and thus also knew that it would take equal, if not more, time and effort to be able to train someone else (*i.e.*, a distributor) to train an end-user physician to use a System to the point where the end-user could use the System independently.**

k. **For the same reasons alleged in ¶61(k) and as alleged in ¶¶112-113, *infra*, Defendants Moll and Van Dick nevertheless signed materially false and misleading SOX required certifications** attesting to the accuracy of Hansen's financial results and effectiveness of the Company's internal controls for Q108.

l. **Both Systems sold to distributors and improperly recognized as revenue were ordered and shipped the last day of the quarter.** As reflected by Ex. A – a report received by the Individual Defendants on a daily basis – the 2 Systems sold to distributors were ordered and shipped on March 31, 2008, the very last day of Q108.  By shipping 2 Systems on the last day of the quarter, Hansen was able to report that quarterly System sales increased to 8 Systems over the 6 Systems originally reported in Q407 rather than reporting that quarterly System sales were flat from Q407 to Q108.

90.     The statements in ¶87 regarding the sale of 401 catheters in Q108 were materially false and/or misleading when made and made with scienter because defendants knew and/or were deliberately reckless in not knowing:

a. **In reporting the sales of 401 catheter, defendants failed to disclose that**

1   the number was inflated approximately 20-25% by stocking as approximately three customers

2   placed large orders near the end of the quarter.   Defendants Moll and Restani later admitted this

3   fact during the Q208 conference call.   During the Q208 conference call, Defendant Moll admitted

4   that the reason for the "decrease in the number of catheters shipped [during Q208] when compared

5   to the [the 401 shipped during the] first quarter of 2008, . . . was due in large part to a few sizeable

6   customer orders placed during Q1[2008]," and Defendant Restani further admitted that "it was more

7   like three [customers], and that was in anticipation-- these customers bought at the end-- towards

8   that end of that first quarter-- in anticipation of future demand in the next quarter . . . [s]o, it would--

9   I would say that had an effect of about 20%, 25%."

10          b.      **Reporting catheter sales of 401 units in Q108 created the materially false**

11   **and/or misleading impression that utilization was increasing faster than it actually was and**

12   **that utilization was 20-25% higher in Q108 than it actually was** (due to the substantial stocking

13   during Q108) since starting in Q108 Hansen stopped reporting the actual  number of procedures

14   conducted during the quarter and instead started reporting the number of catheter sales as the

15   relevant metric for the market to gauge  utilization.

16          c.      **Defendants statements about the 401 catheter sales during Q108 were**

17   **also materially false and/or misleading because defendants failed to correct their prior**

18   **statements (see ¶¶74-77) (from the Q407 conference call) that reporting catheter sales was a**

19   **more accurate way to report/gauge utilization because there was not a significant amount of**

20   **stocking.**   During the subsequent July 31, 2008, conference call, when admitting that there had been

21   substantial stocking during Q108, Defendant Moll conceded "it is clear that quarterly catheter

22   shipments are not a particularly accurate measure of actual quarterly catheter utilization at this stage

23   of our business."

24          d.      **The Individual Defendants represented during the Q407 conference call**

25   **(see supra ¶75) and during the Q108 conference call  (see infra ¶101)  that they were in the**

26   **process of actively reviewing and analyzing utilization rates and other data relating to catheter**

27   **purchases by their customers.**   According to CW1, as set forth in ¶34(q), indicated that generally

28   everyone, including Defendants Moll and Van Dick, would know about any order of at least 5 to 10

catheters to a single customer, as this would be a big sale for the Company and any order over 5 catheters was "celebrated." According to CW1, catheter sales were closely followed at the end of the quarter as catheter sales would be talked about generally as much as System sales in the installation and sales meetings attended by defendants. Also, as set forth in ¶34(o), CW1 further indicated that Adrienne Cox (who entered the orders for catheter sales) kept track of actual catheter orders and maintained a detail report (which was updated on a daily basis) that, among others, specifically listed each customer and how many catheters the customer had ordered during the quarter. CW1 indicated that Defendants Moll, Van Dick, and Restani would see these reports.

e. **CW1, as set forth in ¶34(p) indicated that it was clear that the Company was focused on earnings management and wanted to show increasing quarterly revenues.** CW1 further indicated that with respect to catheters, the Company was "stuffing the channels" and it was important to increase numbers over previous quarters. According to CW5, as set forth in ¶38(a), Hansen did a relatively large bulk sale of catheters prior to Chris Sells' arrival at the Company [*i.e.*, prior to June 2008]. According to CW4, as set forth in ¶37(e), Andreas Ramöller in Europe would sell catheters at a bulk rate.

91. That day, Hansen held the Q108 conference call in connection with the press release announcing the Company's financial results for the Q108. Defendants Moll, Van Dick, and Restani, were present.

92. During the Q108 conference call, the Individual Defendants continued to make materially false and/or misleading statements regarding, among other things, the Installed Base, the Company's revenues, and catheter sales during Q108:

> [*Defendant Moll:*] ***I'm pleased to report that since commercialization we have achieved four consecutive quarters of increases in the number of systems placed. In this last quarter, we recorded revenue on the placement of 8 Sensei Robotic Catheter Systems, bringing the number of units we have recognized revenue on, which we refer to as our installed base, to 23 systems in our first 10 months of commercialization. This represents a more than 50% increase in our installed base, which now includes 14 systems in the United States and 9 in Europe.***
>
> As we reported during our last call, some of our sites are now performing cases independently, so we no longer have complete visibility in the total number of procedures performed. ***As such, we are transitioning from reporting clinical cases to reporting the number of Artisan Catheters sold. I am pleased to report that we***

*shipped 401 catheters this quarter, which exceeds the number of catheters shipped during all of 2007 and nearly doubles the number shipped in Q4 of '07.*

\*     \*     \*

I'm very excited that the Regional Vascular Unit from Imperial College Healthcare Trust at St. Mary's Hospital in London, who recently purchased a system for investigational work in vascular surgery, will present their early work with the Sensei system in the application of endovascular stent graft placement. Their results will be presented at the 2008 Multidisciplinary European Endovascular Therapy Congress in June.

In addition to St. Mary's, a second customer has placed an order for the Sensei system that will be used for vascular applications . . .

*In summary, I'm very pleased with our progress this quarter, the highlights of which include four quarters of sequential revenue growth, a greater then 50% increase in our installed base and a near doubling of the Artisan catheter shipments in Q1 over the previous quarter.* Additionally, we are excited by the successful introduction of CoHesion in Europe and our progress in new markets. Finally, we believe that the number of scientific presentations slated for the HRS is indicative of the accelerating clinical interest in our technology.

\*     \*     \*

[*Defendant Restani:*] Thank you, Fred. *As Fred mentioned in his earlier remarks, during the first quarter we recognized revenue on the sale of 8 systems, including 5 delivered to sites in the United States and 3 systems to Europe*.

*Of the 3European shipments during the first quarter, 1 was a direct sale, 1 was a sale to our Italian distributor, which, in fact, is their second order, and 1 was our first sale to our Spanish distributor.* Both of the distributor units were integrated systems featuring the CoHesion module. We also recorded revenue on the sale of 1 standalone CoHesion module that was placed with an existing Sensei customer in Europe.

Notably, we now have our first multisystem site at St. Mary's Hospital in London. They recently took delivery of their second Sensei system to concentrate on the development of new techniques in vascular surgery.

In the United States, our system installations included the University of Virginia Medical Center in Charlottesville; Methodist Hospital in Houston, Texas; Oklahoma Heart Hospital in Oklahoma City; Midwest Regional Medical Center also in Oklahoma; and Emery Crawford Long Hospital in Atlanta.

\*     \*     \*

[*Defendant Van Dick:*]  *Moving on to our first quarter of 2008 income statement, we recorded revenue of $6.2 million, primarily on the sale of 8 Sensei Systems, shipments of 401 Artisan Control Catheters and 1 CoHesion Module . . .*

*. . . Gross profit for the quarter was $1.3 million . . .*

\*   \*   \*

*Net loss for the first quarter of 2008, . . .was $11.6 million or $0.53 per basic and diluted share . . .*

(Emphasis added).

93.    The statements in ¶92, which were not corrected by any of the other Individual Defendants, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶88-90.

94.    During the Q108 conference call, Defendant Van Dick also stated: "In our previous call, we provided our guidance for annual system placements in 2008 of between 44 to 50 systems. We are reaffirming that guidance today."

95.    Defendant Van Dick's statements in ¶94, regarding the Company's 2008 guidance, which were not corrected by Defendants Moll or Restani, were knowingly false and lacking any reasonable basis for the reasons set forth in ¶¶66, 88-89.

96.    During the Q108 conference call, defendants again touted the Company's success with executing its sales/revenue ramp and told the market that its sales cycle was "consistent" and "on pace."  In particular, Defendant Restani emphasized Hansen's "steady quarterly growth:"

> [*Defendant Restani*:] Yes. Well, from a selling cycle it's been pretty consistent. We've been mining these opportunities for a while and we've been getting, as you saw, a ***steady quarterly growth, four quarters in a row***, so we've been capitalizing on it and it is a back-ended process. Institutions have money, but if they free it up, it usually ends up at the backend of a quarter and it is, you get a lumpy quarter-to-quarter progression, but we're well on pace.

(Emphasis added).

97.    The statements in ¶96, which were not corrected by Defendants Moll or Van Dick, were materially false and/or misleading and made with scienter for the same reasons set forth in ¶¶60(d), 61, 68, 88(c), 89, because the Company did not have quarterly growth for four consecutive quarters. As reflected by Hansen's restatement, sales were actually flat between Q307 and Q407 (with 5 Systems in each quarter) and as further reflected by the restatement, the Company only should have recognized revenue on 6 Systems in Q108, which would have been flat with the 6 Systems originally recognized as revenue in Q407.

98.     During the Q108 conference call, Defendant Restani allayed any potential concerns that Hansen's sales/revenue ramp would be hindered by slowing capital spending:

> [*Defendant Restani*:] . . . [A]s you know, in the capital equipment field there's been a lot of talk in the higher end capital equipment and if you use the $1 million threshold you may see some, I guess, deeper analysis by clinical institutions in making sure they put out those orders. We have not seen that to date.
>
> We have been on track in being able to close our business as we have in the past. We haven't seen any major impact. If anything, there may be a quarter-to-quarter slip, but there are other opportunities that have filled the gap, so we haven't seen that being a prominent concern for us at this point.

99.     Also on the Q108 conference call, Defendant Restani commented on the number of sales representatives employed by the Company and represented the independence of Hansen's distributors to investors:

> [*Defendant Restani*:] Right. Ed, on the sales group, if we look at our customer-facing group, which includes sales and clinical specialists and some of our service people, we're currently a total between U.S. and Europe at approximately 35. We'll be closer to 50 by the end of the year. The sales breakdown is probably 18 throughput 20 in the sales organization, about 20 to 22 in the clinical side and anywhere between 9 to 10 on the service side and *that does not include the distributor organizations in Europe, of course, who have their own salesforce, clinical people and field service people*.

(Emphasis added).

100.     The statements in ¶99, which were not corrected by Defendants Moll or Van Dick, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶60-61, 88-89, because they created the materially false and/or misleading impression that the Company's distributors were independent when in fact, they were not, because, as the Company later admitted: (i) its distributors, including its Italian distributor, were not capable of independently installing Hansen's systems or training end users to use the systems; and (ii) that when distributors eventually sold systems through to an end user, Hansen personnel would be onsite for installation and training.

101.     Hansen's Q108 results reflected a massive increase in catheter sales, which purported to validate defendants' claim that utilization was increasing. During the Q108 conference call, Defendants Moll and Restani demonstrated that they were actively studying customers' utilization:

> [*Analyst*:] . . . How do we look at utilization rates? By consoles and I know it's early, maybe give us an idea of what your best case is, what your worse case is, if the averages mean something, maybe you can offer us some data there too?

[*Defendant Restani*:] Well, averages right now, again, because of the pacing of units and as you know, back ending into quarters usually capital equipment has that and if you look at utilization rates, it's still in our 10-month experience. Obviously we have customers that have hit stride and are in the higher end utilization and then you have the real early users with low utilization.

So the average is, you're right Glenn, would not be a full representation and what we're doing is we're trying to get good models of the clusters of users and as it evolves through that, I think we'll be able to give you better data to that number.

The number of high end users and low end users are so disparate right now and there's not as many of each that it's tough to give you a range, I guess. There are in the 5-range utilization per week and there are some in the 2-range and the under 2-range of utilization per week. So we're seeing a number of customers progressing to that higher range, but it's still, we still have 23 units out there only and 8 of those just basically hit the market.

[*Defendant Moll*:]Yes and Glenn, just to give you my perspective, when we sort of built the model for what was going to happen we sort of talked about low utilization as being one-to-two week and high utilization being four-to-five week and we've got customers in both. And most of it is a reflection of their experience with the product and where they are in training and adoption and certainly you have some people that have had more success earlier and want to use it all the time and people that are slower to start and slower to gain the momentum and we've got -- we have both.

But the success stories are really compelling on the ones that are now using it in a few times a week and are really gaining capability and are big fans of the technology and I think, it hasn't taken them that long to get there. So we're very encouraged by the success stories.

102.     During the Q108 conference call, Defendant Van Dick and Restani exhibited familiarity with the details of the 401 catheters sold during Q108.  Of note, during an exchange with an analyst, Defendants Restani and Van Dick discussed the specific concentrations of Q108 catheter sales and utilization in the United States versus outside the United States ("OUS"):

[*Analyst*:] Okay, fair enough. Without getting too nit picky, I'd love to know, of the 401 catheters that were sold, what was the breakdown between U.S. and OUS? I'm trying to get an idea of utilization. And then what are the differences in ASPs between U.S. and OUS on Artisan catheter sales?

[*Defendant Moll*:] Why don't we start with the first one and then we'll see -- do we have the data on the --?

[Defendant Restani:]Yes. Well, the first -- let me deal with -- obviously, Glenn, as you know, the $1,800 average price was influenced the Euro, the strength of the Euro in that calculation and currently, if you look at our distribution, you're looking probably at about a 25 to 30% ratio in Europe right now.

[*Analyst*:] You mean 25 to 30% of sales are in Europe?

[*Defendant Restani*:] **Of the catheter utilization.**

[*Analyst*:] I'm sorry. So you're saying -- is that --?

[*Defendant Van Dick*:]**Yes, it's probably -- it's -- if you look at the first quarter and its probably about 40% of the units were to the European market.**

(Emphasis added).

103.    Defendants continued to portray during the Q108 conference call, as they had in the Q407 conference call, that catheter sales reflected utilization.  Defendants neither changed nor qualified their position that catheter sales were a reliable metric for gauging utilization.  To that end, the Defendant Restani represented during the Q108 conference call that the catheter sales in Q108 were "pretty well utilization-driven," and defendants claimed that procedural volumes among Hansen's Installed Base were increasing:

[*Analyst*:] . . . [w]hen you sell a new system, I presume that is bundled with a certain number of catheters. Can you give us an idea of how many catheters would typically go along with a system?

[*Defendant Van Dick*:] No, I think that's probably not a good assumption. There are very few systems that we have sold that have been bundled with a preset number of catheters. That's one of the things that, in fact, we kind of push our sales guys as why they can't do that. I mean, it's probably a little bit more common in some of our European sales, where we have seen a little bit of -- the Europeans, when they place a purchase order, they like to not have to deal with the disposables for some period of time. So we've had a couple of our internal accounts where they've actually placed a Sensei System and with the Sensei System a bolus of catheters. But in the U.S.--.

[*Defendant Restani*:] **It's pretty well utilization-driven.**

[*Defendant Van Dick*:] Right. In the U.S. we don't see that very often. I mean, of course, soon after getting the system they place an order of four catheters, but right now we're not seeing a lot of it bundled together on the same PO where they want to get pricing or discounts or something for placing a big bolus of catheter orders with a system.

(Emphasis added).

104.    The statements in ¶¶101-103 which were not corrected by any of the other Individual Defendants present, were materially false and/or misleading and made with scienter for the reasons set forth in ¶90, because:

a.    As subsequently admitted by the Company during the Q208 conference call,

*see infra* ¶¶131-132, the Q108 catheter sales were materially inflated due to substantial stocking by two to three customers;

        b.    The Individual Defendants did not correct the prior statements in ¶¶76-77 from the Q407 conference call that catheter sales were a more reliable method for measuring utilization;

        c.    As a result of the above, defendants' statements created the materially false and/or misleading impression and/or trend that utilization rates were increasing and/or higher than they actually were; and,

        d.    The Individual Defendants' materially false and/or misleading statements on their face establish that the Individual Defendants were knowledgeable, aware, and actively reviewing, utilization among their limited Installed Base (originally reported as 23 Systems at the time), including those users with high utilization versus low utilization, the size/number of catheter purchases, and the distribution between domestic and international sales.

105.    Hansen's Q108 results handily exceeded analysts' expectations.  As noted in a report issued by Thomas Weisel Partners LLC on May 1, 2008, entitled, "Strong Revenue and Margins Drive Beat," Hansen's revenues, earnings per share, and System sales during the quarter were all better than expected:

> Revenues were $6.2mn, well above our estimate of $4.7mn and consensus of $4.8mn. EPS were ($0.53) compared to our estimate of ($0.62) and consensus of ($0.58). System placements were higher than we expected, with 8 in the quarter versus our estimated 7.

106.    Analysts were also impressed that Hansen's revenue/sales ramp continued to appear to be on target.  A report issued on May 2, 2008, by Merriman Curhan Ford & Co., entitled "Hansen's Momentum Continues; Artisan Catheter Sales better than Expected; Reiterate Buy," pronounced that Hansen "remains one of the best growth stories in the small-cap medical technologies sector."  The report also noted catheter sales for the quarter were much higher than expected:

> **• 1Q08 results were ahead of our Street-high expectations.** Revenue of $6.2M was better than our $5.6M estimate due to an increase in ASPs and better-than-expected sales of the Artisan catheter. The company sold eight Sensei units (in-line with our

> estimate) and **401 catheters (*vs. our 300 unit estimate*)**; five Sensei units were placed in the U.S. and three were placed in Europe. The company also sold one Cohesion module in Europe. Notably, St. Mary's Hospital in London bought its second Sensei to explore applications in vascular surgery.

(Emphasis added).

107.   Indeed, a report also issued that day by Needham & Company, LLC, entitled "HNSN: 1Q08 Revs and EPS Beat; Production Ramping; CoHesion Approval Expected Mid-2008; Reiterate Buy," also highlighted the strength of the Company's catheter sales during Q108.  The report, in particular, expressly compared the 401 catheters sold in Q108 with the 350 clinical procedures reported during Q407, without any hesitation that the Company's reported catheter sales might not be a reliable comparison for utilization nor the number of clinical procedures performed:

> **HNSN ramped manufacturing to 3 systems/month during 1Q08 and expects to further build commercial placements to 5+ systems/month by the end of 2Q08. *The company reported shipments of roughly 401 catheters in the quarter. This compares to 350 clinical procedures reported in 4Q07. Beginning in 1Q08 HNSN has started reporting catheter shipments vs. clinical procedures.***

(Emphasis added).

108.   On this news about the Company's earnings for Q108, shares of Hansen increased $0.97 per share, or 5.52%, to close on Friday May 2, 2008, at $18.54 per share, on unusually heavy volume of 2,231,000, representing an increase of 1,654,400 over the prior day's trading volume. The following Monday, shares of Hansen continued to rise, closing up another $0.62 per share, or 3.34%, to close on May 5, 2008, at $19.16 per share, on unusually heavy volume of more than 950,000 shares.  The $19.16 per share closing price of Hansen's stock on May 5, 2008, represented a two day increase of $1.59 per share, or 9.05%, from the closing price on May 1, 2008.

109.   On May 12, 2008, Hansen filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal first quarter.  The Company's Form 10-Q was signed by Defendant Moll and substantially incorporated the same materially false and/or misleading financial results, as set forth above in ¶¶87 and 92, which were announced on May 1, 2008.  The Company's 10-Q stated that the Company's accompanying financial statements were prepared "in conformity with accounting principles generally accepted in the United States."  Additionally, therein, in relevant part, the Company stated and/or reported that during Q108 the Company recognized revenue on the sale of

3 systems internationally.

110.    The statements referenced in ¶109 were each materially false and/or misleading when made for the reasons in ¶¶88-90, above. Additionally, the statements were each materially false and misleading because as admitted and reflected by the Company's restatement: (i) the Company's financial statements were not prepared in accordance/conformity with GAAP; and (ii) the total number of systems sold internationally for which the Company should have recognized as revenue was 1 in Q108, but was misrepresented as 3, which constitutes an overstatement of 2, or 200%.

111.    The materially false and/or misleading statements in ¶109 were made with scienter for the reasons set forth above in ¶¶61, 89-90.

112.    Along with the Company's Quarterly Report on Form 10-Q filed with the SEC on May 12, 2008, pursuant to Section 302 of SOX, Defendants Moll and Van Dick signed SOX required certifications attesting to the accuracy of the financial results and effectiveness of the Company's internal controls as set forth in full in ¶85, above.

113.    For the same reasons as set forth in ¶86, as well as ¶¶61, 89-90, Defendants Moll's and Van Dick's SOX Certifications referenced in ¶112 were materially false and/or misleading when made, and made with scienter, as Defendants Moll and Van Dick knew of and/or were deliberately reckless as to the material weaknesses in the Company's internal controls and financial reporting.[13]

**2008 Fiscal Second Quarter Ending June 30, 2008**

114.    On July 28, 2008, JP Morgan (who had served as an underwriter of Hansen's November 2006 IPO) issued a report that partially revealed the truth about Hansen's previous representations about the demand for the Sensei System as it partially revealed that Hansen's Q208 Systems sales would be flat and not increase over Q108 and that Hansen was being impacted by issues that would potentially delay and/or extend some Q208 system sales/revenue recognition into Q308. The report, entitled, "Earnings Preview: Expect Soft 2Q, Upside 3Q on Timing of Shipments;

---

[13]On May 13, 2008, the day after Hansen filed its quarterly report on Form 10-Q for Q108 with the SEC, Hansen's stock increased $1.35 per share, or 7.41%, to close at a Class Period high of $19.57 per share, on usually heavy volume of 1,056,200, representing a 488.76% increase from the previous day.

1   Updating Model," noted that timing of shipments would impact quarterly sales: "**Strong**
2   **momentum, but timing of shipments likely to impact 2Q sales.** Our checks continue to indicate
3   strong demand for the Sensei system. However, we are moderating our expectations for Hansen's
4   2Q performance to account for a) the timing of recent shipments slipping from 2Q to 3Q and b) the
5   disruption associated with the company's recent move into its new manufacturing facility."
6   (Emphasis in original).  The analyst report's updated "forecast assume[d] 8 worldwide Sensei
7   system placements in the quarter" yet left the "2008 forecast unchanged despite the reduced 2Q
8   outlook."  The report further noted, "[w]hile this implies a sharper ramp in 2H08, we believe that
9   visibility into order flow over the next six months remains solid and expect management to suggest
10  as such on Thursday's call."  While the report did indicate that the firm's "checks" continued to
11  indicate strong demand, the report was nevertheless a partial revelation that the true demand for the
12  Sensei System was not nearly as strong as Hansen had previously represented.  Moreover, the report
13  reflected the materialization of, among others, the concealed risk created by Hansen's improper
14  revenue recognition on Systems shipped to distributors in Q407 and Q108 to show increasing
15  sales/demand, when sales would have actually been flat in each quarter.  For example:

16      a.      Improperly recognizing revenue on 1 System in Q407 allowed Hansen to
17  portray that it recognized revenue on 6 Systems in Q407, after reporting 5 Systems in Q307 and 4
18  Systems in Q207.

19      b.      Improperly recognizing revenue on 2 Systems in Q108 (both shipped to
20  distributors the last day of Q108) allowed Hansen to portray that it recognized revenue on 8 Systems
21  in Q108 a steady increase over the 6 Systems originally reported for Q407.

22      115.    As this news and its implications for Hansen's Q208 results leaked into the market,
23  shares of Hansen declined $0.88 per share, nearly 5%, to close on July 29, 2008, at $17.52 per share,
24  on unusually heavy volume of 766,900, more than three times the prior day's volume.  Hansen's
25  shares continued to decline an additional $1.53 per share, or 8.73%, to close on July 30, 2008, at
26  $15.99 per share, also on unusually heavy volume, with volume rising above 1 million.  Hansen's
27  shares slid another $0.74 per share, nearly 5%, to close on July 31, 2008, at $15.25 per share, again
28  on unusually heavy volume in excess of 1 million.  This closing price on July 31, 2008, represented

a three-day decline of $3.15 per share, or 17.12%, from the closing price on July 28, 2008.

116.    Although the July 28, 2008, JP Morgan analyst report partially revealed that the true demand for the Sensei System was not as strong as Hansen had represented and that Hansen was being impacted by issues that were delaying the timetable for revenue recognition and that were affecting installation times,  defendants' statements referenced above remained materially false and/or misleading because, *inter alia*:

    a.    The Company's Installed Base and financial results for Q407 and Q108, remained materially overstated.

    b.    The Company was improperly recognizing revenue on systems shipped to distributors despite the fact that the distributors were neither capable of independently installing the system nor training the end user physicians.

    c.    The Company's reported Q108 catheter sales were inflated due to stocking and the Company's reported catheter sales were not an accurate proxy for gauging utilization.

    d.    The Company's internal controls were not effective.

117.    On July 31, 2008, after the market closed, Hansen issued a press release entitled, "HANSEN MEDICAL REPORTS 2008 SECOND QUARTER RESULTS."  At the top of the press release, Hansen proclaimed, "***Company Recognizes Revenue on Eight Systems*** and Ships Two Additional Systems," and therein, the Company, in relevant part, stated:

> •    ***Systems: The company recognized revenue on eight Sensei Robotic Systems and shipped two additional systems for which revenue is expected to be recognized in the third quarter. Through June 30, 2008, the company has recognized revenue on a total of 31 systems (which we refer to as our installed base), including 21 in the United States and 10 in Europe.***
>
> •    ***Catheter Sales: 279 Artisan(TM) Control Catheters were shipped in the second quarter.***

                        *      *      *

"I am very pleased with what we have accomplished during our first full year of commercialization," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. "During this past quarter, we achieved a number of important milestones that give us a high level of confidence in our ability to execute our business plan as we continue to build momentum. This includes the successful completion of a secondary offering of common stock, regulatory clearance for the

CoHesion 3D Visualization Module which included a review of our IntelliSense feature, and significant improvements in our manufacturing capacity to help meet the demand for our technology going forward," concluded Dr. Moll.

\*      \*      \*

***Total revenue for the three months ended June 30, 2008 was $5.8 million compared to revenue of $2.4 million in the same period in 2007, equating to a 139% increase over the same period in 2007. The company recognized revenue on eight Sensei Robotic Systems, as well as on shipments of 279 Artisan control catheters and one stand-alone CoHesion module.***

***. . . Gross profit for the quarter was $1.1 million . . .***

\*      \*      \*

***Net loss for the three months ended June 30, 2008, . . . was $14.9 million, or $(0.61) per basic and diluted share . . .***

(Emphasis added).   Additionally, in the financial statements appended to the press release, the Company reported the following for the six month period ending June 30, 2008 ("H1 2008"): (i) revenue of $12,057,000; (ii) gross profit of $2,385,000; (iii) net loss of $ 26,538,000; and (iv) basic and diluted net loss per share of ($1.15).

118.   The statements referenced in ¶117 were materially false and/or misleading when made for the reasons in ¶60(a), above, and because:

a.      As reflected by Hansen's restatement: (i) the Company's Installed Base at the end of Q208 of 25 was misrepresented as 31, which constitutes an overstatement of 6, or 24%; (ii) the Company's international Installed Base at the end of Q208 of 7 was misrepresented as 10, which constitutes an overstatement of 3, or 42.86%; (iii) the Company's domestic Installed Base at the end of Q208 of 18 was misrepresented as 21, which constitutes an overstatement of 3, or 16.67%; (iv) the total number of Systems sold for which the Company should have recognized as revenue was 5 in Q208, but was misrepresented as 8, constituting an overstatement of 3, or 60%; (v) revenue of $3,888,000 for Q208 was misrepresented as $5,813,000, which constitutes an overstatement of the Company's revenues by $1,925,000, or 49.51%; (vi) revenue of $8,511,000 for H1 2008 was misrepresented as $12,057,000, which constitutes an overstatement of the Company's revenues by $3,546,000, or 41.66%; (vii) "Gross profit (loss)" of ($207,000) for H1 2008 was misrepresented

as $2,385,000, constituting an  overstatement of $2,592,000, or 1252.17%; (viii) "Net loss" of ($16,277,000) for Q208 was misrepresented as ($14,906,000), constituting an overstatement of $1,371,000, or 8.42%; (ix) "Net loss" of ($29,130,000) for H1 2008 was misrepresented as ($26,538,000), constituting an overstatement of $2,592,000, or 8.90%; (x) "Basic and diluted net loss per share" for Q208 of ($0.66) was misrepresented as ($0.60), constituting an overstatement of $0.06, or 9.09%; and (xi) "Basic and diluted net loss per share" for H1 2008 of ($1.25) was misrepresented as ($1.14), constituting an overstatement of $0.11, or 8.80%.

b.      The restatement admitted that at least 3 Systems sold domestically and recognized as revenue in Q208, had been improperly recognized as revenue.  While discussing Hansen's restatement during a conference call on November 16, 2009, Defendant Moll indicated that: (i) half of the Systems affected by the restatement involved sales to distributors (as the distributors were not capable of independently installing Systems and training end users); and (ii) the revenue recognition of the other Systems affected by the restatement involved instances where there were temporary installations and/or unfulfilled training obligations, meaning that all of the Company's necessary obligations and requirements for revenue recognition had not been completed. For the foregoing reasons, in conjunction with the fact that Hansen's domestic sales did not involve distributors, Plaintiffs are informed and believe that the at least 3 Systems sold domestically and improperly recognized as revenue during Q208 were due to unmet revenue recognition criteria and outstanding obligations, such as instances of temporary installations or unfilled training obligations.

c.      Improperly recognizing revenue on at least 3 Systems sold in Q208, created the materially false and/or misleading impression/trend that Hansen's quarterly System sales at least remained flat with the 8 Systems originally recognized as revenue in Q108, when in fact, absent improper revenue recognition on at least 3 Systems, the Company's quarterly System sales would have declined dramatically to only 5 Systems.  This further created the materially false and/or misleading impression that the demand for the System was greater than the true demand for the product.

d.      Hansen failed to disclose that the Company was improperly recognizing revenue on Systems to create the appearance that the Company's quarterly System sales were not

1   declining.

2        e.      Plaintiffs are informed and believe that the System sold to Englewood in New

3   Jersey was improperly recognized as revenue in Q208 because Ex. B indicates that the "Special

4   Conditions for Revenue" required both "Cohesion release and use."  Plaintiffs are informed and

5   believe that this requirement could not have been met by the end of the Q208 to allow the System

6   to be recognized as revenue because the FDA did not grant Hansen 510(k) clearance to

7   commercially distribute and market Cohesion in the United States until June 30, 2008, *i.e.*, the last

8   day of Q208.

9        119.    The materially false and/or misleading statements in ¶117 were made with scienter

10  for the reasons set forth above in ¶¶61, 89, because defendants knew and/or were deliberately in not

11  knowing, among others, the following:

12       a.      **For the same reasons alleged in ¶¶60,61,88, 89, the Company's Installed**

13  **Base and financial results were materially inflated due Hansen's prematurely/improperly**

14  **recognizing revenue on at least 1 System shipped to AB Medica in Q407 and at least 2 Systems**

15  **in Q108 shipped to AB Medica and Palex.**

16       b.      **Plaintiffs are further informed and believe that the 3 Systems recognized**

17  **as revenue for the VA Brecksville Hospital, Loyola University  Hospital, and Universtiy of**

18  **Miami Hospital in Florida, were improperly recognized as revenue in Q208 and were**

19  **temporarily installed to contravene the Company's revenue recognition policy.** According to

20  CW12, as set forth in ¶45(a), it was common for Hansen to install Systems and later uninstall the

21  Systems.  CW12 stated that there was a definite pattern at the end of the Company's quarters to

22  install Systems, only to have the Systems uninstalled later.  CW12 stated that the Company's

23  Systems were installed at the end of quarters and uninstalled later because salespeople were giving

24  special prices to customers to buy the Systems earlier than the customers needed them.

25            i.      Specifically, as set forth in ¶45(a), one of the examples provided by

26  CW12 of this practice was the system sold to the VA Brecksville Hospital in Ohio.  CW12's recount

27  as to the temporary installation at the VA Brecksville Hospital is corroborated by CW1, as set forth

28  in ¶34(h) who also noted that the Company's System at VA Brecksville Hospital in Ohio was

installed, but was unused for months.

ii.    According to CW1, as set forth in ¶34(h), the System sold to Loyola University Hospital in Illinois was purchased in June 2008, installed the last week of the quarter and, within two days after the quarter ended, was uninstalled and placed in a closet;

iii.    According to CW1, as set forth in ¶34(h), the System sold to the University of Miami hospital in Florida was installed in early or mid-2008 by Warren Cunningham, was later uninstalled, and then reinstalled in the Spring of 2009.  According to CW1, the system was repeatedly installed and uninstalled and, to CW1's knowledge, the system was never used.

c.    **Plaintiffs are informed and believe that Hansen improperly recognized revenue in Q208 on the System sold to Englewood in New Jersey.**  As indicated in Ex. B (a report reviewed by the Individual Defendants), Hansen recognized revenue on the System despite the fact that the "Special Conditions for Revenue" clearly required both "Cohesion release and use." Plaintiffs are informed and believe that this requirement could not have been met by the end of the quarter as the FDA granted Hansen 510(k) clearance to commercially distribute and market Cohesion in the United States on June 30, 2008, *i.e.*, the last day of Q208.  The Individual Defendants all acknowledged that 510(k) clearance came so late in the quarter that the special condition required for revenue recognition could not have been satisfied by the end of Q208 by falsely indicating that none of the Systems sold domestically and recognized as revenue during Q208 had Cohesion.  For example, during the Q208 conference call:

i.    Defendant Moll conceded that 510(k) clearance came too late in Q208 for Hansen to be able to sell and market Cohesion that quarter.  Defendant Moll stated that "[s]ales and marketing efforts of Cohesion ***to our U.S. customers began in July***, and we anticipate seeing the benefits of that clearance in the coming quarters." (Emphasis added).

ii.    During the Q208 conference call, Defendant Van Dick stated, "[w]hereas over this quarter, with the Cohesion clearance coming so late in the quarter, none of our U.S. shipments were able to go out with Cohesion."

iii.    Defendant Van Dick falsely stated during the Q208 conference call

1   that "[t]his quarter all we sold were two Cohesion upgrades to two customers in Europe." Defendant

2   Restani immediately thereafter continued, "*[b]ecause most of the [Q208 System] sales were in the*

3   *U.S., and as you know we just received approval virtually on the last day of the quarter. So that*

4   *did not impact us in Q2*." (Emphasis added).

5          d.      **For the same reasons alleged in ¶¶61(c), 89(c), defendants would attend**

6   **sales and installation meetings and receive and/review reports about installations and sales.**

7   Defendants Moll, Van Dick, and Restani would receive a copy of a quarterly installation report on

8   a daily basis and Defendants Moll and Van Dick would attend Installation meetings where the status

9   of orders and installations were discussed, including orders to Spain, Italy and Russia.  Moreover,

10  as set forth in ¶34(a)(ii) on Monday mornings at approximately 8:00 a.m. PST, a conference call

11  would be held amongst sales force and Defendants Moll, Van Dick, and Restani, to discuss the status

12  of sales.  During the meetings, CW1 also indicated that Hansen's potential customers and deliveries

13  would be reviewed to determine how to pull in sales.  During the sales meeting, CW1 indicated that

14  there was a report that would be updated by each of the sales people.  CW1 indicated that the report

15  showed customers on a line-by-line basis, and the steps toward receiving a purchase order was

16  included on a column-by-column basis.  According to CW1, the sales report would be updated

17  during the week and distributed *via* e-mail to every manager.  CW1 further indicated that Defendants

18  Moll, Van Dick, and Restani received the sales reports daily *via* e-mail.

19         e.      **For the same reasons alleged in ¶¶61(e), 89(e), Sensei System sales were**

20  **Hansen's core business/operations.**  At the time Hansen originally reported its Q208 financial

21  results, almost all of Hansen's quarterly revenue was derived from the recognition of revenue on

22  sales of 8 Sensei Systems, of which 3 (an astounding 37.5%) were improperly recorded as revenue

23  despite the fact that Hansen had not yet completed all of its obligations and required criteria for

24  revenue recognition.

25         f.      **As alleged in ¶61(f), the Individual Defendants were familiar with and**

26  **knowledgeable of Hansen's revenue recognition criteria.**  During the Q208 conference call, *see*

27  *infra* ¶129, Defendant Van Dick further displayed his familiarity with Hansen's revenue recognition

28  criteria and necessary obligations, as he twice specifically (and falsely) affirmed that "for [Hansen's]

US end users, the multiple elements that [the Company] ha[s] to deliver, of course, is a system, installation and training" and that "for [Hansen's] US customers, we have to not only ship a system, we have to install it, and we have to train the customer before we can take revenue." Further, during the Q208 conference call, *see infra* ¶128, Defendant Van Dick specifically evidenced his thorough familiarity with Hansen's revenue recognition criteria and requirements under SOP 97-2. Defendant Van Dick specifically demonstrated his knowledge with respect to whether Hansen's System sales during the quarter fulfilled these criteria to enable revenue recognition as he specifically stated that Hansen was unable to record revenue on an additional 2 Systems that Hansen shipped during the quarter but had to record as deferred revenue because the Company had not yet met all of the requirements necessary for revenue recognition.

g.    **Of the 7 Systems sold domestically and recognized as revenue in Q208, during the Q208 conference call,** *see infra* **¶121, Defendant Restani evidenced he was familiar with each transaction** as he was able to identify each customer that Hansen purportedly sold Systems, despite the fact that at least 3 of those 7 (a massive 42.86%) Systems had been temporarily installed to circumvent Hansen's revenue recognition policy.

h.    **As alleged in ¶61(h), the Individual Defendants indicated that they monitored the Company's sales pipeline and were familiar with the customers purchasing Systems.** Additionally, during the Q208 conference call, *see infra* ¶121, Defendant Moll indicated that he was familiar with the Company's limited number of customers as he "had the opportunity to speak personally with many of [Hansen's] customers at scientific meetings and in their labs."

i.    **The Individual Defendants' monitoring of utilization and catheter sales data, including review of internal reports of catheter sales would indicate that Systems had been installed but were not being used.** As set forth in ¶34(o), CW1 further indicated that Adrienne Cox (who entered the orders for catheter sales) kept track of actual catheter orders and maintained a detail report (which was updated on a daily basis) that, among others, specifically listed each customer and how many catheters the customer had ordered during the quarter. CW1 indicated that Defendants Moll, Van Dick, and Restani would see these reports. CW1 further indicated that with regard to inactive Systems, once a System was installed it was clear after a few

1  weeks if the System was not being used because the site would not order any catheters.  For

2  example, CW1 indicated that with respect to the System sold to Loyola University in Chicago was

3  put in a closet and it was obvious that no catheters were being sold to Loyola.

4          j.    **Hansen went to great lengths (and even would incur excess storage costs)**

5  **to meet quarterly expectations.**  As set forth in ¶34(s), CW1 also indicated that during installation

6  and/or sales meetings, the sales people would coerce Defendant Van Dick into authorizing a System

7  to be shipped without a purchase order and temporarily stored close enough to the customer so that

8  in the event the purchase order was returned in time the Company could get a sale done before the

9  end of the quarter. As set forth in ¶34(r), CW1 further indicated that in the third month of the

10  quarter, Defendants Moll and Van Dick would become very active.  CW1 recalled that Defendant

11  Moll would fly out to sites and twist arms to get a sale if a customer was on the fence.

12          k.    **For the same reasons alleged in ¶¶61(k), 89(k), and as alleged in ¶¶143-**

13  **144, *infra*, Defendants Moll and Van Dick nevertheless signed materially false and misleading**

14  **SOX required certifications** attesting to the accuracy of Hansen's financial results and

15  effectiveness of the Company's internal controls for Q208.

16          l.    **Given that Defendant Restani was Hansen's Chief Operations Officer,**

17  **for the following reasons, Plaintiffs are informed and believe that Defendant Restani was**

18  **intimately familiar with, involved in, and knowledgeable of the precise details and revenue**

19  **recognition criteria relating to installation and training for each of the sales to Loyola**

20  **University Hospital in Illinois, the VA Brecksville Hospital in Ohio, the University of Miami**

21  **in Florida, and Englewood in New Jersey for which Hansen originally (and improperly)**

22  **recognized revenue on in Q208**: (i) The Company later admitted and indicated that many of the

23  actions that led to the improper revenue recognition of systems purportedly sold in the United States

24  involved activities within the Company's operations division.  As set forth in ¶86(a), according to

25  the Company's 10-K/A and 10-Q/As, Hansen "did not maintain sufficient safeguards to provide

26  reasonable assurance that controls could not be circumvented or overriden by commercial operations

27  management or to prevent or detect possible misconduct by members of [the Company's]

28  commercial operations orgainization with respect to certain revenue transactions;" (ii) Defendant

1    Restani was familiar with the location and identity of each system the Company recognized as

2    revenue during the quarter; (iii) Defendant Restani's careful oversight of the Company's operations

3    is evidenced by his comment during a conference call held that day to discuss Hansen's Q208

4    results, *see infra* ¶121, where Defendant Restani stated: "[S]ales, marketing and field service are

5    critical commercial operations functions that require tremendous focus and attention to ensure we

6    are successful in our next phase of growth;" and (iv) the Company's 10-Q for Q208 stated that

7    Defendant Restani "is important to our operational effectiveness."

8               m.      **The defendants cannibalized future system sales by providing discounts**

9    **at the end of the quarter to pull in future sales and doing temporary installations to contravene**

10   **the Company's revenue recognition criteria**. According to CW1, as set forth in ¶34(a), Defendant

11   Van Dick and Moll attended installation meetings (which were held twice a week near the end of

12   the quarter) and the Individual Defendants participated in a weekly sales meeting during which the

13   participants discussed and reviewed the Company's potential customers/deliveries to determine how

14   to pull in sales.  According to CW12,  as set forth in ¶45, there was a definite pattern at the end of

15   the quarters to install systems, only to have the systems uninstalled later.  CW12 stated that the

16   Company's systems were installed at the end of quarters and uninstalled later because salespeople

17   were giving special prices to customers to buy the systems earlier than the customers needed them.

18               n.      **By prematurely recognizing revenue on at least 3 Systems in Q208, the**

19   **defendants were able to keep the appearance that Hansen's quarterly sales at least stayed flat**

20   (*i.e.*, 8 systems in Q108 and 8 systems in Q208) after previously touting the Company's "stair-step"

21   growth and telling investors that demand would pick up in the second half of 2008.  Absent

22   Hansen's improper revenue recognition on at least 3 Systems, the Company's quarterly sales trend

23   would have massively reversed as quarterly sales would have been less than the number of Systems

24   the Company reported as sold and recognized as revenue in Q407 and Q108.

25               o.      **Hansen was cannibalizing its future catheter sales by getting customers**

26   **to buy more catheters than its customers needed by offering discounts on bulk orders.**  For

27   example, as set forth in ¶37(d), CW4 said that at the direction of Chris Sells, at the end of every

28   quarter, CW4, other clinicians, and salespeople would make lofty promises to entice customers to

buy more catheters.  CW4 said that the sales people would convince users to buy in bulk by giving them discounts of about $50 a catheter.  CW4 said that the problem was that the next quarter there was inventory and it was more difficult to make the customer buy in bulk again.  Similarly, as set forth in ¶36(b), while CW3 encouraged his/her customers to only order eight (8) catheters at a time, CW3 said that the Company created pressure to force customers buy additional catheters.  CW3 told the Senior Vice President of Global Operations, that CW3 refused to force customers to buy additional catheters.  CW3 said that when the Senior Vice President of Global Operations arrived, the Company changed the criteria for establishing bonuses so that they became based, in part, upon the number of catheters sold.  According to CW1, as set forth in ¶34(q), indicated that generally everyone, including Defendants Moll and Van Dick, would know about any of at least 5 to 10 catheters to a single customer, as this would be a big sale for the Company and any order over 5 catheters was "celebrated."  According to CW1, catheter sales were closely followed at the end of the quarter, catheter sales were talked about generally as much as System sales in the installation and sales meetings attended by the defendants.  Also, as set forth in ¶34(o), CW1 further indicated that Adrienne Cox (who entered the orders for catheter sales) kept track of actual catheter orders and maintained a detail report (which was updated on a daily basis) that, among others, specifically listed each customer and how many catheters the customer had ordered during the quarter.  CW1 indicated that these reports would be seen by Defendants Moll, Van Dick, and Restani.

p.     **By claiming to have shipped an additional 2 Systems in Q208 (and reported as deferred revenue), the Company was at least able to assert that the "shipment" of Systems was showing steady growth.**  As reflected by Ex. B, these 2 Systems were both shipped to Villingen and St. Jude Fullerton on June 30, 2008 (the last day of Q208).  Hansen's hasty effort to ship these Systems for the sake of claiming that they were shipped during Q208, is apparent from the description listed under "Action Items" in Ex. B, for the System shipped to Villingen, which states: "Need revised [purchase order] with pricing on it."  Hansen shipped the System despite the fact that as described in its revenue recognition policy in its Form 10-K for FY07 and FY08, "Sales prices are documented in the executed sales contract or purchase order received prior to shipment."

120.    That day, Hansen held a conference call in connection with the press release

1   announcing the Company's financial results for Q208.  The Individual Defendants were present.

2   121.   Due to the lower than expected installations and catheter sales, during the Q208

3   conference call, the Individual Defendants attempted to allay any concern that Hansen's

4   sales/revenue ramp would not materialize as the defendants lead the market to believe.  The

5   defendants continued to tout materially false and/or misleading information about the Company's

6   revenues, Installed Base, and quarterly System sales:

> [*Defendant Moll*:] . . . [D]uring the second quarter of 2008, ***we recognized revenue on the total of eight Sensei Robotic Catheter Systems*** and shipped two other systems which we presently expect to recognize revenue during the third quarter.
>
> ***As of the end of the second quarter, the number of units on which we have recognized revenue, which we refer to as our installed base, has now grown to 31. We believe that the Company's results during our first four full quarters of sales are tremendous*** . . .
>
> ***Our installed base now includes 21 systems in the United States and 10 in Europe. Given our positive outlook for the business and how things are currently progressing, we are reaffirming guidance of between 44 and 50 system placements for the full-year of 2008.***
>
> *          *          *
>
> . . . we are pleased that the FDA cleared our CoHesion 3D Visualization Module for promotion and sale in the US as previously reported. . .
>
> Sales and marketing efforts of CoHesion to our US customers began in July, and we anticipate seeing the benefits of that clearance in the coming quarters.
>
> *          *          *
>
> As previously reported, in addition to St. Mary's, we have already delivered a second Sensei System to one of our US customers for use in the development of vascular and structural heart applications. . .
>
> In summary, I'm very pleased with our progress and accomplishments during our first full four quarters of commercialization. . .
>
> Throughout the last number of months, I have had the opportunity to speak personally with many of our customers at scientific meetings and in their labs. It has been gratifying to see the difference that Robotic Technology is making in their practices for both patients and physicians.
>
> *          *          *
>
> [*Defendant Restani:*] ***As Fred mentioned in his earlier remarks, during the second quarter we recognized revenue on eight Sensei Systems and also shipped two***

*additional systems. Of the eight on which we recognized revenue, seven were delivered to sites in the United States and one to Europe.* We also recorded revenue on the sale of one stand-alone CoHesion Module in Europe.

*In the United States, our recognized system installations included Duke University Medical Center, Scripts Medical Clinic in La Jolla, California, University of Miami Hospital, Loyola University in Chicago, our second system to Methodist Hospital in Houston, the VA Brecksville Hospital in Cleveland, and also Englewood Hospital in New Jersey.*

As I'm sure you'll appreciate, sales, marketing and field service are critical commercial operations functions that require tremendous focus and attention to ensure we are successful in our next phase of growth. To that end, we are extremely pleased to have Chris Sells join us in June as our Senior Vice President of Commercial Operations.

Amongst other key roles in the medical device industry, Chris notably spent approximately seven years at Intuitive Surgical in various sales leadership positions, including his most recent role as Vice President of Western Area Sales, and brings an impressive record of commercial accomplishments to our team.

                    *        *        *

[*Defendant Van Dick:*] *Moving first to our second quarter of 2008 income statement, we recorded revenue of $5.8 million, primarily on the sale of eight Sensei Systems, shipments of 279 Artisan Control Catheters and a CoHesion Module.* This represents a 139% increase over the $2.4 million of revenue in the same period in 2007.

We presently anticipate that revenue and the shipments of the two additional Sensei Systems shipped during the quarter will be recorded during the third quarter . . .

*. . . Gross profit for the quarter was $1.1 million . . .*

                    *        *        *

*Net loss for the second quarter of 2008 . . .was $14.9 million, or $0.61 per basic and diluted share . . .*

(Emphasis added).

122.     The statements in ¶121, which were not corrected by any of the other Individual Defendants, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶118-119.

123.     During the Q208 conference call, with regard to the Company's FY08 guidance, Defendants Van Dick and Moll, in relevant part, stated:

[*Defendant Van Dick:*] Moving on to our business outlook, in our previous calls, we

provided our guidance for annual system placements in 2008 of between 44 to 50 systems. ***I would like to emphasize that, today, we are reaffirming our guidance for the whole year 2008 based on our present favorable business outlook . . .***

\*       \*       \*

[*Defendant Moll*:] We are confident that, given our continued favorable outlook for the business, ***reiteration of our annual guidance of 44 to 50 systems for 2008 is appropriate***.

(Emphasis added).

124.    In addition to the reasons alleged in ¶66, the statements by Defendants Van Dick and Moll in ¶123 regarding the Company's guidance for FY08, which were not corrected by any of the other Individual Defendants, were knowingly false and lacked any reasonable basis because:

a.      The Company's guidance was premised on the fact that it had already recognized revenue on the sale of 16 Systems in the first half of FY08 (implying that Hansen only had to sell and recognize revenue on an additional 28 to 34 Systems during the second half of FY08 to achieve its guidance), when as alleged in ¶¶88-89, 118-119, Hansen had improperly recognized revenue on at least 5 Systems during Q108 and Q208.

b.      For the same reasons set forth in ¶119(d), (o), (m), the Company was cannibalizing its future sales.

125.    Due to Hansen's purported addition of only 8 Systems to its Installed Base in Q208, which was below the market's expectation of 10, during the Q208 conference call, the Individual Defendants went to great lengths to make it appear as if Hansen was still on pace with its sales/revenue ramp – *i.e.*, by claiming that Hansen shipped the expected 10 Systems during the quarter but was only able to recognize revenue on 8. The Individual Defendants boldly pronounced that Hansen was still on track and that given their visibility into the second half of 2008, that the Company was maintaining its guidance for System placements for the rest of the year:

[*Analyst*:] So, what everybody's going to want here is to get some comfort with your visibility on the back half of the year. You shipped and recognized revenues on 16 systems in the first half of the year. You're saying that you feel confident that you can ship 28 to 34 in the back half of the year.

So, help people to understand a little bit about your degree of visibility on the business and on the demand picture. I know you guys aren't reporting on a backlog or an order book at this point. But, how good is your visibility on the back half? And

help us understand it.

[*Defendant Moll*:] **So, Mike, I think-- and I hope we weren't too redundant in the prepared text about how we have a very good feeling about the demand for the Sensei System and that we think reiterating our guidance is very appropriate based on the conditions we're seeing, based on the enthusiasm for the product and our general outlook for the second half of 2008.**

[*Analyst*:] Talk, Fred, for a minute about the time from the hospital discussion in placing an order to actually the placement of the unit.

[*Defendant Moll*:] So, it varies.

And then, I think, again, we tried to emphasize that what we are seeing is very consistent with early stage of this sort of business, the lumpiness of the orders and the unpredictability of the timelines associated from initial expression of interest to closing of an order.

And so, we've talked about in the past, we can go through that process in less than six months but, certainly, most often it's a six-month or more process, and that it's fairly unpredictable.

Having said that, we feel very confident that from the amount of interest in the product, from the number of processes that we've started with clinicians who have expressed strong interest, we feel very comfortable that, again, the guidance is appropriate and we're going to be successful in getting to our goal in 2008.

(Emphasis added).

126.    The analysts on the call questioned defendants regarding the decision to maintain the FY08 guidance seeking reaffirmation that Hansen's revenue/sales ramp was on pace and that the guidance was achievable.  Defendant Moll retorted that it was "appropriate guidance for the year," as did Defendants Van Dick and Restani, who demonstrated their familiarity with Hansen's pipeline:

[*Analyst*:] . . . And then, a final question is around guidance. You've got quite a few systems to place out there. You sound very confident about your ability to do that. I was just wondering if you could explain to us whether or not it was HRS that people wanted to kind of take a look at systems, and then have a chance to talk to you. And then, it takes time to build them. Or is it just you were expecting more in the back half of the year when you gave your guidance anyway, and it's following the trend you were expecting? Any more color around that would be helpful in that.

[*Defendant Van Dick*:] Yes, I would say it is following very closely the trend we expected. We expected to be back end-loaded, for 2008 to be back end-loaded.

We expected it to be lumpy and a bit unpredictable, but I'm very confident that the orders are going to be there. And based on the enthusiasm we had going into HRS, the HRS experience and the progress we've made since the convention in moving forward with those potential customers.

[*Defendant Restani*:] And the late stage activity and how we interface with our customers that have been in the pipeline with demonstrations, demos, and training of the system, that's where we're getting our strong feeling of it. ***It's not something that we feel is a hope***.

***It's a very strong pipeline identification process that we've taken. We knew it was going to be back end-loaded, and it is playing out fairly close to what we had anticipated.***

(Emphasis added).

127.   The statements in ¶125-126, which were not corrected by the other Individual Defendants, were materially false and/or misleading and made with scienter for the reasons in ¶124.

128.   When asked why the Company had been unable to recognize revenue on 2 of the 10 Systems shipped during the quarter, Defendant Van Dick demonstrated his familiarity with Hansen's revenue recognition requirements, as well as the timing of revenue recognition for Hansen's sales:

[*Analyst*:] Let me just ask, you said there were two units that shipped during the quarter that you didn't recognize revenues on.

[*Defendant Moll*:] Yes.

[*Analyst*:] The timing of that revenue recognition, maybe you'd just want to explain that to people. And to what degree did manufacturing hold you up during the quarter? Was that a constraint on the timing of the shipments, the recognition of revenue? And will that be a constraint at all going forward?

[*Defendant Moll*:] Yes. No, manufacturing is not a constraint at this point. And I'll let Steve talk about the revenue recognition of the two units.

[*Defendant Van Dick*:] ***Yes. On these two specific units, as you know, we fall under SOP 97-2 with the multiple element features. And there's just multiple deliverables to each of these orders.***

***And in order for us to recognize revenue in any particular period, we have to complete all those deliverables. And for two of these systems, we were able to ship the units during the quarter, but not able to complete the remainder of those deliverables before the end of the quarter. So, we can't recognize them for revenue.***

***But, we feel highly confident that both of these units will be recognized as revenue, that they should be recognized as revenue in Q3 of this year.***

(Emphasis added).

129.   Defendant Van Dick further demonstrated his familiarity with Hansen's revenue recognition criteria and specifically the training requirement:

[*Analyst*:] And then, Steve, you talked briefly about revenue recognition, but just maybe remind us that-- is it still correct that you're not recognizing revenue until the system is shipped, installed and up and running?

[*Defendant Van Dick*:] **Yes. I mean, for our US end users, the multiple elements that we have to deliver, of course, is a system, installation and training . . . So, for our US customers, we have to not only ship a system, we have to install it and we have train the customer before we can take revenue**.

[ *Analyst*:] Okay. And then, where were our training times right now?

[*Defendant Van Dick*:] **Most of our training for our systems, at least in the US, occurs prior to shipment.**

[*Analyst*:] Okay. And just two last quick questions.

[*Defendant Van Dick*:] It takes a day to a day-and-a-half, two days, to go through the training process.

[*Analyst*:] Okay. So, pretty immaterial.

[*Defendant Van Dick*:] **Yes, it's normally not a significant part of the process.**

(Emphasis added).

130.   The statements in ¶128-129, which were not corrected by Defendants Restani or Moll, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶60, 61, 88-89, 118-119, because the Company was violating its own revenue recognition policy and because the Company improperly recognized revenue on at least 3 System sales in Q208.

131.   During the Q208 conference call, the Individual Defendants partially disclosed that contrary to Defendants' statements in ¶¶74-77, Hansen's sales of Artisan Catheters were not a reliable and/or accurate proxy for the utilization, that Hansen's Q108 catheter sales had been inflated by a "few sizeable customer orders placed during Q1," and that utilization was lower than the defendants had led the market to believe.  During the conference call, Defendant Moll, in relevant part, admitted:

During the second quarter, we also shipped 279 catheters, which brings our year-to-date total to 680 catheters, ***although this represents a decrease in the number of catheters shipped when compared to the first quarter of 2008, this was due in large part to a few sizeable customer orders placed during Q1.***

***We mentioned during last quarter's conference call that we would report to you catheter shipments as a proxy for catheter utilization. As we explained, we have good visibility about what we actually shipped, but less visibility on catheter***

*utilization due to many of our customers becoming independent.*

*Currently, it is clear that quarterly catheter shipments are not a particularly accurate measure of actual quarterly catheter utilization at this stage of our business.* However, over longer time periods, we still believe that trends in shipments will reflect the trends in utilization. For example, when comparing the last half of 2007 with the first half of 2008, our catheter shipments almost doubled from the mid-300s to the high 600s.

Overall, we are confident that our utilization is heading in the right direction, but the lumpiness in catheter sales is likely to continue for the next several quarters as our business continues to grow.

Going forward, we will implement new measures that give us the ability to more accurately assess the relationship between catheter sales and utilization metrics as our customers transition to independent use of the Sensei System.

(Emphasis added).

132.   Defendants admitted that the "few sizeable customer orders placed during Q1" pertained to three customers that purchased bulk quantities (*i.e.*, stocking) at the end of Q108:

[*Analyst*:] . . . [Y]ou mentioned in the first quarter that the 401 units . . . included some shipments to larger customers. Can you give us a sense what that-- if you sort of backed that out, the two large orders?

[*Defendant Restani*:] **Yes. Actually, it was more like three, and that was in anticipation-- these customers bought at the end-- towards that end of that first quarter-- in anticipation of future demand in the next quarter**.

[*Analyst*:] Um-hmm.

[*Defendant Restani*:] **So, it would-- I would say that had an effect of about 20%, 25%.**

[*Analyst*:] Okay. So, taking it out, sort of flattish on shipments sequentially?

[*Defendant Restani*:] On shipments, that's correct.

[*Analyst*:] Okay.

[*Defendant Restani*:] As Fred mentioned, that's one thing we're trying to better ascertain, the relationships. As time goes on, that metric will become more meaningful--.

[*Analyst*:] --Okay--.

[*Defendant Restani*:] --But, at this early-- in a quarter, it's tough to tie that directly to utilization.

(Emphasis added).

1    133.    Defendants' statements in the press release and Q208 conference call partially

2    revealed: (a) that Q108 catheter sales had been inflated due to stocking and that catheter sales were

3    not a reliable and/or accurate proxy for utilization rates; (b) that utilization rates were not as strong

4    as Hansen had previously indicated; and (c) that Hansen was experiencing revenue recognition

5    issues, relating to installation/training, which were extending the timing for revenue recognition.

6    134.    Hansen's financial results announced in the July 31, 2008 press release and

7    conference call also reflected the materialization of the following concealed risks, among others:

8           a.     Q208 catheter sales plummeted as result of the Company cannibalizing future

9    catheter sales in Q108 and customers stocking catheters in Q108;

10          b.     Catheter sales/utilization declined and/or did not increase due to the fact that

11   Systems sold to distributors and included in the Company's Installed Base were inactive and sitting

12   idle with the distributors; and

13          c.     The Company did not add as many Systems to its Installed Base as expected

14   because the Company's distributors were still holding systems from prior quarters and the Company

15   had misrepresented the demand for its products by improperly reporting distributor sales to show

16   a materially false and/or misleading trend of "stair-step" growth.

17   135.    Nevertheless, defendants' statements were materially false and/or misleading

18   because, among others:

19          a.     The Company's financial results for Q407 through Q208 and Installed Base

20   at the end of Q208, remained materially overstated;

21          b.     The Company was improperly recognizing revenue on Systems shipped to

22   distributors despite the fact that the distributors were not capable of independently installing

23   Systems and training the end-users;

24          c.     The Company was improperly recording revenue on temporary installations;

25          d.     The Company's FY08 guidance remained knowingly false;

26          e.     The Company was cannibalizing its future catheter and System sales by

27   offering end of the quarter discounting and conducting temporary system installations; and

28

f.      The demand for the Company's product was not as strong as the defendants had led the public to believe as the Company's improper revenue recognition on at least 3 system sales made what in reality was a sequential decline in quarterly system installations appear to remain flat.

g.      Hansen's internal controls were not effective.

136.    Analysts quickly reacted, issuing reports that reflected concern with the unexpectedly lower catheter sales and apparent lengthening of the Company's revenue recognition due to installation and training.  With regard to the latter, JP Morgan noted in an August 1, 2008 analyst report (which was a follow up to the Company's July 28, 2008, report): "**As we outlined in Monday's preview note, it was the timing of shipments that dinged Hansen's quarter, not the demand.** The company actually shipped 10 systems but was only able to recognize 8 owing to its hurdles for revenue recognition (full installation and training)." (Emphasis in original).  The report also commented on Hansen's disclosure that Q108 catheter sales had included stocking: "**However, catheter sales were light this quarter.** After shipping 401 catheters in 1Q, the number shipped declined to 279 in 2Q, with management suggesting that stocking had boosted 1Q numbers by ~100 units." (Emphasis in original).

137.    In some instances, the reported catheter sales for Q208 were approximately half of what some analysts had expected.  An August 1, 2008, report issued by ThinkPanmure, LLC, entitled, "HNSN 2Q Sends Mixed Message; Reducing Price Target," observed that it was now apparent that the strength in the Q108 catheter sales had actually been stocking:

> **THINK ACTION:**
> The number of second-quarter system shipments was slightly ahead of our estimates, ***but delayed revenue recognition on two systems and lower-than-expected catheter sales cause some concern. We are lowering our out-year revenue estimate based on catheter usage, but are not changing our estimate for installations.*** We still have confidence in demand for systems as well as management's ability to make HNSN the leader in flexible medical robots. However, we believe that unclear recurring revenue streams merit a lower price target. We reiterate our Buy rating.
>
> **KEY POINTS:**
> **High Expenses, Low Catheter Sales, Delayed System Sales**
> Second-quarter results showed several areas of concern, in our opinion . . . ***a significant sequential decrease in catheter sales give insight that the first-quarter catheter sales strength was stocking, and actual usage is unclear, even though***

*management believes it is increasing. We believe it is still too early to use direct catheter sales as a proxy for utilization, but that the dramatic drop in 2Q requires a significant adjustment to the model . . .* [T]wo systems shipped in the quarter were not recognized as revenue, as the entire installation and training process had not been completed. That should make 3Q numbers easier to hit, but it points out that the demand may be slightly greater than HNSN is ready to meet. Of note, management went to great pains to reiterate 44-50 installation in 2008.

**Decrease In Revenue Due To Lower Catheter Assumptions**
We are not changing our Sensei installation assumptions going forward for units placed . . . *Catheter sales inconsistency highlights a concern going forward as to the predictability of the recurring revenue stream. We are assuming a lumpy 2H08 and have significantly reduced our out-year catheter sales, as it is unclear to us what real-world utilization will be.*

(Emphasis added).

138.    Another report issued that day by Merriman Curhan Ford & Co., entitled "Lack of Visibility in Artisan Catheter Sales Mitigates Our Enthusiasm for Now; Reducing Estimates and Downgrading to Neutral," noted that the reported Q208 Artisan Catheter sales of 279 fell below the firm's 450-unit expectation and that Q108 sales had been benefitted by several large orders:

**Investment Conclusion**
Hansen Medical reported disappointing 2Q08 results on July 31, after the market close. *Shipments of its Sensei robots were largely in-line with expectations, and while we think revenue recognition issues due are forgivable in this case, the unexpected downturn in catheter sales is worrisome to us given that we believe it does not bode well for the near-term uptake of catheters among the install base. We are reducing our FY08 and FY09 estimates and downgrading the stock to Neutral from Buy.*

\*        \*        \*

• **Sensei shipments in-line.** The company shipped 10 systems in the quarter, but only recognized revenue on eight systems; the remaining two will be recognized in 3Q08. The company maintained its guidance of 44-50 system placements for the full year of 2008.

• *Catheter sales below expectations; visibility is low, in our view. The company sold 279 Artisan catheters in the quarter, well below our 450-unit estimate. The company noted that there were several large orders in the first quarter, and near-term catheter sales may be lumpy and unpredictable. Management maintains that utilization is "on the right trajectory," but in the absence of further granularity, we find this quarter's results mitigating our near-term enthusiasm.*

(Emphasis added).

139.    On this news, the following day shares of Hansen declined by $2.01 per share, or 13.18%, to close on August 1, 2008, at $13.24 per share, on unusually heavy volume of 2,163,600

1   shares, more than twice the number of shares as the prior day and nearly fives times the approximate

2   average of 443,772 shares per trading day for the month of July 2008.  Shares of Hansen's stock

3   continued to decline the following day of trading, losing another $1.30 per share, or 9.82%, to close

4   at $11.94 on August 4, 2008, again on unusually heavy volume of more than 1.5 million shares. The

5   closing price on August 4, 2008, represented a two-day decline of $3.31 per share, or approximately

6   21.71%.

7        140.    On August 5, 2008, Hansen filed its Quarterly Report with the SEC on Form 10-Q

8   for Q208.  The Company's Form 10-Q was signed by Defendants Moll and Van Dick, and

9   substantially incorporated the same materially false and/or misleading financial results, as set forth

10  above in ¶117, which were announced on July 31, 2008.  The Company's 10-Q stated that the

11  Company's accompanying financial statements were prepared "in conformity with accounting

12  principles generally accepted in the United States."  Additionally, therein, in relevant part, the

13  Company stated and/or reported: (i) "Revenues for the second quarter of 2008 primarily related to

14  the sale of one Sensei system in Europe and seven Sensei systems in the United States;" and (ii)

15  "Revenues for the first six months of 2008 primarily related to the sale of four Sensei systems in

16  Europe and 12 Sensei systems in the United States."

17       141.    The statements referenced in ¶140 were each materially false and/or misleading when

18  made for the reasons in ¶118, above.  Additionally, the statements were each materially false and

19  misleading because as admitted and reflected by the Company's restatement: (i) Hansen's financial

20  statements were not prepared in accordance/conformity with GAAP; (ii) the total number of Systems

21  sold domestically that Hansen should have recognized as revenue was 4 in Q208, but was

22  misrepresented as 7, which constitutes an overstatement of 3, or 75%; (iii) the total number of

23  Systems sold that the Company should have recognized as revenue was 11 in H1 2008, but was

24  misrepresented as 16, constituting an overstatement of 5, or 45.45%; (iv) the total number of

25  Systems sold domestically that Hansen should have recognized as revenue was 9 in H1 2008, but

26  was misrepresented as 12, which constitutes an overstatement of 3, or 33.33%; and (v) the total

27  number of Systems sold internationally that Hansen should have recognized as revenue was 2 in H1

28  2008, but was misrepresented as 4, which constitutes an overstatement of 2, or 100%.

142.    The materially false and/or misleading statements in ¶140 were made with scienter for the reasons set forth above in ¶¶61, 89, 119, 130.

143.    Along with the  Company's Quarterly Report on Form 10-Q filed with the SEC on August 5, 2008, pursuant to Section 302 of SOX, Defendants Moll and Van Dick signed SOX required certifications attesting to the accuracy of the financial results and effectiveness of the Company's internal controls as set forth in full in ¶85, above.

144.    For the same reasons as set forth in ¶¶86, 119, 130, above, Defendants Moll's and Van Dick's SOX Certifications referenced in ¶143 were materially false and/or misleading when made, and made with scienter, as Defendants Moll and Van Dick knew of and/or were deliberately reckless as to the material weaknesses in the Company's internal controls and financial reporting.

**2008 Fiscal Third Quarter Ending September 30, 2008**

145.    On October 23, 2008, Hansen issued a press release entitled, "HANSEN MEDICAL REPORTS 2008 THIRD QUARTER RESULTS."  At the top of the press release, Hansen claimed, "Company Achieves Record Quarterly Revenues, System Sales and Catheter Shipments."  Therein, the Company, in relevant part, stated:

> • ***System Sales: The company recognized revenue on a single-quarter record of 14 Sensei(TM) Robotic Catheter Systems, which brings the total worldwide number of systems on which the company has recognized revenue (which the company refers to as its installed base) to 45, including 30 in the United States and 15 in Europe.***

> • ***Catheter Sales: The company shipped and recognized revenue on 423 Artisan(TM) Control Catheters, also a record for a single quarter***.

> • ***Revenue Growth: The company generated revenues of $10.9 million, a 214% year-over-year increase and the highest quarterly result in the company's history.***

> \*      \*      \*

> ***"The third quarter was our most successful commercial quarter to date and I am very pleased with our accomplishments," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. "During this record-breaking quarter, we achieved the highest quarterly level of revenues, system sales and catheter shipments in the history of our company. I continue to be impressed with the enthusiasm expressed for our technology by customers in a variety of different hospital settings  . . ."***

2008 Third Quarter Financial Results

*Total revenue for the three months ended September 30, 2008 was $10.9 million, a 214% increase compared to revenue of $3.5 million in the same period in 2007. The company recognized revenue on 14 Sensei Robotic Systems, including nine systems configured with the CoHesion(TM) module, as well as on shipments of 423 Artisan control catheters.*

*. . . Gross profit for the quarter was $4.2 million . . .*

\*        \*        \*

*Net loss for the three months ended September 30, 2008,  . . .was $12.0 million, or $(0.48) per basic and diluted share* . . .

\*        \*        \*

*Total revenue for the nine months ended September 30, 2008 was $22.9 million*, compared to $5.9 million for the same period last year. *The company's net loss for the nine months ended September 30, 2008, . . . was $38.5 million, or $(1.61) per basic and diluted share* . . .

(Emphasis added).  Additionally, in the financial statements appended to the press release, the Company reported the following for the ninth month period ending September 30, 2008; (i) revenue of $22,921,000; (ii) gross profit of $6,606,000; (iii) net loss of $38,525,000; and (iv) basic and diluted net loss per share of ($1.61).

146.    The statements referenced in ¶145 were materially false and/or misleading when made for the reasons in ¶60(a), above, and because:

a.       As reflected by the Company's restatement: (i) the Company's Installed Base at the end of Q308 of 37 was misrepresented as 45, which constitutes an overstatement of 8, or 21.62%; (ii) the Company's international Installed Base at the end of Q308 of 10 was misrepresented as 15, which constitutes an overstatement of 5, or 50%; (iii) the Company's domestic Installed Base at the end of Q308 of 27 was misrepresented as 30, which constitutes an overstatement of 3, or 11.11%; (iv) the total number of Systems sold that Hansen should have recognized as revenue was 12 in Q308, but was misrepresented as 14, constituting an overstatement of 2, or 16.67%; (v) revenue of $9,573,000 for Q308 was misrepresented as $10,864,000, which constitutes an overstatement of the Company's revenues by $1,291,000, or 13.49%; (vi) revenue of $18,084,000 for the nine month period ended September 30, 2008, was misrepresented as $22,921,000, which constitutes an overstatement of the Company's revenues by $4,837,000, or

1   26.75%; (vii) "Gross profit (loss)" of $3,351,000 for Q308 was misrepresented as $4,221,000,

2   constituting an overstatement of $871,000, or 25.96%; (viii) "Gross profit (loss)" of $3,144,000 for

3   the nine month period ended September 30, 2008, was misrepresented as $6,606,000, constituting

4   an overstatement of $3,462,000, or 110.11%; (ix) "Net loss" of ($12,857,000) for Q308 was

5   misrepresented as ($11,987,000), constituting an overstatement of $871,000, or 6.77%; (x) "Net

6   loss" of ($41,987,000) for the nine month period ended September 30, 2008, was misrepresented

7   as ($38,525,000), constituting an overstatement of $3,462,000, or 8.52%; (xi) "Basic and diluted net

8   loss per share" for Q308, of ($0.51) was misrepresented as ($0.48), constituting an overstatement

9   of $0.03, or 5.88%; (xii) "Basic and diluted net loss per share" for the nine month period ended

10  September 30, 2008, of ($1.76) was misrepresented as ($1.61), constituting an overstatement of

11  $0.15, or 8.52%; and (xiii) Artisan Catheter units sold during the quarter of 413 was misrepresented

12  as 423, an overstatement of 10.

13      b.      The restatement admitted that at least 2 of the 5 Systems recognized as

14  revenue on sales to customers in Europe were improperly recognized as revenue in Q308. Plaintiffs

15  are informed and believe that the Company improperly recognized revenue on the 2 Systems sold

16  to AB Medica (which were the Company's 3rd and 4th Systems shipped to AB Medica).[14]

17      c.      Hansen failed to disclose that it was improperly/prematurely recognizing

18  revenue on Systems and providing distributors with Systems in excess of the distributors' demand.

19  Indeed, according to CW1, as set forth in ¶34(g), at one point AB Medica was holding all 5 Systems

20  it was provided during the Class Period (including 1 System from Q407, 1 System from Q108, and

21  the 2 Systems from Q308) were sitting in a warehouse.  The Company later conceded that as of

22  November 2009, AB Medica had been unable to find customers to purchase the 2 Systems Hansen

23  shipped to AB Medica in Q308.

24      147.    The materially false and/or misleading statements in ¶145 were made with scienter

25  _____

26      [14]On a November 17, 2009, conference call discussing the restatement, Defendant Moll
    conceded these sales to AB Medica had been improperly recognized as revenue by admitting that
27  "AB Medica . . . [has] taken delivery of five systems and they have [only] been able to sell two of
    those systems" and the revenue for the last 3 Systems sold to AB Medica had been reclassified to
28  deferred revenue and would be recognized once AB Medica sold the systems through to end-users.

1  for the reasons set forth above in ¶¶61, 89, 119, 130, because defendants knew and/or were

2  deliberately reckless in not knowing, among others, the following:

3         a.    **For the same reasons alleged in ¶¶60, 61, 88, 89, for sales to distributors,**

4  **the Company was improperly/prematurely recognizing revenue on shipment** despite the fact that

5  the distributors were not capable of independently installing Systems and training end-users.

6         b.    **As alleged in ¶¶118-119, Hansen was improperly recognizing revenue on**

7  **temporary installations** and the Company's Installed Base and financial results were materially

8  inflated/overstated due to Hansen's improper/premature revenue recognition on at least 3 Systems

9  sold domestically and temporarily installed in Q208.

10         c.    **For the same reasons alleged in ¶¶61(c), 89(c), 119(d), defendants**

11  **attended installation and sales meetings and received/reviewed reports dealing with sales and**

12  **installation**: the Individual Defendants would receive a copy of a quarterly installation report on

13  a daily basis, Defendants Moll and Van Dick would attend installation meetings where the status of

14  orders and installations were discussed, including orders to Spain, Italy, and Russia, the Individual

15  Defendants received sales reports, and the Individual Defendants attended weekly sales meetings

16  to discuss the status of sales and potential customers and deliveries would be reviewed to determine

17  how to pull in sales.

18         d.    **At least 1 System sold domestically and recognized as revenue during**

19  **Q308 (to the VA Cincinnati in Ohio) was a temporary installation and improperly recognized**

20  **as revenue.**  As set forth in ¶34(h), CW1 indicated the Company's System for VA Cincinnati, Ohio

21  was installed and not used for months, and that the system was uninstalled and later reinstalled.  In

22  the information available *via* the Federal Procurement Data System – which indicates that the

23  available information was last updated "09/15/2008 09:50:21" – the description of the contract

24  award lists the "Completion Date" as "10/30/2008" and the "Est. Ultimate Completion Date" as

25  "11/26/2008," both of which are in Q408.

26         e.    **For the same reasons alleged in ¶¶61(e), 89(e), 119(e), Sensei System Sales**

27  **were Hansen's core business/operations.**  At the time Hansen originally reported its Q308

28  financial results, almost all of the Company's quarterly revenues came from the sale of only 14

1 Systems, of which, at least 2 were improperly recorded as revenue (or 14.29%) in violation of the

2 Company's revenue recognition policy.

3         f.      **As alleged in ¶¶61(f),119(f), the Individual Defendants were familiar with**

4 **and knowledgeable of Hansen's revenue recognition criteria.**

5         g.      **During the Q308 conference call, Defendant Restani demonstrated his**

6 **familiarity with the 14 Systems/transactions originally reported and recognized as revenue**

7 **that quarter**, *see infra* ¶149, as Defendant Restani cited specific details about the quarter's

8 transactions, including that the Veterans Administration purchased three systems, the Company had

9 its 1st System sale in excess of $1 million (and the fact that it included a second robotic arm), that

10 9 of the Systems were equipped with the Cohesion Module, and that 1 System was the initial sale

11 done pursuant to the Company's Co-Marketing Agreement with St. Jude Medical.

12         h.      **As alleged in ¶¶61(h), 119(h), the Individual Defendants indicated that**

13 **they monitored Hansen's sales pipeline** and were familiar with the customers purchasing Systems.

14         i.      **For the same reasons alleged in ¶119(i), the Individual Defendants**

15 **monitored catheter sales and reviewed internal reports that would indicate that Systems in the**

16 **Company's Installed Base were not being used and had not ordered any catheters.** As an

17 example, CW1 indicated that the System sold to Loyola in Chicago was "literally put in a closet for

18 a year" and it was obvious that no catheters were being sold to Loyola.

19         j.      **For the same reasons alleged in ¶119(j), Hansen went to great lengths**

20 **(and would even incur excess costs) to meet quarterly expectations.**

21         k.      **For the same reasons alleged in ¶¶61(k), 89(k), 119(k), and as alleged in**

22 **¶¶168-169,** *infra***, Defendants Moll and Van Dick nevertheless signed materially false and/or**

23 **misleading SOX required certifications** attesting to the accuracy of Hansen's financial results and

24 effectiveness of the Company's internal controls for Q308.

25         l.      **For the same reasons alleged in ¶119(l), as Hansen's COO, Defendant**

26 **Restani was familiar with, knowledgeable of, and involved in Hansen's commercial operations**

27 **division where the Company admits that it lacked adequate internal controls** "to provide

28

1   reasonable assurance that controls could not be circumvented or overridden by commercial

2   operations management or to prevent or detect possible misconduct by members of [the Company's]

3   commercial operations organization with respect to certain revenue transactions."

4        148.   That day, Hansen held a conference call in connection with the press release

5   announcing the Company's financial results for Q308.  The Individual Defendants were present.

6        149.   After Hansen's reported Q208 catheter sales were below analyst estimates and raised

7   concerns about utilization rates, defendants gave the market exactly what it wanted and more when

8   Hansen reported its Q308 results to prove that the Hansen story was intact and to quell any concerns

9   about Hansen's ability to execute its sales/revenue ramp.  The Individual Defendants once again

10   touted materially false and/or misleading information about, among others, Hansen's revenues,

11   Installed Base, quarterly sales of systems, and guidance for FY08:

> [*Defendant Moll*:] **I am pleased to report a record breaking third quarter in which we recognized revenue on 14 Sensei systems. This represents a 75% increase in revenue units over our previous quarterly high. As of the end of the third quarter, the total number of Sensei systems on which we have recognized revenue, which we refer to as our installed base, has now grown to 45. This includes 30 systems in the United States and 15 in Europe.**
>
> **I am also pleased to report a record breaking third quarter in which we recognized revenue on 423 Artisan catheters. The 423 catheters shipped during the third quarter brings our year-to-date total to 1,103. This is a 190% increase in shipments compared to our seven months of commercial shipments in 2007.**
>
> \*       \*       \*
>
> With regard to market conditions and their affect on our future revenues, I can report that thus far we have not yet observed any material negative effects of the economic downturn and credit crisis on our business prospects.
>
> While none of us can know how credit markets and economic conditions may affect the healthcare sector in general, we believe that the capital constraints may be largely mitigated for Hansen relative to our competition and due to our favorable value proposition. We believe that we are better positioned than our primary competitor whose system requires a significantly larger upfront investment, as well as a multimillion-dollar facility renovation.
>
> \*       \*       \*
>
> [*Defendant Restani*:] **. . . the third quarter was a record-breaking quarter for Hansen. We had our best quarter ever in terms of systems sales, catheter unit sales, and total revenues.**

*Of the 14 systems that contributed to the third quarter revenue, nine were delivered to sites in the United States and five delivered to Europe.*

Notably, we recorded our first Sensei sale exceeding $1 million. This sale was to a customer that embraced the flexibility of the Sensei system by ordering a second robotic arm for placement in a second EP lab suite.

Also of note this quarter, our decision to add a national account function is demonstrating its value. We expect that our ability to sell effectively in hospital buying groups and integrated delivery networks is becoming an important element for future growth. Case in point, we sold three systems to the VA this quarter, and we also signed a master sales agreement with a prominent IDN.

\*        \*        \*

With regard our St. Jude collaboration, sales and marketing efforts of our CoHesion product to our US customers began during this past quarter. And we are pleased to announce that nine Sensei systems sold in the third quarter were configured with the CoHesion module, four of which were sold in the US.

. . . we also recorded our first sale to St. Jude Medical under our co-marketing agreement. As a reminder, our co-marketing agreement allows St. Jude to sell our CoHesion enabled Sensei system to hospitals when it is leveraged with other St. Jude products. We feel that our co-marketing agreement with St. Jude will provide our customers with an alternative to traditional means of acquiring capital equipment.

\*        \*        \*

[*Defendant Van Dick*:] *. . . we recorded a record quarterly revenue of $10.9 million, primarily on the sale of 14 Sensei systems and shipments of 423 Artisan Control Catheters. This represents a 214% increase over the $3.5 million of revenue in the same period in 2007, in which we sold five Sensei systems and 140 Artisan catheters.*

\*        \*        \*

*Gross profit for the quarter was $4.2 million . . .*

\*        \*        \*

*Net loss for the third quarter of 2008, . . .or $0.48 per basic and diluted share* . . .

\*        \*        \*

[*Defendant Moll*:] *As evidenced by our system and catheter sales this last quarter, we are experiencing strong demand for our technology in the electrophysiology market*. . .

(Emphasis added).

150.    The statements in ¶149, which were not corrected by any of the other Individual

1    Defendants, were materially false and/or misleading and made with scienter for the reasons set forth

2    in ¶¶146-147.

3         151.    During the Q308 conference call, Defendant Van Dick again provided materially

4    false/or misleading guidance to the public:

> Moving on to our business outlook, in our previous calls we provided full year
> guidance for annual system sales in 2008 of between 44 to 50 systems. So far, we
> have performed as we expected, with our sales being backend loaded toward the
> second half of the year, and we fully expect this trend to continue next year.
>
> ***Given the current outlook for our business, we are now able to tighten our
> guidance range to between 45 and 48 system sales for the full year of 2008. Given
> the 30 systems on which we recognized revenue on through the first three quarters
> of 2008, this new guidance implies recognizing revenue on between 15 to 18
> systems in the fourth quarter.***

(Emphasis added)

12        152.    The statements in ¶151, which were not corrected by Defendants Moll or Restani,

13   were knowingly false and lacking any reasonable basis for the reasons set forth in ¶¶66, 124, 146,

14   147.  Additionally, defendants knew and/or were deliberately reckless in not knowing that  while

15   the FY08 guidance was premised on the inclusion of "the 30 systems on which [Hansen] recognized

16   revenue on through the first three quarters of 2008 . . . [and] implies recognizing revenue on between

17   15 to 18 systems in the fourth quarter," the Company had improperly recognized revenue on at least

18   7 of the 30 Systems it originally recognized as revenue during Q108, Q208, and Q308.

19        153.    During the Q308 conference call, Defendant Restani exhibited his knowledge of the

20   Company's operations department and again represented the independence of the Company's sales

21   and operations personnel from the Company's distributors:

> [*Defendant Restani:*] Yes, in the US, we've -- we will have what I call 25 customer
> facing people.
>
> We're going to have 12 salespeople, there's a senior VP, sales VP, 12 other regional
> and sales directors. And we have 12 clinical sales specialists. So, that adds up to a
> total of 25 at the end of this year in the US.
>
> In Europe, we have a total of seven direct people in our direct countries. As you
> know, it's UK, Germany, Switzerland, and Austria, and the others are distributor
> representatives, feet on the ground, which handle our business in Italy, Spain, and
> France, which are other distribution capabilities.

1    So, in total, direct reps is -- sales reps is 20 -- I'm sorry, 17, and we have 15 clinical
2    sales specialists, which are customer facing. Then, we have nine service people in
     the US and three in Europe.

3        154.    The statements in ¶153, which were not corrected by Defendants Moll or Van Dick,

4    were materially false and/or misleading and made with scienter for the reasons set forth in ¶100, and

5    created the materially false and/or misleading impression that the Company's distributors were

6    independent and capable of acting independently of the Company when in fact they were neither

7    independent nor capable of acting independently of the Company, and Hansen's employees

8    handled/assisted the installation and training for Hansen's distributors.

9        155.    Also during the Q308 conference call, the Individual Defendants displayed their fluid

10   knowledge of the Company's sales and operations departments, and in particular, the training

11   process involved with the installation of the Company's Sensei System.  In response to an analyst

12   question, Defendant Moll elaborated on the pride he felt with respect to the Company's business

13   model and the training and clinical service Hansen provided to its customers:

14       [*Analyst*:] And in terms of the cases that are being done, can you characterize, with
15       a broad brush, do the reps have to be physically present per case once you get a
         system up and going? And is there a funneling effect that the procedure cannot be
16       done because the rep is not present or vice versa? How would you say --?

17       [*Defendant Moll*:] No, no, no. And we've talked about this in the past. We're very
         proud of the fact that in our business model and in our training programs, we plan to
18       train and support the customer up to a point where they can gain true independence
         from any involvement or participation from our reps.

19
         And so, when that occurs is a little fluid because it depends on the -- somewhat on
20       logistics and somewhat on the amount of training that the clinician -- that the clinical
         support staff believes the clinical clinician can -- is appropriate. So -- but, we have
21       a pattern of training clinically, supporting the clinician for a number of cases, and
         then planning the exit such that they will be fully independent from Hansen clinical
22       support.

23       156.    In the wake of the prior quarter's sudden drop off in catheter sales, Defendant Moll

24   made sure to provide an update on the Company's efforts to evaluate utilization, explaining that in

25   Q308 the Company started counting customers' inventories:

26       On our last call, I indicated that we would be implementing a process to better
         understand our actual utilization of catheters in clinical cases as compared to the
27       number of catheters shipped. In the third quarter, we began this process by
         quantifying our customer's existing inventory. We plan to continue to gather this
28       information in order to better understand and determine actual quarterly utilization.

We believe it will take us an additional two or three quarters to establish meaningful utilization, but thus far we are pleased with how our catheter utilization is trending.

157.     Although Hansen's reported an impressive 14 System sales in Q308, during the Q308 conference call, the Individual Defendants nevertheless had to again stave off analysts' questions regarding the relatively low catheter sales and utilization rates.  Analysts seemed puzzled by the relatively stagnant growth in catheter sales and utilization given the recent growth in the Company's Installed Base.  Defendant Moll rejected the possibility that there may be "sleeping Sensei[s]," instead characterizing the situation as more reflective of early utilization among Systems sold:

[*Analyst*:]  And Fred, on a rolling basis, whether you talk about two quarters or three quarters or four quarters, ***how many Sensei in the field would you characterize as sleeping Sensei? That means they're really not up and going.*** And I come back to your original point, if I look upon four procedures per week, average for your really high volume users, that's about 50 catheters a quarter. If you're selling 423 in a quarter, it goes without saying someone of the Sensei are sleeping and/or really not up to speed. In how much time do you think the Sensei are up to speed where you would say, even though you don't have a good idea about utilization, you'll say, "You know what? They're really not sitting idle. They're producing something."

[*Defendant Moll*:]  ***No, I wouldn't call it sitting idle. I mean, certainly there are -- there's probably a couple examples where Sensei that actually have had the time to percolate through the process aren't being used a lot. But, there's -- there are a number of systems in that we are growing placements rapidly per quarter, so there is a lot of systems that are sort of in the early stages of utilization.***

And just by definition, if you're early in the utilization cycle, you're not going to do the volume that the systems that have been around for a while and have people -- multiple people trained on a system in certain institutions, you're just not going to do the same sort of a volume.

***And so, it is a -- it does take time for the system, once we obtain a purchase order, install the system, train the clinicians, schedule the training -- schedule the cases that the Hansen clinician will be present at, and come get that clinician up to speed, it's a process that takes a while and it's different for every system we sell.***

***And so, there is -- there aren't a lot of systems that are sleeping. There are systems that are not anywhere near up to full utilization because they haven't sort of gone through the process of getting up to full independence and utilization by the institution -- the people qualified at the institution to use it, not just the one clinician that stuck up his hand to say, "We got to get this, and I want to get started."***

So, it's a process. And we are -- ***the reason I mentioned our utilization study is we want to be all over that. We want to understand the process of where we're getting full utilization quickly and how that happened, and where we're getting slower adoption and what are the barriers to faster adoption.*** Is it more training? It is some

sort of support for the customer that we're not doing?

And so, I'd say this is work in progress. And we're -- I lived through the days of Intuitive when we couldn't get more than a couple cases a month and nobody understood why. And it just grows. Utilization always grow slower than you'd like it. But, we are seeing favorable trends and excited to -- sort of this is a compounding thing where you get -- once you get the formula of how to move a new customer rapidly into a high volume situation, once we get that formula, I think it's going to make a big difference.

(Emphasis added).

158.    The statements in ¶157, which were not corrected by Defendants Van Dick or Restani, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶60-61, 88-89, 118-119, 146-147, because, among others:

a.    **As alleged above, the Company was including system sold to distributors in the Company's Installed Base despite the fact that these Systems would not be installed and in use until some later time.**  CW8, as set forth in ¶41, described the distributors as being more like figureheads.  CW8 stated that distributors had to receive the product, bring it into the country, track the serial number, bring it to the hospital and then Hansen would bring someone in to install it.

b.    **Even though Defendant Moll essentially denied that there were "sleeping" Sensei (or idle Systems) by characterizing the situation as one reflecting low utilization among new users, there were in fact sleeping Systems.**  As Defendant Moll later admitted – during the November 17, 2009, conference call discussing the restatement – at the end of the Q309, the Company had approximately 10 Systems included in deferred revenue (which were originally recognized as revenue during the Class Period, and as result of the restatement, reclassified to deferred revenue) some of which had originally been reported as sold and recognized as revenue as early as Q208 yet were still in the possession of the distributors who ere unable to sell the Systems through to an end user.

c.    **As alleged above in ¶¶119(b), 147(d), Plaintiffs are informed and believe, that there were multiple temporary installations in Q208 and Q308 that were inactive.**

d.    **According to CW1, as set forth in ¶34(g)-(h), multiple Systems included in Hansen's reported Installed Base were inactive.**  Plaintiffs are informed and believe that of

1    Hansen's originally reported Installed Base at the end of Q308 of 45 Systems, the following 11 to

2    13 Systems in Hansen's then reported Installed Base were effectively inactive, including, *inter*

3    *alia*:[15]

4                 i.    AB Medica was holding 4 Systems.  As set forth in ¶34(g), CW1

5    indicated that at one point, AB Medica had at least 5 systems in a warehouse.  Given that, as set

6    forth in ¶34(j), AB Medica did not receive its 5th System until Q109 (which as reflected by Ex. C

7    was not ordered until March 31, 2009), at the time of the Q308 conference call, Plaintiffs are

8    informed and believe there were 4 inactive Systems being held by AB Medica in an Italian

9    warehouse.

10                ii.    As set forth in ¶34(h), according to CW1, the System for Loyola

11   University Hospital in Illinois (which was recognized as revenue in Q208) was purchased in June

12   2008, installed the last week of the quarter and, within two days after the quarter ended, was

13   uninstalled and placed in a closet.

14                iii.    As set forth in ¶34(h), according to CW1, the System for the

15   University of Miami hospital in Florida (which was recognized as revenue in Q208) was installed

16   in early or mid-2008 by Warren Cunningham, was later uninstalled, and then reinstalled in the

17   Spring of 2009.  According to CW1, the System was repeatedly installed and uninstalled and, to

18   CW1's knowledge, it was never used.

19                iv.    As set forth in ¶34(h), according to CW1, the System for Sequoia

20   Hospital in California (which was recognized as revenue in Q307) was installed, but the hospital

21   stopped using it after one month and the System ended up in mothballs.

---

[15]Plaintiffs' information and belief is corroborated by Hansen's restatement.  Of the originally reported Installed Base (45 Systems) at the end of Q308, the restatement reflects that the Installed Base was overstated by at least 8 Systems (an overstatement in excess of 21%).  Further, of the at least 8 Systems improperly included in the Installed Base, at least 5 Systems were international.  As most of the improperly recognized international systems were to distributors, which on a restated basis would be shifted to the quarter in which the System was sold through and actually installed at the end user's facility, the mere fact that the international installed base was overstated by 5 Systems suggests that at least 5 Systems were being held by distributors and inactive.

1             v.     As set forth in ¶34(h), the System for Riverside Hospital in Ohio

2 (which was recognized as revenue in Q307) was used for a while and then went unused.

3             vi.    As set forth in ¶34(h), CW1 indicated that the System for

4 Massachusetts General Hospital (which recognized as revenue in Q407) remained unused after the

5 doctor who performed the procedures moved.

6             vii.   As set forth in ¶34(h), CW1 indicated that the System for VA

7 Brecksville Hospital in Ohio  (which was recognized as revenue in Q208) was installed, but was

8 unused for months.  As set forth in ¶45(a), CW12 also cited the System for VA Brecksville Hospital

9 as a temporary installation.

10           viii.   As set forth in ¶34(h), CW1 indicated the System for VA Cincinnati,

11 Ohio (which was recognized as revenue in Q308) was installed and not used for months, and that

12 the system was uninstalled and later reinstalled.

13             ix.    As set forth in ¶34(h), CW1 indicated the System for Midwest

14 Regional Medical Center in Oklahoma (which was recognized as revenue in Q108) was installed,

15 but the doctor who was to use the system left the hospital and the system was never used.

16        **e.**    **For the same reasons alleged in ¶¶119(i), 147(i), the Individual**

17 **Defendants monitored catheter sales and reviewed internal reports that would indicate that**

18 **Systems in the Company's Installed Base were not being used and had not ordered any**

19 **catheters.**

20        **f.**    **Defendants, including Defendant Moll, repeatedly stated during the Q108**

21 **and Q208 conference calls that defendants were actively studying utilization and catheter sales**

22 **among the Installed Base.**  During the Q308 conference call, Defendant Moll indicated that the

23 Company implemented "a process to better understand [the Company's] actual utilization" and that

24 during the quarter Hansen began the process of "quantifying its customers existing inventory and

25 was continuing to gather information to better understand and determine actual utilization."  As

26 such, by constantly monitoring and/or reviewing data pertaining to customers' utilization and

27 catheter sales, Defendants were admittedly actively reviewing data which would indicate and/or

28

1   demonstrate that there were in fact numerous systems that were sitting inactive, had been installed

2   and not used, were no longer being used, and/or had been temporarily installed.[16]  Indeed, in the

3   above statement, Defendant Moll states that defendants were looking to determine any "barriers to

4   faster adoption:"

5
> *[T]he reason I mentioned our utilization study is we want to be all over that*. We want to understand the process of where we're getting full utilization quickly and how that happened, and *where we're getting slower adoption and what are the barriers to faster adoption*."  (Emphasis added).

6

7

8   159.   During the Q308 conference call, analysts repeatedly sought reassurances from the

9   Individual Defendants that Hansen was not being negatively impacted by the economy.  In fact, each

10  of the Individual Defendants ostensibly denied that the economy was having any material impact

11  on Hansen's business:

12
> [*Analyst*:] . . . [J]ust to be clear, your view at this point on at least your business within the US and O-US hospitals is that you're really not picking up any signs of delayed orders, any requests to push out timelines on your systems?

13

14
> [*Defendant Moll*:] *So, yes, as I said, we have not observed any material negative effect of the downturn, economic downturn, in our business prospects. And no one knows how the credit markets and the economic conditions are going to affect healthcare, but as I said, we believe that we are very well positioned relative to our competitors. And because of what we think is a very strong value proposition and the ability to sell systems in a leveraged way with St. Jude, all those things, I think, are working in our favor.*

15

16

17

18                                    *       *       *

19
> [*Analyst*:] We're in sort of special times here with the credit crisis, and if you could give us any more details. I'm not sure if you could share placements that you've had, say, since the beginning of October that might have been financed or even late in September since this whole credit crisis hit. If you can provide that, that's great. If you can't, we understand. Is that something you could tell us?

20

21

22
> [*Defendant Van Dick*:] *I mean, currently, right now, we don't have any more details that we can really provide, other than the fact that we just haven't seen any material impact on our September or in our business that we see closing in Q4.*

23

24                                    *       *       *

25

26  _____

27  [16]Even if a temporarily installed System had been subsequently reinstalled, studying utilization data for the "barriers to faster adoption" would nevertheless alert Defendants to the mere fact that the System had been temporarily installed as it would inherently be a substantial (if not the primary) factor in the site's delayed uptake in utilization.

28

[*Analyst*:] What is the length of the sales cycle currently, and have you all seen any change recently?

[*Defendant Restani*:] **Yes, that's a great question because with all this concern about the markets, you have to understand that we've always been in a pretty lengthy sales cycle. And our sales cycles, from getting the lead to fruition, can be anywhere from six to 18 months. And the key is the pipeline that you've got in those cycles, right? And you are constantly moving that forward.**

**So, to Fred's earlier comments, we have not seen a material change. The effort we're going to really be putting on is ensuring we keep the right amount of opportunities in the upcoming quarter in play.** And so, we always keep more opportunities than you would have that you'd want to build in play, and that's the -- **I guess the focus of our confidence is that our pipeline looks solid. We haven't seen our pipeline deteriorate, again, materially. There's always going to be a one or two movement, and we've seen that before prior to these situations. They've moved from a quarter to another quarter.**

Again, we can't -- we haven't got a crystal ball but we feel, in this area, our value proposition and how we manage the sales process, and by that I mean we just don't sell to the EP. We go right up to the CEO suite in each account. So, we have very good visibility as to where our system procurement is and at what stage it's at. So, we try to manage that very, very clearly.

(Emphasis added).

160.    Again, Defendant Moll made very clear that "to date" Company did not see "the effects of the credit crisis" and affirmatively represented that Defendants had no indication that the only way Hansen would be able to sell its systems was to "cut price."

[*Defendant Moll*:] Well, I guess I'll say this. I sure don't -- I **mean, we have no evidence that we would be in a situation where we would -- the only way we're going to move systems is to cut price.** We have seen no evidence of that to date. And as I said, we haven't -- we just don't see the effects of the credit crisis. And, again, as we've said before, we think we're positioned well to weather the storm if there -- if in fact the storm comes our way.

So, I don't -- I'll say it again, I don't have a crystal ball. But, we do feel good about where we are, and we will manage our business according to sort of changing economic conditions. So, other than that, I can't be more specific.

(Emphasis added).

161.    The statements in ¶160, which were not corrected by Defendants Van Dick or Restani, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶119(d),(m), (o), because contrary to Defendant Moll's statement, the Company would cannibalize its future System sales by offering potential/future customers discounts at the end of the quarter to

take Systems earlier than the customers would need the System and/or to get customers to allow the Company to temporarily install Systems.

162.    Hansen's reported Q308 financial results helped to greatly restore the market's confidence that the Company's sales/revenue ramp was still on target as Hansen exceeded analysts' expectations for almost every metric.  On October 24, 2008, Brean Murray Carret & Co., issued a report praising the Company's Q308 results entitled, "Hansen Delivers a Comeuppance – Beats Estimates and Maintains FY08 Guidance; Reiterate Buy."  The report observed that the Company "handily beat" expectations, that Hansen tightened its FY08 guidance, and that Hansen's "execution plan remains very much intact despite concerns over the economy:"

**Investment Summary**

We recently initiated coverage of Hansen Medical with a Buy rating and a $12 target price. ***While we remain concerned that there may be an overall slowdown in the capital equipment sector, we believe that an early-stage technology such as Hansen's should remain relatively immune to the emerging economic downturn. We believe our thesis was supported when the company bested our 3Q08 expectations and maintained its guidance for 2008. Hence, we are reiterating our Buy rating at this time.***

**Discussion**

**Hansen Medical handily beats our expectations for the quarter.** Hansen's stock fell precipitously ahead of yesterday's conference call in anticipation of a miss or a pullback in guidance. ***In an appropriate comeuppance, the company surprised with sales of 14 Sensei systems and 423 Artisan catheters, besting our 12 and 300 unit estimates, respectively. Nine of the Sensei units were shipped with the higher-priced Cohesion modules. ASP for the Sensei was $722,000.*** The significant rise in ASP was driven by the Cohesion module sales as well as the sale of a single two-arm system for over $1 million. Nine Sensei units were sold in the U.S., while the remainder was sold in the E.U. Total top-line revenue was $10.9 million versus our estimate of $8.4 million. Gross margin of 38.9% was higher than our 19% estimate. The Company expects COGS to continue to scale following the recent transition to a new facility.

**Guidance for 2008 remains solid.** The company previously guided to 44-50 Sensei shipments for 2008. ***Noting that it had not seen any material negative impact from the economy, management maintained its guidance within the prior range by more specifically stating that it expects to ship 45-48 units (15-18 for 4Q08) for the whole of 2008.***

\*        \*        \*

***Raising estimates. We are raising our 2008 unit estimate to 48 Sensei units from 43, with our revenue estimate going to $35.8 million from $30.8 million.  Our 2009***

*revenue estimate is now $54.5 million, up from our previous forecast of $51.9 million.* Our unit sales estimates remain largely unchanged, but our ASP assumption for the Sensei rises to $675,000 for FY09.

**Reiterating Buy rating.** We recently initiated coverage of Hansen with a Buy rating and a 12-month target price of $12. In a rebuttal of the sentiment going into the earnings call, *the company beat expectations and demonstrated that its execution plan remains very much intact despite concerns over the economy.* With the stock near its all-time low, we strongly urge investors to cover short or build long positions at these levels. We reiterate our Buy rating and $12 target price, based on a 2009 EV/S ratio of 6x.

(Emphasis added).

163.    A report from J.P. Morgan also issued that day entitled, "Strong 3Q; Installed Base Continues to Ramp," commented on the Company's confidence in its guidance with two months left in the quarter and remarked on the success of the Company's revenue/sales ramp:

**Finally, with just two months left in the year, management remains confident in its ability to achieve the system placement target it set back in February,** even tightening its guidance range on its 3Q call. This is fairly remarkable given how early the company was in its ramp heading into 2008 and the usual lumpiness and unpredictability of capital equipment MedTech businesses. Even more impressive, in our view, is how quickly Hansen has been able to ramp up its installed base. Exiting 3Q08, the company had placed 45 Sensei systems worldwide in just four full quarters of sales (US approval didn't come until May 2007). By way of comparison, it took Stereotaxis nearly 3 years to reach the same point.

(Emphasis in original).

164.    On this news, shares of Hansen's stock increased by $2.04 per share, or 30.09%, to close on October 24, 2008, at $8.82 per share, on unusually heavy volume of 1,057,800 shares, more than double the number of shares that traded during the prior day of trading.

165.    On November 5, 2008, Hansen filed its Quarterly Report with the SEC on Form 10-Q for Q308.  The Company's Form 10-Q was signed by Defendants Moll and Van Dick, and substantially incorporated the same materially false and/or misleading financial results, as set forth above in ¶145, which were announced on October 23, 2008.  The Company's 10-Q stated that the Company's accompanying financial statements were prepared "in conformity with accounting principles generally accepted in the United States."  Additionally, therein, in relevant part, the Company stated and/or reported: (i) "Revenues for the third quarter of 2008 primarily related to the sale of five Sensei systems in Europe and nine Sensei systems in the United States;" and (ii)

1   "Revenues for the first nine months of 2008 primarily related to the sale of nine Sensei systems in

2   Europe and 21 Sensei systems in the United States."

3        166.   The statements referenced in ¶165 were each materially false and/or misleading when

4   made for the reasons in ¶146, above.  Additionally, the statements were each materially false and

5   misleading because as admitted and reflected by the Company's restatement: (i) the Company's

6   financial statements were not prepared in accordance/conformity with GAAP; (ii) the total number

7   of Systems sold internationally that Hansen should have recognized as revenue was 3 in Q308, but

8   was misrepresented as 5, which constitutes an overstatement of 2, or 66.67%; (iii) the total number

9   of Systems sold that Hansen should have recognized as revenue was 23 for the nine month period

10  ended September 30, 2008, but was misrepresented as 30, constituting an overstatement of 7, or

11  30.43%; (iv) the total number of Systems sold domestically that Hansen should have recognized as

12  revenue was 18 for the nine month period ended September 30, 2008, but was misrepresented as 21,

13  which constitutes an overstatement of 3, or 16.67%; and (v) the total number of Systems sold

14  internationally that Hansen should have recognized as revenue was 5 for the nine month period

15  ended September 30, 2008, but was misrepresented as 9, an overstatement of 4, or 80%.

16       167.   The materially false and/or misleading statements in ¶165 were made with scienter

17  for the reasons set forth above in ¶¶146-47, 158.

18       168.   Along with the  Company's Quarterly Report on Form 10-Q filed with the SEC on

19  November 5, 2008, pursuant to Section 302 of SOX, Defendants Moll and Van Dick signed SOX

20  required certifications attesting to the accuracy of the financial results and effectiveness of the

21  Company's internal controls as set forth in full in ¶85, above.

22       169.   For the same reasons as set forth in ¶¶86, 147, above, Defendants Moll's and Van

23  Dick's SOX Certifications referenced in ¶168 were materially false and/or misleading when made,

24  and made with scienter, as Defendants Moll and Van Dick knew of and/or were deliberately reckless

25  as to the material weaknesses in the Company's internal controls and financial reporting.

26       170.   On December 5, 2008, the Company conducted a presentation at the JPMorgan Tenth

27  SMid Cap Conference on December 5, 2008, at the JPMorgan Conference Center in New York City.

28  Defendants Moll and Van Dick were present for the presentation.

171.     During the December 5, 2008, analyst conference, Defendant Moll touted Hansen as the "global leader in flexible robotics" by proudly providing the materially false and/or misleading information about the Company's Q308 revenues and Installed Base as of the end of Q308:

> So, where we are today is we sold 45 Sensei systems worldwide through Q 3 of '08. And we're coming off a record quarter of sales of almost $11million dollars and we feel very good about that. We have installed 45 systems…. 30 in the US and as you can see where they're located geographically and 15 systems in Europe.

172.     The statements in ¶171, which were not corrected by Defendant Van Dick, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶146-147, 158.

173.     During the December 5, 2008, analyst conference, Defendant Moll specifically highlighted the false and/or misleading trend – that Hansen's revenue/sales ramp was progressing at a pace unrivaled by its competitors/predecessors:

> So if you look at our system and adoption rate relative to a couple of the robotics companies, we feel pretty good about where we are, in that we have a faster ramp than either my previous company Intuitive, in the first couple of years, or certainly Sterotaxis, which is our direct competitor in the electric physiology  business.

174.     The statements in ¶173, which were not corrected by Defendant Van Dick, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶60-61, 88-89, 118-119, 130, 146-147, 158, because Hansen's sales/revenue ramp was materially lower than defendants had led the market to believe as the apparent speed/success of Hansen's ramp was largely the result of improperly/prematurely recognizing revenue and thus, inflating the Installed base.

175.     Finally, during the December 5, 2008, analyst conference, Defendant Moll addressed the issue of the economy and falsely assured the market by indicating that while things were tougher, the enthusiasm for the purchase of Hansen's systems remained, the Company was simply working harder, and nevertheless, the Company would deliver in the face of the then economic environment:

> . . . [F]inally again we think we have an attractive business model. As I mentioned we did almost 11million in rev last quarter, as of Sept, 30th we have 35mil in the bank, and believe me we have sufficient funding to last through 2009, and we think that despite the economic environment that everybody asks about, you know, is your business falling apart, has it gotten harder out there to sell capital equipment? Absolutely. Do we feel like there's any less enthusiasm for the purchase of the

system? Absolutely NOT. And so, yea, we're working harder, but still believe that we can deliver on a very good business in 2009.

176.   The statements in ¶175, which were not corrected by Defendant Van Dick, were materially false and/or misleading and made with scienter for the same reasons in ¶174, as the true demand for the Sensei System was not as strong as Defendants had led the public to believe.

**2008 Fiscal Fourth Quarter Ending December 31, 2008**

177.   On January 8, 2009, Morgan Stanley issued an analyst report entitled, "Hansen Medical, Inc., Product Cycle Not Enough; Lowering Numbers."  Therein, in relevant part, the analyst report, stated:

> **Capital Spending and Sensei:** Our recent survey of 50 hospitals of varying sizes and geographies returned only 1 center considering a purchase of Sensei.  When asked to rank spending priorities, robotic surgery ranked last.  Because Sensei's benefits are not yet mainstream and AF is a relatively small procedure, hospitals may delay capital outlays in this environment.  We are now forecasting 56 Sensei System Placements for '09 (lowered from 74) and $74 mn in total sales (vs. $55 mn for consensus).

> \*       \*       \*

> *Hospital budgets are tight and a lower priority is being given to buying Sensei systems.  A large portion of hospitals are not deeming the system as a crucial purchase and are postponing or no longer considering the capital outlay to acquire one.*

(Emphasis in original).

178.   The January 8, 2008, Morgan Stanley analyst report partially revealed that and/or reflected the following materializations of concealed risks: (a) that the demand for the Company's products was lower than defendants led the market to believe due to the Company creating the false appearance of demand through improper revenue recognition on System sales to distributors and temporary installations, as well as cannibalizing future sales; and (b) that the Company might not achieve its FY08 guidance.

179.   On this news, shares of Hansen's stock declined $1.59 per share, or 20.25%, to close on January 8, 2009, at $6.26 per share, on unusually heavy volume of 812,600, which  was 623,900 greater than the volume on January 7, 2009, of 188,700.

180.   Nevertheless, defendants' statements continued to be  materially  false  and/or

1   misleading for the following reasons, among others: (a) Hansen's financial results for Q407 through

2   Q308 and Installed Base at the end of Q308, remained materially overstated; (b) the Company was

3   improperly recognizing revenue for distributor sales upon shipment despite the fact that the

4   distributors were not capable of independently installing systems and training the end-user

5   physicians; (c) Hansen was improperly recording revenue on temporary installations; (d) the

6   Company's Installed Base included numerous Systems that were effectively inactive; (e) the

7   Company's FY08 guidance remained knowingly false; (f) the Company was cannibalizing its future

8   catheter and System sales by offering end of the quarter discounting and doing temporary system

9   installations; (g) for the foregoing reasons, the demand for the Company's product was not as strong

10  as Defendants had led the public to believe; and (h) Hansen's internal controls were not effective.

11      181.    On January 8, 2009, after the market closed, Hansen issued a press release entitled,

12  "Hansen Medical Announces Preliminary Fourth Quarter 2008 Revenue Results and Provides

13  Preliminary 2009 Outlook."  Therein, the Company, in relevant part, stated:

> **For the fourth quarter, Hansen Medical shipped 11 Sensei systems and expects to recognize revenue on the sale of 10 systems**. The eleventh system shipped in the fourth quarter should be recognized as revenue in the first quarter of 2009. **For the full 2008 year, the company expects to recognize revenue on 40 systems. The lower than expected system sales were due primarily to the sluggish global macroeconomic environment and credit tightening that resulted in a number of potential customers postponing orders for the company's Sensei systems.**

> "**The economic downturn and its effect on our customers' capital spending has been more dramatic than we anticipated when we provided our fourth quarter and full year outlook for system sales**," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. "As economic conditions continued to deteriorate during the fourth quarter, several potential customers who appeared to be on track to purchase Sensei systems during the quarter postponed their orders due to capital spending constraints. While this will impact our near term operating results, I remain confident in our ability to grow our business going forward. We are not aware of any of these delayed fourth quarter orders having been cancelled, but instead believe they remain under consideration for future purchases. In addition, I continue to be impressed with the enthusiasm expressed for our technology by clinicians who indicate they are better able to perform complex interventional procedures using the Sensei system. I also believe Hansen Medical's superior value proposition gives us a competitive advantage over our primary competitor whose system requires a significantly larger up-front investment," said Dr. Moll.

> **The company expects 2008 fourth quarter revenues to be in the range of $7.1 million to $7.4 million. In addition to the 10 Sensei systems, revenues for the quarter are expected to include the shipment of approximately 520 Artisan catheters.** The expected range and components of 2008 fourth quarter revenue are

estimates pending the audit of the company's financial results for the year ended December 31, 2008 and accordingly are subject to change.

***Hansen Medical currently expects to recognize revenue on 53 to 65 systems for 2009. "Among other factors, this range takes into account the uncertainty around the length and severity of the current economic recession and the impact it will have on our potential customers," said Dr. Moll.***

(Emphasis added).

182.   The announcement called management's credibility into question after Defendant Moll's recent positive comments on December 5, 2008, and additionally, partially revealed: (a) that Hansen had not achieved its FY08 guidance; (b) that the true demand for the Sensei System was not as strong as the Company had led the public to believe; (c) that the Company was further facing issues that were delaying revenue recognition; and (d) that utilization was not increasing to the extent the Company had led the public to believe.

183.   Hansen's preliminary financial results in the January 8, 2009, press release also reflected the following materializations of concealed risks:

a.   The Company was unable to achieve its FY08 guidance, which had been knowingly false as defendants were prematurely recognizing revenue and prematurely including systems in the installed base, including systems sold to distributors and temporary installations.

b.   The Company was unable to add as many systems to its Installed Base as expected  because certain distributors were still holding Systems from prior quarters that the distributors were unable to sell through to end users and could not take any additional inventory.

c.   The Company was unable to sell and install enough Systems due to the fact that in prior quarters the Company had already cannibalized its future sales through end-of-quarter discounts to get customers to take Systems earlier than was needed and/or to allow temporary installations. The Company's announcement that "potential customers [were] postponing orders for the company's Sensei systems" was a result of the fact that the Company could not get any additional potential/future customers to pull their sales into the quarter.

d.   The Company's catheter sales and utilization rates were lower than expected due to the numerous systems that were effectively inactive.

e.      The demand for the Company's Systems and the Company's sales/revenue ramp now appeared to be slower than the public had been led to believe because the Company had misrepresented the demand for its Systems and the speed of its revenue/sales ramp by improperly and prematurely recognizing revenue on System sales.

f.      As set forth in ¶34(v), CW 1 stated that the guidance Hansen provided to the public in 2008 and 2009 for System sales was produced using a "top-down" approach. CW 1 stated that the numbers represented management's goal, but that these numbers were not based on any historical numbers that were contained in installation or sales reports. CW 1 stated that the System sales goals did not change until later in each year when it was obvious that the original goals were impossible to make.

184.    Hansen's preliminary results for Q408 were well below analysts expectations. Analysts reacted to the Company's announcement that delays in capital spending had negatively impacted the quarter and the apparent downward trend in utilization. On January 8, 2009, Thomas Weisel Partners LLC issued a report entitled, "Tightening Capital Equipment Budgets Hurt 4Q08 Results" which noted:

> **Hansen Medical reported preliminary 4Q08 results after the market close on Thursday, January 8.** Revenues are expected to be $7.1-7.4mn compared to our estimate of $12.5mn and consensus of $12.2mn. The company did not comment on bottom line performance.
>
> **Tough economy drives a tough quarter:** Console placements in the quarter were soft, at 10 systems compared to our estimate of 15, and the bottom end of guidance of 14-20. The company stated that dramatic tightening of hospital capital equipment budgets caused several customers to delay existing orders, none have cancelled to date. The company shipped 520 Artisan catheters were shipped in the quarter, well below our estimate of 960.
>
> **Remain cautious on hospital spending environment and low catheter utilization:** This quarter confirms our concerns that the broader hospital spending environment could be a drag on the business, a trend that seems unlikely to abate in the near term. Continued softness in disposables sales is of particular concern. Last quarter we commented that utilization on a per console appears to be in a downward trend. This trend continued this quarter, with the implication that use of existing consoles may be stagnating. In an environment where hospitals are only spending on "need to have" equipment, this is a bad sign.
>
> **2009 guidance:** The company issued 2009 guidance to a range of 53 to 65 system placements. This compares to our estimate of 60 system placements.

185.    On this news, the following day shares of Hansen's stock further declined $0.50 per share, or 7.99%, to close on Friday January 9, 2009, at $5.76 per share, on unusually heavy volume of 587,700.  On Monday January 12, 2009, the Company's stock declined another $0.60 per share, to close at $5.16 per share, again on unusually heavy volume of more than 400,000.  This two trading-day decline represented a total decline of $1.10 per share, or 17.58%, from the closing price on January 8, 2009, and represented a remarkable three day decline of $2.69 per share, or 34.27%, from the closing price of $7.85 per share on January 7, 2009, which marks the last time that Hansen's stock closed above $7.00 per share.

186.    Nevertheless, the statements referenced in ¶181 were materially false and/or misleading when made for the reasons in ¶60(a), above, and because:

a.    As reflected by the Company's restatement: (i) the total number of Systems sold that the Company should have recognized as revenue was 6 in Q408, but was misrepresented as 10, constituting an overstatement of 4, or 66.67%; (ii) the total number of systems sold that the Company should have recognized as revenue was 29 for FY08, but was misrepresented as 40, constituting an overstatement of 11, or 37.93%; and (iii) revenue of $5,362,000 for Q408 was misrepresented as being in a range between $7,100,000, to $7,400,000 which constitutes an overstatement of the Company's revenues by at least $1,738,000, more than 30%.

b.    The Company's later restatement reflected that at least 1 of the 6 domestic sales recognized as revenue during Q408 was improperly recorded as revenue.  While discussing the Company's restatement during a November 17, 2009, conference call, Defendant Moll admitted that the System sold and recognized as revenue to Yale had been improperly recognized as revenue during the Class Period and should have been properly recognized as revenue in Q309.

c.    The Company's restatement reflected that least 3 of the 4 international sales recognized as revenue during Q408 were improperly recognized as revenue.   For the following reasons, Plaintiffs are informed and believe that these 3 Systems were each of the 3 Systems sold to distributors (including, Palex, Minogue Medical in Canada, and St. Jude in France) and recognized as revenue in Q408:

i.    For the same reasons alleged in ¶¶60-61, 88-89, 146-147, for sales to

distributors, the Company was improperly/prematurely recognizing revenue on shipment despite the fact that the distributors were not capable of installing Hansen's Systems and training end-user physicians to use Hansen's Systems.

ii.      The System sold to Hansen's Canadian Distributor (Minogue Medical) was not able to be sold through and installed because the distributor never obtained the necessary approvals from the Canadian government. *See* ¶34(i).

iii.     The System sold through the distributor relationship with St. Jude in France was not sold through until June of 2009 to Hospital Saint Joseph in Marseille (the first Sensei System in France) as reflected by a press release put out by the hospital and reflected by the lack of catheter sales in Q109 and the only catheter order during Q209 on June 26, 2009, to "St. Joseph - St. St. Jude" listed in "Marseille" in "France". *See* Exs. E - F**,** respectively.

d.      Hansen failed to disclose: (i) that the Company was prematurely/improperly recognizing revenue on  distributor sales; (ii) a significant number of Systems in the Company's Installed Base were essentially inactive; and (iii) that Hansen's guidance simply reflected management's goals.  As set forth in ¶34(v), CW 1 stated that the guidance provided to the public in 2008 and 2009 for System sales was produced using a "top-down" approach. CW 1 stated that the numbers represented management's goal, but that these numbers were not based on any historical numbers that were contained in installation or sales reports.  CW 1 stated that the System sales goals did not change until later in each year when it was blatantly obvious that the original goals were impossible to make.

187.   The materially false and/or misleading statements in ¶181 were made with scienter for the reasons set forth above in ¶¶61, 89, 119, 130, 147, 158, 161, because defendants knew and/or were deliberately reckless in not knowing, among others, the following:

a.      **For the same reasons alleged in ¶¶60, 61, 88, 89, 146, 147, for sales to distributors, the Company was improperly/prematurely recognizing revenue on shipment** despite the fact that the distributors were not capable of installing Hansen's Systems and training end-user physicians to use Hansen's Systems.

1          b.    **Hansen recognized revenue on a System sold to its Canadian distributor**

2 **(Minogue Medical) despite the fact that the Canadian distributor did not have regulatory**

3 **approval from the Canadian government.**  According to CW1, as set forth in ¶34(i), Hansen sold

4 a System to a customer in Canada in December 2008 and recognized the revenue although the

5 System was never installed.  CW1 stated that the distributor never succeeded in obtaining approval

6 from the Canadian government to use the equipment, and as of November 2009, the System had

7 never been installed and was placed in a warehouse.

8          c.    **For the same reasons alleged in ¶¶61(c), 89(c), 119(d), 147(c), the**

9 **defendants would attend sales and installation meetings and receive and/review reports about**

10 **installations and sales:** the Individual Defendants would receive a copy of a quarterly installation

11 report on a daily basis, Defendants Moll and Van Dick would attend installation meetings where the

12 status of orders and installations were discussed, including orders to Spain, Italy, and Russia, the

13 Individual Defendants received sales reports, and the Individual Defendants attended weekly sales

14 meetings to discuss the status of sales and potential customers and deliveries would be reviewed to

15 determine how to pull in sales.

16          d.    **As alleged in ¶¶118-119, 146, 147, Hansen was improperly recognizing**

17 **revenue on temporary installations** and the Company's Installed Base and financial results were

18 materially inflated/overstated due to Hansen's improper/premature revenue recognition onSystems

19 sold domestically and temporarily installed in Q208 and Q308.

20          e.    **Hansen temporarily installed a system at Yale-New Haven Hospital**

21 **("Yale") the last week of December, which was uninstalled the following week.**

22          i.    As set forth in ¶34(e), CW1 stated that Warren Cunningham, who

23 worked for CW1, was the Hansen employee who installed the Company's system at Yale on

24 December 31, 2008.  According to CW1, Chris Sell's sales representatives were very involved in

25 the Company's account with Yale, including CW7 and Chris Fong.  CW1 confirmed that the

26 Company's system at Yale was uninstalled within one week of installation.  CW1 stated that Hansen

27 then had to deliver the system, install it, and obtain the customer's acceptance through a signature.

28 According to CW1, training the physicians was always part of the process and Jess Ayars had to

obtain a training certificate reflecting that the physicians were trained to use the Company's systems. CW1 stated that with respect to the Company's system sold to Yale, the training certificate was generated in late December and that he/she heard that the document was manufactured in order for the Company to recognize revenue from the sale.  As set forth in ¶35(a), CW2 also knew that Hansen had installed a system at Yale-New Haven Hospital (or "Yale") in the last week of December 2008, which was uninstalled one week later.  CW2 was told that the official reason had to do with a room placement issue.  According to CW2, Hansen conducted temporary installations when CW2 began to work at the Company.  CW2 provided an example of a particular temporary installation in Boston where the machine was installed even though it was going to be eventually installed in another environment.  It was CW2's understanding that a similar temporary installation occurred at Yale because Yale was in the process of building a new laboratory.  CW2 also heard that Hansen made the sale and recognized revenue for the system without the physicians being trained. CW1 and CW2's account is corroborated by CW4.  As set forth in ¶37(g), CW4 was told by his/her boss that Hansen had recorded revenue on a system installed at Yale that eventually was taken out, which had been installed to make the revenue numbers for the quarter look good.  CW7, as set forth in ¶40(a), confirmed that a Hansen System was installed at Yale in the last week of December 2008 and removed one week later.  As set forth in ¶45(a), CW12 who was performing a nearby installation the same day, confirmed that Yale was a temporary installation and that the system was installed on December 31, 2008, and thereafter uninstalled.  CW12 cited Yale as an example of systems being installed at the end of quarters and uninstalled later because salespeople were giving special prices to customers to buy the systems earlier than the customers needed them.

ii.     Indeed, these accounts are corroborated by Defendant Moll's admission during the November 17, 2009, conference call, that the Yale system had been improperly recognized as revenue during the Class Period and that as a result, it was instead being recognized in Q309;

iii.    The accounts of CW1, CW2, CW4, CW7, and CW12, are further corroborated by information on file with the Connecticut Office of Healthcare Access ("OHCA"), which indicates that Yale could not have been done remodeling its new EP labs as of Q408 and that

1  the equipment purchased by Yale was purchased to go along with a GE system that did not become

2  operational until July 30, 2009 (*i.e.*, Q309).  During 2008, Yale was in the process of submitting a

3  Certificate of Need ("CON") for new EP equipment and renovations to the EP laboratory to

4  accomodate the new EP equipment.  Specifically, Yale was seeking a GE Inova Single-Plane

5  imaging system and various compatible equipment including, among others, a Hansen system.  The

6  GE system "was mated with the Hansen Navigation component."  Yale's application stated that the

7  estimated construction time would take 5 months from OHCA approval of the funding. The OHCA

8  approved the funding on December 24, 2008, and requested that Yale notify the OHCA of the initial

9  date the equipment became operational. Yale, however, in February 2009 requested an increase in

10  authorized capital expenditure from the OHCA because Yale's final vendor analysis found that the

11  equipment that best met the facilities needs was a GE biplane system and which was more expensive

12  than originally anticipated.  Subsequently, the OHCA approved the additional funding on March 3,

13  2009.  Thereafter, on October 9, 2009, Yale sent a letter to the OHCA indicating that the project was

14  completed within the budget  and "[t]he new Electrophysiology Laboratory, which is an Innova

15  2121Q Biplane System, is manufactured by GE Healthcare" and "[T]he first date of operation was

16  July 30, 2009."

17            f.        **As alleged in ¶¶61(f),119(f), the Individual Defendants were familiar with**

18  **and knowledgeable of Hansen's revenue recognition criteria.**  Further, during the Q408

19  conference call *see infra* ¶206, Defendant Van Dick specifically spoke again to the Company's

20  revenue recognition criteria and expressly stated that defendants looked at the required revenue

21  recognition obligations for every order:

22            ". . . *[E]very time we get an order, we look at all of our obligations to the customer*
              *for that order, and given our requirements, we have to make sure that we fulfill all*
23            *of our obligations under the sales contract before we can take revenue.* And there
              will be times from quarter-to-quarter where those obligations that we have will span
24            from one quarter to the next quarter."

25  (Emphasis added).

26            g.        **For the same reasons alleged in ¶¶61(e), 89(e), 119(e), 147(e), Sensei**

27  **System Sales were Hansen's core business/operations.**  At the time Hansen originally reported

28  its Q408 financial results, almost all of the Company's quarterly revenues were from the sale of only

1    10 Systems, at least 4 (an astounding 40%) of which were improperly recognized as revenue in

2    violation of the Company's revenue recognition policy.

3          h.    **During the Q408 conference call,** *see infra* **¶200, Defendant Restani**

4    **demonstrated he was familiar with the details of the 10 systems reported as recognized as**

5    **revenue in Q408,** as he was able to indicate the breakdown of domestic versus international sales,

6    the number sold to distributors, the fact that the Canadian distributor purchased its initial System,

7    and that there was a System sold through the Co-Marketing Agreement with St. Jude;

8          i.    **For the same reasons alleged in ¶¶119(i), 147(i), the Individual**

9    **Defendants monitored catheter sales and reviewed internal reports that would indicate that**

10   **Systems in the Company's Installed Base were not being used and had not ordered any**

11   **catheters.**  CW1 cited Yale as one such example, and noted that the System was signed off, the

12   revenue was recognized, the System was put in a closet on January 3 or 5, 2009, and that two weeks

13   later, everyone knew the System was not being used because there was a lack of catheter sales.

14   Indeed, as reflected in Exs. E-F, (reports received and reviewed by Defendants Moll and Van Dick

15   that list all of the catheter sales for Q109 and Q209, respectively), Yale did not purchase any

16   catheters until June 30, 2009 (*i.e.*, the last day of Q209).

17         j.    **For the same reasons alleged in ¶¶119(j), 147(j), Hansen went to great**

18   **lengths (and would even incur excess costs) to meet quarterly expectations**.

19         k.    **As alleged in ¶¶61(h), 119(h), 147(h), the Individual Defendants indicated**

20   **that they monitored the Company's sales pipeline and were familiar with the customers**

21   **purchasing Hansen's Systems.**  Further, during the Q408 conference call, *see infra* ¶205,

22   defendants demonstrated they were familiar with the Company's customers, sales process, and

23   pipeline during Q408, and in general, by "understanding where we are with each potential customer

24   account."

25         l.    **For the same reasons alleged in ¶119(l), as Hansen's COO, Defendant**

26   **Restani was familiar with, knowledgeable of, and involved in Hansen's commercial operations**

27   **division** where the Company admits that it lacked internal controls "to provide reasonable assurance

28   that controls could not be circumvented or overridden by commercial operations management or to

1   prevent or detect possible misconduct by members of [the Company's] commercial operations
2   organization with respect to certain revenue transactions."

3            m.      **For the same reasons alleged in ¶¶61(k), 89(k), 119(k),147(k), and as**
4   **alleged in ¶¶212-213, *infra*, Defendants Moll and Van Dick nevertheless signed materially false**
5   **and/or misleading SOX required certifications** attesting to the accuracy of Hansen's financial
6   results and effectiveness of the Company's internal controls for Q408 and FY08.

7            n.      **According to the Company, an anonymous "whistleblower" indicated**
8   **that at least one "irregularity" had "resulted in improper revenue recognition" on at least 1**
9   **system in Q408.**

10           o.      **Hansen's FY09 guidance was knowingly false for the same reasons**
11  **alleged in ¶¶66, 124,** and because, as alleged above: (i) the Company was improperly/prematurely
12  recognizing revenue on sales to distributers that were not capable of installing the systems and
13  training end-user physicians to use the System; (ii) as a result, the Company was prematurely
14  including systems in its "Installed Base" that, in reality, were indefinitely inactive and simply being
15  held until a purchaser could be found to purchase the system, at which time the distributor would
16  have the system delivered to the end user's facility and Hansen personnel would assist with the
17  installation and training; (iii) Hansen was improperly/prematurely recognizing revenue (on sales to
18  distributors and temporary installations); (iv) Hansen was cannibalizing its future sales; and (v) as
19  set forth in ¶34(v), CW 1 stated that the guidance Hansen provided to the public in 2008 and 2009
20  for System sales was produced using a "top-down" approach.  CW 1 stated that the numbers
21  represented management's goal, but that these numbers were not based on any historical numbers
22  that were contained in installation or sales reports.  CW 1 stated that the System sales goals did not
23  change until later in each year when it was blatantly obvious that the original goals were impossible
24  to make.

25           188.   On January 12, 2009, the Company conducted a presentation at the JPMorgan
26  Healthcare Conference in San Francisco.  Defendants Moll and Restani were present for the
27  presentation.

28           189.   At the January 12, 2009 conference, Defendant Moll began the presentation by

highlighting Hansen's purported 2008 performance in spite of the difficult economic conditions that the Company had blamed for its below expectation Q408 performance:

> I want to start by saying that despite these dreary economic times, I think that Hansen is very well positioned to continue to be the leader in flexible robotics. I want to review with you some of the progress that we've made. We've sold 55 sensei systems worldwide through 4Q08. And this year we sold 40 of those systems and are projecting a greater than 30% growth rate in 2009.

> \*       \*       \*

> So, as I said, we are building a very significant installed base-55 systems. That comes with, we think, a mounting clinical data story that is very powerful. Just want to review the revenue growth by quarter. You see this up to Q3, we had a big Q3, we expect, as we announced a few days ago, a bit of a downturn in Q4 due to macro economic conditions. We're projecting between 7.1 and 7.4M in revenue in Q4.

190.    The statements in ¶189, which were not corrected by Defendant Restani, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶186,187.

191.    Once again, Defendant Moll used the opportunity during the January 12, 2009, conference to highlight the purported impressive speed and success of Hansen's revenue/sales ramp when compared to its peers and customers:

> So I think you know we've been active for about a year and a half commercialization. If you look at the adoption rate I think there's reason to be feel very good about where we are.  If you look at historical examples of Intuitive Surgical.  Their growth rate through their first 3 years of system sales and adoption or our direct competitor Stereoaxis, we are outpacing both of these companies.

> It may not be exactly a fair comparison with Intuitive in that robotics is very new. When we first introduced that. But I do think that it puts into perspective, the amount of progress we've made in unit sales in a little more than a year and a half.

192.    The statements in ¶191, which were not corrected by Defendant Restani, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶174, 187.

193.    Defendant Moll also took the opportunity during the January 12, 2009 conference, to provide more detail about the purported impact the economy was having on the Company's sales cycle and that nevertheless, given the Company's pipeline and potential customers, defendants felt "very comfortable" and "confident" with the FY09 guidance the Company provided a few days earlier on January 8, 2009:

> Let me conclude by saying, as I started off by saying, this isn't the easiest time for

business generally and specifically for the capital equipment business, selling to hospitals. Having said that, we feel good about where we ended the year, with selling 40 systems. And the 4th quarter was honestly a bit of a surprise to us, in that the final 60 days of the quarter, we found that CFOs of hospitals were wanting to sort of step back and say, 'gee, I'm not sure what we're dealing with here, let's wait until 2009.' Having said that, we did not, we did not get responses that sounded like, 'we're don't think we're interested in this technology anymore, we're not going to be able to buy it, we're going to have to rethink our strategy with regard to using technology to build our business in EP.' What we heard was 'gee, this is a scary situation; we're gonna wait until the 1st of the year,' to understand in those particular hospitals that had been hard hit by the economics of the downturn, 'we're gonna wait and see where we are . . . and let's talk in Q1.'

And we believe that going forward… although we may cast out net  a little bit boarder over the number of hospitals we're looking for, ***that our pipeline and our opportunity to sell systems is broad enough that we feel very comfortable with the guidance that we gave a few days ago, and think that the type of growth that that represents, which is a little bit north of 30% growth, is very doable in this environment. Now, none of us have a crystal ball, but we feel very confident that given the pipeline, given the list of potential customers and the state at which the conversations exist with those customers standing here today, we feel very comfortable we're going to have a very reason able 2009.***

(Emphasis added).

194.    During the January 12, 2009, analyst conference, Defendant Moll further discussed the Company's FY09 guidance, which he indicated was "conservative."  Defendant Moll highlighted that Hansen sales people thought they could achieve the FY09 guidance "in their sleep" and that they were "100% certain we can do at least 53 systems:"

We sold 15 systems in 07. We sold 40 in 08.  We're suggesting we can sell between 53 and 65 in 09, and I gotta tell you, the sales guys [..] ***"are you kidding me, we can do that in our sleep***."  We don't know what's coming, you don't know what's coming, and ***so we're trying to be conservative without gutting sales projections and in a way that doesn't make any sense***.  And we are also going to control operating expenses to a reduced sales figure.  We are very serious about right-sizing the operations to really fit a downsized revenue target, but until we see that there's any evidence that says we can't do ***what the sales guy's saying, "I'm 100% certain we can do at least 53 systems." We're going to operate under the fact that next year's going to be tough but it's not going to be impossible***.

195.    The statements in ¶194 about the Company's FY09 guidance, which were not corrected by Defendant Van Dick, were knowingly false for the reasons set forth in ¶187(o). Additionally, Defendant Moll's past/present-tense statements about Hansen trying to be conservative in setting its FY09 guidance and about the confidence of Hansen's sales force in achieving the FY09 guidance, which were not corrected by Defendant Van Dick, were materially false and/or misleading

1    and made with scienter because Defendant Moll and Van Dick knew and/or were deliberately in not

2    knowing, the following:

3            a.    Hansen was not being "conservative" in setting its FY09 guidance and as set

4    forth in ¶34(v), CW 1 stated that the guidance Hansen provided to the public in 2008 and 2009 for

5    System sales was produced using a "top-down" approach. CW 1 stated that the numbers represented

6    management's goal, but that these numbers were not based on any historical numbers that were

7    contained in installation or sales reports.  CW 1 stated that system sales goals did not change

8    until later in each year when it was blatantly obvious that the original goals were impossible to

9    make.

10           b.    Hansen's sales force was not as confident in their ability to sell 53 Systems

11   in 2009.  As set forth in ¶34(v), while CW1 recalls the sales force being optimistic for 2009, CW1

12   did not recall anyone expressing that selling 53 Systems in 2009 would be easy.  Rather, CW1

13   indicated that the sales people would often express that it was tough to say no to Chris Sells with

14   respect to sales estimates.  CW1's account is corroborated by CW11 who, as set forth in ¶44(a),

15   stated that it was impossible to  make his/her numbers and that Chris Sells made effectively

16   impossible demands that CW11 press the Company's customers for unrealistic sales.

17       196.    On February 12, 2009, Hansen issued a press release entitled, "HANSEN MEDICAL

18   REPORTS 2008 FOURTH QUARTER AND YEAR-END RESULTS."  At the top of the press

19   release, the Company highlighted, "***40 Sensei Robotic Catheter Systems Placed During 2008***

20   ***Bringing Worldwide Installed Base to 55 Systems After 20 Months of Commercialization***," and

21   therein, in relevant part, stated:

22       •    ***System Sales: During the fourth quarter, the company recognized revenue***
             ***on 10 Sensei Robotic Systems and shipped one additional system for which***
23           ***revenue is expected to be recognized in the first quarter of 2009. For the***
             ***full year of 2008, the company recognized revenue on 40 systems. Through***
24           ***December 31, 2008, the company has recognized revenue on a total of 55***
             ***systems (which the company refers to as its installed base), including 36 in***
25           ***the United States and 19 in Europe***.

26       •    ***Catheter Sales: The company shipped and recognized revenue on 520***
             ***ArtisanTM Control Catheters in the fourth quarter, a record for a single***
27           ***quarter.***

28

- ***Revenue Growth: The company generated fourth quarter revenues of $7.3 million, a 74% year-over-year increase. Full-year 2008 revenues are $30.2 million***.

- CoHesion Adoption: Of the 10 systems sold in the fourth quarter, seven were configured with CoHesion modules, and two additional CoHesion modules were sold to the existing installed base.

*     *     *

"I am pleased with our progress and accomplishments during this past year," said Frederic Moll, M.D., co-founder and chief executive officer of Hansen Medical. ***"Adoption rates for our technology have been strong, with an installed base of 55 systems worldwide since we began commercial shipments in May 2007.*** In addition, we made important investments in our business and established partnerships that we believe put us in a position to significantly expand our technology in the years ahead. We are also encouraged by the progress we are making in markets outside EP and believe that this success provides evidence of the opportunity to leverage the Sensei platform into a variety of other interventional applications," concluded Dr. Moll.

2008 Fourth Quarter Financial Results

***Total revenue for the three months ended December 31, 2008 was $7.3 million, a 74% increase compared to revenue of $4.2 million in the same period in 2007. The company recognized revenue on 10 Sensei Robotic Systems, including seven systems configured with the CoHesionTM module, as well as on shipments of 520 Artisan control catheters.***

***. . . Gross profit for the quarter was $2.1 million, yielding a gross margin of 28.7%. This compares to gross profit of negative $23,000 and negative gross margin of 0.5% for the same period in 2007, which included non-cash stock compensation expense of $139,000 . . .***

*     *     *

***Net loss for the three months ended December 31, 2008 . . . was $14.9 million, or $(0.59) per basic and diluted share, based on average basic and diluted shares . . .***

*     *     *

***Total revenue for the year ended December 31, 2008 was $30.2 million, compared to $10.1 million for the same period last year. The company's net loss for 2008, . . . was $53.4 million, or $(2.21) per basic and diluted share . . .***

(Emphasis added).

197.    The statements referenced in ¶196 were materially false and/or misleading when made for the reasons in ¶¶60(a), 186, and because as reflected by the Company's restatement: (i) the Company's "Installed Base" at the end of Q408 of 43 was misrepresented as 55, which constitutes

an overstatement of 12, or 27.91%; (ii) the Company's international "Installed Base" at the end of Q408 of 11 was misrepresented as 19, which constitutes an overstatement of 8, or 72.73%; (iii) the Company's domestic "Installed Base" at the end of Q408 of 32 was misrepresented as 36, which constitutes an overstatement of 4, or 12.50%; (iv) the total number of systems sold for which the Company should have recognized as revenue was 6 in Q408, but was misrepresented as 10, constituting an overstatement of 4, or 66.67%; (v) the total number of systems sold for which the Company should have recognized as revenue was 29 for FY08, but was misrepresented as 40, constituting an overstatement of 11, or 37.93%; (vi) revenue of $5,362,000 for Q408 was misrepresented as $7,312,000, which constitutes an overstatement of the Company's revenues by $1,950,000, or 36.37%; (vii) revenue of $23,446,000 for FY08, was misrepresented as $30,233,000, which constitutes an overstatement of the Company's revenues by $6,787,000, or 28.95%; (viii) "Gross profit (loss)" of $1,137,000 for Q408 was misrepresented as $2,099,000, constituting an overstatement of $962,000, or 84.61%; (ix) "Gross profit (loss)" of $4,281,000 for FY08, was misrepresented as $8,705,000, constituting an overstatement of $4,424,000, or 103.34%; (x) "Net loss" of ($15,881,000) for Q408 was misrepresented as ($14,919,000), constituting an overstatement of $962,000, or 6.06%; (xi) "Net loss" ($57,868,000) for FY08, was misrepresented as ($53,444,000), constituting an overstatement of $4,424,000, or 7.64%; (xii) "Basic and diluted net loss per share" for Q408, of ($0.59) was misrepresented as ($0.63), constituting an overstatement of $0.04, or 6.35%; (xiii) "Basic and diluted net loss per share" for FY08, of ($2.39) was misrepresented as ($2.21), constituting an overstatement of $0.18, or 7.53%; and (xiv) Artisan Catheter units sold during the quarter of 493 and during FY08 of 1,591, were misrepresented as 520, and 1,621, respectively, representing overstatements of 27 and 30, respectively.

198.    The materially false and/or misleading statements in ¶196 were made with scienter for the reasons set forth above in ¶187.

199.    That day, Hansen held a conference call in connection with the press release announcing the Company's financial results for the 2008 fiscal year and fourth quarter. Defendants Moll, Van Dick, and Restani were present.

200.    During the Q408 conference call, defendants tried to convince the public that the

1  Hansen revenue/sales ramp was intact and that the effects from the economy would not be a

2  significant issue going forward.   Again, defendants boasted about the growth during FY08 in the

3  Company's Installed Base, revenues, and sales, as well as the Company's guidance for FY09.  Also,

4  defendants announced that Defendant Restani would be stepping down from his position as an

5  officer of the Company, but would continue to serve as a director.  In relevant part, the Individual

6  Defendants stated:

> [*Defendant Moll*:] Despite a challenging economic climate, 2008 was a year of tremendous accomplishment for Hansen Medical. ***We wrapped up the year with an install base of 55 systems worldwide, and shipped over 1600 Artisan catheters.*** We were also successful in establishing strong partnerships that we believe will put us in a position to significantly expand our business in the years ahead.
>
> \*     \*     \*
>
> ***As we disclosed early last month, during the fourth quarter we shipped 11 Sensei Systems and recognized revenue on the placement of 10 systems. The 11th system shipped in the fourth quarter is expected to be recognized as revenue in the first quarter of 2009.***
>
> ***For the full year of 2008, we recognized revenue on 40 systems. To the end of 2008, we had recognized revenue on 55 systems, which we refer to as our worldwide installed base. This includes 36 systems in the United States and 19 in Europe. Placing 55 systems in the field after 20 months of commercialization outpaces the adoption rate of both Intuitive Surgical and Sterotaxis at a similar phase in their commercial lifecycles.***
>
> \*     \*     \*
>
> ***I am also pleased to report another strong quarter of disposable sales. During the fourth quarter we recognized revenue on 520 Artisan catheters, bringing the year total to 1,621 catheters.***
>
> \*     \*     \*
>
> In summary, I am very pleased with our progress and accomplishments during this past year. Despite a tough economic environment, adoption of our technology has been strong. We have now gained experience from a large number of clinical cases in a variety of different hospital settings, which is indicative of the broad appeal of our system. I continue to be impressed with the enthusiasm with which the majority of our customers embrace our Sensei technology, and I believe we are building a strong position in the EP market.
>
> ***With full acknowledgment of the uncertain economic environment in 2009, we do believe that based on our current field activity, it is appropriate to reaffirm our system placement guidance of 53 to 65 systems for 2009.***
>
> \*     \*     \*
>
> [*Defendant Restani*:] Thank you, Fred. I will begin by providing some additional

color on our system and catheter sales during the quarter. *Of the 10 systems that contributed to fourth quarter revenue, six were delivered to sites in the United States and four were delivered internationally. Our four international sales consisted of three systems sold to distributors including our first sale to our Canadian distributor, and one direct sale to an end-user.*

*Looking at disposable sales during the quarter, the 520 catheters sold is more than 20% higher than the previous single quarter record of 423 established in Q3. Our 2008 full year total of 1621 catheters is more than five times higher than the total number of catheters sold during our seven months of commercial catheter shipments in 2007.*

\*     \*     \*

We received FDA 510(k) clearance for the CoHesion Module mid-year, and since receiving regulatory approval, the vast majority of our system sales have included the CoHesion Module, demonstrating the clinical value of this enhancement. We are pleased to report that seven Sensei Systems sold in Q4 were configured with the CoHesion Module, five of which were sold in the US.

*In the fourth quarter we also recorded our second sales to St. Jude Medical under our co-marketing agreement. As a reminder, our co-marketing agreement allows St. Jude to sell our CoHesion-enabled Sensei System to hospitals when it is leveraged with other St. Jude products. We feel that our co-marketing agreement with St. Jude will provide our customers with an alternative to traditional means of acquiring capital equipment, which I believe is especially valuable in today's economic environment.*

*In addition, during the fourth quarter, we signed a distribution agreement with St. Jude in France. This agreement contributed to the sale of one unit during the quarter. We will continue to work to establish additional distribution channels in 2009 to complement our direct international sales organization.*

\*     \*     \*

*In conclusion, our business performance remains very solid. Our adoption rates are strong with 55 systems placed in the first 20 months of our commercialization* . . .

\*     \*     \*

[*Defendant Van Dick*:] *Moving first to our fourth quarter 2008 income statement, we recorded quarterly revenue of $7.3 million primarily on the sale of 10 Sensei Systems and the shipments of 520 Artisan Control Catheters. This represents a 74.3% increase over the 4.2 million (inaudible) catheters.*

\*     \*     \*

. . . *Gross profit for the quarter was $2 million* . . .

\*     \*     \*

*Net loss for the fourth quarter of 2008 . . . was $14.9 million, or $0.59 per basic and diluted share* . . .

(Emphasis added).

201.    The statements in ¶200, which were not corrected by any of the other Individual Defendants, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶186-187, 197-198.

202.    During the Q408 conference call, Defendants Moll and Van Dick reiterated the Company's guidance for FY09:

> [*Defendant Van Dick*:] *Before wrapping up my prepared remarks, I'd like to reiterate our business outlook for 2009, which we initially provided last month when we pre-announced our fourth quarter results. The economic downturn has significantly impacted many of our customers' capital spending decisions, which increases the difficulty of accurately forecasting the timing of our system sales. As a result, we are looking at a wider range of possible system placement scenarios in 2009 than might ordinarily be the case. Based on our pipeline of potential customers that we have identified, we continue to expect to recognize revenue on a range of 53 to 65 systems for 2009.*
>
> *Among other factors, we believe this range takes into account the uncertainty around the length and severity of the current economic recession and the impact it will have on our customers' purchase decisions in 2009. That said, it is important to note that the low end of this range represents a more than 30% growth in system sales compared to 2009.*
>
> [*Defendant Moll*:] *With 55 systems in the field in a little over a year and a half of commercialization, and projected year-over-year system sales growth of more than 30% in 2009,* we believe we are experiencing strong demand for our technology in the EP market . . .

(Emphasis added).

203.    Defendants also went to great lengths to convey to analysts and the market that despite the economy's purported effect on Q408, Hansen's guidance for system sales for FY09 was based on the Company's visibility and detailed analysis of the potential customers in Hansen's sales pipeline, and incorporated the troubles with the economy.  When questioned about the basis for the Company's the FY09 guidance range of 53 to 65 systems, Defendants Moll and Restani stated:

> [*Defendant Moll*:] *It's based on looking at our pipeline and having the benefit now of almost a month and a half of Q1, and understanding and reassessing that pipeline, and doing the hard work, understanding where we are with each potential account.*

[*Defendant Restani*:] I think the range, Ben, was **based on the depth and breadth of our pipeline**. It's not that is there new opportunities that come along? Absolutely. In fact, in Q4, we did convert an account which wasn't on our pipeline because it was solidly in the Stereotaxis camp and they sacrificed their down payment to shift the order to Hansen. So, you get those type of things happening. **But overall we have a very good visibility of the depth and breadth of our pipeline, and that's how we build our ranges.**

[*Defendant Moll*:] **And I think, as Steve mentioned in the call, that is blended with the recognition of the uncertainty of the economic environment in 2009, is we pretty bullish on 2009, but understand we don't know where the economy is going any better than anybody else. And so a wider guidance we think is prudent.**

(Emphasis added).

204.    The statements by Defendants Moll, Van Dick, and Restani, in ¶¶202-203, which were not corrected any of the Individual Defendants, were knowingly false for the reasons set forth in ¶¶187,195.

205.    Defendant Moll talked at length about not only his familiarity with Hansen's potential customers, but his considerable knowledge and review of the ability of those potential customers to fund the purchase of a Sensei System:

[*Defendant Moll*:] Well, I think they're certainly, with this economic environment, there are certainly hospitals that have tightened their budget and are less able to buy capital equipment than they were certainly a year ago or six months ago. There's no question about it.

On the other hand, that -- we think that's a fairly small percentage of the hospitals that are potential candidates to buy a **system. But what it speaks to is the need to, we think, approach your sales activity a little differently, which is -- an important part of building our pipeline is to not only identify a customer that's very interested in the technology and an institution that might consider buying it, but also qualifying that institution with regard to their ability to purchase. And obviously we did that before, but we're really putting a real focus on really understanding each institution in our pipeline with regard to not only interest and enthusiasm, but ability to pull the trigger and the ability to fund the purchase of the system.**

So, I think there is certainly in some institutions, there is either going to be less ability to buy, or you will experience a slower process in the sale of the system. Having said that, there are plenty of institutions that still have plenty of capability to buy systems, and it's really our job to, with the broad pipeline we have, to understand how to go about selling this year the most efficient and the most effective way to really match an institution that has the financial wherewithal to buy a system to a clinician that is very excited and will drive the purchase process to the executive level.

**So, I think it's the environment demand is a little bit different in sales strategy, but we think we still have a very robust pipeline that can be managed in the way that we get to our goals.**

(Emphasis added).

206. Also during  the Q408 conference call, defendants sought to ease any concerns regarding the delayed revenue recognition on one shipment during the quarter.  Again, Defendant Van Dick displayed his intimate knowledge of the Company's revenue recognition criteria, represented that the Company adhered to its revenue recognition criteria, and indicated that once the Company received an order, he and the other defendants "***make sure that we fulfill all of our obligations under the sales contract before we can take revenue:***"

> [*Analyst*:] Hi gentlemen. A couple of questions here. Let's see here. This is the second quarter, or maybe it's the third, that we've shipped more systems than we were able to book revenue for. Could you give us a little insight as to whether that's a function of just the environment that we're in and the billing cycles? Or is that something that we should perhaps think about of building it into our models going forward simply because you might ship something out on the last day of the quarter, for example, and obviously not be able to recognize it until it's installed. How should we think about that particular item?
>
> [*Defendant Van Dick*:] Jose, this is Steve. That's the reason there are some quarters where we get an order in in the last days of a quarter and a customer is looking to take delivery of that in a specific time period, yet through various reasons we can't complete our obligations under the amt before the end of the quarter, and therefore it's a unit that's shipped but we can't take revenue on. ***Understanding that, we do fall under a 97-2 in terms of our revenue recognition policy, which means that we have to be able to deliver the system, we have to install it, the customer has to be trained in most cases before we can take revenue.***
>
> [*Analyst*:] Okay.
>
> [Defendant Van Dick:] ***So, anytime we have -- every time we get an order, we look at all of our obligations to the customer for that order, and given our requirements, we have to make sure that we fulfill all of our obligations under the sales contract before we can take revenue. And there will be times from quarter-to-quarter where those obligations that we have will span from one quarter to the next quarter.***

(Emphasis added).

207. The statements in ¶206, which were not corrected by Defendants Restani or Moll, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶130, 187, because Hansen was violating its own revenue recognition policy.

208. The Individual Defendants also tried to quell any concern about what appeared to be a sudden multi-executive departure from Hansen, as Defendant Restani and at least two other high level executives were leaving the Company:

[*Analyst*:] Okay. And your press release mentioned that there were two executive separation costs in the quarter. Who were you referring to?

[*Defendant Van Dick*:] During the fourth quarter we had David Shaw, our general counsel, leave the Company, as well as a VP of Sales, Jed Palmacci.

[*Analyst*:] It seems like there's quite a few departures in recent time. Maybe Fred could address, is there anything we should read into this as the Company -- I think that's fair. Is there anything that we should read into this?

[*Defendant Moll*:] No. I think -- there are two things we're trying to accomplish, obviously. One is have the best managing team possible; the other one is to control costs. And there's been some shuffling around, there's -- but it -- I think it does not reflect on any sort of internal issues that you can point to. There was a -- we hired a VP of Commercialization over our VP of Sales, and although we didn't know how that would turn out, it was, I wouldn't say predictable, but it was not a big surprise that VP of Sales was going to depart. And with regard to David Shaw, there was a lack of fit, and I'm not going to go into sort of the whole story, but he contributed an enormous amount when he was here, but he left on very good terms and there was a -- we felt for a variety of reasons it was the right move. But there is nothing to read into this other than we're trying to, as I say, build the right team, have the right fit with the right people, and have a fairly flat organization that can execute on sales and product development, and we think we have that. And so I feel very good about the team and the go-forward plan with this team.

209. On March 16, 2009, Hansen filed its Annual Report with the SEC on Form 10-K for the 2008 fiscal year. The Company's Form 10-K was signed by Defendant Moll and substantially incorporated the same materially false and/or misleading financial results, as set forth above in ¶196, which were announced on February 12, 2009. The Company's 10-K stated that the Company's accompanying financial statements were prepared "in accordance with accounting principles generally accepted in the United States." Additionally, therein, in relevant part, the Company stated and/or reported, "Revenues for 2008 primarily related to the sale of 27 Sensei systems in the United States and 13 Sensei systems in Europe" and "[a]s of December 31, 2008, 30 of the 55 systems we have shipped and recognized revenue on are configured with the CoHesion Module."

210. The statements referenced in ¶209 were each materially false and/or misleading when made for the reasons in ¶¶186, 197, 207, and because as admitted and reflected by the Company's restatement: (i) the Company's financial statements were not prepared in accordance/conformity with GAAP; (ii) the total number of systems sold domestically for which the Company should have recognized as revenue was 23 for FY08, but was misrepresented as 27, which constitutes an overstatement of 4, or 17.39%; (iii) the total number of systems sold internationally for which the

Company should have recognized as revenue was 6 for FY08, but was misrepresented as 13, which constitutes an overstatement of 7, or 116.67%; and (iv) as of December 31, 2008, the number of systems that the Company shipped and should have properly recorded revenue on that were configured with the Cohesion Module was 21, but was misrepresented as 30, which constitutes an overstatement of 9, or 42.86%.

211. The materially false and/or misleading statements in ¶209 were made with scienter for the reasons set forth above in ¶¶187, 198.

212. Along with the Company's Annual Report on Form 10-K filed with the SEC on March 16, 2009, pursuant to Section 302 of SOX, Defendants Moll and Van Dick signed SOX required certifications attesting to the accuracy of the financial results and effectiveness of the Company's internal controls as set forth in full in ¶85, above.

213. For the same reasons as set forth in ¶¶86, 187, Defendants Moll's and Van Dick's SOX Certifications referenced in ¶212 were materially false and/or misleading when made, and made with scienter, as Defendants Moll and Van Dick knew of and/or were deliberately reckless as to the material weaknesses in the Company's internal controls and financial reporting.

**2009 Fiscal First Quarter Ending March 31, 2009**

214. On April 16, 2009, Hansen issued a press release announcing its intention to conduct a public offering of Hansen stock. Additionally, Hansen issued a press release entitled, "Hansen Medical Announces Preliminary First Quarter 2009 Revenue Results and Tightens Guidance for 2009." Therein, the Company, in relevant part, stated:

> *For the first quarter of 2009, Hansen Medical expects to recognize revenue on the sale of 10 Sensei(R) Robotic Catheter Systems at an average sales price of approximately $585,000. The company expects first quarter revenues to be in the range of $7.0 million to $7.2 million. In addition to the 10 Sensei systems, revenues for the quarter are expected to include the shipment of approximately 600 Artisan catheters at an average sales price of approximately $1,620.* The expected range and components of 2009 first quarter revenue are estimates and are subject to change.

> *Based on its preliminary first quarter results and the current market conditions, Hansen Medical is tightening its 2009 full year guidance for system sales and currently estimates recognizing revenue on a range of 53 to 60 Sensei systems.*

*Earlier in the first quarter, the company provided a 2009 full year guidance range of 53 to 65 systems.*

(Emphasis added).

215.   On May 5, 2009, Hansen issued a press release entitled, "HANSEN MEDICAL REPORTS 2009 FIRST QUARTER RESULTS ."  Again, Hansen touted its system sales at the top of its press releases, stating, "*10 Sensei Robotic Catheter Systems Sold During Quarter*" and therein, the Company, in relevant part, stated:

• *System Sales: During the first quarter, the company recognized revenue on 10 Sensei Robotic Systems. Through March 31, 2009, the company has recognized revenue on a total of 65 systems (which the company refers to as its installed base), including 43 in the United States and 22 in international markets.*

\*      \*      \*

*"Sensei system sales are off to a good start in 2009 and I continue to be pleased with the rate of adoption of our technology," said Frederic Moll, M.D., president and chief executive officer of Hansen Medical.* "While our pipeline of potential customers remains solid, the sluggish global economy has extended the length of the average sales cycle for Sensei systems and resulted in some price elasticity of demand. *However, based on the enthusiasm expressed for our technology by a growing group of clinicians and what we believe is a superior value proposition versus the competition, I remain confident in our ability to expand our business in 2009," said Dr. Moll.*

2009 First Quarter Financial Results

*Total revenue for the three months ended March 31, 2009 was $7.1 million, a 14% increase compared to revenue of $6.2 million in the same period in 2008. The company recognized revenue on 10 Sensei Robotic Systems, including seven systems configured with the CoHesion(R) module, as well as on shipments of approximately 600 Artisan control catheters.*

. . . Gross profit for the quarter was $1.9 million . . . .

\*      \*      \*

*Net loss for the three months ended March 31, 2009, . . .was $14.3 million, or $(0.57) per basic and diluted share . . .*

(Emphasis added).

216.   The statements referenced in ¶214-215 were materially false and/or misleading when made for the reasons in ¶60(a), and because:

a.      As reflected by the Company's restatement: (i) the Company's "Installed

1    Base" at the end of Q109 of 53 was misrepresented as 65, which constitutes an overstatement of 12,

2    or 22.64%; (ii) the Company's domestic "Installed Base" at the end of Q109 of 40 was

3    misrepresented as 43, which constitutes an overstatement of 3, or 7.50%; and (iii) the Company's

4    international "Installed Base" at the end of Q109 of 13 was misrepresented as 22, which constitutes

5    an overstatement of 9, or 69.23%; and

6            b.       Additionally, at the time Hansen reported its Q109 results, its sales and

7    financial results were even further overstated at that time than is reflected by the restatement.

8    Although the Company originally reported 10 System sales during the quarter (7 domestically and

9    3 internationally) contributing to revenue and the restated results reflect that Hansen sold 10 Systems

10   during the quarter (8 domestically and 2 internationally), this means that the restated financial results

11   (including revenue, gross profit, and net income) at first blush, appear more favorable to Hansen

12   than actually is the case.  The restated financial results reflect the off-setting benefit to Hansen of

13   at least 1 improperly recognized domestic sale from a prior quarter shifting into Q109 and increasing

14   Hansen's restated quarterly revenue for Q109.[17]  As such, when evaluating the propriety of Hansen's

15   originally reported results, the results were even further overstated because at least 1 of the 10

16   Systems that Hansen originally claimed to have sold and recognized as revenue during Q109 was

17   improperly recognized as revenue.  Moreover, the restated results reflect the addition of at least 30

18   Artisan Catheter sales that had previously been improperly recorded and recognized as revenue

19   during 2008.

20           c.       In Q109, Hansen improperly recognized revenue on the 1 System sold to AB

21   Medica which, as reflected by Ex. C, was ordered on March 31, 2009.  This was the 5th System sold

22   and recognized as revenue to AB Medica.  While discussing the Company's restatement during a

23   conference call on November 17, 2009, Defendant Moll conceded this System had been reclassified

24   to and remained as deferred revenue as of Q309 because AB Medica was still unable to find

25

26   _____

27       [17]During the November 17, 2009, conference call to discuss the restatement and Hansen's
     financial results for Q309, Defendant Moll acknowledged that the restatement affected a total of 24
28   system sales during the Class period and of those, revenue from 13 Systems should have been
     deferred and recognized in a later period than the period in which it was improperly recognized.

1    customers to purchase the System (along with 2 other Systems held by AB Medica).

2            d.      Plaintiffs are further informed and believed that in Q109 Hansen also

3    improperly recognized revenue on the distributor sales to St. Jude in Australia and to Rosslyn (the

4    Company's Russian distributor), both of which, as reflected by Ex. C, were ordered on the last two

5    days of Q109, and as reflected by Exs. E, F, neither distributor purchased any catheters in Q109 nor

6    Q209.

7            e.      Hansen failed to disclose: (i) as alleged above in ¶146(c), that the Company

8    was improperly recognizing revenue on Systems and providing distributors with Systems in excess

9    of the distributor's demand; (ii) as alleged above in ¶158, that numerous Systems in the Company's

10   Installed Base were essentially inactive; (iii) Hansen was pulling in future sales by offering

11   discounts at the end of the quarter and shipping Systems to distributors the last day of the quarter

12   to create the appearance that the demand for the Sensei System and the Company's quarterly System

13   sales were not declining; (iv) Hansen was stuffing catheters and that of the Company's record 601

14   catheter sales, 311 were sold in the last month of the quarter, including 188 of which were sold at

15   the very end of Q109.  Moreover, 106 of the 601 were sold to a single customer, AB Medica, that,

16   as alleged above, had not yet sold through any of the 4 prior Systems it had received from Hansen

17   nor the 1 System it ordered on the last day of Q109.

18       217.    The materially false and/or misleading statements in ¶214-215 were made with

19   scienter for the reasons set forth above in ¶¶61, 86, 89, 119, 130, 147, 158, 161, 187, 194, because

20   defendants knew and/or were deliberately reckless in not knowing, among others, the following:

21           a.      **For the same reasons alleged in ¶¶60,61,88,89,146,147,187, Hansen was**

22   **improperly/prematurely recognizing revenue upon shipment for sales to distributors,** despite

23   the fact that the distributors were not capable of installing Hansen's Systems and training end-user

24   physicians to use Hansen's Systems.

25           b.      **As alleged in ¶¶118-119,146-147,187, that Hansen was improperly**

26   **recognizing revenue on temporary installations** and the Company's Installed Base and financial

27   results were materially inflated/overstated due to Hansen's improper/premature revenue recognition

28   on Systems sold domestically and temporarily installed in Q208, Q308, and Q408.

1        c.     **For the same reasons alleged in ¶¶61(c), 89(c),119(d),147(c),187(c),  the**
2  **defendants would attend sales and installation meetings and receive and/review reports about**
3  **installations and sales**: Individual Defendants would receive a copy of a quarterly installation
4  report on a daily basis, Defendants Moll and Van Dick would attend installation meetings where the
5  status of orders and installations were discussed, including orders to Spain, Italy, and Russia, the
6  Individual Defendants received sales reports, and the Individual Defendants attended weekly sales
7  meetings to discuss the status of sales and potential customers and deliveries would be reviewed to
8  determine how to pull in sales.

9        d.     **5 of the 65 Systems in Hansen's reported Installed Base, which had been**
10  **sold to AB Medica, had not yet been sold through to customers.**  Defendant Moll later admitted
11  during the November 17, 2009, conference call discussing the Company's restatement, during the
12  Class Period, Hansen sold as many as 5 Sensei Systems to AB Medica, the Company's Italian
13  Distributor, of which AB Medica was still in possession of at least 3 Systems (as of Q309) that the
14  distributor was unable to sell through to an end user.  The 5th System sold to AB Medica was in
15  Q109, and as indicated in Ex. C, was ordered on March 31, 2009 (the last day of Q109). As set forth
16  in ¶34(g), CW1 stated that at one point, AB Medica had at least 5 of Hansen's Systems that were
17  placed in a warehouse.  CW1 also indicated that the Systems sold to AB Medica were discussed
18  during installation meetings. For the foregoing reasons, Plaintiffs are informed and believe, that at
19  the end of Q109 all 5 Systems had not yet been sold through by AB Medica.

20        e.     **For the same reasons alleged in ¶¶61(e),89(e),119(e),147(e),187(g), Sensei**
21  **System Sales were Hansen's core business/operations.**  At the time Hansen originally reported
22  its Q109 financial results, almost all of Hansen's quarterly revenue was derived from recognizing
23  revenue on the sale of only 10 Systems, at least 1 of which was improperly recognized in violation
24  of the Company's own revenue recognition policy.

25        f.     **As alleged in ¶¶61(f),119(f), 187(f), the Individual Defendants were**
26  **familiar with and knowledgeable of Hansen's revenue recognition criteria.**

27        g.     **Defendant Moll demonstrated during the Q109 conference call that he**
28  **was familiar with the details of each of the 10 transactions/System sales originally recognized**

1   **as revenue during Q109.**  *See infra* ¶219.  Defendant Moll was able to specifically identify that

2   each of the 3 international systems were sold to distributors and that one of which was part of a new

3   distribution agreement in Australia with St. Jude Medical, and was able to identity specific domestic

4   Systems/customers (*e.g.*, "Customers this quarter included Stanford University Hospital and St.

5   David's Hospital in Austin, Texas.").

6           h.   **As alleged in ¶¶61(h), 119(h), the Individual Defendants indicated that**

7   **they monitored the Company's sales pipeline and were familiar with the customers purchasing**

8   **Hansen's Systems**.

9           i.   **For the same reasons alleged in ¶¶119(i), 147(i), the Individual**

10  **Defendants monitored catheter sales and reviewed internal reports that would indicate that**

11  **Systems in the Company's Installed Base were not being used and/or had not ordered any**

12  **catheters.**  As alleged in ¶158, there were numerous Systems in Hansen's Installed Base that were

13  essentially inactive.  With regard to inactive Systems, CW1, as set forth in ¶34(o) indicated that it

14  was obvious from looking at the reports that sites were not buying catheters.  CW1 cited Yale

15  (which had been temporarily installed on December 31, 2008) as one such example, and noted that

16  the System was signed off, the revenue was recognized, the System was put in a closet on January

17  3 or 5, 2009, and that two weeks later, everyone knew the System was not being used because there

18  was a lack of catheter sales.  Indeed, as reflected in Ex. E (a report received and reviewed by

19  Defendants Moll that lists all of the catheter sales for Q109) Yale did not purchase a single catheter

20  during Q109 and as reflected in Ex. F, Yale did not purchase a catheter until June 30, 2009 (the last

21  day of Q209).

22          j.   **For the same reasons alleged in ¶119(j), Hansen went to great lengths**

23  **(and would even incur excess costs) to meet quarterly expectations.**

24          k.   **For the same reasons alleged in ¶¶61(k), 89(k), 119(k),147(k),187(m), and**

25  **as alleged in ¶¶230-231,** *infra***, Defendants Moll and Van Dick nevertheless signed materially**

26  **false and/or misleading SOX required certifications** attesting to the accuracy of Hansen's

27  financial results and effectiveness of the Company's internal controls for Q109.

28          l.   Of the 65 Systems in Hansen's reported Installed Base at the end of Q109,

the following customers/sites, **representing 25 of the 65 Systems (or 38.46%), did not purchase a single catheter during Q109**: (i) *Riverside Methodist Hospital* (sold Q307); (ii) *Sequoia Hospital* (sold Q307); (iii) *Massachusetts General Hospital* (sold Q407); (iv) *University of Maryland* (sold Q407); (v) *Mount Sinai Hospital* (sold Q407); (vi) *Midwest City Regional* (sold Q108); (vii) *Emory Crawford Long Hospital* (sold Q108); (viii) *Palex* (Spain/Portugal distributor received *2 Systems*, including 1 System sold in Q108 and 1 System sold Q408); (ix) *Duke University Medical Center* (sold Q208); (x) *VA Brecksville* (Louis Stokes Cleveland VA Medical Center); (xi) *Loyola University Medical Center* (sold Q208); (xii) *Miller School of Medicine at the University of Miami* (sold Q208); (xiii) *Rosslyn* (Russian distributor *received 2 Systems*, including 1 System in Q208 and 1 System in Q109); (xiv) *Aurora St. Luke's Medical Center* (sold Q308); (xv) *Cincinnati VA Medical Center* (sold Q308); (xvi) *Giessen* (sold Q308); (xvii) *Yale-New Haven Hospital* (sold Q408); (xviii) *Minogue Medical* (Canadian distributor - sold Q408); (xix) *St. Jude France* (French distributor - sold Q408); (xx) *Jersey Shore Medical Center* (sold Q109); (xxi) *Scripps La Jolla Hospital* (sold Q109); (xxii) *St. Barnabas* (sold Q109); and (xxiii) *St. Jude Australia* (Australian distributor - sold Q109)**[18]**

m.     **All 3 international sales were ordered by distributors on the last 2 days of the quarter (as reflected by Ex. C)**.

n.     **For the same reasons alleged in ¶119(m), Hansen was cannibalizing future sales by providing discounts at the end of the quarter to pull in future sales**.  As reflected by Ex C (a report received and reviewed by Defendants Moll and Van Dick), of the 7 Systems sold and recognized as revenue domestically during Q109:

i.     1 System sold to Stony Brook Hospital had been a deferred sale from Q4 2009.  The Company received the order on December 31, 2008 (the last day of Q408) and was priced at $590,000.

ii.     3 of the Systems were ordered in January or February. 2 Systems were

---

[18]Arguably a customer holding a 26th System did not purchase any catheters in Q109 because as reflected in Ex. E, the 5 catheters sold to Stanford on March 27, 2009, were actually included in the purchase price of the System that was sold to Stanford and recognized as revenue in Q109.

1   priced at $625,000 and 1 System was priced at $660,000

2         iii.    3 of the Systems were ordered on March 26th and 27th, 2009.  Of these

3   3 Systems, 2 Systems were priced at $550,000,[19] and 1 System was priced at $510,000.

4         iv.    Also, of the 5 Cohesion modules sold domestically during the quarter,

5   the one sold to Stanford (which as noted by Ex. I, did not end up using its System until May 18,

6   2009) received its Cohesion module at $65,000, whereas the rest were all sold at $85,000.

7       o.   **For the same reasons set forth in ¶¶119(o), Hansen was "stuffing"**

8   **catheters and doing bulk sales at discounts.**  For example, review of Ex. E (a report received and

9   reviewed by Defendants Moll and Van Dick list Q109 catheter sales by date), clearly indicates:

10        i.    Despite the fact that as alleged above, AB Medica had not yet sold

11  through any of the 4 Systems it had ordered in prior quarters (including, Q407, Q108, and Q308),

12  AB Medica mysteriously purchased 106 catheters during Q109 (including 50 the last week of the

13  quarter) and then, as reflected by Exs. F - G, AB Medica did not purchase a single catheter in Q209

14  nor Q309.

15        ii.    As reflected by Ex. E and also by Ex. H, the monthly pattern of

16  catheter sales in Q109 clearly reflects a "hockey stick" pattern:

17

18

19

20  

21

22

23

24

25        iii.    As reflected by Ex. E, an astounding 188 of the 601 catheters sold in

26  Q109 were sold at the end of March 2009, including two large sales (for 50 and another for 40).

27  ————————————————

28  [19]Of these Systems, 1 System was sold to Stanford and, as reflected in Ex. E, the $550,000
    selling price also included 5 catheters.



iv.     Hansen clearly provided a discount to at least 1 customer at the end of Q109 in exchange for a bulk order to boost quarterly catheter sales at the expense of the Company's Q209 catheter sales.  For example, a review of Ex. E shows that on a number of occasions during Q109, Oklahoma Heart Hospital purchased only 1 or 2 catheters at $1,600 per catheter, yet on March 27, 2009, suddenly purchased 25 catheters at a $100 per catheter discount. Review of Ex. F shows the purchasing pattern depleted Q209 sales as Oklahoma Heart Hospital only purchased only 1 catheter between April 1, 2009 and June 9, 2009 (thus indicating that Hansen essentially stole the 25 catheter sales from the first two months of Q209).  Again, as reflected in Ex. F, on June 30, 2009 (*i.e.*, the last day of Q209),Oklahoma Heart Hospital purchased another 30 catheters in bulk at the discounted price of $1,500 per catheter (*i.e.*, a discount of $100 per catheter), which again cannibalized Hansen's future catheter sales in Q309 as there were no purchases in July or August, and only 10 total for all of Q309 (as reflected by Ex. G)  The following chart (based on Exs. E-G), summarizes the purchases by Oklahoma Heart Hospital during Q109, Q209 and Q309:

| QUARTER | ORDER DATE | UNITS | PRICE PER UNIT |
|---------|-----------|-------|----------------|
| *Q109* | 1/14/2009 | 1 | $1,600.00 |
| | 1/14/2009 | 1 | $1,600.00 |
| | 1/16/2009 | 1 | $1,600.00 |
| | 1/19/2009 | 1 | $1,600.00 |
| | 1/22/2009 | 2 | $1,600.00 |
| | 1/27/2009 | 1 | $1,600.00 |
| | 1/30/2009 | 1 | $1,600.00 |
| | 2/4/2009 | 2 | $1,600.00 |
| | 2/5/2009 | 2 | $1,600.00 |
| | 2/6/2009 | 2 | $1,600.00 |
| | 2/12/2009 | 1 | $1,600.00 |
| | 2/13/2009 | 1 | $1,600.00 |

| | 2/18/2009 | 1 | $1,600.00 |
|---|---|---|---|
| | 2/19/2009 | 1 | $1,600.00 |
| | 2/20/2009 | 2 | $1,600.00 |
| | 2/26/2009 | 2 | $1,600.00 |
| | 3/3/2009 | 1 | $1,600.00 |
| | 3/6/2009 | 1 | $1,600.00 |
| | 3/11/2009 | 1 | $1,600.00 |
| | 3/17/2009 | 1 | $1,600.00 |
| | 3/19/2009 | 2 | $1,600.00 |
| | 3/25/2009 | 1 | $1,600.00 |
| | 3/27/2009 | 1 | $1,600.00 |
| | *3/27/2009* | *25* | *$1,500.00* |
| *Q209* | 4/1/2009 | 1 | $1,600.00 |
| | 6/10/2009 | 1 | $1,600.00 |
| | 6/11/2009 | 2 | $1,600.00 |
| | 6/19/2009 | 1 | $1,600.00 |
| | 6/23/2009 | 2 | $1,600.00 |
| | 6/24/2009 | 1 | $1,600.00 |
| | 6/25/2009 | 1 | $1,600.00 |
| | 6/30/2009 | 4 | $1,600.00 |
| | *6/30/2009* | *30* | *$1,500.00* |
| *Q309* | 9/11/2009 | 4 | $1,600.00 |
| | 9/16/2009 | 2 | $1,600.00 |
| | 9/29/2009 | 4 | $1,650.00 |

218.   Also on May 5, 2009, Hansen held a conference call in connection with the announcement of its financial results for Q109. Defendants Moll and Van Dick were present.

219.   During the Q109 conference call, Defendants Moll and Van Dick again provided analysts and the markets with materially false and misleading information about Hansen's revenue/sales ramp and portrayed the Company as successfully executing its sales/revenue ramp in the face of economic pressures:

> [*Defendant Moll*:] . . . *As we pre-announced last month, during the first quarter, we recognized revenue on the placement of 10 Sensei systems. This represents a 25% year-over-year increase in units placed compared to the first quarter last year.*
>
> *In less than two years of commercial activity, we have now recognized revenue on 65 systems, which we refer to as our worldwide installed base. This includes 43 systems in the United States and 22 in international markets. Of the 10 systems that contributed to first quarter revenue, seven were sold to sites in the United States and three were sold to international distributors.*
>
> *Customers this quarter included Stanford University Hospital*, as well as Saint David's Hospital in Austin, Texas. Saint David's has now purchased two Sensei

systems, and this second system purchased was in response to increasing procedure volume in their EP Lab.

*Internationally, one of our three systems sales was the result of our expanding relationship with St. Jude Medical. During the quarter, we signed a distribution agreement with St. Jude in Australia, which follows an agreement we signed in the fourth quarter for St. Jude to act as our distributor in France. We will continue to work to establish additional distribution channels in 2009 to complement our international direct sales organization.*

*In regard to recurring revenues, we have now experienced three successive quarters of increasing sales in catheters and service. In the first quarter, we sold approximately 600 Artisan catheters, which compares to 520 catheters in Q408 and 420 catheters in Q308. Also, I am pleased to report that through the first quarter, we have converted a total of 30 customers to extended service agreements.*

\*       \*       \*

[*Defendant Van Dick:*] *Now let's move on to our first quarter 2009 income statement. We recorded quarterly revenue of $7.1 million, primarily on the sale of 10 Sensei systems and approximately 600 Artisan control catheters. This represents a 14.1% increase over the $6.2 million of revenue in the same period in 2008, in which we sold eight Sensei systems and approximately 400 Artisan catheters.*

\*       \*       \*

*. . . Gross profit for the quarter was $1.9 million . . .*

\*       \*       \*

Net loss for the first quarter of 2009, . . . was $14.3 million or $0.57 per basic and diluted share . . .

(Emphasis added).

220.    The statements in ¶219, which were not corrected by any of the other Individual Defendants, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶216-217.

221.    During the Q109 conference call, Defendants Moll and Van Dick reaffirmed the FY09 guidance, boldly asserting that the guidance factored in the potential impact from the economy:

*Before wrapping up my prepared remarks, I'd like to reiterate our business outlook for 2009, which we initially provided last month when we pre-announced our first quarter results.*

*Based on our pipeline of potential customers that we have identified, we continue to expect to recognize revenues on a range of 53 to 60 systems for 2009. Among other factors, we believe this range takes into account the uncertainty around the length and severity of the current economic recession, and the impact it will have on our potential customers' purchase decisions in 2009.*

*That said, it is important to note that at the low end of this range, represents a more than 30% growth in system unit sales compared to 2008.*

*               *               *

[*Defendant Moll*:] *With 65 systems in the field in less than two full years of commercialization and projected year-over-year system sales growth of more than 30% in 2009, we believe we are experiencing strong demand for our technology in the electrophysiology market. In addition, we are pleased with our progress in developing other platform opportunities for our technology and with the successful completion of an equity financing last month.*

We believe that our current financial position provides us with the resources to execute our business plan through cash flow breakeven. *And in spite of the tough economic environment, we are optimistic regarding the Company's commercial opportunities in 2009 and beyond.*

222.     Defendants Moll and Van Dick's statements in ¶221, which were not corrected by each other, were knowingly false for the reasons set forth in ¶¶187,195, 217.

223.     In response to a question from an analyst about the economy, Defendant Moll indicated that while there was still pressure, things had become more stable:

[Defendant Moll:] So, I would characterize it as -- *it's gotten much more stable and I think, incrementally, a better environment than Q4.* And so there is it -- there still is pressure. And I think the sales cycles continue to be extended.

There are certainly hospitals that are very hesitant to do any capital equipment purchasing. *But relative to Q4, we saw in sort of the latter half of Q1 and, more recently, that there's a bit of a falling out of the environment. And I think optimistic that it, although I think it's not going to change overnight, that it's gotten incrementally a bit better*.

(Emphasis added).

224.     When asked, Defendant Van Dick would not commit to any particular guidance for Q309 or Q4 2009, but indicated that again Hansen's sales would likely again be back-end loaded in the second half of 2009:

[Defendant Van Dick:] No, I mean I think we see, certainly, the year will be somewhat back-end loaded, but we think -- we don't have a fine enough view to say Q3 is going to be this and Q4 is going to be that. *We think that, historically, the capital equipment business -- the second half of the year is much stronger than the first half of the year and we think we're going to see that this year*.

(Emphasis added).

225.   Again, Defendant Moll staved off analysts' concerns about the apparent failure of catheter sales and utilization rates to match the purported growth rates of System sales.  Defendant Moll brushed off any concern that utilization was not increasing by instead assuring that the current trend was indeed positive:

> [*Analyst*:] Fred, the system placements seem to be on track based on what you all have been saying over the last few quarters. However, system utilization based on the Artisan catheters being shipped does not seem to be picking up, at least by the numbers that I have.
>
> Is this strategy -- you know, when you say that the demand for technology is increasing, are you measuring more -- the strategies more to broadened penetration? Or is it more to deepened penetration?
>
> [*Defendant Moll*:] Both, and I wouldn't agree with you that it's not picking up. In any new technology, you're going to have high-volume users, sort of medium volume users, and low to no-volume users, based on where they are in the cycle of when they bought it, how well they were trained, what their initial experience was.
>
> And it's not to say that we don't have work to do on the low volume users to get them to reasonable volumes, but we also have people that are having enormous success with the product. And so I'll give you an example of the best in the industry, with regard to catheter utilization, is Biosense Webster, which we believe to be selling essentially two catheters a week -- 2.1, 2.2 catheters a week.
>
> And so when we say we have some clinicians doing two, three, four catheters a week and some clinicians doing less than one, that's exactly what you expect at this stage. And as we continue to sell more catheters every quarter, we think we are on track with building utilization.
>
> We're not where we want to be in every account; there's no question about it, but we do see very positive current trend in the customers that have really embraced the product and are utilizing it on a routine basis.

226.   The statements in ¶225, which were not corrected by any of the other Individual Defendants, were materially false and/or misleading and made with scienter for the reasons set forth in ¶¶158, 216-217, because:

a.   Defendant Moll's response created the materially false and/or misleading impression that most of Systems in the Installed Base were in use when in fact there were multiple Systems with distributors that were effectively inactive/ idle and/or not purchasing catheters.

i.   Hansen's later conceded that Systems sitting with distributors as far

1   back as Q208 were still sitting with the distributors unable to be sold through to end users. As

2   alleged above in ¶¶216(c), 217(d), by the end of Q109, all 5 Systems that Hansen had sold to AB

3   Medica and recognized as revenue had not yet been sold through, including at least 3 Systems that

4   Defendant Moll conceded (on a conference call on November 17, 2009) that as of Q3  2009, AB

5   Medica had not been able to find an end user to purchase the 3 Systems. As alleged in ¶187(b), 1

6   System in the Company's Installed Base was sitting with its Canadian distributor since Q4 2009

7   because the distributor had been unable to get regulatory approval from the Canadian government.

8           ii.      As alleged above ¶217(l),customers/sites representing  at least 25 of

9   the 65  Systems in the Company's reported Installed Base did not purchase a single catheter during

10  the quarter.

11          b.      The only way Hansen was able to portray that it had "continue[d] to sell more

12  catheters every quarter," as alleged in ¶217(o), was by doing large bulk orders, "stuffing catheters,"

13  and cannibalizing future catheter sales.

14          227.    On May 8, 2009, Hansen filed its Quarterly Report with the SEC on Form 10-Q for

15  Q109.  The Company's Form 10-Q was signed by Defendants Moll and Van Dick, and substantially

16  incorporated the same materially false and/or misleading financial results, as set forth above in ¶215,

17  which were announced on May 5, 2009.  The Company's 10-Q stated that the Company's

18  accompanying financial statements were prepared "in conformity with accounting principles

19  generally accepted in the United States" and, in relevant part, stated and/or reported that 1Q 2009

20  revenues consisted of 3 Systems sold internationally to distributors.

21          228.    The statements referenced in ¶227 were each materially false and/or misleading when

22  made for the reasons in ¶¶216-217, and because as admitted by the restatement: (i) the Company's

23  financial statements were not prepared in accordance/conformity with GAAP; and (ii) the total

24  number of systems sold internationally for which the Company should have recognized as revenue

25  was 2 in Q109, but was misrepresented as 3, which constitutes an overstatement of 1, or 50%.

26          229.    The materially false and/or misleading statements in ¶227 were made with scienter

27  for the reasons set forth above in ¶¶216-217.

28

230.    Along with the Company's Quarterly Report on Form 10-Q filed with the SEC on May 8, 2009, pursuant to Section 302 of SOX, Defendants Moll and Van Dick signed SOX required certifications attesting to the accuracy of the financial results and effectiveness of the Company's internal controls as set forth in full in ¶85, above.

231.    For the same reasons as set forth in ¶¶86, 217, Defendants Moll's and Van Dick's SOX Certifications referenced in ¶230 were materially false and/or misleading when made, and made with scienter, as Defendants Moll and Van Dick knew of and/or were deliberately reckless as to the material weaknesses in the Company's internal controls and financial reporting.

232.    On June 10, 2009, Hansen presented at the 8th Annual Needham Life Sciences Conference.  Defendants Moll and Van Dick were present.

233.    During the analyst conference, Defendant Moll began by once again boasting about the number of Systems Hansen had sold since launching the product, stating, "we believe we've established ourselves as the global leader in flexible robotics having sold 65 Systems and showing a pattern of increased utilization quarter-to-quarter."   For this reason, Defendant Moll touted Hansen's apparent ability to ramp sales and revenue of its products faster than its competitors had been able:

> Let me talk a little bit about the – our progress in building systems placements. We feel very good about our ramp in systems having sold 15 in the first year of commercialization, 40 in the second year *and we have previously given guidance of 53 to 60 for 2009. This compares very favorably this ramp in the first two years, compares very favorably to the first two years of either our closest competitors Stereotaxis or my former company Intuitive Surgical*.

(Emphasis added).

234.    The materially false and/or misleading statements in ¶233, which were not corrected by Defendant Van Dick, were made with scienter for the reasons set forth above in ¶¶174, 187(o), 217, and because Defendant Moll lacked any reasonable basis for his positive statements about the Company's FY09 guidance since, as reflected by Ex. C, between April 1, 2009, and June 10, 2009, Hansen had only received 1 order.

235.    During the conference, Defendant Moll discussed the Company's sales operations:

I'll tell you a little bit about our marketing and distribution, we have now about 30

professionals, about half in selling organization, half that are clinical specialists. ***We sell direct in the U.S. – in the U.S., U.K. and in Germany and we have seven distributors in Europe, Canada, Russia and now Australia.*** So having sold 65 systems, we believe that represents a very small about 3.5% of the overall market opportunity for penetration of high volume electrophysiology centers.

236.    The materially false and/or misleading statements in ¶235, which were not corrected by Defendant Van Dick, were made with scienter for the reasons set forth above in ¶¶61(a)-(b), 174, 187, 217, and because as set forth in ¶34, CW1 stated that the Canadian distributor never succeeded in obtaining approval from the Canadian government to use the equipment.  According to CW1, as of November 2009, the 1 System sold to the Canadian distributor in Q408 had never been installed and was placed in a warehouse.

237.    Defendant Moll also exhibited his knowledge about the makeup of Hansen's Installed Base, discussing its composition:

These are our, some of our system placements and you know they - we have sold systems to the most obvious sites, big academic centers and large community hospitals that do high-volume EP, the obvious first targets for a system like this. ***We also have had a very good luck in Europe and although we sell the mix of just direct selling and distributors in Europe. We are building a installed base there that's - that's very significant and productive in disposable sales.***

238.    The materially false and/or misleading statements in ¶237, which were not corrected by Defendant Van Dick, were made with scienter for the reasons set forth above in ¶¶61(a)-(b), 89, 147, 158, 187, 216-217, and because defendants knew and/or were deliberately reckless in not knowing:

a.    As Defendant Moll admitted on the November 17, 2009, conference call discussing the Company's restatement, there were Systems sold to distributors that had been improperly recognized as revenue as far back as Q208 that the distributors were unable to sell.

b.    Hansen's Italian distributor, AB Medica, was still in possession of  at least 3 of the 5 Systems it was sold during the Class Period and was unable to sell these 3 Systems to end users.  These 3 Systems represented approximately 4.62% of the Company's total Installed Base as of the end of Q109 and 13.64% of the Company's international Installed Base as of the end of Q109.  As set forth in ¶34(g), CW1 indicated that at one point, AB Medica had at least 5 Systems in a warehouse.  As indicated by Ex. C, AB Medica ordered its 5th System on March 31, 2009, the last

1    day of Q109.  For these reasons, Plaintiffs are informed and believe that at the end of Q109, AB

2    Medica had not yet sold through any of 5 Systems and they all remained inactive.

3              c.    Contrary to Defendant Moll's Statement, Hansen's Installed Base in Europe

4    was not "significant and productive in disposable sales."  At the end of Q109, of the 22 Systems in

5    Hansen's international Installed Base, 20 Systems were in Europe.  As set reflected by Ex. F (a

6    report of catheter sales by day for Q209 that was received and reviewed by Defendants Moll and

7    Van Dick), in April and May of 2009 (*i.e.*, the first two months, or 2/3s, of Q209,

8    International/European customers only accounted for 43 of the 199 catheters sales.  Of these, 33

9    catheters were sold to only 4 direct customers (possessing 5 of the 20 Systems in Europe through

10   Q109).   The other 10 were sold to a distributor, Palex, who had received 2 of the 20 Systems in

11   Europe through Q109, and ordered a 3rd System in April 2009.[20]  Thus, at least 13 of the 20 Systems

12   did not contribute to the sale of a single catheter in April or May of 2009.  Indeed, as reflected by

13   Ex. F, AB Medica did not purchase a single catheter during Q209.

14        239.    Finally, when asked about the economy, Defendant Moll indicated that there had not

15   been "too big a change in the last number of months" and that "things have eased a bit:"

16        [*Sameer Harish, Analyst, Needham & Company*:] Yeah, Fred, just maybe a quick
         question then we'll move to the breakout. Can you give us an update on what you're
17       seeing at the economy's impact today, the current hospital spending environment.
         Have you seen any changes from the end of the year or sort of what you've seen in
18       the first quarter?

19       [*Defendant Moll*:] So, you know, it is certainly not, you know, ***there hasn't been too
         big a change in the last number of months in, you know the headwinds associated***
20       ***with the capital equipment market***, having said that we do believe that, you know
         it is based on what we hear from our sales executives that just in the last, you know
21       few months that ***things have eased a bit with regard to the hospitals willingness to***
         ***consider once again funding capital equipment in a way that they were many***
22       ***institutions were hesitant to fund just you know two quarters ago***.

23   (Emphasis added).

24   **2009 Fiscal Second Quarter Ending June 30, 2009**

25        240.    On July 6, 2009, Hansen issued a press release entitled, Hansen Medical Announces

26

27   _____

28   [20]The 10 catheters were ordered by Palex on April 16, 2009, and were likely bundled with
     the 1 System ordered by Palex on April 17, 2009 (Palex's 3rd System).  *See* Exs. C, F.

1  Preliminary Second Quarter 2009 Revenue Results." Therein, the Company, in relevant part, stated:

2

3      ***During the second quarter of 2009, Hansen Medical shipped six Sensei(R) Robotic
       Catheter Systems and expects to recognize revenue in the second quarter on the
4      sale of three of these systems. The company expects second quarter revenues to be
       in the range of $3.1 million to $3.3 million. In addition to the three Sensei systems,***
5      ***revenues for the quarter are expected to include the shipment of approximately 626
       Artisan(TM) catheters***, approximately 100 of which were sold to a single
6      international medical center. The expected range and components of 2009 second
       quarter revenues are estimates and are subject to change.
7

8      "Sensei system sales during the second quarter were adversely affected by general
       macroeconomic conditions that continue to significantly impact our potential
9      customers' capital spending," said Frederic Moll, M.D., president and chief
       executive officer of Hansen Medical. "As a result of credit, financial and general
10     economic conditions, several potential customers sought additional approvals prior
       to making their purchase decision or spent time evaluating alternative financing
11     arrangements, both of which extended the length of sales cycles for Sensei systems
       and resulted in potential customers' orders moving out of the quarter. While sales
12     cycles will continue to be influenced by macroeconomic trends, we are confident that
       our current technology and planned product development activities present a
13     compelling value proposition to hospitals and payors."

14     ***Based on its preliminary second quarter results and the current market conditions,
       Hansen Medical is withdrawing its previous guidance for system placements for
15     2009,*** but will provide an updated outlook for 2009 and complete second quarter
       financial results in its regularly scheduled 2009 second quarter press release and
16     conference call to be scheduled for late July or early August.

17  (Emphasis added).

18         241.   The statements referenced above in ¶240 were materially false and/or misleading

19  when made for the reasons alleged in ¶60(a), above, and because:

20         a.      As reflected by the Company's restatement: (i) the total number of Systems

21  sold for which the Company should have recognized as revenue (when including  the offsetting

22  adjustment for recognition during the quarter of improperly recognized sales from prior periods) was

23  2 in Q209, but was misrepresented as 3, constituting an overstatement of 1, or 50%; and (ii) the

24  number of Artisan Catheters sold during Q209 of 576 was misrepresented as 626, a discrepancy of

25  50, or nearly 9%; and

26         b.      Additionally, at the time Hansen reported its preliminary Q209 results,  the

27  Company's preliminary System sales and revenue results were actually even further overstated

28  because at that time, of the 3 systems for which Hansen expected (and subsequently did) recognize

as revenue, 2 of those 3 turned out to be improperly recognized as revenue.  The restated financial results reflect the off-setting benefit to Hansen of at least 1 improperly recognized domestic sale from a prior quarter shifting into Q209 and increasing Hansen's restated quarterly revenue for Q209.  Thus, Hansen's originally reported preliminary System sales of 3 (along with their accompanying revenue) was overstated by 200%.

c.    While discussing the restatement during a conference call on November 17, 2009, Defendant Moll conceded that the System sold to the distributor in South Africa had been improperly recognized as revenue in Q209 and should have been recognized as revenue inQ309.  Furthermore, Plaintiffs are informed and believe that the System sold to Palex was also improperly recognized in Q209 because as alleged in ¶61, Hansen's distributors (including Palex) were not capable of independently installing Sensei Systems and training end users, and Defendant Van Dick, *see infra* ¶278, indicated that the System was installed in the "July timeframe," *i.e.*, in Q308.

d.    As reflected by Ex. D, Hansen also improperly recognized revenue on a Cohesion sale to Yale on June 30, 2009 (the last day of Q209), representing $125,000 of revenue, which should have been recognized as revenue in Q309 just as the System sold to Yale, which had been temporarily installed at Yale on December 31, 2008, and improperly recognized as revenue in Q408, *see* ¶¶186-187, should have been properly recognized as revenue in Q309.

e.    Catheter sales were not a quarterly record as the reported 626 catheter sales, which as reflected by the Company's restatement, were overstated by at least 50 catheters.  Plaintiffs are informed and believe that the 50 catheters were, as reflected by Ex. F, sold to the distributor for South Africa on June 23, 2009, because the Company admittedly also improperly recognized revenue on a System sale to that distributor in Q209 that should have been recognized in Q309.  Corroborating Plaintiffs' information and belief is the fact that in Q309, the Company reported catheter sales of 497, while Ex. H (summary of Quarterly sales) only lists 447, suggesting that the 50 catheters improperly recognized as revenue were shifted to Q309 in the same fashion as the revenue from the System sale to that distributor.

f.    Hansen failed to disclose that:

i.    As alleged above in ¶216(e)(i), Hansen was improperly recognizing

revenue on Systems sold to distributors and providing distributors with Systems in excess of the distributors' demand.

ii.     As alleged above in ¶¶158, 216(e)(ii), 217(l), there were numerous Systems in Hansen's Installed Base that were essentially inactive and/or not ordering any catheters.

iii.    A significant number of Systems in Hansen's Installed Base that were sold to distributors were inactive and sitting with the distributors who were unable to sell the Systems through to end users, including at least 3 Systems being held by AB Medica and 1 System held by Minogue Medical (in Canada).

iv.     As alleged in ¶¶216(e)(iv), 217(o), Hansen was stuffing catheters, including discounting bulk sales at the end of the quarter and that, as reflected by Ex. F (listing catheter sales by day for Q209), the Company's purported quarterly record of 626 catheters was only achieved by selling 170 catheters the last day of the quarter (i.e., more than 25% of Q209 sales) and by selling 313 catheters (*i.e.*, 50% of Q209 sales), on the last 8 days of the quarter.  Indeed, a staggering 427 of the 626 catheters (*i.e.*, more than 66%) were sold in June of 2009 (the last month of Q209).

v.      The approximately 100 catheters identified as shipped to a single international medical center (actually 102 catheters) were ordered on June 30, 2009, *i.e.*, the last day of the quarter.

242.    The materially false and/or misleading statements in ¶240 were made with scienter for the reasons set forth above in ¶217, and because defendants (Hansen, Moll, and Van Dick) knew and/or were deliberately reckless in not knowing, among others, the following:

a.      **For the same reasons alleged in ¶¶60-61, 88-89, 146-147, 186-187, 216-217, Hansen was improperly/prematurely recognizing revenue upon shipment for sales to distributors,** despite the fact that the distributors were not capable of installing Hansen's Systems and training end-user physicians to use Hansen's Systems.

b.      **As alleged in ¶¶118-119,146-147,158,186-187,216-217, Hansen was improperly recognizing revenue on temporary installations** and the Company's Installed Base

1   and financial results were materially inflated/overstated due to Hansen's improper/premature

2   revenue recognition on at least 3 Systems sold domestically and temporarily installed in Q208, and

3   at least 1 System temporarily installed in Q308 and at least 1 System in Q408.

4            c.      **For the same reasons alleged in ¶¶61(c), 89(c), 119(d), 147(c), 187(c), the**

5   **defendants would attend sales and installation meetings and receive and/review reports about**

6   **installations and sales**: Defendants Moll and Van Dick would receive a copy of a quarterly

7   installation report on a daily basis, Defendants Moll and Van Dick would attend installation

8   meetings where the status of orders and installations were discussed, including orders to Spain, Italy,

9   and Russia, the Defendants Moll and Van Dick received sales reports, and the Individual Defendants

10  attended weekly sales meetings to discuss the status of sales and potential customers and deliveries

11  would be reviewed to determine how to pull in sales.

12           d.      **As alleged in ¶217(d), at least 3 of the 65 Systems in Hansen's reported**

13  **Installed Base, which had been sold to AB Medica, had not yet been sold through to customers.**

14  Defendant Moll later admitted during the November 17, 2009, conference call discussing the

15  Company's restatement, during the Class Period, Hansen sold as many as 5 Sensei System's to AB

16  Medica, the Company's Italian Distributor, of which AB Medica was still in possession of at least

17  3 Systems (as of Q309) that the distributor was unable to sell through to an end user.

18           e.      **For the same reasons alleged in ¶¶61(e),89(e),119(e),147(e),187(g),217(e),**

19  **Sensei System Sales were Hansen's core business/operations.**   At the time Hansen originally

20  reported its Q209 financial results, almost all of the Company's quarterly revenue was derived from

21  revenue recognition on the sale of only 3 Systems, of which 2 Systems were improperly recognized

22  as revenue.

23           f.      **As alleged in ¶¶61(f),119(f), 187(f), the Individual Defendants were**

24  **familiar with and knowledgeable of Hansen's revenue recognition criteria.** Further, Defendants

25  Moll and Van Dick established that they were familiar with and knowledgeable about the

26  Company's revenue recognition policy.  Specifically, during a conference call on July 6, 2009, *see*

27  *infra* ¶251, to discuss the Company's preliminary Q209 results, Defendant Moll specifically

28  represented to the public that Hansen has "a very strict revenue recognition policy" and that the

Company "need[s] to get a lot of things done during the quarter in order to recognize revenue." Defendant Van Dick specifically spoke to about the Company's revenue recognition policy and represented to the public that Hansen could not recognize revenue on the sale to a distributor unless the Company had first completed its obligations to train that distributor:

> And based off of our revenue recognition rules, we can't take revenue on a system placed even with a distributor until we've completed our obligations to train that distributor. And so we had two units of the six that we couldn't take a revenue, because we hadn't yet completed the training in all the various countries that the distributor arrangement covered.

g.     **Defendants Moll and Van Dick demonstrated they were thoroughly familiar with the 3 system sales/transactions recognized as revenue in Q209** while discussing the Company's quarterly results during a conference call on August 4, 2009, *see infra* ¶274.  For example, Defendant Moll generally identified to whom each System was being sold and Defendant Van Dick was familiar enough with the 2 international distributor transactions to indicate whether the Systems had been sold through to end users and installed.

h.     **As alleged in ¶¶61(h), 119(j), Defendants Moll and Van Dick indicated that they monitored Hansen's sales pipeline and were familiar with Hansen's customers.**

i.     **For the same reasons alleged in ¶¶119(i), 147(i), the Individual Defendants monitored catheter sales and reviewed internal reports that would indicate that Systems in the Company's Installed Base were not being used and had not ordered any catheters.**  CW1 cited Yale (which had been temporarily installed on December 31, 2008) as one such example, and noted that the System was signed off, the revenue was recognized, the System was put in a closet on January 3 or 5, 2009, and that two weeks later, everyone knew the System was not being used because there was a lack of catheter sales.  Indeed, Ex. E (a report received and reviewed by defendants that lists all of the catheter sales for Q109) clearly indicates that Yale did not purchase a single catheter during Q109 and as reflected in Ex. F, Yale did not purchase any catheters until June 30, 2009 (the last day of Q209).

j.     **For the same reasons alleged in ¶119(j), Hansen went to great lengths (and would even incur excess costs) to meet quarterly expectations.**

k.  **For the same reasons alleged in ¶¶61(k), 89(k), 119(k),147(k),187(m), 217(k), and as alleged in ¶¶287-288,** *infra,* **Defendants Moll and Van Dick nevertheless signed materially false and/or misleading SOX required certifications** attesting to the accuracy of Hansen's financial results and effectiveness of the Company's internal controls for Q209.

l.  **For the same reasons alleged in ¶¶61(i), 89(i), Defendants Moll and Van Dick were familiar with the distributor agreements and/or the contract terms and conditions with Hansen's distributors.**  Further, Defendant Van Dick demonstrated that he was thoroughly familiar with Hansen's distributor agreements and the Company's obligations to train distributors while discussing the Company's preliminary Q209 quarterly results during a conference call on July 6, 2009, *see infra* ¶252.  He stated:

> . . . When we enter into a distributor agreement with anyone, whether it be St. Jude or some other third-party distributor, our distribution agreement normally contains some type of obligation to, in some cases, clinically train their sales and their clinical support people. And then also, in some cases, requires us to technically train their service engineers to be able to maintain the equipment.
>
> And so, if we have -- and many distributors want our obligations spelled out pretty specifically in the distributor arrangement to train them. And since it is spelled out pretty specifically, we have to complete that obligation under our current rev-rec rules before we can take revenue on them -- on either a demo system placed in their demo center or a system that they purchased for their first end user sale.
>
> *            *            *
>
> Yes, once you get through some of the basic obligations of a new distributor agreement then it normally just -- depending on the type of agreement it is, normally we just have to get the unit installed at the end-user site, if they are what we call a Tier 2 distributor.

m.  **As of the end of Q209, of the Company's reported Installed Base of 68 systems worldwide, the Company's distributors were holding numerous Systems that the distributors could not sell through to end users, including at least 3 Systems held by AB Medica.**  As reflected by the Company's restatement, the Company's International Installed Base was overstated by 11 systems as of the end of Q209 and of those 11 systems, 1 System was recognized as revenue in Q309 (*i.e.*, the sale to the South African Distributor improperly recognized as revenue in Q209). The Company subsequently admitted that as of Q309, 10 of the Systems recognized as revenue had been reclassified to deferred revenue.  For the foregoing reasons,

1  Plaintiffs are informed and believe that as of the end of Q209, the Company's distributors were

2  holding up to 10 Systems that had been improperly recognized as revenue during the Class Period,

3  which were sitting idle and/or effectively inactive.

4          n.  **During a conference call on July 6, 2009,** *see infra* **¶257, to discuss the**

5  **Company's preliminary Q209 results, Defendants Moll and Van Dick demonstrated they were**

6  **familiar with the Company's utilization rates.**  Defendant Moll was able to speak specifically

7  about the quarterly catheter sales, identify one customer as purchasing 100 catheters, and identify

8  that customer's historical quarterly catheter purchases.

9          o.  **As reflected by Ex. D, Hansen also improperly recognized revenue on a**

10  **Cohesion sale to Yale on June 30, 2009 (the last day of Q209), despite the fact that the System**

11  **temporarily installed at Yale on December 31, 2008 and improperly recognized as revenue in**

12  **Q408,** *see* **¶¶186-187, should not have been recognized as revenue until Q309.**  Moreover, as

13  reflected by Exs. E-F, Yale did not purchase any catheters during Q109 and only first purchased 6

14  catheters on June 30, 2009, the same day as the Cohesion sale.

15          p.  **Of the 68 Systems in Hansen's Installed Base at the end of Q209, the**

16  **following customers/sites, attributable for 27 of the 68 Systems (an astounding 39.71%), did**

17  **not purchase a single catheter during Q209**: (i) *AB Medica* (Italian distributor - received *5*

18  *Systems*, including 1 System in Q407, 1 System in Q108, 2 Systems in Q308, and 1 System in

19  Q109); (ii) *Riverside Methodist Hospital* (sold Q307); (iii) *Sequoia Hospital* (sold Q307); (iv)

20  *University Hospital in Hamburg, Germany* (sold Q307); (v) *Massachusetts General Hospital* (sold

21  Q407); (vi) *Mount Sinai Hospital* (sold Q407); (vii) *The University of Virginia* (sold Q108); (viii)

22  *Midwest Regional Medical Center* (sold Q108); (ix) *VA Brecksville* (a/k/a Louis Stokes Cleveland

23  VA Medical Center) (sold Q208); (x) *Scripps Medical* (a/k/a Scripps Green) (sold Q208); (xi) *Miller*

24  *School of Medicine at the University of Miami* (sold Q208); (xii) *Rosslyn* (Russian distributor -

25  received 2 Systems, including 1 System in Q208 and 1 System in Q109); (xiii) *Aurora St. Luke's*

26  *Medical Center, Wisconsin* (sold Q308); (xiv) *Southern Arizona VA* (sold Q308); (xv) *Cincinnati*

27  *VA Medical Center, Ohio* (sold Q308); (xvi) *Giessen* (sold Q308); (xvii) *Our Lady of Lourdes*

28  *Regional Medical Center* (sold Q408); (xviii) *St. Joseph's Hospital of Atlanta* (sold Q408); (xix)

*Minogue Medical* (Canadian distributor - sold Q408); (xx) *Stanford* (Sold Q109); (xxi) *St. Jude Australia* (Australian distributor - sold Q408); (xxii) *St. Thomas* (sold Q209)

q.   ***For the same reasons set forth in ¶¶119(o),217(o), Hansen was "stuffing" catheters and doing discounted bulk sales at the end of the quarter.***  For example, review of Ex. F, clearly indicates, among others, the following:

i.   As reflected in Exs. F, H, the quarterly sales again reflected a remarkable hockey stick pattern as 427 of the 626 catheters (*i.e.*, more than 66%) were sold in June of 2009 (the last month of the quarter):



ii.   A staggering 313 catheters (*i.e.*, exactly ½ of the 626 catheters sold during Q209), were sold during the last 8 days of the quarter (including, as reflected by Ex. F, 170 of which were sold the last day of the quarter (*i.e.*, more than 25% of Q209 sales)):

iii.   As alleged above, ¶217(o), Hansen provided customers discounts at the end of the quarter to purchase in bulk and thus, inflate quarterly catheter sales at the expense of

future catheter sales. In addition to the bulk order placed by Oklahoma Heart hospital on June 30, 2009 (*see* ¶217(o)(iv)), other examples reflected in Ex. F include: (1) Scottsdale Healthcare purchased 4 catheters on April 24, 2009, and another 2 on April 26, 2009, at a price of $1,600 per catheter, yet received "promotional pricing" of $1,500 per catheter on 18 catheters on June 23, 2009; and (2) Hansen similarly cannibalized catheter sales from the Methodist Hospital (as it did Oklahoma Heart Hospital) depicted by the below chart (summarizing information from Exs. F-G), showing that Hansen did a discounted bulk sale on the last day of Q209, which essentially depleted its Q309 catheter sales to that customer:

| QUARTER | ORDER DATE | UNITS | PRICE PER UNIT |
|---------|-----------|-------|----------------|
| *Q209* | 4/1/2009 | 3 | $1,600 |
| | 4/7/2009 | 2 | $1,600 |
| | 4/8/2009 | 2 | $1,600 |
| | 4/22/2009 | 3 | $1,600 |
| | 5/19/2009 | 3 | $1,600 |
| | 5/20/2009 | 2 | $1,600 |
| | 5/29/2009 | 2 | $1,600 |
| | 6/9/2009 | 5 | $1,600 |
| | 6/16/2009 | 3 | $1,600 |
| | *6/29/2009* | *30* | *$1,500* |
| *Q309* | *9/8/2009* | *10* | *$1,500* |

243. That day, Hansen held a conference call in connection with the press release announcing the Company's preliminary financial results for Q209 (the "Q2 (Prelim) 2009 conference call"). Defendants Moll and Van Dick were present.

244. At the beginning of the Q2 (Prelim) 2009 conference call, Defendant Moll briefly summarized the preliminary and shockingly dismal results announced that day and Hansen's announcement that the Company was withdrawing its FY09 guidance. Defendant Moll tried to falsely blame the Company's results on the troubled economic environment:

> [*Defendant Moll:*] *As we indicated in the press release issued earlier this afternoon, for the second quarter of 2009, the Company expects revenues to be in the range of $3.1 million to $3.3 million. During the quarter, we shipped six Sensei robotic catheter systems, and we expect to recognize revenue in the second quarter on the sale of three of these systems.*
>
> *In addition to the three Sensei systems, revenues for the quarter are expected to include the shipment of approximately 626 artisan catheters, a quarterly record for*

*disposable sales; approximately 100 catheters were sold to a single international medical center.*

System sales during the second quarter were adversely affected by general macroeconomic conditions that continue to significantly impact our potential customers' capital spending. Due to the tight credit markets, financial and general economic conditions, several potential customers sought additional approvals prior to making their purchase decision or spent time evaluating alternative financing arrangements. In both cases, this extended the length of sales cycles for Sensei systems and resulted in potential customers' orders moving out of the quarter.

*As a result of these market conditions we are currently experiencing, Hansen Medical is withdrawing its previous guidance for the system placements for 2009. However, we will provide an updated outlook for 2009, along with a complete second quarter financial results, in our regularly scheduled 2009 second quarter press release and conference call, to be scheduled for late July or early August.*

Clearly, the preliminary second quarter results were disappointing. However, while sales cycles will continue to be influenced by macroeconomic trends, we are confident that our technology and planned product development activities present a compelling value proposition to hospitals and payors. Furthermore, we believe that our pipeline of prospective customers to be quite healthy, and that this 12-week disappointment is not reflective of Hanson's product opportunity.

(Emphasis added).

245.    The statements in ¶244 were materially false and/or misleading and made with scienter for the reasons set forth above in ¶¶241-242.

246.    Given defendants' previously favorable comments as recently as May and June 2009 regarding Hansen's continued performance despite a more difficult economic environment, analysts were skeptical about Defendants' Moll and Van Dick's attempt to suddenly change course and blame economic pressures for the Company's Q209 performance.  Analysts questioned defendants on exactly how the quarter had unfolded, and defendants' responses increasingly revealed that Hansen's problems had little, if anything, to do with the economy:

[*Analyst*:] . . . [M]aybe you can just start off with talking a little bit about how things developed as you went through the quarter, and what kind of visibility you feel you have as you look out at the balance of the year.

[*Defendant Moll*:] So, obviously, there were some surprises at the end of the quarter. We -- as I said, we feel good about our pipeline and we were working through the quarter. And it really is a matter of -- *the timing in this particular 12 weeks was such that things dragged out with regard to closing. And with customers shopping for alternative financing means and evaluating a variety of options, the timing of closing, shipping, training, and getting sales booked was not favorable in the quarter. And so I'd say generally that was what we experienced.*

(Emphasis added).

247.   One analyst probed deeper, questioning whether in fact there was some other significant reason for Hansen's shockingly poor quarterly performance.  Defendant Moll rejected the notion but nonetheless conceded that he appreciated why, from the analyst's perspective, the analyst would question the credibility of Hansen's guidance:

> [*Analyst*:] Okay. Maybe just one last one. I'm curious -- you just gave guidance a couple of months back here and I'm curious why -- what might have changed so dramatically here in the second quarter? I mean, was there something that -- and I know it's a bit of an open-ended question, but with the number being so dramatically lower than I think most of us had been looking for, is it just really a continued softening in the outlook out there for capital spending on the part of hospitals?
>
> [*Defendant Moll*:] ***You know, I think that there is certainly soft conditions; but keep in mind, this is 12 weeks and the selling cycle has been stretched out. And so, it's very difficult to have real clarity on when these orders are going to close and when we get them installed, and when we'll recognize revenue.***
>
> And appreciate the fact that this is -- ***the credibility of our guidance is you would, in your position, question it. But we do see a very good pipeline. We don't see -- there was no big event.***
>
> It was 12 weeks of a lot of activity, and towards the end of it, not the number of the accounts that we're looking at -- ***for example, dealing with St. Jude and doing a leverage deal, which they looked at. And it takes some 30 to 60 days to understand sort of the specifics of what that means, if they enter into that sort of deal. And then if they don't like it, they come back to looking at alternatives.*** And it's just a longer cycle than certainly we experienced a year ago, and very difficult to predict.

(Emphasis added).

248.   As Defendant Moll fended off questions from disbelieving analysts, he increasingly characterized the quarterly shortfall as being the result of orders not getting finalized or received by the end of the quarter:

> [*Analyst*:] Okay. You guys did mention a little bit about kind of what you saw going on in the quarter; but maybe, if you could, just -- when was it apparent that the quarter was going to be at risk? Were you seeing sort of the same environment at the hospital level through the quarter and then the orders just didn't come through or --? When was your early indications coming there?
>
> [*Defendant Moll*:] Yes, it was very late in the quarter, actually. And as I said, we expected to have a very different result. ***The slowdown at the end of the quarter with regard to the ability to just get the orders in, finalize the agreements, and do the paperwork, and get signed off and so forth with the hospitals was -- you know, it was just -- it was slow, and in many cases, just didn't make the timelines that we'd expected.***

(Emphasis added).

249.   Indeed, one analyst astutely expressed skepticism given the Company's lengthy sales cycle and the fact that the difficult economic environment had been ongoing for quite sometime:

> [*Analyst*:] And Fred, if I remember correctly, on one of the earlier calls, and I forget which one, the number six to nine months of a sales cycle was brought up. Would you concur that that's the usual sales cycle for the Sensei?
>
> [*Defendant Moll*:] Well, I would say six to 12 months is probably more like it.
>
> [*Analyst*:] If I use the six to nine months, Fred, I guess my last question and I'll hop back into the queue -- ***what I'm trying to understand is the macroeconomic environment was already known. I mean, we've been in this morass for a long time.***
>
> And when I -- obviously, on the Q1 call, when you finished your secondary, things were fine. ***But something happened suddenly that was either unanticipated or I'm not sure -- and I'm still trying to pinpoint. I'm not sure through all the conversation I understood, what exactly happened that knowing six to nine months you're in a sales cycle -- what caused a hospital, let's say, to scramble for alternative financing or --? I'm not sure I have connected the dots or understood the entire picture yet.***
>
> [*Defendant Moll*:] Well, you know, as I say, we have a good pipeline. And we work through the pipeline and the accounts that we've focused on, that we believed were closer to committing on a sale than they turned out to be, after going through the cycle of evaluating a variety of different financing options. And so there was no -- I can't tell you any big event.
>
> ***It -- or whether this is specific to this 12-week period that we -- that the particular accounts wind up the way they did; whether capital equipment has gotten incrementally harder in the last quarter or not. But I think it's just in a small period of time, it's just difficult to say what the specifics were that led up to this, other than I think it's just a very slow cycle that is hard to time in any particular quarter. And I'm sorry I can't give you a better view than that.***

(Emphasis added).

250.   The statements made by Defendant Moll in ¶¶248-249, which were left uncorrected by Defendant Van Dick, were materially false and/or misleading and made with scienter for the reasons set forth above in ¶242(d), (m), because in reality the Company had been unable to push systems on its distributors who already had systems they were unable to sell through to end users, including AB Medica who was holding 3 systems, and as alleged above in ¶217(n), the Company had pulled sales from Q209 into Q109.

251.   Again, during the Q2 (Prelim) 2009 conference call, Defendants Moll and Van Dick

demonstrated their knowledge of Hansen's revenue recognition criteria, and specifically, the Company's required training obligations with respect to distributor sales. When questioned about the delayed revenue recognition on shipments during Q209, the two defendants spoke in detail about what Defendant Moll characterized as Hansen's "very strict revenue recognition policy:"

> [*Analyst*:] Okay. And then just -- the three systems being recognized versus six shipped. We've had some mismatch in the past, but it's typically just been one system or two that will spill over from quarter to quarter. Can you just review your policy on when you can recognize revenue and what the lag time usually is between shipment and recognition?
>
> And then speak to anything that might have been unusual with all the activity here falling very late in June, I would assume.
>
> [*Defendant Moll*:] So, I think Steve can talk more specifically to this point, ***but we do have a very strict revenue recognition policy. And we need to get a lot of things done during the quarter in order to recognize revenue. Some of them are in our control; some of them are not in our control.*** And one system in particular is still waiting for -- Steve, correct me if I'm wrong -- a state approval or a license from the -- or an approval letter from the state.
>
> [*Defendant Van Dick*:] Yes, state approval. The customer decided -- this particular customer decided to be ultra-conservative in today's environment and went to the state to get approval on our system because they were going out and getting other pieces of equipment at the same time and decided to aggregate those all into a single CON, which in times past customers may not have done that.
>
> ***In terms of some of the other things that you saw this quarter, in terms of differentiating between the three taken for revenue versus the six shipped, this quarter was the first time we had in the Company's history we've entered into some multi-country distributor arrangements with St. Jude. And as a result of that, there are obligations mostly focused on training obligations that are going to carry over beyond Q2 into Q3 and Q4.***
>
> ***And based off of our revenue recognition rules, we can't take revenue on a system placed even with a distributor until we've completed our obligations to train that distributor. And so we had two units of the six that we couldn't take a revenue, because we hadn't yet completed the training in all the various countries that the distributor arrangement covered.***
>
> And then the third was the US system that Fred was alluding to, that a customer decided to go out and get a state approval, which meant that we could not install the system. And so, for typically, we need to be able to -- once we get a purchase order, we need to be able to ship a unit to a customer, install the unit, and train the customer prior to being able to take revenue.

(Emphasis added).

    252.    In response to a further question, Defendant Van Dick clarified that the systems that

were shipped during the quarter but for which revenue recognition had not occurred because of unmet training obligations related to distributor sales. Furthermore, Defendant Van Dick showed an intimate knowledge of Hansen's distributor agreements and training obligations:

> [*Analyst*:] . . . And just wanted to follow up a little bit on the St. Jude side. If I understand correctly, the timing of the training was training the St. Jude reps or the customers that they were selling the systems into?

> [*Defendant Van Dick*:] This would be the St. Jude reps.

> [*Analyst*:] Train the St. Jude reps, okay.

> [*Defendant Van Dick*:] Yes. ***When we enter into a distributor agreement with anyone, whether it be St. Jude or some other third-party distributor, our distribution agreement normally contains some type of obligation to, in some cases, clinically train their sales and their clinical support people. And then also, in some cases, requires us to technically train their service engineers to be able to maintain the equipment.***

> And so, if we have -- and ***many distributors want our obligations spelled out pretty specifically in the distributor arrangement to train them. And since it is spelled out pretty specifically, we have to complete that obligation under our current rev-rec rules before we can take revenue on them -- on either a demo system placed in their demo center or a system that they purchased for their first end user sale.***

> [*Analyst*:] So were these two systems for St. Jude demo purposes or systems for customers?

> [*Defendant Van Dick*:] These initial two systems that we took were for going into St. Jude demo centers in the respective countries.

> [*Analyst*:] Okay, got it. And have you been able to recognize revenue on those? Or is this more of a longer-term process -- since the quarter closed?

> [*Defendant Van Dick*:] Well, the two that we shipped and took revenue on, obviously, we were able to take revenue on those systems. But the two that we couldn't is because we still have outstanding training obligations.

> [*Analyst*:] Okay, got it. And they're still outstanding, is what I'm asking?

> [*Defendant Van Dick*:] Yes, they're still outstanding.

> [*Analyst*:] Okay.

> [*Defendant Van Dick*:] Well, they've actually (multiple speakers) --

> [*Analyst*:] Do you think as you get through these, you'll be able to recognize revenue from St. Jude contributions faster in future quarters?

[*Defendant Van Dick*:] **Yes, once you get through some of the basic obligations of a new distributor agreement then it normally just -- depending on the type of agreement it is, normally we just have to get the unit installed at the end-user site, if they are what we call a Tier 2 distributor.**

(Emphasis added).

253. The statements in ¶¶251-252, which were left uncorrected by the other defendants on the call, were materially false and/or misleading and made with scienter for the reasons set forth above in ¶¶61, 89, 147, 187, 217, 242, as Hansen improperly recognized revenue on at least 1 System sold to a distributor (and likely 2) during that same quarter, and Hansen had been violating its revenue recognition criteria since Q407 for the precise reason that Hansen had not trained its distributors to independently install systems and train end-user physicians to use the systems. Additionally, Defendants Moll and Van Dick failed to disclose that, as indicated by CW1, as set forth in ¶34(c), the Company trained its distributors, such as AB Medica and Palex, in Mountain View, California, to install and repair systems, insufficiently for the distributors to be able to independently install systems and train end users, but that training provided to distributors was not comprehensive enough to enable distributors to conduct installations independently.

254. Furthermore, Defendant Van Dick demonstrated his knowledge of the terms of the agreements with the Company's distributors:

[*Analyst*:] Fred, in terms of the units, especially international, is Hansen providing any sort of financing, any looser credit terms to the hospital?

[*Defendant Moll*:] Not directly. We offer the -- in conjunction with St. Jude, we offer an option that is a bundled sale with St. Jude, which is a type of leverage sale that St. Jude can offer. And if they're interested in a more conventional lease, we work with third parties to provide lease terms for the sale of the systems.

[*Defendant Van Dick*:] Yes. **On our distributor contracts, we have pretty standard terms that range anywhere from 60 to 90 days that's built into the distributor agreement. And we provide no financing other than standard trade terms.**

[*Defendant Moll*:] Oh, I'm sorry, you were talking about distributors.

(Emphasis added).

255. During the Q2 (Prelim) 2008 conference call Defendants Moll and Van Dick represented that the single customer, who purchased approximately100 catheters during Q209,

typically placed bulk orders of 30 to 40 catheters per quarter:

[*Analyst*:] I wonder if I could ask a little bit about the catheter number. You mentioned the 100 getting placed with one customer. Do you typically see such large orders to one customer?

[*Defendant Moll*:] **Yes, I mean, that's a -- they got a discount.** They're a fairly high-volume user and they took the opportunity to get a good price on 100 catheters. That is uncharacteristic; we usually -- orders are usually in the single digits or small, low, double digits. So, yes, that's a big order, which is why I called it out to make sure there wasn't -- that wasn't --

[*Defendant Van Dick*:] Hey, Fred, I could provide a little bit more color on that.

[*Defendant Moll*:] Yes.

[*Defendant Van Dick*:] Yes. **This customer historically has made bulk purchases. I mean, when they originally got the system, they placed a large order for catheters. And so they're used to buying and placing their orders in large. In fact, the order that we actually got was for more units than we actually shipped for the quarter.**

**So, this was the smallest number of units that they were willing to accept. And I think part of it has to do with getting it through customs -- one, they don't want to have to deal with it on a lot of multiple little shipments, and so they like to buy in larger bulk. And it is unusual, but it's not unusual -- and this customer typically takes 30 to 40 units per quarter.**

[*Analyst*:] Well, the reason I ask is if you back it out and you look at sort of the utilization number, I know it's not a perfect calculation, but it dropped significantly in the quarter. And I'm curious what might have been in the quarter that caused the systems to be used less than they had been?

[*Defendant Moll*:] **I would disagree that it dropped significantly. You back out some of the 100, I understand that, but you wouldn't -- those are higher volume users; you wouldn't back them all out. And so I actually think it was a good quarter for utilization. And as you know, our catheter sales go up and down, but this is more catheters than we've sold in any other quarter, so.**

[*Analyst*:] Sure, sure. But I guess -- so, you're saying that we shouldn't, in a sense, get too concerned about the utilization number here in the second quarter?

[*Defendant Moll*:] No. No.

(Emphasis added).

256.    Moreover, Defendant Van Dick demonstrated his familiarity with the Company's sales of Artisan Catheters and the level of Artisan Catheters typically sold with the placement of a new system:

[*Analyst*:] Okay. And second, just to get back to the catheters, so the catheters number was a touch light compared to what we were expecting. And I was just wondering how much of that could be related to stocking sales with Sensei placements.

[*Defendant Moll*:] You know, the reason why we talked about the 100 units is that, obviously, is a big order for us. Other orders are not big orders; they're small orders. ***So we don't stuff catheters.*** I do think that this -- the Heart Rhythm Society plays into utilization in this quarter. But generally, we were fairly pleased with the number, based on the time of the year and the timing of the conference.

[*Analyst*:] (multiple speakers) Right. ***Well, I was just going to ask -- do you -- is there typically some stocking sale associated with a new box placement? And to the extent that you missed out on some box placements, are you also missing out on some catheter placements?***

[*Defendant Van Dick*:] ***That would be true. I mean, it is -- our sales guys, when they go out there and place a system, they're also out there trying to -- when that system is sold, also trying to sell anywhere from 2 to 10 catheters with the system.***

And to reiterate what Fred was saying about the -- typically, our -- typically being if you compare to last year, in our second quarter of '08 we did see a significant drop-off in the shipment of our catheters. And it looks like that is becoming -- it wasn't as much of a factor this quarter, but we have seen, I think, some drop-off as the clinicians, especially some of the key high-volume clinicians spend two to three weeks preparing and then out at the HRS meeting.

***So our ability to maintain and show growth in catheter shipments in the second quarter, we see as kind of a real positive compared to our trend from last year.***

(Emphasis added).

257.     Nevertheless, Defendant Moll continued to defend the utilization rate by trying to ease any concern among analysts that the Company's utilization rate did not appear to be matching the growth of Hansen's Installed Base:

[*Analyst*:] Okay. And in terms of maybe providing a little more color on the catheter utilization, you have one big center both US, O-US, where you're doing a lot of training and demo'ing of the product. Beyond those top centers, what are we seeing in terms of trends of utilization?

[*Defendant Moll*:] Well, you know, in a number of centers, we're seeing very, very positive trends where there are -- we sort of call them our super-users. And they are people that have truly bought into the Hansen value equation and use our system on a routine basis for most of the ablations they do.

Now that's not the majority of our customers, but it is a growing group of users from which we're basing the model of how does one -- what's a successful installation? And how do you grow a user group that can enjoy the benefits of the system on a routine basis and build a very significant volume?

And that's something that we're really focused on. And as we get more experience in marketing and training, we understand how to take a new customer through a learning phase that can be as little as 10 or 12 cases, but as much as 20, 25 cases, and make sure that when they hit that 20th case or that 25th case, that they have a very good experience and that they're ready to graduate into that super-user category.

And so there's a great model there in a dozen or so accounts of how you get there. And we are really focused on that, to make sure that the majority of our systems -- new sales going forward can head in that direction.

[*Analyst*:] Okay, so it sounds like if we were to measure the dispersion of your utilization across your centers, it would be a fairly narrow curve at this point?

[*Defendant Moll*:] I'm not sure what you mean.

[*Analyst*:] Graphically, if we were to look at utilization across all your centers, it seems like you're still -- the super-users, as you describe them, seem to be still doing a majority of the procedures. Is that fairly characterizing it as you described it?

[*Defendant Moll*:] Well, I think there are three groups. I mean, I think there's the high volume users, there's the medium volume users, and the low volume users. And the low volume users are -- they haven't even started yet or we have a system with a distributor that's being placed at a new customer location, and they're doing zero to one. And that's catheters per week, per system.

And in that sort of mid-category is someone that's just coming up the curve and they're doing maybe 0.5 to 1 case a week. And then you have the high volume users that are doing more than one case a week.

And remember, if you're doing two a week, you're doing 100 a year. And if you're doing 100 a year, you're doing a lot of cases as electrophysiology goes. And so there's -- we have a group of each. And I'm not sure it's one-third, one-third, one-third, but it's something like that.

258.   The statements in ¶¶255-257, which were left uncorrected by the other defendants on the call, were materially false and/or misleading and made with scienter for the reasons set forth above in ¶¶158,216-217,241-242, because Hansen was stuffing catheters, there were numerous Systems that were essentially inactive, and because Defendants Moll and Van Dick knew and/or were deliberately reckless in not knowing the following:

a.   Defendants Moll's and Van Dick's statements created the materially false and/or misleading impression that the 100 catheters purchased by a particular customer was not that unusual of an order for that particular customer and only represented an order approximately 2.5 to 3 times larger than normal, when this order was extremely unusual for the customer and was approximately 6.5 to 10 times larger than normal.

1              i.      Contrary to Defendant Van Dick's assertion in ¶255 that this customer

2    typically purchased between 30 to 40 catheters per quarter,  as set forth in ¶34(t), CW1 indicated that

3    this was an abnormal bulk order for that customer.  CW1 recalled that this particular customer would

4    normally buy approximately 10 and 15 catheters at a time.  CW1 recalled that everyone cheered

5    when hearing about the sale.  CW1 indicated that it would take at least a few months for the

6    customer to work through the inventory.  CW1 further indicated that the customer received a

7    significant discount that was generally better than any other discounts Hansen would provide to

8    customers.  As reflected by Ex. F, this sale was to  St. Georges Hospital in Germany and was for 102

9    catheters.  As reflected by Exs., E, G, K, in addition to the 102, in Q109, the customer purchased 5

10   catheters in March 2009, 8 in April 2009, and no catheters between July and October 2009.

11             ii.     Contrary to Defendant Van Dick's statements  in ¶255 that "the order

12   that we actually got was for more units than we actually shipped for the quarter," Plaintiffs are

13   informed and believe that, as reflected by Ex. K, (indicating that this customer – identified  in the

14   document as "Asklepios Kliniken" or "System Serial #119" – ordered 150 catheters in June but

15   Hansen only shipped 102), that the order Hansen received was for only 150 catheters.

16             iii.    Contrary to Defendant Moll's statements in ¶255 that this type of large

17   bulk discounted sale was "uncharacteristic" and that "orders are usually in the single digits or small,

18   low, double digits" as reflected by Ex. E-G, there were typically bulk orders and such an order was

19   not uncharacteristic, as exemplified by the 106 catheters sold to AB Medica in Q109 (including 50

20   sold in the last week of the quarter), 64 catheters sold to Cardion in Q109 (including 40 sold in the

21   last week of the quarter), and the following sales in Q209: (1) 34 catheters sold to Oklahoma Heart

22   Hospital on June 30, 2009; (2) 30 catheters sold to the Methodist Hospital on June 29, 2009; (3) 30

23   catheters sold to St. Jude France (French distributor) on June 26, 2009; (4) 50 catheters sold to

24   Amayeza Abantu Bio-Medical (Hansen's South African distributor) on June 23, 2009; and (5) 18

25   catheters sold to Scottsdale Healthcare on June 23, 2009.

26           b.     Defendant Moll's statement in ¶255 that he did not agree that utilization

27   dropped during the quarter because "you back out some of the 100, I understand that, but you

28   wouldn't –those are higher volume users; you wouldn't back them all out," created the materially

1    false and/or misleading impression that the purchase had taken place during the quarter (or in the

2    middle of Q209) and reflected actual utilization during the quarter, when in fact, as reflected by Ex.

3    F, the order was on the very last day of the quarter.

4         c.    Contrary to Defendants' Moll and Van Dick statements in ¶¶255-257,

5    Hansen's increasing quarterly catheter sales did not reflect increased utilization but rather, bulk

6    orders and "stuffing" catheters.

7         d.    Contrary to Defendant Moll's statement in ¶256 that "we don't stuff

8    catheters," as alleged in ¶¶119(o), 217(o), 242(q), Hansen did "stuff" catheters.

9         e.    Contrary to Defendant Van Dick's statements in ¶256 about the stocking sales

10   associated with new System placements being between 2 to 10 catheters, of the 3 Systems originally

11   sold and recognized as revenue in Q209, as reflected by Ex. F, the 1 System sold and recognized as

12   revenue to Hansen's South African distributor was accompanied by the sale of 50 catheters.

13        f.    Defendant Moll's statements in ¶257 about "low volume users," failed to

14   disclose: (i) that as alleged in ¶242(l), that customers/sites attributable for 27 of the 68 Systems in

15   Hansen's Installed Base (approximately 40%), did not purchase a single catheter during Q209; and

16   (ii) as alleged in ¶242(d),(m), the Company's distributors had numerous Systems that they were

17   unable to find customers to purchase the Systems, including 3 Systems held by AB Medica.

18        259.    Finally, Defendants Moll and Van Dick dismissed the suggestion that somehow the

19   Company pulled sales from Q209 into Q109:

20        [*Analyst*:] Were there any -- as best as you all can say -- I know this is pretty
          subjective in terms of when the sales get closed, do you think there were any pull-
21        through from Q2 into Q1?

22        [*Defendant Moll*:] From Q2 into --

23        [*Analyst*:] Let's say some units were, quote/unquote, technically would have landed
24        up in Q2 but they were pulled up into Q2 -- maybe the timing for a variety of
          reasons. Do you anticipate any of that happened?

25        [*Defendant Moll*:] No, I wouldn't say so. Steve, do you want to --?

26        [*Defendant Van Dick*:] No, I mean, I can't -- I'm trying to think back at the Q1 deals
27        that were done. And the sales guys are always out there trying to close all their
          potential targets that they've hit. And whether something would naturally occur in

28

a Q1 or a Q2 or over some other different period of time, it's really difficult to evaluate.

But I can't -- I think I'm like Fred, I can't think of anything specifically where you'd say, well, gee, this was a May or June order, and somehow you were able to convince a customer to do it in February or March.

[*Defendant Moll*:] So, the flip side of that is we do expect the systems that we didn't recognize revenue on that we will recognize revenue either this quarter or we expect this quarter or next. And so in that sense, there may be some spillover to Q3.

260.    The statements made by Defendants Moll and Van Dick in ¶259, which were left uncorrected, were materially false and/or misleading and made with scienter for the reasons set forth above in ¶¶119, 187, 216, 217, as the Company would routinely cannibalize future sales by pulling in sales from future quarters.  Plaintiffs are informed and believe that the Company did pull in several System sales into Q109 for the same reasons alleged in 217(n) and because as noted by Ex. I, Stanford did not end up using its System until May 18, 2009, and although St. Barnabas, Scripps La Jolla, and Jersey Shore Medical Center purchased Systems in Q109, as reflected by Ex. E, none of those customers purchased any catheters during Q109.

261.    The announcement called management's credibility into question, especially considering that Defendants Moll and Van Dick had repeatedly stated that the FY09 guidance had already factored in the impact from the economy and considering Defendant Moll's recent positive comments on June 10, 2009.  The July 6, 2009, announcement also partially revealed that:

a.      The Hansen FY09 guidance was unattainable;

b.      The demand for the Sensei System was not as strong as the Company had led the public to believe;

c.      The Company was further facing issues that were delaying revenue recognition; and

d.      Utilization was not increasing to the extent the Company had led the public to believe.

262.    Hansen's preliminary financial results in the July 6, 2009, press release also reflected the following materializations of concealed risks:

a.      The Company was unable to achieve its FY09 guidance, which had been

1   knowingly false as defendants were prematurely recognizing revenue and prematurely including

2   systems in the installed base, including systems sold to distributors and temporary installations;

3           b.      The Company was unable to add as many systems to its Installed Base as

4   expected  because certain distributors were still holding systems from prior quarters that the

5   distributors were unable to sell through to end users and could not take any additional inventory;

6           c.      The Company was unable to sell and install enough systems due to the fact

7   that in prior quarters the Company had already cannibalized its future sales through end of the

8   quarter discounts to get customers to take systems earlier than was needed and/or to allow temporary

9   installations;

10          d.      The Company's catheter sales and utilization rates were lower than expected

11  due to the numerous systems that were effectively inactive; and

12          e.      The demand for the Company's systems and the Company's sales/revenue

13  ramp now appeared to be slower than the public had been led to believe because the Company had

14  misrepresented the demand for its systems and the speed of its revenue/sales ramp by improperly

15  and prematurely recognizing revenue on system sales.

16          263.    Nevertheless, defendants' statements remained materially false and/or misleading

17  because, among others:

18          a.      The Company's financial results for Q407 through Q209 and Installed Base

19  at the end of Q209, remained materially overstated;

20          b.      The Company was improperly recognizing revenue on systems shipped to

21  distributors despite the fact that the distributors were neither capable of independently installing the

22  system nor training the end-user physicians;

23          c.      The Company was improperly recording revenue on temporary installations;

24          d.      The Company's Installed Base included numerous systems that were

25  effectively inactive;

26          e.      The Company was cannibalizing its future catheter and system sales by

27  offering end of the quarter discounting and doing temporary system installations; and

28

1        f.     For the foregoing reasons, the demand for the Company's product was not

2  as strong as Defendants had led the public to believe.

3        264.    An analyst report issued that evening by JP Morgan entitled, "Big Miss: 2Q Well

4  Short of Expectations - ALERT" noted that the Company's preliminary revenue figures for Q209

5  of "just $3.1-3.3M" were "well below current Street consensus of $8.8M and represent[ed] a decline

6  of roughly 45% [year-over-year] and 55% sequentially."  The report further noted that Hansen

7  withdrew its guidance for FY09 system placements and even though the Company planned to update

8  its expectations when reporting its actual Q209 results, credibility issues would remain as "investor

9  confidence in any new outlook could be limited given management's recent track record."

10       265.    The following morning, an article entitled, "Hansen Medical Credibility As Weak

11  As The Stock" posted on the website *24/7 Wall St.*, stated the obvious by noting that Hansen was

12  becoming "an embarrassment for analysts to cover."  The article also observed that management's

13  credibility has been in question for some time given its track record:

> Hansen Medical Inc. (NASDAQ: HNSN) is becoming the Boulevard of Broken Dreams in the land of speculative medical instrument stocks. We gave a volume spike alert at VSInvestor.com on this one, but this situation goes much deeper now. The maker of The Sensei® robotic catheter systems guided second-quarter revenues lower and withdrew previous system placements guidance. ***While the company cited delays in purchases by customers, it is becoming a serious question (actually, it has been a serious question for a while) as to whether or not this is a real company with a solid future or if its basis is hype around its founders and nothing more.***

> The problem here that may make Hansen all bark and no bite is that the Chief Technology Officer is Rob Younge and the President & CEO is Frederic Moll, who are both co-founders of Intuitive Surgical, Inc. (NASDAQ: ISRG).  That company has also peaked and come under pressure of its expensive DaVinci robotic surgical system due to soft finances at many of the nation's hospitals.  ***When you see the guidance, you'll understand why this may be all bark.***

> ***The company expects second quarter revenues to be in the range of $3.1 million to 3.3 million, short of the $8.8 million expected by analysts.***  The company said it will give an updated outlook for 2009 and complete second quarter financial results in its regularly scheduled 2009 second quarter press release and conference call in late July or early August.

> ***Hansen medical is becoming one of the device makers which is now an embarrassment for analysts to cover.  When you have the guys that led the great and famous Intuitive Surgical and then they come out with such a low-selling flop like this you have to wonder.  "Play it again, Sam." is a line we all know rather well.  But sometimes playing-it-again ends up like the kids game where "Do-over!" is allowed.  The 2007 revenues were $10.08 million and the 2008 revenues were***

*$30.23 million. Before this nasty warning, estimates for 2009 and 2010 were $37.8 million and $56.26 million respectively. It is safe to assume that those estimates will be coming down to earth faster than a meteor.*

There is another issue to address here. The company was also expected to already lose money in 2009 and 2010. Its own organic cash flows have been going to the wrong way. It is probably too soon to begin questioning its viability. *But its credibility is another issue entirely.*

*Shares are down over 30% pre-market* and are trading at $3.18. Its 52-week trading range is $2.65 to $20.20.

(Emphasis added).

266.     Credibility issues were further echoed in a report issued that day by SMH Capital entitled, "HNSN: Disappointing Performance Continues; Maintaining Neutral Rating." Therein, the report, in relevant part, expressed frustration trying to grasp "what changed so suddenly" since the Company's "bullish tone on [the Company's] Q1 call" in May 2009 "as to cause an increase in the sales cycle that Hansen did not foresee." Ultimately, the report observed that "we are not able to connect the dotted lines between May 5th and the end of June:"

Given the recent closing of a secondary offering at the end of May and the company's bullish tone on its Q1 call, we wonder what changed so suddenly so as to cause an increase in the sales cycle that Hansen did not foresee. On yesterday's call, the company indicated that the sales cycle for the Sensei has increased to about 6 to 12 months from 6 to 9 months. *The key factors cited for the revenue shortfall were delays on the part of St. Jude (STJ/NYSE – Neutral) as part of the packaged deals and some centers scrambling to find alternative financing. Our understanding is that the financing process takes a few weeks, and hospitals are well cognizant of the tight credit environment. We are not able to connect the dotted lines between May 5th and the end of June.*

267.     Other analysts expressed doubts about the excuses provided by Defendants. A report issued that day by Summer Street Research Partners entitled, "Management Pre-Announces a Rough Q2:09" questioned whether the real explanation was due to decreasing interest in Hansen's Sensei System:

*Management blamed macroeconomic issues for the miss, but declining interest in Sensei systems from medical community could also be a key reason.* During the recent Heart Rhythm Society (HRS) meeting (May 2009) we were concerned that the interest level in Sensei technology seemed to be low. Thus, we are concerned that a dismal quarter may not be entirely due to the economic challenges.

(Emphasis in original).

268.     In another report issued that day entitled "HNSN: 2Q09 Preliminary Revs

Significantly Below Expectations; 2009 Guidance Withdrawn; Reiterate Hold," an analyst from Needham & Company, LLC, expressed concern that the apparent lengthening in Hansen's sales cycle  which was negatively impacting revenue recognition would continue, and voiced concern over the recent management exodus:

> **Sales cycle is getting longer.** The elongating sales cycle for HNSN is delaying system placements and negatively impacting revenue recognition. Of the three systems shipped, but not recognized this quarter, two were international, via the St. Jude Medical (STJ) distribution partnership, and one was domestic. The domestic system was pushed out due to delays in obtaining the necessary (State) approvals to finalize the sale and the international shipments were demo units for STJ. The company expects to recognize revenue on the STJ systems upon completion of the necessary training of STJ personnel. We expect ongoing sales disruptions due to the negative impact of the longer sales cycles through 2009.

> **We are concerned senior management departures may create disruption.** In the past several quarters we have seen departures in sales, marketing, legal, and operations. Notably, Gary Restani stepped down as President and COO of the company, effective March 1, 2009. Mr. Restani, however, remains on the board of directors.

269.    On this news, the following day shares of Hansen's stock declined precipitously by $1.58 per share, or 33.40%, to close on July 7, 2009, at $3.15 per share on unusually heavy volume of 4,370,200, more than 4 million more than prior day's volume of 357,200.  Shares of Hansen's stock again declined sharply the following day losing another $0.27 per share, or 8.57%, to close on July 8, 2009, at $2.88 per share, on unusually heavy volume of more than 1.2 million.  This two-day decline represented a decline of $1.85 per share, nearly 40%, of the closing price on July 6, 2009, of $4.73 per share.

270.    On August 4, 2009, Hansen issued a press release entitled, "HANSEN MEDICAL REPORTS 2009 SECOND QUARTER RESULTS." Therein, the Company, in relevant part, stated:

> •   *System Sales: During the second quarter, the company recognized revenue on three Sensei(TM) Robotic Systems and shipped three additional systems. From commercial launch through June 30, 2009, the company has recognized revenue on a total of 68 systems (which the company refers to as its installed base), including 43 in the United States and 25 in international markets.*

> •   Catheter Sales: *The company shipped 626 Artisan(TM) Control Catheters in the second quarter*, approximately 100 of which were sold to a single international medical center.

\*      \*      \*

*"I believe that we are taking the right steps to weather the current macroeconomic challenges and to put ourselves in a position to expand our business as market conditions improve," said Frederic Moll, M.D., president and chief executive officer of Hansen Medical. "Despite lower than expected Sensei system sales in the second quarter, our pipeline of potential customers is healthy and catheter sales were at a new quarterly high. In addition, I am excited about the progress we are making in enhancing our current platform and developing new capabilities for our technology. I am also encouraged by the progress we have made to reduce spending and improve our cost structure during these challenging times," said Dr. Moll.*

2009 Second Quarter Financial Results

*Total revenue for the three months ended June 30, 2009 was $3.3 million, a 43% decrease compared to revenue of $5.8 million in the same period in 2008. The company recognized revenue on three Sensei Robotic Systems, including one system configured with the CoHesion(R) module, as well as on shipments of 626 Artisan control catheters.*

*. . . [G]ross profit for the quarter was $0.4 million . . .*

\*      \*      \*

*Net loss for the three months ended June 30, 2009, . . . was $14.6 million, or $(0.42) per basic and diluted share . . .*

(Emphasis added).  Additionally, in the financial statements appended to the press release, the Company's condensed consolidated balance sheets reported that as of the sixth month period ending June 30, 2009, the Company's accounts receivable was $4,918,000.

271.    The statements referenced in ¶270 were each materially false and/or misleading when made for the reasons in ¶¶60(a), 241-242, and because as reflected by the restatement: (i) the Company's "Installed Base" at the end of Q209 of 55 was misrepresented as 68, which constitutes an overstatement of 13, or 23.64%; (ii) the Company's international "Installed Base" at the end of Q209 of 14 was misrepresented as 25, which constitutes an overstatement of 11, or 78.57%; (iii) the Company's domestic "Installed Base" at the end of Q209 of 41 was misrepresented as 43, which constitutes an overstatement of 2, or 4.88%; (iv) the total number of systems sold for which the Company should have recognized as revenue was 2 in Q209, but was misrepresented as 3, constituting an overstatement of 1, or 50%; (iv) revenue of $2,949,000 for Q209 was misrepresented as $3,306,000, which constitutes an overstatement of the Company's revenues by $357,000, or

12.11%; (v) "Gross profit (loss)" of $285,000 for Q209 was misrepresented as $360,000, constituting an overstatement of $75,000, or 26.32%; (vi) accounts receivable at the end of Q209, of $4,340,000, was misrepresented as $4,918,000, constituting an overstatement of $578,000, or 13.32%; and (vii) catheter units sold during the quarter of 576 was misrepresented as 626, which constitutes an overstatement of 50, or 8.68%.

272.    The materially false and/or misleading statements in ¶270 were made with scienter for the reasons set forth above in ¶242.

273.    That day, Hansen held a conference call in connection with the press release, announcing the Company's financial results for Q209 (the "Q2 (actual) 2009 conference call"). Defendants Moll and Van Dick were present.

274.    During the Q2 (actual) 2009 conference call, Defendant Moll continued to falsely blame the economy for the Company's massive shortfall in Q209, while nevertheless falsely boasting to investors and the market the size of the Company's Installed Base and progress Hansen had made on its commercial launch of the Sensei System and revenue/sales ramp:

> [*Defendant Moll*:] Due to an illness and laryngitis, our CFO, Steve Van Dick, will limit his vocal participation on this call. For that reason, I've asked [Jay Hampton], our Director of SEC reporting, and [Machmood Alascari], our Director of Financial Planning and Analysis, to be available for financially related questions.
>
> We believe that Hansen is making good progress in building its business in flexible robotics. Although the market for capital spending in hospitals presents a challenging environment and although we are very disappointed by our system sales in Q2, catheter sales were at a record level and we believe utilization rates for active systems in the field are holding steady.
>
> *            *            *
>
> **As we preannounced last month, during the second quarter we shipped six Sensei robotic catheter systems and recognized revenue on three. Of the systems we contributed to the second quarter revenue, one was sold to an existing distributor for Spain and Portugal, one to a distributor in South Africa, and the final unit went to a hospital in the United Kingdom.**
>
> Sales were adversely affected by general macroeconomic conditions that continues to significantly impact our customers' capital spending due to the tight credit markets and general economic conditions. Several potential customers sought additional approvals prior to making their purchase decision and/or spent time evaluating alternative financing arrangements during the second quarter.

We also found ourselves competing for the same capital equipment budget with other capital equipment technology. In each case, this extended the length of the sales cycle for Sensei systems and resulted in potential customers' orders moving out of the quarter.

In the meantime, our pipeline for potential customers is healthy and we are taking actions to improve our system sales performance in this challenging environment by restructuring our sales, clinical and service groups into regionalized teams and providing additional training for both our clinical and sales personnel.

*On a cumulative basis through the end of the second quarter, we have recognized revenue on a total of 68 systems, which we refer to our worldwide -- refer to as our worldwide installed base. This includes 43 systems in the United States and 25 in international markets.*

*With regard to recurring revenues, we have now experienced four successive quarters of increasing sales in catheters in service. In the second quarter we sold a quarterly record of 626 Artisan catheters, which compares to 601 catheters for the first quarter, 520 catheters in the fourth quarter of 2008, and 420 catheters in the third quarter of 2008.*

Also, I am pleased to report that through the second quarter we have now converted a total of 41 customers to extended service agreements, up from 30 customers at the end of the first quarter.

One of the metrics that we are frequently asked about is the average utilization rate for our systems in the field. We've been reluctant to provide detailed information on utilization for various reasons, including the size of our installed base, the early stage of our commercialization efforts, and the inability to capture actual cases performed due to the number -- a number of our customers performing cases independently.

In order to better track actual utilization, the Q1 -- in Q1 our engineers developed software tools that will allow us to analyze logs that can be downloaded from our Sensei system and determine the actual number of procedures performed by that system over a defined period of time. Going forward, we'll pull these logs from our installed base approximately every six to eight weeks and analyze the data to determine the procedures done per week in a predefined time period.

Although we are not up and running with the new software in all systems, *I am able to report that the data we have retrieved from a majority of active accounts, which we define the system -- as system placements that were clinically active during the quarter, average about one case a week.*

*Clearly, this is an average utilization for our active systems, with some "super users" performing significantly more cases and some lower volume users performing fewer cases.*

*On a positive note, we have had a number of users able to accomplish three procedures a day, and some very active users are accomplishing six procedures a week. Going forward, we are evaluating our training and clinical support protocols and together with the release of the next generation Artisan and Sensei software, we believe that we can positively impact utilization rate.*

\*     \*     \*

In summary, we are confident that our technology and planned product development activities, coupled with the clinical data demonstrating the benefits of our technology, present a compelling value proposition to hospitals and payors. Furthermore, we believe that our pipeline of prospective customers remains healthy and the disappointing second quarter's system sales is not reflective of Hansen's longer term business opportunities.

\*     \*     \*

*Now let's move on to our second quarter 2009 income statement. We reported quarterly revenue of $3.3 million, primarily on the sale of three Sensei systems and 626 Artisan control catheters, approximately 100 of which were sold to a single international medical center. This represents a 43% decrease over the $5.8 million of revenue in the same period of 2008, where we sold eight Sensei systems and approximately 279 Artisan catheters.*

\*     \*     \*

*Gross profit for the quarter was $0.4 million . . .*

\*     \*     \*

*Net loss for the second quarter of 2009, . . . was $14.6 million, or $0.42 per basic and diluted share, . . .*

\*     \*     \*

*Before wrapping up my prepared remarks, I'd like to reiterate that we have withdrawn our previous guidance regarding the number of expected system sales for 2009. While we don't feel that the second quarter is representative of the interest in our technology, the quarter has demonstrated how the current economic environment makes it difficult to accurately predict the timing of customer orders.*

We continue to be encouraged by clinical interest in our technology. But given the uncertainty around the length and severity of the current economic recession and the impact it's having on our potential customers' purchase decision, we're not providing specific quantitative guidance on the number of units we expect to recognize revenue on for the remainder of 2009.

(Emphasis added).

275.   The statements in ¶274, which were not corrected by Defendant Van Dick, were materially false and/or misleading and made with scienter for the reasons set forth above in ¶¶158, 216-217, 241-242, 271-272, and additionally, because defendants failed to disclose that numerous systems within the Installed Base were effectively inactive.  For the first time, during the Q2 (actual) 2009 conference call, Defendant Moll started referring to "active accounts" and "active systems"

1  and stated that "I am able to report that the data we have retrieved from a majority of active

2  accounts, which we define the system -- as system placements that were clinically active during the

3  quarter, average about one case a week."[21]   Based on Defendant Moll's statement, he was aware that

4  the Company's Installed Base included active and inactive systems.

5      276.   Analysts were reluctant to accept defendants' attempts to blame Hansen's poor Q209

6  performance on the economy, as one analyst generally asked for some insight as to why other

7  companies in the same field as Hansen were not impacted to the same extent that Hansen claimed

8  to have been.  Defendant Moll emphasized that demand had not been an issue, but rather, the sales

9  cycle had been lengthened:

10     [*Defendant Moll*:] Well, I think what I said in the -- in my prepared remarks is that
       we were certainly surprised by how Q2 came in. But we weren't -- it was not a
11     matter of seeing in the marketplace a decreased interest and/or demand for the
       system. What we saw was there's a lot of angst about paying for capital equipment
12     and that the sales cycle was stretched out to the point where in a 12-week period,
       very difficult for us. And clearly we were surprised at what did and did not happen
13     then in Q2. But we don't see that as reflective of our business going forward.

14     277.   During the Q2 (actual) 2008 conference call, Defendant Moll exhibited that he was

15  familiar with the Company's sales pipeline as he declined to provide the number of customers in the

16  pipeline but nevertheless represented that it was "healthy:"

17     [*Analyst*:] Okay. Traditionally you guys haven't talked about a backlog, but we keep
       hearing about pipeline. Maybe can you talk a little bit, if you care to quantify maybe
18     a backlog number of systems that hospitals you're talking to or perhaps just give us
       some indication of kind of how the backlog has fared since the start of the year?
19
20     [*Defendant Moll*:] So, I think as I've said previously, we feel very good about our
       pipeline. We don't talk about a backlog because a backlog suggests that you have
21     orders that you're waiting to ship that are dependent on sort of timing of installation.
       ***And as you know, we get an order, we can ship and install in a short period of***
22     ***time, so that's the distinction we're making. And I'm not going to get into the***
       ***number of systems in our pipeline, but I've described it as healthy and I think***
23     ***that's the right descriptor.***

24     [*Analyst*:] Okay. Just as a last follow-up on that same line, if we talk more about
       pipeline versus backlog, the number of hospitals that you would consider in that
25

26  ────────────────────

27     [21]At the time, these terms were ambiguous and benign to the unsuspecting public because,
    *inter alia*, during the conference call on July 6, 2009, Defendant Van Dick had previously indicated
28  that Hansen shipped 2 Systems in Q209 that "were going into the St. Jude demo centers" and
    presumably not "clinically active."

pipeline arena, has that materially changed in the last three months?

[*Defendant Moll*:] No. I mean no. If I understand your question, I don't think the market opportunity has changed.

(Emphasis added).

278.     When asked about whether the systems sold to distributors during the quarter were sold through to end users, Defendant Van Dick was able to speak in detail about the sales, including the location of the distributor and whether subsequently it had since become clinically active or installed:

[*Analyst*:] All right. well, then, maybe on international, of the -- since two of the three were -- of the placements were to distributors, could you tell us whether or not any of these were guaranteed contracts that they had to fulfill or whether or not they were actually sold through systems?

[*Defendant Moll*:] So, we have a relationship with St. Jude and I honestly can't answer. Steve, are you --

[*Defendant Van Dick*:]Yes.

[*Defendant Moll*:] Yes. Can you --

[*Defendant Van Dick*:] Let me try that. Of the systems that were sold, one was to an end user. The second was through to South Africa. ***That unit is already clinically active in July. And the third system was (inaudible - background noise) Spanish or Portugal distributor and I believe that that system was also installed (inaudible - microphone inaccessible) in the July timeframe.***

(Emphasis added).

279.     The materially false and/or misleading statements in ¶278 were made with scienter for the reasons set forth above in ¶¶241-242, as Plaintiffs are informed and believe that the Company improperly recognized revenue on the sale to the South African distributor and the Spanish/Portugal distributor.

280.     The statements in the Company's August 4, 2009 Press Release and Conference Call further partially revealed and/or reflected the following materialization of concealed risks: (i) that the Company's sales cycle was longer than the Company had represented; (ii) that the demand for the Company's Sensei System was lower than the Company had led the market to believe; and (iii) that utilization rates were declining.

281.   An analyst report issued on August 5, 2009, by Neeham & Company, LLC, entitled, "HNSN: Lowering Estimates; 2009 Guidance Remains Withdrawn; Reiterate Hold" highlighted the continued concern that delays and lack of growth in catheter utilization would continue, and noted that slowing system sales could be linked to the "lack of traction" among the existing users of Sensei Systems:

> **Sales cycle is getting longer.** The elongating sales cycle for HNSN is delaying system placements and negatively impacting revenue recognition. Of the three systems shipped, but not recognized this quarter, two were international, via the St. Jude Medical (STJ) distribution partnership, and one was domestic. The domestic system was pushed out due to delays in obtaining the necessary (State) approvals to finalize the sale and the international shipments were demo units for STJ. The company expects to recognize revenue on the STJ systems upon completion of the necessary training of STJ personnel. We expect ongoing sales disruptions due to the negative impact of the longer sales cycles through 2009.

> **We are concerned that the slowing U.S. market of Sensei sales may be tied to a lack of traction within active Sensei accounts.** HNSN reported an active customers' utilization rate of approximately 1 per week. This compares to competitive robotic surgical company utilization rates of approximately 2-3 per week. Notably, with a small user base, HNSN's reported activity rate may be influenced by a small number of high volume users.

282.   On this news, the following day shares of the Company's stock declined $0.33 per share, more than 8%, to close on August 5, 2009, at $3.71 per share, on heavy volume of 539,600.

283.   Nevertheless, defendants' statements remained materially false and/or misleading because, among others: (i) the Company's financial results for Q407 through Q209 and Installed Base at the end of Q209, remained materially overstated; (ii) the Company was improperly recognizing revenue on systems shipped to distributors despite the fact that the distributors were neither capable of independently installing the system nor training the end-user physicians; (iii) the Company was improperly recording revenue on temporary installations; (iv) the Company's Installed Base included numerous systems that were effectively inactive; (v) the Company was cannibalizing its future catheter and system sales by offering end of the quarter discounting and doing temporary system installations; (vi) for the foregoing reasons, the demand for the Company's product was not as strong as Defendants had led the public to believe.

284.   On August 6, 2009, Hansen filed its Quarterly Report with the SEC on Form 10-Q for the 2009 fiscal second quarter.  The Company's Form 10-Q was signed by Defendants Moll and

1   Van Dick, and substantially incorporated the same materially false and/or misleading financial

2   results, as set forth above in ¶270, which were announced on August 4, 2009.  Hansen's10-Q stated

3   that the Company's accompanying financial statements were prepared "in conformity with

4   accounting principles generally accepted in the United States."  Additionally, therein, in relevant

5   part, Hansen stated/reported that in Q209, it recognized revenue on the sale of three systems

6   internationally and that for the sixth month period ending June 30, 2009 ("HI 2009), the Company:

7   (i) recognized revenue on the sale of 13 systems during H1 2009; and (ii) the total number of

8   systems sold internationally for which the Company recognized as revenue during H1 2009 was 6.

9        285.    The statements referenced in ¶284 were each materially false and/or misleading when

10  made for the reasons in ¶271, above.  Additionally, the statements were each materially false and

11  misleading because as admitted and reflected by the Company's restatement: (i) the Company's

12  financial statements were not prepared in accordance/conformity with GAAP; (ii) the total number

13  of systems sold internationally for which the Company should have recognized as revenue was 1 in

14  Q209, but was misrepresented as 3, which constitutes an overstatement of 2, or 200%; (iii) the total

15  number of systems sold for which the Company should have recognized as revenue was 12 for H1

16  2009, but was misrepresented as 13, constituting an overstatement of 1, or 8.33%; and (iv) the total

17  number of systems sold internationally for which the Company should have recognized as revenue

18  was 3 for H1 2009, but was misrepresented as 6, which constitutes an overstatement of 3, or 100%.

19       286.    The materially false and/or misleading statements in ¶284 were made with scienter

20  for the reasons set forth above in ¶¶242, 272, 275, 279.

21       287.    Along with the  Company's Quarterly Report on Form 10-Q filed with the SEC on

22  August 6, 2009, pursuant to Section 302 of SOX, Defendants Moll and Van Dick signed SOX

23  required certifications attesting to the accuracy of the financial results and effectiveness of the

24  Company's internal controls as set forth in full in ¶85, above.

25       288.    For the same reasons as set forth in ¶¶86, 241-242, 271, Defendants Moll's and Van

26  Dick's SOX Certifications referenced in ¶287 were materially false and/or misleading when made,

27  and made with scienter, as Defendants Moll and Van Dick knew of and/or were deliberately reckless

28  as to the material weaknesses in the Company's internal controls and financial reporting.

**Disclosures at the End and After the Class Period**

289.   On October 19, 2009, Hansen issued a press release entitled, "HANSEN MEDICAL ANNOUNCES NEED TO RESTATE PRIOR FINANCIAL RESULTS."  Therein, the Company, in relevant part, stated:

> Hansen Medical, Inc. (Nasdaq: HNSN) today announced that it plans to restate its financial statements for the year ended December 31, 2008 and for the quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009 and June 30, 2009 in order to correct certain errors, some of which arose from potential irregularities occurring outside of the accounting department, regarding the timing of revenue recognition on the sale of some of its Sensei® Robotic Catheter Systems. Through June 30, 2009 Hansen shipped 68 systems based on valid customer purchase orders for which revenue was recognized. Hansen has received full payment for all but two of these systems. Of these two systems, Hansen has not been paid for one system on which it recognized revenue in the quarter ended June 30, 2009 and to date has received partial payment of $320,000 on the sale of a system to a distributor on which it recognized revenue in the quarter ended March 31, 2009. An investigation by Hansen's audit committee, with the assistance of independent outside counsel, has identified systems for which revenue should have been recognized in a later period than the period in which it was recognized and revenue on a smaller number of systems that should have been reflected as deferred revenue on Hansen's balance sheet as of June 30, 2009. As software is more than incidental to the functioning of the Sensei system, Hansen's revenue recognition policy is based on American Institute of Certified Public Accountants, Statement of Position 97-2, Software Revenue Recognition.
>
> Hansen's review is ongoing so it is not yet able to estimate the extent and timing of adjustments that will be required to its financial statements. The ultimate findings of Hansen's ongoing review and the impact of these matters on Hansen's results of operations as previously reported is not yet known. Hansen is working diligently towards completing the restatement and filing its quarterly report on Form 10-Q for the period ended September 30, 2009.

290.   On October 19, 2009, Hansen filed a Current Report with the SEC on Form 8-K. Therein, the Company, in relevant part, stated:

> **ITEM 4.02.   NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW.**
>
> (a) On October 15, 2009, the audit committee of our board of directors, upon the recommendation of management, concluded that the previously issued financial statements contained in our annual report on Form 10-K for the year ended December 31, 2008, and our quarterly reports on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009 and June 30, 2009 (collectively, the "Prior Periods") should no longer be relied upon because of errors in those financial statements, some of which arose from potential irregularities outside of the accounting department. Through June 30, 2009, we shipped 68 Sensei Robotic Catheter Systems based on valid customer purchase orders for which revenue was recognized. We have received full payment for all but two of these

systems. Of these two systems, we have not been paid for one system on which we recognized revenue in the quarter ended June 30, 2009 and to date have received partial payment of $320,000 on the sale of system to a distributor on which we recognized revenue in the quarter ended March 31, 2009. We have identified systems for which revenue should have been recognized in a later period than the period in which it was recognized and revenue on a smaller number of systems that should have been reflected as deferred revenue on our balance sheet as of June 30, 2009.

In addition to the financial statements for the Prior Periods referenced above, related press releases, reports and stockholder communications describing our financial statements for the Prior Periods and the report of our independent registered accounting firm, PricewaterhouseCoopers LLP, related to the year ended December 31, 2008, should no longer be relied upon.

Our revenues are primarily derived from the sale of our Sensei system. As software is more than incidental to the functioning of our Sensei system, our revenue recognition policy is based on American Institute of Certified Public Accountants, Statement of Position 97-2, Software Revenue Recognition, or SOP 97-2. Under our policy, revenues are recognized when, among other conditions, delivery to the customer has occurred and our services have been fully rendered. Since most of our sales contracts for systems include installation and training services and because we do not have vendor-specific objective evidence of the fair value of these services, we are required by SOP 97-2 to defer all such system revenues until training and installation is completed. We also sell systems to independent distributors, and have recognized revenue upon shipment of systems to those distributors that we believed were independently capable of performing required installation and training.

The disclosures in this Form 8-K are the result of an investigation by our audit committee, with the assistance of independent outside counsel, that commenced following our receipt in August 2009 of an anonymous "whistleblower" report alleging a single irregularity that resulted in improper revenue recognition in the quarter ended December 31, 2008. As a result of the investigation, the audit committee and management have determined that there are instances where revenue recognition occurred prior to the completion of all our obligations to customers. In addition, the investigation may result in a determination that one or more distributors were not independently capable of installing systems at the time we first recognized revenue of systems purchased by such distributor(s).

291.     On this news, shares of Hansen declined $0.31 per share, or 9.04%, to close on October 19, 2009, at $3.12 per share, on unusually heavy volume of 1,567,000.

292.     The news further called the Company's credibility into question, but the language in the press release, however, also served to placate some concerns as it created the false impression that the revenue recognition issues were limited to only a handful of systems. An October 20, 2009, a Morningstar report, entitled, "Hansen Medical to Restate Results" noted:

Hansen Medical announced Monday that it needs to restate its prior financial results in order to correct some potential errors in its revenue recognition policy. As a result,

we are trimming our fair value estimate.

Hansen will need to restate its financial statements from first-quarter 2008 until second quarter 2009 due to the period in which the firm booked its Sensei sales. We don't expect these changes to materially affect 2008 results as the firm has received full payment for all those systems. Instead, we think recognition of systems sales will mostly shift to later quarters to better reflect when payments were made. We predict that these changes will have the most effect on 2009 revenues since the firm detailed that they had not received full payment for two systems sold during this year. Given that one system was partially paid for and the other was sold to a distributor, we expect that recognition of these sales may shift to the latter half of the year. However, we think that these potential errors in recognition will result in a tighter revenue recognition policy going forward. As a result, we have reassessed our near-term system sales forecasts as the tough capital spending environment will likely cause customers to delay full payments for systems and push some system sales into 2010.

*Also, we are very disappointed in Hansen's stewardship practices. Given that Hansen has sold 13 systems this year (and only three in the second quarter), we thought they would exercise conservatism in recognizing revenues. We hope that the recognition errors do not go beyond the few systems named in the disclosure and that management will tighten their internal controls in the future.*

(Emphasis added).

293.   On October 22, 2009, Hansen filed a Current Report with the SEC on Form 8-K. Therein, the Company, in relevant part, disclosed that on October 21, 2009, Christopher Sells, Senior Vice President of Commercial Operations resigned from his employment effective October 22, 2009.

294.   Shortly thereafter, on November 10, 2009, Hansen filed another Current Report with the SEC on Form 8-K further announcing that the Company would also have to restate its financial results for Q407 and FY07.  Therein, the Company, in relevant part, stated:

**ITEM 4.02.   NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW.**

(a) As previously reported in our Current Report on Form 8-K, filed on October 19, 2009 (our "Form 8-K"), on October 15, 2009, the audit committee of our board of directors, upon the recommendation of management, concluded that the previously issued financial statements contained in our annual report on Form 10-K for the year ended December 31, 2008, and our quarterly reports on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009 and June 30, 2009 (collectively, the "Prior Periods") should no longer be relied upon because of errors in those financial statements, some of which arose from potential irregularities outside of the accounting department. *Following the filing of our Form 8-K, we continued our investigation and, on November 9, 2009, the audit committee of our board of directors, upon recommendation of management,*

*concluded that the previously issued financial statements contained in our annual report on Form 10-K for the year ended December 31, 2007 (the "2007 Period") should also no longer be relied upon because of an error in those financial statements regarding the recognition of revenue on one Sensei Robotic Catheter System sold to a distributor in the quarter ending December 31, 2007. Through June 30, 2009, we shipped 68 Sensei Robotic Catheter Systems based on valid customer purchase orders for which revenue was recognized. We have received full payment for all but one of these systems. This one system that we have not been paid for was reported as recognized revenue in the quarter ended June 30, 2009. We have identified systems for which revenue should have been recognized in a later period than the period in which it was recognized and revenue on systems that should have been deferred.*

*In addition to the financial statements for the Prior Periods and the 2007 Period referenced above, related press releases, reports and stockholder communications describing our financial statements for the Prior Periods and the 2007 Period and the reports of our independent registered accounting firm, PricewaterhouseCoopers LLP, related to the years ended December 31, 2008 and December 31, 2007 should no longer be relied upon.*

Our revenues are primarily derived from the sale of our Sensei system. As software is more than incidental to the functioning of our Sensei system, our revenue recognition policy is based on American Institute of Certified Public Accountants, Statement of Position 97-2, Software Revenue Recognition , or SOP 97-2. Under our policy, revenues are recognized when, among other conditions, delivery to the customer has occurred and our services have been fully rendered. Since most of our sales contracts for systems include installation and training services and because we do not have vendor-specific objective evidence of the fair value of these services, we are required by SOP 97-2 to defer all such system revenues until training and installation is completed. We also sell systems to independent distributors, and have recognized revenue upon shipment of systems to those distributors that we believed were independently capable of performing required installation and training.

*The disclosures in this Form 8-K are the result of an investigation by our audit committee, with the assistance of independent outside counsel, that commenced following our receipt in August 2009 of an anonymous "whistleblower" report alleging a single irregularity that resulted in improper revenue recognition in the quarter ended December 31, 2008. As a result of the investigation to date, we have determined that there are other irregularities that resulted in improper revenue recognition and that there are other instances where revenue recognition occurred prior to the completion of all our obligations to customers. In addition, the investigation has identified facts not previously reported to our accounting department that have led to a determination that distributors were not independently capable of installing systems and/or clinically training end users at the time we recognized revenue on systems purchased by distributors. Therefore, revenue on such systems should have been deferred until installation and training had occurred at the distributor's end user.*

Our review is ongoing so we are not yet able to estimate the extent and timing of adjustments that will be required to our financial statements for the Prior Periods or the 2007 Period. The ultimate findings of our ongoing review and investigation and the impact of these matters on our results of operations and financial condition as previously reported are not yet known. We are also reviewing the restatement's effect on our internal control over financial reporting and our disclosure controls and

1

procedures. We will not reach a final conclusion on our internal control over financial reporting or disclosure controls and procedures until completion of the restatement process. We are working diligently towards completing the restatement and timely filing our quarterly report on Form 10-Q for the period ended September 30, 2009 by November 16, 2009 within the extension period afforded by Rule 12b-25; however, given the scope and complexity of the review, there can be no assurance that this timing goal will be met.

2

3

4

5

(Emphasis added).

6

295.   On November 16, 2009, concurrently with announcing its Q309 financial results,

7

Hansen issued a press release entitled, "Hansen Medical Completes Financial Restatement."

8

Therein, the Company, in relevant part, stated:

9

MOUNTAIN VIEW, CA, Nov 16, 2009 (MARKETWIRE via COMTEX) -- Hansen Medical, Inc. (NASDAQ: HNSN) today announced that it has completed its previously announced financial restatement of its consolidated financial statements for the years ended December 31, 2007 and 2008, for each of the quarters of the year ended December 31, 2008 and for the first two quarters of the year ending December 31, 2009, and has filed with the Securities and Exchange Commission (SEC) its amended Annual Report on Form 10-K/A for the year ended December 31, 2008, which includes a restatement of the financial statements for the year ended December 31, 2007 and December 31, 2008 and its amended Quarterly Reports on Form 10-Q/A for the quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009 and June 30, 2009. A table setting forth the impact of the restatement on system and catheter sales, system ASP, revenue, basic and diluted loss per share, cash balance and the current portion of deferred revenue for the effected periods is provided at the end of this press release.

10

11

12

13

14

15

16

17

296.   On November 16, 2009, Hansen filed its 10-K/A and Form 10-Q/As reflecting the

18

restatement of the Company's financial results for Q407 through Q209.  Therein, in relevant part,

19

the Company stated:

20

Hansen Medical, Inc. (the "Company") previously announced its intention to restate its consolidated financial statements for the years ended December 31, 2007 and 2008, for each of the quarters of the year ended December 31, 2008, and for the first two quarters of the year ending December 31, 2009 as a result of the improper recognition of revenue with regard to sales of Sensei Robotic Catheter Systems. Through June 30, 2009, the Company shipped 68 systems based on valid customer purchase orders for which revenue previously had been recognized. As of November 10, 2009, the Company had received full payment for all but one of these systems.

21

22

23

24

\*      \*      \*

25

In August 2009, the Company received an anonymous "whistleblower" report alleging a single irregularity that resulted in improper revenue recognition in the quarter ended December 31, 2008. The Company's audit committee, with the assistance of independent outside counsel, undertook an investigation into the allegation and a review of the Company's historical revenue recognition practices. The audit committee's investigation determined that information was withheld from

26

27

28

the Company's accounting department and independent auditors, documentation related to certain revenue transactions was falsified, and there was not an effective control environment in the Company's sales, clinical and field service departments. This led to incomplete information regarding temporary installations, unfulfilled training obligations, the inability of distributors to independently install systems and train end users, and undisclosed side arrangements. As a result, there were instances where revenue was recognized prior to the completion of all of the elements required for revenue recognition under the Company's revenue recognition policy. All of the irregularities that were identified during the investigation occurred outside of the accounting department. The Company is implementing revised controls and procedures designed to prevent a recurrence of the improper recognition of revenue. For more information on these matters, please refer to Note 3 of the Notes to the Condensed Consolidated Financial Statements, Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 4, "Controls and Procedures."

297.    The Company's Form 10-K/A and Form 10-Q/As reevaluated and reported previously unreported material weaknesses in the Company's internal controls over financial reporting for those periods covered by the restatement.  Therein, in relevant part, the Company stated:

**Material Weaknesses in Internal Control over Financial Reporting**

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

In connection with the restatement described in Note 3 to the financial statements, we reevaluated our internal control over financial reporting and have identified the following material weaknesses:

1. *Control Environment.* We did not maintain an effective control environment, which is the foundation upon which all other components of internal controls are based. Specifically:

•    Our commercial operations leadership did not consistently support the importance of strict adherence to our revenue recognition policy and to GAAP and did not take sufficient steps to ensure good faith compliance with revenue recognition policies throughout our sales, clinical and field service departments. As a result, information related to certain revenue transactions was not communicated to accounting personnel to appropriately consider the financial reporting implications of such transactions.

•    We did not maintain sufficient safeguards to provide reasonable assurance that controls could not be circumvented or overridden by commercial operations management or to prevent or detect possible misconduct by members of our commercial operations organization with respect to certain revenue transactions. Our commercial operations organization was structured such that the sales, clinical and field service departments all reported to the executive in charge of our commercial operations, leading to a conflict of

oversight and incentives, such as the desire to meet quarterly sales goals.

- We did not maintain effective procedures for communicating to all relevant personnel our accounting policies, the importance of consistent application of our accounting policies, and essential data required to properly apply GAAP to our transactions.

- Additionally, we did not effectively communicate the process of reporting unusual or uncertain circumstances. As a result, we did not detect deficiencies in compliance with our accounting policies on a timely basis.

This material weakness led to errors and irregularities that in turn resulted in errors in the preparation of our financial statements. This material weakness also contributed to the existence of the material weakness described in item 2 below.

2. *Revenue recognition process.* We did not maintain effective controls related to the process for ensuring completeness and accuracy of our accounting for revenue to provide reasonable assurance that all significant details of agreements with our distributors and customers were provided to those making revenue recognition decisions and that all appropriate personnel received sufficient training on revenue recognition.

- Certain employees were able to withhold information from accounting personnel or falsify documentation related to certain revenue transactions without discovery, which resulted in improper recognition of revenue in the period.

- Accounting personnel were not provided the necessary information to determine the financial reporting consequences of certain revenue transactions. Specifically, this led to incomplete information regarding temporary installations, unfulfilled training obligations, the inability of distributors to independently install systems and train end users, and undisclosed side arrangements.

These material weaknesses resulted in material errors and the restatement of the our annual statements for 2007, annual and interim financial statements for 2008 and interim financial statements for the first and second quarters of 2009, impacting revenue, cost of goods sold, deferred cost of goods sold, and deferred revenue accounts. Additionally, these material weaknesses could result in further misstatements of these accounts that would result in a material misstatement of our financial statements that would not be prevented or detected on a timely basis.

Notwithstanding the material weaknesses described above, we concluded that the interim financial statements included in this Form 10-Q/A fairly present, in all material respects, our financial condition, results of operations and cash flows as of and for the periods presented in accordance with GAAP.

\*        \*        \*

**Management's Plan for Remediation**

Beginning in October 2009, our management began to design and implement

certain remediation measures to address the above-described material weaknesses and enhance our system of internal control over financial reporting. Management believes the remediation measures described below will remediate the identified control deficiencies and strengthen our internal control over financial reporting. As management continues to evaluate and work to enhance our internal control over financial reporting, it may be determined that additional measures must be taken to address control deficiencies or it may be determined that we need to modify or otherwise adjust the remediation measures described below.

The remediation efforts outlined below are intended both to address the identified material weaknesses and to enhance our overall financial control environment.

***Control Environment and Organizational Structure.*** Our plan is to create and communicate an effective culture and tone throughout the Company's commercial operations organization in the following ways:

- Certain employees have been terminated and other employees will be disciplined for actions relating to this restatement.

- We will improve the annual ethics training for all sales, clinical and field service employees to enhance their understanding of critical accounting and ethics policies.

- We will reorganize our sales, clinical and field service teams such that they will no longer report to the same vice president to ensure that each team has the proper oversight and incentives.

***Revenue Recognition Process.*** We will enhance our internal controls related to the revenue recognition process and training in the following ways:

- We will increase management oversight by expanding our processes to include more rigorous representations made by sales, clinical and field service personnel and more detailed documentation regarding elements required for revenue recognition and timely accountability for details underlying elements of revenue recognition.

- We will improve communications between accounting personnel responsible for revenue recognition and sales, clinical and field service personnel responsible for the execution of the work on those transactions and will institute quarterly meetings involving accounting and sales, clinical and field service personnel involved in each system sale during the quarter.

- We will improve the annual ethics training for all sales, clinical and field service employees to enhance their understanding of critical accounting and ethics policies.

- We will expand our revenue recognition training to include clinical and field service employees to promote their understanding of and appreciation for our revenue recognition policy and process.

- We will improve our existing revenue recognition training to include a more

1        detailed description of our revenue recognition process.

2    (Emphasis in original).

3        298.    The following day, on November 17, 2009, in connection with the Company's

4    concurrent announcement of its Q309 financial results, the Company held a conference call with

5    investors to discuss the Company's Q309 financial results and address the Company's restatement

6    of its prior financial results.  Defendants Moll and Van Dick were present.

7        299.    During the Q309 conference call, with respect to the Company's restatement,

8    Defendant Moll started off the call by addressing the restatement:

As previously announced, following an anonymous whistleblower report, Hansen Medical's audit committee, with the assistance of independent counsel, investigated the whistleblower report and reviewed our historical revenue recognition practices on the sale of our Sensei Robotic Catheter Systems. This investigation has resulted in the restatements of our financial statements that we filed yesterday. In total, the restatement impacted revenue recognition on 24 systems sold between the fourth quarter of 2007 through the second quarter of 2009. In the case of 13 of these systems, revenue should have been deferred and recognized in a later period than the period in which it was originally recognized. In the case of 10 systems, these systems remained as deferred revenue on our balance sheet as of September 30, 2009. Revenue on one system during this period was reversed pending clarification and quantification of our obligations under a letter of intent regarding a potential research study.

With that being said, I'd like to highlight several points. First, all of these systems on which we recognized revenue prior to restatement were shipped under valid purchase orders to legitimate customers. We have received full payment from our customers on all but one of these systems. We expect this system will be paid in full next month. As a result, the restatement is a cash neutral event and it has no impact on our previously reported cash flow. Second, for the systems that remain as deferred revenue on our balance sheet, we expect to recognize revenue in future periods once outstanding obligations are met. Third, the irregularities that were identified during the investigation occurred outside of Hansen Medical's accounting department. And finally, while these events are unfortunate, it does not indicate – it does indicate that our whistleblower procedures are functioning properly and is an effective tool in helping us uncover issues within our operations.

That being said, we are pleased that the financial restatement is complete and our periodic filings with the SEC remain current. Before we leave the matter, I think it is important for me to address directly to all shareholders of Hansen three questions surrounding the restatement. First, how did it happen? Second, what was involved? And third, what is being done to make sure it will not happen again? With regard to the cause of the restatement, it is clear that we did not maintain effective procedures for communicating to all relevant personnel the importance of strict adherence to our revenue recognition and other accounting policies and what data is required to properly apply GAAP to our transactions. Also, we did not maintain sufficient safeguards to prevent or detect improper conduct and the withholding of relevant information by members of our commercial operations organization with respect to

revenue transactions.

300. Defendant Moll continued to provide several examples of the types of transactions that were involved in the restatement:

I'll speak about our remediation actions in a moment, but first let me describe some examples of revenue transactions that were restated. Approximately half of the transactions that were subject to the restatement involved sales to distributors. For some distributors we recognized revenue upon shipment of systems to the distributors based on our belief, at the time, that the distributors were independently capable of installing the systems and training end users. However, through the course of our investigation, we determine – determined that Hansen personnel were onsite when distributors first installed systems at their custom – at their customer locations. This contributed to a determination that these distributors were not independently capable of installing systems and training end users.

301. During the call, Defendant Moll also confirmed that going forward, the Company would only recognize revenue on distributor sales once the product was sold to the end user, the system was installed, and the end user was trained. Further, the Company would ensure that in direct sales, the intended primary user of the system would be trained prior to revenue recognition. Defendant Moll stated:

For the immediate future, we plan to recognize revenue on systems sold to these distributors on a sell-through basis. That is, we will recognize revenue once the system is installed at the distributor's customer and the distributor's customer has been trained. In the future, some of our distributors may demonstrate that they have become fully independent to install systems and conduct training. Despite the fact that there are system sales to distributors in deferred revenue, I want to emphasize that all of our sales to distributors have been paid for.

To use another example, we must train our end user clinician prior to recognizing revenue. In a few instances, we had provided training to a clinician who had privileges at a hospital. But by the end of the quarter in which we previously recognized revenue, we had not yet trained the intended primary user of the system at that hospital. As a result of this, remaining obligation for the company, we delayed revenue recognition for the system in our restated financials until the intended primary user was trained. Unfortunately, there are also some instances where employees in Hansen's Commercial Operations group falsified documents and misrepresented facts or did not disclose potential side arrangements. We have no tolerance for such behavior and none of the employees responsible for these actions are still with the company.

302. Defendant Moll also addressed the Company's internal controls and plans for remedy internal control weaknesses:

Now, let me address some of the remedial actions we are taking to correct the material weaknesses we identified. Our plan to strengthen our internal controls in our Commercial Operations include the following actions. First, as I mentioned a

moment ago, we have terminated some employees and will be appropriately disciplining other employees for actions related to the restatement. Second, we have reorganized our sales and service organizations so that they no longer report to the same Vice President, in order to reduce the risk of conflicts between oversight and incentives.

Third, we'll examine -- expand our revenue recognition training to involve field clinical and field service personnel and we'll improve our revenue recognition to include more detailed descriptions of revenue – of the revenue recognition process. Also, we will take steps to improve communication between our accounting department and our sales field clinical and field service personnel. Finally, we will demand that more rigorous representations be made by sale personnel and are adopting new representations for our field clinical and field service personnel. We will also require more detailed documentation regarding elements required for revenue recognition and timely accountability. Going forward, Hansen Medical is committed to maintaining the highest possible standards in financial reporting. And we are also committed to being as open and transparent as possible in communications with the financial community.

303.    Defendant Moll also discussed the Company's sales from Q309, and identified two previous sales (to Yale and the South African distributor) which were improperly recognized as revenue during the Class Period and subsequently recognized in Q309 after the restatement:

Now I'd like to move on, and overview our third quarter results. During the third quarter, we shipped five Sensei Robotic Catheter Systems and recognized revenue on five systems. Contributing to the third quarter revenue, where three systems that were shipped during the third quarter and two that had been categorized as deferred revenue, as part of the restatement. In addition, two of the five systems shipped in the quarter remained as deferred revenue as of the end of the third quarter. Of the five systems that contributed to third quarter revenue, one was sold to Hartford hospital, one to the University of Heidelberg and one unit went to John Radcliffe Hospital in Oxford, U.K. The two systems that were reclassified from deferred revenue to revenue during the quarter, include units sold to Yale University and to a new distributor in South Africa.

304.    In response to an analyst's question about the age of certain sales which were previously recognized as revenue and now considered part of deferred revenue, Defendant Moll admitted that there were systems the Company sold to distributors as far back as Q208 that the distributor still had and were unable to sell through to a customer:

[*Analyst*:] Okay, well I just had one question on the current systems in your deferred revenue account. Do you have any visibility on – well, first of all, let me take a step back. Can you give us a little more color on the aging of those systems and whether or not you have visibility on the timing of the revenue to be recognized yet?

[*Defendant Moll*:] Yeah, let me – let me try to answer that. ***The age of those units that are now in deferred revenue as a result of the restatement go all the way back from Q2 of 08 to current.*** And even though its – most of those are related to distributors. We have 15 units, 15 Sensei Systems that are in the deferred revenue as

of the end of September 30. *Eleven of those are related to just distributors. And of those 11, that's where it gets really difficult in terms of determining when revenue will be recognized on those because we've got to – we need to understand the distributor pipeline which we don't have a good sense for at the current time and it depends on when the distributor can find and sell that unit to their end user and then we can get that end user trained.*

So, for those, of that group, we think there are probably a couple that are within – that should be recognized as revenue in the next couple quarters. Of the remaining five, three to five, we really feel that those we will recognize as revenue in the next couple of quarters.

[*Analyst*:] *Okay, so just to confirm: you have some systems that have been in the deferred revenue account since Q2 of 2008?*

[*Defendant Moll*:] *On a restated basis, yes.*

(Emphasis added).

305.   Additionally, during the conference call, Defendant Moll admitted that the Company's Italian distributor had been sold five systems total during the Class Period, yet was still holding three systems it was unable to sell:

[*Analyst*:] Okay, and I assume those would be at the top of the list in terms of systems about to be recognized?

[*Defendant Moll*:] Well, it's not so much a top of the list as they come from different distributors, *for example, AB Medica which is our Italian distributor over – they have taken delivery of five systems and they have been able to sell two of those systems.* Now, we don't keep specific serial number tracking so we've just been kind of, in terms of the deferred revenue, its just a first in, first out kind of basis. *So they still have three systems that they need to sell through to their end users and, unfortunately for us right now, difficult for us to predict the timing of our distributors' sale to the end users in their geographical locations.*

(Emphasis added).

306.   The size and impact of the restatement on Hansen's Installed Base was far greater than analysts had expected.  As noted by an analyst report issued by Piper Jaffray following the announcement, "the impact of the restatement was bigger than we expected *particularly on the installed base of systems*."  (Emphasis added).  As the report noted:

Hansen announced that it has completed the audit and restatement of its historical financials.  The extent of the restatement appears to be greater than our initial thinking.  The total installed base of systems at the end of Q2:09 has been reduced from 68 to 55 with revenue from 13 systems reclassified as deferred revenue on the balance sheet. *It's unclear to us if the deferred systems are just sitting as some distributor's inventory or are catheter-utilizing systems.*

(Emphasis added).

307. On November 17, 2009, a Morningstar analyst similarly expressed that the impact of the restatement on Hansen's Installed Base was larger than expected, and commented on Hansen's "loose internal controls:"

> As we expected, the revenue restatement effect was minimal from a cash standpoint, as the firm received full payment on all but one system. ***From a revenue-recognition standpoint, however, system sales shifts turned out to be larger than expected.*** Management disclosed that from the fourth quarter 2007 until the current quarter, 13 systems should have been classified as deferred revenue and recognized in a later period. Ten systems should be recognized as deferred revenue and recognized once Hansen or distributors meet certain conditions. The installed base now stands at 60 systems. Recognition conditions have tightened in light of the investigation. Hansen had previously recognized sales to distributors once shipped, if it believed the distributor could independently train the end user. Now Hansen will recognize revenue once systems have been installed and the end user has been trained. ***The firm currently has 15 units as deferred revenue, dating back to shipments made in the second quarter of 2008.*** Eleven of these relate to distributor orders, so they will probably represent the systems that will be recognized the latest despite when cash payment was received. ***As a result of the broad restatement, we will lower our Stewardship Grade to reflect management's loose internal controls.***

(Emphasis added).

308. Thereafter, on March 16, 2010, Hansen filed its Annual Report with the SEC on Form 10-K for the 2009 fiscal year. Therein,

> In assessing the results of an investigation conducted by the audit committee of our board in 2009 as well as the internal review and recertification procedures performed for purposes of the preparation and certification of our restated consolidated financial statements in November 2009, our management has identified material weaknesses as of December 31, 2008 and December 31, 2007 that resulted in errors in our financial reporting with regard to our accounting for revenue recognition with respect to the sale of our Sensei Robotic Catheter Systems. Such errors resulted in a restatement of the Company's audited annual financial statements as of and for the years ended December 31, 2008 and December 31, 2007 and the unaudited interim financial statements as of and for the quarterly periods ended June 30, 2009, March 31, 2009, September 30, 2008, June 30, 2008 and March 31, 2008. ***Additionally, audit adjustments identified in connection with the audit of our December 31, 2009 financial statements resulted in material weaknesses.*** We evaluated our controls in association with our assessment of the effectiveness of internal control over financial reporting as of December 31, 2009. While many remedial measures were undertaken to correct the control structure under which the errors occurred, not all remedial measures were complete as of December 31, 2009 and not enough time had passed under those remedial measures. As such, we continue to report material weaknesses in our internal control over financial reporting as of December 31, 2009. A description of the material weakness related to our inadequate controls over the accounting for, and disclosure of, the application of our control environment, information and communication, revenue recognition process and complex arrangements is set forth in Part II Item 9A "Controls and Procedures."

309.     Mysteriously, the two material weaknesses the Company disclosed immediately following the restatement multiplied, as the Company's Annual Report on Form 10-K for the 2009 fiscal year further disclosed the following two deficiencies:

a.       The Company "did not maintain effective controls over complex arrangements. Specifically, we did not maintain effective controls over the evaluation of a joint development arrangement to ensure complete and accurate accounting in accordance with GAAP."

b.       The Company "did not maintain effective information and communication" because the Company "did not maintain effective procedures for communicating to all relevant personnel our accounting policies, the importance of consistent application of our accounting policies, and essential data required to properly apply GAAP to our transactions" and "did not effectively communicate the process of reporting unusual or uncertain circumstances."

310.     The following day, Hansen's stock declined by $0.17 per share, approximately 7.4%, to close on March 17, 2010, on heavy volume of nearly 600,000 shares, nearly three times the prior day's volume.

## ADDITIONAL SCIENTER ALLEGATIONS

311.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Hansen, his/her control over, and/or receipt and/or modification of Hansen's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hansen, participated in the fraudulent scheme alleged herein.

312.     Defendants knew or were deliberately reckless as to the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing

1  fraudulent scheme described in this complaint could not have been perpetrated over a substantial

2  period of time, as has occurred, without the knowledge and complicity of the personnel at the

3  highest level of the Company, including the Individual Defendants.

4      313.   Defendants' scienter is also reflected by, among others, the dissemination of

5  materially false and/or misleading statements regarding the Company's core business/operations and

6  Defendants' motivation to conduct equity offerings, as explained in detail below.

7  ## Core Business/Operations Doctrine

8      314.   Hansen is a relatively small company with approximately 200 employees during the

9  Class Period.  According to the Company's originally filed Form 10-K for FY08, "as of December

10  31, 2008, [Hansen] had 208 employees, 60 of whom were engaged directly in research and

11  development, 69 in manufacturing and service, 28 in general administrative and accounting

12  activities, 15 in regulatory, clinical affairs and quality activities and 36 in sales and marketing

13  activities."

14      315.   The Company's executive management was fairly small, as according to the

15  Company's proxy materials filed with the SEC on April 29, 2009, the Company listed only six

16  people under the section entitled, "Executive Officers and Key Employees."

17      316.   During the Class Period, the Company's business was almost entirely derived from

18  the sale of its flagship Sensei Robotic Catheter System to a limited number of customers, along with

19  limited additional sales of disposable Artisan Catheters to existing Sensei customers/users.  As such,

20  during each quarter of the Class Period, almost all of the Company's revenues were generated from

21  anywhere between three to fourteen system sales (as originally reported).  As such, during the entire

22  Class Period (*i.e.*, seven quarters), most of the Company's revenues (as originally reported) were

23  derived from the "purported" sale of only fifty-nine systems.

24      317.   As alleged in detail above, throughout the Class Period, on numerous occasions,

25  Defendants asserted their active knowledge, familiarity, and review of, *inter alia*, the Company's

26  sales, revenues, customers, system placements, customer training obligations, revenue recognition

27  obligations, distributors, installations, catheter utilization, *etc.*.

28

318.    Essentially, systems sales were Hansen's one-trick pony.  Defendants constantly monitored and were aware of the Company's sales and customers.

### Hansen's Equity Offerings

319.    Defendants were highly motivated to inflate Hansen's financial results and stock price to execute at least two equity offerings during the Class Period to raise the capital necessary to fund the Company's revenue/sales ramp.

320.    During the Class Period, and with the Company's securities trading at artificially inflated prices, on or around April 7, 2008, the Company completed a  public offering of more than approximately 3 million shares of Hanson's common stock at a price of $13.34 per share, for net proceeds to the Company of more than $39.4 million.  The timing of the Company's equity offering was highly unusual given that, among other reasons, it occurred just months after the Company started reporting materially false and/misleading statements and overstated financial results.

321.    Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, on or around April 22, 2009, the Company completed a  public offering of more than 11,690,000 shares of Hanson's common stock at a price of $3.25 per share, for net proceeds to the Company of more than $35 million.  The timing of the Company's equity offering was highly unusual given that, among other reasons, it occurred just months prior to the Company's announcement that it would have to restate its financial results.

### HANSEN'S VIOLATION OF GAAP RULES

**All or Portions of Products and Services Bundled in Sales Transactions Had Not Been Delivered or Performed in the Quarter Revenue Was Recognized**

322.    As part of its restatement, Hansen has admitted it improperly and prematurely recognized at least $7.4 million of revenue when all or portions of the products and services "sold" to certain customers had not yet been provided, but rather had only been promised to be provided in the future, or were not even available at the time revenue was originally recognized. Such commitments included promises to prospectively provide free product, software, training, and installation services some time in the future, among other things. Despite the fact that portions of sales agreements would not be provided until some future date, if at all, Hansen improperly

recognized all the revenue up front rather than properly deferring portions of the revenue recognition on undelivered portions of the sale until the products or services were actually delivered.

323.    Generally Accepted Accounting Principles governing revenue recognition on undelivered products or unperformed services is well established. AICPA Statement of Position ("SOP") 97-2, Software Revenue Recognition, the well known 1997 accounting rule governing software and related technology revenue recognition, states that, when an arrangement to provide software contains multiple elements, including post-contract support, services, future upgrades and enhancements or training, the fee from the sale must be allocated to the different elements:

> If an arrangement includes multiple elements, the fee should be allocated to the various elements based on vendor-specific objective evidence of fair value, regardless of any separate prices stated within the contract for each element. [SOP 97-2, 10.]

324.    SOP 97-2 further requires that in the case of multiple element arrangements, the portion of the revenue or fee allocated to the undelivered or unperformed future services must be deferred until such delivery or services are performed.

325.    Hansen, however, flagrantly ignored these fundamental accounting rules spelled out in SOP 97-2, and instead of allocating and deferring portions of revenue on such transactions, it improperly recorded all the revenue immediately, regardless of the fact that portions of the arrangement had not yet been met. This fact cannot be disputed. The Company admitted that it was required to follow SOP 97-2.

326.    By improperly recognizing this revenue on future undelivered portions of sales agreements instead of deferring such revenue until the future products or services were delivered, Hansen also failed to comply with the most basic accounting rules governing revenue recognition, including SEC Staff Accounting Bulletin ("SAB") 104, SEC Codification of Staff Accounting Bulletins, Topic 13; Revenue Recognition, as amended, and SAB 101, Revenue Recognition in Financial Statements. SAB 104 and the other SEC pronouncements concisely and clearly state that revenue is realized or realizable and earned only if and when all of the following criteria are met:

> (a) "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction;

(b) "Delivery has occurred or services have been rendered";

(c) "The seller's price to the buyer is fixed or determinable"; and

(d) "Collectibility is reasonably assured."

327.    By recognizing revenue before delivery on portions of multiple element arrangements, Hansen expressly violated SABs 104 and 101 and the SEC Codification of Staff Accounting Bulletin, Topic 13 criterion that "[d]elivery has occurred or services have been rendered" before revenue can be recognized. Hansen has since admitted in its 2008 10-K\A that it was required to follow the SEC's guidance.

328.    In addition, Hansen violated the overarching accounting principle that revenues and gains should not be recognized in financial statements until they are both earned and realizable (FASB Statement of Concepts ("CON") No. 5, Recognition and Measurement in Financial Statements of Business Enterprises:

(a) "Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash [CON 5 83a]."

(b) "Revenues are not recognized until earned. An entity's revenue- activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues [CON 5, 83b]."

(c) "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers [CON 5, 84a]."

329.    Defendants intentionally ignored these long-standing accounting rules and, in doing so, improperly recognized at least $7.4 million in revenue during the Class Period.

### Hansen's Additional Violation of GAAP Rules In Its Financial Statements Filed WithThe SEC

330.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with

1   GAAP, nor was the financial information a fair presentation of the Company's operations due to the

2   Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

3        331.    GAAP are those principles recognized by the accounting profession as the

4   conventions, rules and procedures necessary to define accepted accounting practice at a particular

5   time. Regulation S-X (17 C.F.R. §210.4 01(a) (1)) states that financial statements filed with the SEC

6   which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

7   Regulation S-X requires that interim financial statements must also comply with GAAP, with the

8   exception that interim financial statements need not include disclosure which would be duplicative

9   of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

10       332.    The fact that Hansen restated its financial statements, and informed investors that

11  these financial statements should not be relied upon is an admission that they were false and

12  misleading when originally issued (APB No.20, 7-13; SFAS No. 154, 25).

13       333.    Given these accounting irregularities, the Company announced financial results that

14  were in violation of GAAP and the following principles:

15       (a)    The principle that "interim financial reporting should be based upon the same

16  accounting principles and practices used to prepare annual financial statements" (APB No. 28, 10);

17       (b)    The principle that "financial reporting should provide information that is

18  useful to present to potential investors and creditors and other users in making rational investment,

19  credit, and similar decisions" (FASB Statement of Concepts No. 1, 34);

20       (c)    The principle that "financial reporting should provide information about the

21  economic resources of an enterprise, the claims to those resources, and effects of transactions,

22  events, and circumstances that change resources and claims to those resources" (FASB Statement

23  of Concepts No. 1, 40);

24       (d)    The principle that "financial reporting should provide information about an

25  enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, 42);

26       (e)    The principle that "financial reporting should provide information about how

27  management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

28

1   for the use of enterprise resources entrusted to it" (FASB Statement of Concepts No. 1, 50);

2           (f)     The principle that "financial reporting should be reliable in that it represents

3   what it purports to represent" (FASB Statement of Concepts No. 2, 58-59);

4           (g)     The principle that "completeness, meaning that nothing is left out of the

5   information that may be necessary to insure that it validly represents underlying events and

6   conditions" (FASB Statement of Concepts No. 2, 79); and

7           (h)     The principle that "conservatism be used as a prudent reaction to uncertainty

8   to try to ensure that uncertainties and risks inherent in business situations are adequately considered"

9   (FASB Statement of Concepts No. 2, 95).

10          334.    The adverse information concealed by Defendants during the Class Period and

11  detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17

12  C.F.R. §229.303).

## CLASS ACTION ALLEGATIONS

14          335.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

15  Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities other than

16  defendants who purchased or otherwise acquired the common stock of Hansen between February

17  19, 2008 and October 18, 2009, inclusive (the "Class Period"), and who were damaged thereby, for

18  violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder

19  (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company,

20  at all relevant times, members of their immediate families and their legal representatives, heirs,

21  successors or assigns and any entity in which Defendants have or had a controlling interest.

22          336.    The members of the Class are so numerous that joinder of all members is

23  impracticable.  At all relevant times, Hansen's securities were actively traded on National

24  Association of Securities Dealers Automated Quotations Market ("NASDAQ").  While the exact

25  number of Class members is unknown to Plaintiffs at this time and can only be ascertained through

26  appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the

27  proposed Class.  Millions of Hansen shares were traded publicly during the Class Period on the

28

NASDAQ and as of July 31, 2009, Hansen had 37,420,821 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Hansen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

337.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

338.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

339.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are: (i) whether the provisions of the Exchange Act were violated by defendants' acts as alleged herein; (ii) whether the public statements issued by defendants to the investing public omitted and/or misrepresented material facts about the Company and its business; and (iii) to what extent the members of the Class have sustained damages and the proper measure of damages.

340.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class individually to redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

341.   The market for Hansen's securities was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, Hansen's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Hansen's securities relying upon the integrity of the market price of the Company's securities and market information

relating to Hansen, and have been damaged thereby.

342.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Hansen's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Hansen's business, operations, and prospects as alleged herein.

343.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Hansen's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS**

344.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

345.    During the Class Period, as a result of the open, well-developed, and efficient market for Hansen's stock, the prices of Hansen's stock fell when the misrepresentations alleged herein, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to investors and the artificial inflation was removed over time from the price of Hansen's stock.  Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Hansen's stock price throughout the Class

1   Period until Defendants began to disclose the truth regarding the Company's financial condition to

2   the market.

3       346.    As alleged above, as the truth was partially revealed and/or concealed risks

4   materialized, on or about, including but not limited to, July 28, 2008, July 31, 2008, January 8, 2009,

5   July 6, 2009, August 4, 2009, and October 19, 2009, the price of Hansen's stock declined

6   precipitously on heavy trading volume.

7       347.    Specifically, on July 28, 2008, JP Morgan issued a report partially revealing that

8   Hansen was impacted by issues that would potentially delay or extend some revenue recognition for

9   the Company's sales of systems in the second quarter of 2008 until the third quarter of 2008. As this

10  news and its implications for Hansen's financial results for the second quarter of 2008 leaked into

11  the market, Hansen's share price declined $0.88 per share, nearly 5%, to close on July 29, 2008, at

12  $17.52 per share, on unusually heavy volume of 766,900 – more than three times the prior day's

13  volume. Hansen's shares continued to decline an additional $1.53 per share, or 8.73%, to close on

14  July 30, 2008, at $15.99 per share, also on unusually heavy volume. Hansen's share price declined

15  another $0.74 per share, nearly 5%, to close on July 31, 2008, at $15.25 per share, again on unusually

16  heavy volume in excess of 1 million. This closing price on July 31, 2008, represented a three-day

17  decline of $3.15 per share, or 17.12%, from the closing price on July 28, 2008. Despite these partial

18  disclosures, defendants continued to misrepresent and conceal material information concerning the

19  Company's operations and true financial condition.

20      348.    Additionally, on July 31, 2008, defendants issued a press release and held a

21  conference call to discuss the Company's financial results for the second quarter of 2008. Through

22  these announcements, defendants partially revealed that: (1) the Company's 2008 catheter sales for

23  the first quarter of 2008 were inflated due to stocking and that catheter sales were not a reliable or

24  accurate proxy for utilization rates; (2) Hansen's utilization rates were not as strong as the Company

25  previously indicated; and (3) the Company was experiencing revenue recognition issues related to

26  installation and training that were extending the timing for revenue recognition. On this news, the

27  following day Hansen's share price declined by $2.01 per share, or 13.18%, to close on August 1,

28  2008, at $13.24 per share, on unusually heavy volume of 2,163,600 shares – more than twice the

number of shares as the prior day and nearly fives times the approximate average of 443,772 shares per trading day for the month of July 2008.  Shares of Hansen's stock continued to decline the following day of trading, losing another $1.30 per share, or 9.82%, to close at $11.94 on August 4, 2008 – again on unusually heavy volume of more than 1.5 million shares. The closing price on August 4, 2008, represented a two-day decline of $3.31 per share, or approximately 21.71%.  Despite these partial disclosures, defendants further misrepresented and concealed material information concerning the Company's operations and true financial condition.

349.    On January 8, 2009, Morgan Stanley issued an analyst report entitled, "Hansen Medical, Inc., Product Cycle Not Enough; Lowering Numbers" that partially revealed that: (1) demand for the Company's products was lower than defendants led the market to believe; and (2) the Company might not achieve its guidance for fiscal year 2008.  On this news, Hansen's stock price declined $1.59 per share, or 20.25%, to close on January 8, 2009, at $6.26 per share, on unusually heavy volume of 812,600, which  was 623,900 greater than the volume on January 7, 2009, of 188,700.  Despite these partial disclosures, defendants continued to misrepresent and conceal material information concerning the Company's operations and true financial condition.

350.    On January 8, 2009, after the market closed, defendants preliminarily announced the Company's financial results for the fourth quarter of 2008 and partially revealed that: (1) Hansen had not achieved its guidance for the 2008 fiscal year; (2) demand for the Company's systems was not as strong as the Company had led the public to believe; (3) the Company was facing further issues that were delaying revenue recognition; and (4) utilization was not increasing to the extent the Company had led the public to believe. On this news, the following day Hansen's stock price further declined $0.50 per share, or 7.99%, to close on Friday January 9, 2009, at $5.76 per share, on unusually heavy volume of 587,700.  On Monday January 12, 2009, the Company's stock price declined another $0.60 per share, to close at $5.16 per share, again on unusually heavy volume of more than 400,000.  This two trading-day decline represented a total decline of $1.10 per share, or 17.58%, from the closing price on January 8, 2009, and represented a remarkable three day decline of $2.69 per share, or 34.27%, from the closing price of $7.85 per share on January 7, 2009, which marks the last time that Hansen's stock price closed above $7.00 per share.  Again, despite these

1    partial disclosures, defendants continued to misrepresent and conceal material information

2    concerning the Company's operations and true financial condition.

3          351.    On July 6, 2009, in announcing Hansen's preliminary results for the second quarter

4    of 2009, defendants partially revealed: (1) the truth about the Company's prior statements regarding

5    catheter sales and utilization; (2) that Hansen's guidance for 2009 was unattainable; (3) that demand

6    for Hansen's systems was not as strong as the Company had led the public to believe; (4) that the

7    Company was facing further issues that were delaying revenue recognition; and (5) that utilization

8    was not increasing to the extent the Company had led the public to believe. On this news, the

9    following day Hansen's stock price declined precipitously by $1.58 per share, or 33.40%, to close

10   on July 7, 2009, at $3.15 per share on unusually heavy volume of 4,370,200 – more than 4 million

11   more than prior day's volume of 357,200. Hansen's stock price again declined sharply the following

12   day, losing another $0.27 per share, or 8.57%, to close on July 8, 2009, at $2.88 per share, on

13   unusually heavy volume of more than 1.2 million. This two-day decline represented a decline of

14   $1.85 per share, nearly 40%, of the closing price on July 6, 2009, of $4.73 per share. Despite these

15   partial disclosures, defendants continued to misrepresent and conceal material information

16   concerning the Company's operations and true financial condition.

17         352.    On August 4, 2009, in announcing the Company's financial results for the second

18   quarter of 2009, defendants further partially revealed that: (1) the Company's sales cycle was longer

19   than the Company had represented; (2) demand for the Company's systems was lower than the

20   Company had led the market to believe; and (3) utilization rates were declining. On this news, the

21   following day the Company's stock price declined $0.33 per share, more than 8%, to close on

22   August 5, 2009, at $3.71 per share, on heavy volume of 539,600. Despite these partial disclosures,

23   defendants further misrepresented and concealed material information concerning the Company's

24   operations and true financial condition.

25         353.    On October 19, 2009, Hansen announced that the Company would have to restate its

26   prior financial results. Specifically, the Company stated:

27         MOUNTAIN VIEW, Calif., October 19, 2009 – Hansen Medical, Inc. (Nasdaq:
           HNSN) today announced that it plans to restate its financial statements for the year
28         ended December 31, 2008 and for the quarters ended March 31, 2008, June 30, 2008,

September 30, 2008, March 31, 2009 and June 30, 2009 in order to correct certain errors, some of which arose from potential irregularities occurring outside of the accounting department, regarding the timing of revenue recognition on the sale of some of its Sensei® Robotic Catheter Systems. Through June 30, 2009 Hansen shipped 68 systems based on valid customer purchase orders for which revenue was recognized. Hansen has received full payment for all but two of these systems. Of these two systems, Hansen has not been paid for one system on which it recognized revenue in the quarter ended June 30, 2009 and to date has received partial payment of $320,000 on the sale of a system to a distributor on which it recognized revenue in the quarter ended March 31, 2009. An investigation by Hansen's audit committee, with the assistance of independent outside counsel, has identified systems for which revenue should have been recognized in a later period than the period in which it was recognized and revenue on a smaller number of systems that should have been reflected as deferred revenue on Hansen's balance sheet as of June 30, 2009. As software is more than incidental to the functioning of the Sensei system, Hansen's revenue recognition policy is based on American Institute of Certified Public Accountants, Statement of Position 97-2, Software Revenue Recognition.

354.    On this news, shares of Hansen declined $0.31 per share, or 9.04%, to close on October 19, 2009, at $3.12 per share, on unusually heavy volume of 1,567,000.

355.    Since October 19, 2009, Hansen's stock price has not nearly recovered its Class Period value.  As a result, members of the Class who purchased or otherwise acquired Hansen securities during the Class Period have sustained economic injury resulting from the decline in value of Hansen's securities resulting from the revelations of Defendants' misstatements and omissions during the Class Period.  Thus, the damages suffered by Plaintiffs and other members of the Class were a direct result of Defendants' misrepresentations, omissions, and fraudulent scheme to artificially inflate the price of Hansen stock and caused the subsequent significant declines in the value of Hansen stock when Defendants' prior misrepresentations and omissions during the Class Period were revealed.  The allegations described herein demonstrate that the damages suffered by Plaintiffs and the Class were caused by the scheme to defraud as alleged herein and negate any inference that the losses suffered by Plaintiffs and the Class were the result of general market conditions or other factors wholly unrelated to Defendants' material misstatements and omissions alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

356.    The market for Hansen's securities was open, well-developed and efficient at all

1  relevant times.  As a result of the materially false and/or misleading statements and/or failures to

2  disclose, Hansen's securities traded at artificially inflated prices during the Class Period.  On May

3  13, 2008, the price of the Company's common stock reached a Class Period high of $19.57 per

4  share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's

5  securities relying upon the integrity of the market price of Hansen's securities and market

6  information relating to Hansen, and have been damaged thereby.

7      357.    During the Class Period, the artificial inflation of Hansen's stock was caused by the

8  material misrepresentations and/or omissions particularized in this Complaint causing the damages

9  sustained by Plaintiffs and other members of the Class.  As described herein, during the Class

10  Period, Defendants made or caused to be made a series of materially false and/or misleading

11  statements about Hansen's business, prospects, and operations.  These material misstatements and/or

12  omissions created an unrealistically positive assessment of Hansen and its business, operations, and

13  prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant

14  times, and when disclosed, negatively affected the value of the Company stock.  Defendants'

15  materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other

16  members of the Class purchasing the Company's securities at such artificially inflated prices, and

17  each of them has been damaged as a result.

18      358.    At all relevant times, the market for Hansen's securities was an efficient market for

19  the following reasons, among others:

20          (a)    Hansen stock met the requirements for listing, and was listed and actively

21  traded on the NASDAQ, a highly efficient and automated market;

22          (b)    As a regulated issuer, Hansen filed periodic public reports with the SEC

23  and the NASDAQ;

24          (c)    Hansen regularly communicated with public investors *via* established market

25  communication mechanisms, including through regular dissemination of press releases on the

26  national circuits of major newswire services and through other wide-ranging public disclosures, such

27  as communications with the financial press and other similar reporting services; and

28

1    (d)    Hansen was followed by securities analysts employed by major brokerage

2    firms who wrote reports about the Company, and these reports were distributed to the sales force

3    and certain customers of their respective brokerage firms.  Each of these reports was generally

4    publicly available and entered the public marketplace.

5    359.    As a result of the foregoing, the market for Hansen's securities promptly digested

6    current information regarding Hansen from all publicly available sources and reflected such

7    information in Hansen's stock price.  Under these circumstances, all purchasers of Hansen's

8    securities during the Class Period suffered similar injury through their purchase of Hansen's

9    securities at artificially inflated prices and a presumption of reliance applies.

10    **NO SAFE HARBOR**

11    360.    The statutory safe harbor provision for forward-looking statements under certain

12    circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The

13    statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

14    In addition, to the extent certain of the statements alleged to be false may be characterized as

15    forward looking, they were not identified as "forward-looking statements" when made and there

16    were no meaningful cautionary statements identifying important factors that could cause actual

17    results to differ materially from those in the purportedly forward-looking statements. In the

18    alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking

19    statements pleaded herein, Defendants are liable for those false forward-looking statements because

20    at the time each of those forward-looking statements was made, the speaker had actual knowledge

21    that the forward-looking statement was materially false or misleading, and/or the forward-looking

22    statement was authorized or approved by an executive officer of Hansen who knew that the

23    statement was false when made.

24

25

26    **FIRST CLAIM**
**Violation of Section 10(b) of**
27    **The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**
28

361.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

362.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Hansen's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

363.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Hansen's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

364.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Hansen's financial well-being and prospects, as specified herein.

365.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hansen's value, performance and continued substantial growth.  This conduct included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hansen and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.  The Company also engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the

1   Class Period.

2       366.   Each of the Individual Defendants' primary liability, and control person liability,

3   arises from the following facts: (i) the Individual Defendants were high-level executives and/or

4   directors at the Company during the Class Period and members of the Company's management team

5   or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities

6   as a senior officer and/or director of the Company, was privy to and participated in the creation,

7   development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii)

8   each of these defendants enjoyed significant personal contact and familiarity with the other

9   defendants and was advised of, and had access to, other members of the Company's management

10  team, internal reports and other data and information about the Company's finances, operations, and

11  sales at all relevant times; and (iv) each of these defendants was aware of the Company's

12  dissemination of information to the investing public which they knew and/or recklessly disregarded

13  was materially false and misleading.

14      367.   Defendants had actual knowledge of the misrepresentations and/or omissions of

15  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

16  ascertain and to disclose such facts, even though such facts were available to them. Such defendants'

17  material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

18  and effect of concealing Hansen's financial well-being and prospects from the investing public and

19  supporting the artificially inflated price of its securities.   As demonstrated by Defendants'

20  overstatements and/or misstatements of the Company's business, operations, financial well-being,

21  and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the

22  misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by

23  deliberately refraining from taking those steps necessary to discover whether those statements were

24  false or misleading.

25      368.   As a result of the dissemination of the materially false and/or misleading information

26  and/or failure to disclose material facts, as set forth above, the market price of Hansen's securities

27  was artificially inflated during the Class Period.   In ignorance of the fact that market prices of the

28  Company's securities were artificially inflated, and relying directly or indirectly on the false and

misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Hansen's securities during the Class Period at artificially high prices and were damaged thereby.

369.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Hansen was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Hansen securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

370.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

371.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against All Defendants

372.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

373.    This Count is asserted against Defendants Hansen, Moll, Van Dick, and Restani.

374.    Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did

1    influence and control, directly or indirectly, the decision-making of the Company, including the

2    content and dissemination of the various statements which Plaintiffs contend are false and

3    misleading.  The Individual Defendants were provided with or had unlimited access to copies of the

4    Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be

5    misleading prior to and/or shortly after these statements were issued and had the ability to prevent

6    the issuance of the statements and/or cause the statements to be corrected.  Additionally, Hansen

7    controlled the Individual Defendants.

8          375.    In particular, each of these Defendants had direct and supervisory involvement in the

9    day-to-day operations of the Company and, therefore, is presumed to have had the power to control

10   or influence the particular transactions giving rise to the securities violations as alleged herein, and

11   exercised the same.

12         376.    As set forth above, Hansen and the Individual Defendants each violated Section 10(b)

13   and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their

14   positions as controlling persons, defendants are liable pursuant to Section 20(a) of the Exchange Act.

15   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of

16   the Class suffered damages in connection with their purchases of the Company's securities during

17   the Exchange Act Class Period.

18                               **PRAYER FOR RELIEF**

19         WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

20         (a)     Determining that this action is a proper class action under Rule 23 of the Federal

21   Rules of Civil Procedure;

22         (b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members

23   against all defendants, jointly and severally, for all damages sustained as a result of Defendants'

24   wrongdoing, in an amount to be proven at trial, including interest thereon;

25         (c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

26   action, including counsel fees and expert fees; and

27         (d)     Such other and further relief as the Court may deem just and proper.

28

1

**JURY TRIAL DEMANDED**

2

Plaintiffs hereby demand a trial by jury.

3

DATED: July 26, 2010

**GLANCY BINKOW & GOLDBERG LLP**

4

By: ___/s/ Michael Goldberg___

5

Lionel Z. Glancy (#134180)
Peter A. Binkow (#173848)

6

Michael Goldberg (#188669)
Ex Kano S. Sams II (#192936)

7

Robert V. Prongay (#270796)
1801 Avenue of the Stars, Suite 311

8

Los Angeles, California 90067
Telephone: (310) 201-9150

9

Facsimile: (310) 201-9160

10

*Lead Counsel for Plaintiffs*

11

**ROBBINS GELLER RUDMAN**

12

**& DOWD LLP**
Byron S. Georgiou (#61250)

13

Willow E. Radcliffe (#200087)
655 West Broadway, Suite 1900

14

San Diego, CA  92101-3301
Telephone: (619) 231-1058

15

Facsimile: (619) 231-7423

16

**LAW OFFICES OF HOWARD G. SMITH**

17

Howard G. Smith
3070 Bristol Pike, Suite 112

18

Bensalem, PA 19020
Telephone: (215) 638-4847

19

Facsimile: (215) 638-4867

20

*Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

**PROOF OF SERVICE BY ELECTRONIC POSTING**
**PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND**
**ECF GENERAL ORDER NO. 45**
**AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On July 26, 2010, I caused to be served the following document:

**SECOND CONSOLIDATED AMENDED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

By posting these documents to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the following parties:

**See Attached Service List.**

And by US mail to all known non-ECF registered parties.

**See Attached Service List.**

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 26, 2010, at Los Angeles, California.

*S/Michael Goldberg*
Michael Goldberg

# Mailing Information for a Case 5:09-cv-05094-JF

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter Arthur Binkow**
  info@glancylaw.com,pbinkow@glancylaw.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **John D. Pernick**
  john.pernick@bingham.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Lionel Z Glacny
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
```