IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT CURRY, Individually and on Behalf of All Others Similarly Situated, | No. C 09-5094 CW |
| Plaintiff, | ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO DISMISS THIRD CONSOLIDATED AMENDED COMPLAINT |
| v. | |
| HANSEN MEDICAL, INC.; FREDERIC H. MOLL; STEVEN M. VAN DICK; GARY C. RESTANI; and CHRISTOPHER SELLS, | |
| Defendants. | |
| _____/ | |

In this consolidated securities fraud class action, Defendants Hansen Medical, Inc., and former Hansen employees Frederic H. Moll, Steven M. Van Dick, Gary C. Restani and Christopher Sells move to dismiss the Third Consolidated Amended Complaint (3AC).[1]  Lead Plaintiffs Mina and Nader Farr, and Plaintiffs Robert Curry, Kim M. Prenter, Muthusamy Sivanantham, and Jean and Gary Cawood, (collectively, Plaintiffs), bringing this putative class action on behalf of the Hansen shareholders who purchased or acquired stock between February 19, 2008 and

---

[1] Sells, who is named as a defendant for the first time in the 3AC, files his motion separately.  In a related action, the Securities and Exchange Commission charges Sells and Timothy Murawski, another former Hansen employee, with violations of federal securities laws.  See SEC v. Sells and Murawski, C 11-4941 CW.  Sells and Murawski's motion to dismiss the SEC's complaint is addressed in a separate order.

United States District Court
For the Northern District of California

October 18, 2009 (Class Period), oppose the motion.  Plaintiffs allege that, during the Class Period, Defendants induced them to acquire Hansen stock at artificially inflated prices by making knowing and intentional misstatements regarding Hansen's revenue recognition and sales performance in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  The motion was heard on May 3, 2012. Having considered all of the parties' papers and oral argument on the motion, the Court grants Defendants' motion in part, with leave to amend.

BACKGROUND

I. Second Amended Complaint

The parties in this action previously stipulated to the filing of a first amended complaint and a second consolidated amended complaint (2AC).  On August 25, 2011, another judge of this Court granted Defendants' motion to dismiss the 2AC, with leave to amend.  Docket No. 59.  The statement of facts in that order is summarized as follows.

Defendants are Hansen, Hansen's former Chief Executive Officer (CEO), Defendant Moll; Hansen's former Chief Financial Officer (CFO), Defendant Dick; Hansen's former Chief Operating Officer (COO), Defendant Restani; and Hansen's former Senior Vice President (SVP) of Commercial Operations, Defendant Sells. Hansen's revenue recognition policy for its main product, the

Sensei Robotic Catheter System (Sensei unit), is based on American Institute of Certified Accountants, Statement of Position 97-2 (SOP 97-2), Software Revenue Recognition, which allows recognition of revenue only after installation of the product and training of the end-users are complete. In August 2009, an investigation conducted by Hansen's audit team with independent counsel concluded that data on certain sales transactions was withheld from Hansen's accounting department and outside auditors, and that documents related to some revenue were falsified so that Hansen's accounting department had incomplete information about temporary installations, unfulfilled training obligations and undisclosed side agreements. Also, the investigation raised questions about Hansen's distributors' ability to install Sensei units and train end-users independently. On October 8, 2009, these findings were made public in Hansen's Form 8-K filed with the Securities and Exchange Commission (SEC). On November 16, 2009, Hansen restated its financial statements for the year ending December 31, 2008, and for the quarters ending March 31, June 30 and September 30, 2008 and March 31 and June 30, 2009 (the Restatement). As a result of the Restatement, Hansen's stock price decreased significantly.

In the August 25, 2011 Order, the Court found that Plaintiffs had not alleged that Defendants made misstatements with actual knowledge of their falsity. Order at 7. The Court held that the accounts from twelve confidential witnesses (CWs) were

insufficient to allege scienter because: (1) only one of the CWs was employed by Hansen throughout the entirety of the class period; (2) none of the CWs worked directly with revenue recognition; (3) many of the allegations were hearsay and, even at face value, failed to demonstrate Defendants had knowledge of the alleged fraudulent activity; and (4) the allegations stated information that could only circumstantially give rise to an inference of scienter. Order at 8. The Court found the following allegations were insufficient to show scienter: (1) Defendants' presumed knowledge of Hansen's core business activity; (2) the magnitude of the Restatement and accounting violations; (3) Defendants' certifications pursuant to the Sarbanes-Oxley Act of 2002 (SOX), 15 U.S.C. § 7201, et seq.; and (4) Defendants' decision to conduct two public equity offerings during the Class Period. Order at 9-11.

II. Third Amended Complaint

    A. Allegations Against Defendant Sells

    Sells was one of only six Hansen executives and, as the SVP of Commercial Operations, he was responsible for sales, training, installation and customer service. 3AC ¶ 23. He participated in weekly meetings with the other Defendants regarding the status of Sensei unit sales and installations, received Sensei unit sales and installations reports, and monitored utilization of Sensei

units and catheter sales data.[2]   During installation status meetings, Van Dick, Moll and Sells would reach a consensus on which Sensei units could be recognized as revenue.  3AC ¶ 52. Sells participated in calls with Hospital A and reprimanded a Hansen employee for documenting an agreement that the Sensei unit installed would immediately be taken apart, stored and reinstalled in a later quarter when the construction of Hospital A's laboratory was complete.  3AC ¶¶ 125, 127.  Sells directed a Hansen employee to obtain signatures required to recognize revenue from a Sensei unit sold to Hospital B, even though Sells knew it would be impossible for the required training to be completed before the end of the quarter.  3AC ¶¶ 134-36.  Sells entered into a side agreement to make a leasing company whole if Hospital C returned its Sensei unit, by helping the leasing company find another buyer.  3AC ¶¶ 142-48.  Sells helped arrange for the installation and immediate dismantling and storage of a Sensei unit sold to Hospital D, which allowed Hansen to record approximately $550,000 in revenue for the quarter.  3AC ¶¶ 149-54.

B. Allegations Against Other Individual Defendants

In meetings and conversations with financial analysts, Defendants Moll, Van Dick and Restani consistently gave optimistic predictions about the pipeline for future Sensei unit sales and the utilization of Sensei units by purchaser hospitals.  In these

---

[2] Catheter sales were an indicator of Hansen's hospital customers' utilization of the Sensei units they had purchased.

United States District Court
For the Northern District of California

conversations, Moll, Van Dick and Restani also provided positive interpretations of questionable data regarding sales of catheters. Based upon the sales data and reports they received on a weekly basis, Defendants Moll, Van Dick and Restani knew or should have known that revenue was recognized for installations that did not meet Hansen's accounting guidelines.  Based upon sales of catheters, Defendants Moll, Van Dick and Restani knew or should have known that utilization of Sensei units at customer hospitals was not strong.

Plaintiffs assert the following claims for relief: (1) against all Defendants, violation of § 10(b) of the Exchange Act and Rule 10b-5(b); (2) against Sells alone, violation of § 10(b) of the Exchange Act and Rules 10b-5(a) and (c); and (3) against all Defendants, violation of § 20(a) of the Exchange Act.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe

United States District Court
For the Northern District of California

them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

## REQUESTS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994).

Defendants request that the Court take judicial notice of copies of completed SEC filings by Hansen, Stereotaxis and Intuitive Services, Inc. They also request that the Court take judicial notice of conference call transcripts. Plaintiffs object to the request for judicial notice of these documents if they are taken for the truth of the matter asserted. Plaintiffs seek judicial notice of two SEC filings by Sells documenting that he sold Hansen securities on August 8, 2008 and March 3, 2009.

United States District Court
For the Northern District of California

The Court grants Plaintiffs' request for judicial notice of Sells' SEC filings.  See Dreiling v. American Exp. Co., 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings may be judicially noticed).  The Court takes judicial notice of the filings by Hansen, Stereotaxis and Intuitive Services and the conference calls for the fact that they were made on the dates specified, but not for the truth of the matters asserted therein.

DISCUSSION

I.   Section 10(b) of the Exchange Act and Rule 10b-5(b)

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); see also 17 C.F.R. § 240.10b-5 (Rule 10b-5).  Rule 10b-5(b) clarifies that it is "unlawful for any person, directly or indirectly, . . . to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . "  17 C.F.R. § 240.10b-5(b).  To state a claim under Rule 10b-5(b), a plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  In re

United States District Court
For the Northern District of California

Gilead Sciences Securities Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

Plaintiffs must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.  In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1543 (9th Cir. 1994) (en banc).  Pursuant to the requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

A.   Misrepresentation or Omission of a Material Fact

To state a claim pursuant to Rule 10b-5(b), Plaintiffs must allege, among other things, a misrepresentation or omission of a material fact.  "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard."  Metzler Investment v. Corinthian Colleges, 540 F.3d 1049, 1070 (9th Cir. 2008); Falkowski v. Imation Corp., 309 F.3d 1123, 1133 (9th Cir. 2002).

1. Sells' Liability for Rule 10b-5(b) Violation

Sells argues that, because there are no allegations that he made statements or that he was required to make statements, he

United States District Court
For the Northern District of California

cannot be liable under Rule 10b-5(b).  Plaintiffs do not allege that Sells made any false or misleading statements or omissions of material facts.  In the appendix to the 3AC, Plaintiffs present a list of press releases and investor calls in which Hansen's financial situation was discussed.  No statements are attributed to Sells.  Nor do Plaintiffs allege that Sells signed any of Hansen's SEC filings.

Nevertheless, Plaintiffs argue that, as a result of the decisions Sells took to manipulate Hansen's financial results, he made it necessary and inevitable that false and misleading statements regarding Hansen's financial condition would be communicated to investors.  They also argue that, as a member of the disclosure committee, Sells had responsibility for the accurate and fair presentation of Hansen's press releases and SEC quarterly filings.

Both sides cite a recent Supreme Court case, Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), in support of their positions.  In Janus, the Court held that, for purposes of Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  Id. at 2302. The Court explained that, without control, a person can only suggest what to say, not make a statement in his or her own right. Id.  The Court noted that this was exemplified by the relationship between a speechwriter and speaker; the speechwriter drafts the

United States District Court
For the Northern District of California

speech, but the speaker is responsible for its content and is the person who takes the credit, or the blame, for what is said.  Id.

Plaintiffs' argument that their allegations regarding Sells are sufficient under Janus is unavailing.  Janus clarifies that the lack of allegations that an individual was the maker of a statement is fatal to a Rule 10b-5(b) claim against that individual.  Therefore, the Rule 10b-5(b) claim against Sells is dismissed.  Because this claim was alleged for the first time in Plaintiffs' 3AC, dismissal is with leave to amend, if Plaintiffs can truthfully allege that Sells made a statement as required by Janus.

2. Other Defendants' Liability Under Rule 10b-5(b)

Plaintiffs allege that, throughout the Class Period, Hansen published false statements about its financial performance, the number of Sensei units installed each quarter and the market outlook for Sensei units.  In the Restatement, Hansen admitted making these false statements and Defendants do not dispute this.  Because, as discussed below, Plaintiffs sufficiently allege Hansen made these misstatements with scienter, they have stated a Rule 10b-5(b) claim against Hansen.

Plaintiffs allege that Defendants Moll, Van Dick and Restani made false statements regarding Hansen's past and present sales of Sensei units.  For instance, during a 4Q07 conference call with industry analysts, Moll stated that "we've been able to move from four units in the second quarter to five in the third and sixth--

United States District Court
For the Northern District of California

six units in our fourth quarter.  I think we're going to continue, we would continue to expect to see a stair-step approach going into '08, and as a natural consequence of a stair step, you're going to see obviously more units in the back half of the year than the front half."  3AC ¶ 204.  Plaintiffs allege that this was false because Hansen's 4Q07 sales were not reported accurately and sales were flat between 3Q07 and 4Q07.

In the 1Q08 conference call, Moll stated, "I'm pleased to report that since commercialization we have achieved four consecutive quarters of increases in the number of systems placed."  3AC ¶ 207.  During the same call, Restani stated that Hansen had experienced "steady quarterly growth, four quarters in a row."  3AC ¶ 207.  Plaintiffs allege this was false because the Restatement reflects that Hansen improperly recognized revenue for two Sensei units in 1Q08.  3AC ¶ 208.  Without these two "manufactured" sales, Hansen's growth for 1Q08 would be flat.  3AC ¶ 208.  Plaintiffs have sufficiently alleged that these statements, of past and present financial and sales results, were false.

During a 3Q08 conference call with industry analysts, a question was asked about the stagnant growth in catheter sales and utilization of installed Sensei units that might be "sitting idle" or "sleeping," as an indicator of future sales of Sensei units. Moll replied, "No, I wouldn't call it sitting idle.  I mean, certainly there are--there's probably a couple examples where

Sensei that actually have had the time to percolate through the process aren't being used a lot.  But, there's--there are a number of systems in that we are growing placements rapidly per quarter, so there is [sic] a lot of systems that are sort of in the early stages of utilization. . . . And so, there is--there aren't a lot of systems that are sleeping.  There are systems that are not anywhere near up to full utilization because they haven't sort of gone through the process of getting up to full independence and utilization by the institution . . ."  3AC ¶ 163.  Plaintiffs allege that Moll made this statement when reports showed that at least three of the forty-five Sensei units sold were never used and customers for these Sensei units never purchased any catheters.  3AC ¶ 164.  Plaintiffs have sufficiently alleged that this statement of present utilization of Sensei units was false.

Plaintiffs also allege that Defendants first stated in a 4Q07 conference call that Hansen's customers do not buy catheters in bulk and that "there's not a lot of stocking built into our numbers at this point."  3AC ¶ 220 (Restani statement).  Van Dick added that this was because the "current shelf life on a catheter is not that long.  Id.  Moll explained that the number of catheters sold was a better indicator of utilization than reporting the number of procedures performed with each Sensei unit.  3AC ¶ 221.  In 1Q08, Hansen reported sales of 401 catheters.  3AC ¶ 223.  However, Defendants failed to disclose that this number was inflated by twenty to twenty-five percent

because three customers placed large orders near the end of the first quarter.  3AC ¶ 225a.  The report of such a high number of catheter sales in 1Q08 created the misleading impression among investors that utilization of Sensei units was increasing faster than it was.  3AC ¶¶ 226, 227 (positive analyst reports based on 401 catheter sales as compared to analysts' 230 unit estimate).  Plaintiffs have sufficiently alleged that the failure to disclose the fact that a significant number of catheter sales in 1Q08 was made in bulk to three customers was an omission of material fact.

Defendants argue that the alleged misstatements are protected by the PSLRA safe harbor provision because they are forward-looking and accompanied by meaningful cautionary language.

In order for the safe harbor provision to apply, a statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).  The "bespeaks caution" doctrine, which was formulated by courts prior to the enactment of the PSLRA, operates in a similar fashion.  This doctrine

> provides a mechanism by which a court can rule as a matter of
> law . . . that defendants' forward-looking representations
> contained enough cautionary language or risk disclosure to
> protect the defendant against claims of securities fraud.

Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996) (citing In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1413-14

United States District Court
For the Northern District of California

(9th Cir. 1994)).  "Cautionary statements must be precise and directly address[] . . . the [defendants'] future projections . . . Blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim."  Id.

Defendants correctly argue that Plaintiffs cannot assert claims based solely on Hansen's alleged failure to predict the extent to which the 2008 economic recession would affect Hansen's sales, 3AC ¶¶ 249-70, or on vague predictions of "stair-step" growth or puffery of "strong demand" or a "healthy" pipeline, 3AC ¶¶ 206-07, 264-65.  See In re Cutera Securities Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) (optimistic, subjective assessments do not rise to the level of a securities violation; investors devalue the optimism of corporate executives).  Indeed, the Court's August 25, 2011 Order held that statements such as "'we feel very confident that given the pipeline . . . we're going to have a very reason[able] 2009'" are protected by the safe harbor provision.  Order at 6-7.  However, in the Order, the Court noted that references to concrete rates of Sensei unit sales and user activity would not be immune.  Order at 6 (citing Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 947-48 (9th Cir. 2005) (statements of present or historical fact are not protected under safe harbor provision)).

In addition to puffery and optimistic forward-looking statements, as discussed above, Plaintiffs cite statements of

15

historical or present fact made by Defendants.  Defendants' report of a high number of catheter sales, without clarifying that a significant percentage was due to large orders from three customers, misrepresented present customer utilization activity and Defendants' statement that Hansen had experienced steady growth for four quarters in a row misrepresented historical facts. Therefore, some of Defendants' alleged statements are not protected by the safe harbor provision.

B. Scienter For Rule 10b-5(b) Claim

Pursuant to the requirements of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness.  15 U.S.C. § 78u-4(b)(2); In re Silicon Graphics, Inc. Secs. Litig., 183 F.3d 970, 977 (9th Cir. 1999).  Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness.  Id. at 979.  To satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."  Id.

When evaluating the strength of an inference, "the court's job is not to scrutinize each allegation in isolation but to

assess all the allegations holistically." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325 (2007). "The inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." Id. at 324. However, "the inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id. The Tellabs decision suggests that Silicon Graphics and its progeny may have been "too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright." South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008). Thus, Tellabs "permits a series of less precise allegations to be read together to meet the PSLRA requirement . . . . Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." Id.

Scienter also can be shown by pleading "a highly unreasonable omission, involving an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009).

In the August 25, 2011 Order, the Court noted that:

Witness accounts can give rise to a strong inference of

United States District Court
For the Northern District of California

scienter if: (1) witnesses are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged;" and (2) the statements attributed to witnesses are indicative of scienter.  In re Daou Sys., Inc., 411 F.3d 1006, 1015-16 (9th Cir. 2005).  The Ninth Circuit concluded in Zucco that allegations made by witnesses who were not employed throughout the length of the relevant time period were unreliable.  552 F.3d at 996-97.

August 25, 2011 Order at 7.

The Order noted that the 2AC set forth accounts from twelve confidential witnesses (CWs), but rejected most of the allegations from these witnesses for the following reasons: (1) only one of the twelve CWs was employed by Hansen throughout the entirety of the class period; (2) none of the twelve witnesses worked with revenue recognition; (3) none of the witnesses would have been in a position to know whether the individual Defendants knew or should have known of Hansen's improper recognition of revenue; and (4) certain allegations relied on hearsay and, even at face value, failed to demonstrate that the individual Defendants had knowledge of the alleged fraudulent activities.  August 25, 2011 Order at 8. The Court found that the most compelling allegations came from CW1, who was the only witness who was employed throughout the Class Period, and who allegedly worked with customer support and managed installations.  Id.  In its previous Order, the Court found that CW1 was described with sufficient particularity.  CW1 was Director of Customer Support from April 2006 to November 2009. Initially, CW1 completed sales in Europe and later managed all of Hansen's Sensei unit installers.  CW1 attended weekly installation

18

meetings with Van Dick and Moll where they discussed, line by line, reports showing installations for each customer, with columns for the order, installation date and training dates. <u>Id.</u> The August 25, 2011 Order indicated that CW1 mentioned that there were several incomplete transactions for which revenue should have been deferred, but that he did not indicate that this information was made known to Defendants at the weekly meetings. <u>Id.</u> at 9. The Court also noted that CW1 stated that catheter sales would be talked about at the meetings, but did not indicate how this would alert Defendants to the misstatements noted in the Restatement. <u>Id.</u>

In the 3AC, Plaintiffs again include statements from CW1 and include statements from two new CWs, CW2 and CW3. CW2 was Sales Director for Central and Eastern Europe from 2007 through 2011. He participated in conference calls with Defendants, during which the participants discussed the status of Sensei unit sales, one at a time. 3AC ¶ 26. CW3 was Sales Director of the Southeast Region from September 2006 through June 2009. 3AC ¶ 27. CW3 stated that, on occasion, he received calls from Van Dick wanting to know about the closure of particular deals. 3AC ¶ 27.

Unlike the other confidential witnesses mentioned in the 2AC, CW2 and CW3, as well as CW1, worked for Hansen during the Class Period and had direct knowledge of Sensei unit sales and installations. Moreover, CW1 and CW2 attended weekly meetings with Defendants at which they discussed sales and installations to

19

specific customers, which are central to the alleged misstatements about premature revenue recognition. Therefore, their accounts of the circumstances surrounding Sensei unit sales and installations and of what occurred at the staff meetings are relevant to scienter. The statement alleged to be made by CW3, that Van Dick wanted to know about deals closing, provides some support for Defendants' knowledge or scienter.

       1. Scienter of Individual Defendants Moll, Van Dick and Restani For Rule 10b-5(b) Claim

Plaintiffs argue that Hansen's Restatement of its financial statements for 4Q07 through 2Q09 demonstrates Defendants' direct knowledge of the previous misstatements they made. The Court previously held, in the August 25, 2011 Order, that the accounting mistakes acknowledged in Hansen's Restatement were not so egregious that Defendants must have been aware of them. Order at 10-11. The Court also addressed Plaintiffs' allegations regarding core operations, the magnitude of the Restatement, and the certifications made pursuant to the Sarbanes-Oxley Act of 2002 (SOX), and concluded that "Plaintiffs have laid a foundation for their 10(b) claim, but additional specificity is needed to show that Defendants acted with the requisite mental state." Order at 12.

As discussed below, Plaintiffs now provide specific allegations that Defendants ignored information that it was impossible for Hansen to meet its training obligations to certain

United States District Court
For the Northern District of California

distributors in the quarter in which Hansen recognized revenue from Sensei unit sales to those distributors.  These allegations sufficiently state that Defendants willfully ignored information in their possession and exclude the Court's previous hypothesis, based on the allegations in the 2AC, that Defendants could have been ignorant of the improper revenue recognition because they were provided with false information.

The 3AC alleges that, in its Restatement, Hansen disclosed that, for Sensei unit sales to "independent distributors," it had "recognized revenue upon shipment of Systems to those distributors that we believed were independently capable of performing required installation and training," but "the distributors were not independently capable of installing systems and/or clinically training end users at the time we recognized revenue on systems purchased by distributors" and "therefore, revenue on such Systems should have been deferred until installation and training had occurred at the distributor's end user."  3AC ¶ 57.

Plaintiffs allege that Defendants knew or recklessly disregarded Hansen's post-shipment obligations that made revenue recognition upon shipment to its purportedly independent distributors improper.  For instance, CW1 explained that the two days of training that distributors received was insufficient for them independently to install Sensei units for their customers and to train them.  3AC ¶ 59.  Defendants would have been aware of this because Hansen installation personnel received two weeks of

training at a Hansen facility and then three to six months of training in the field under the supervision of a senior employee. 3AC ¶ 59.

In a 4Q07 conference call, Restani admitted that training new end-users took three to six months, 3AC ¶ 97, and Van Dick explained, during a 2Q09 conference call, that Hansen had to complete its training obligations to distributors before it could recognize revenue on its sales to them.  3AC ¶ 46.

CW2 confirmed that distributors' personnel attended only a three or five-day training session for both installations and end-user support.  3AC ¶ 61.  CW2 indicated that, during weekly conference calls with the individual Defendants, training was often discussed.  3AC ¶ 68.  CW2 also indicated that two of Hansen's distributors were incapable of supporting an end-user. 3AC ¶¶ 68-69.  To show that Defendants knew that the distributors required extensive training from Hansen personnel, Plaintiffs cite the reselling and distribution agreements that Hansen entered into with its distributors.  3AC, Ex. 14 (October 31, 2007 Agreement with Italian distributor AB Medica signed by Restani on behalf of Hansen).  Exhibit C to the Agreement, titled "Clinical Support Services for Reseller," indicated that Hansen would provide appropriate training for the Reseller's clinical support personnel and that the Reseller would be responsible for providing ongoing clinical support for end-users.  Exhibit D to the Agreement, titled, "End-User Training Provided by Hansen," provided that

United States District Court
For the Northern District of California

every end-user was required to attend and satisfactorily complete end-user peer training before making human clinical use of the Sensei units and that Hansen would evaluate each participant who was trained to determine whether certification was appropriate or whether further training was needed.

These allegations show that Moll, Van Dick and Restani were aware of the amount of training of distributors that was necessary to ensure that they could install Sensei units and train end-users.

Plaintiffs also allege that, in several instances, Hansen recognized revenue at the time it sold a Sensei unit to a distributor rather than after the distributor sold the unit to an end-user. In conjunction with allegations of Defendants' knowledge of this practice, this raises an inference of scienter. Revenue recognition upon the sale to a distributor was improper because Hansen accounting procedures did not allow revenue recognition until the end-user had been sufficiently trained. For instance, Plaintiffs allege that one Sensei unit was sold to AB Medica on the last day of 1Q08 and revenue was recognized for its sale in that quarter. Plaintiffs allege that AB Medica personnel were not sufficiently trained to install the unit for an end-user; AB Medica was independently unable to provide clinical support for an end-user; AB Medica, as of March 31, 2008, did not have an end-user to purchase the Sensei unit; and, even if AB Medica did have a purchaser in mind, an end-user could not have completed the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

required training to allow Hansen to recognize revenue in that quarter.  3AC ¶ 94.  Plaintiffs allege that these facts were known to Defendants because by March 31, 2008, it was clear that AB Medica had been unable independently to install and support a system it sold to a hospital end-user.  3AC ¶ 94.

Plaintiffs also allege that Hansen recognized revenue in 1Q08 from a sale to Palex, another distributor, made on the last day of 1Q08.  3AC ¶¶ 96-97.  Plaintiffs allege that Moll, Van Dick and Restani knew or should have known that it was improper to recognize revenue from this sale because it was impossible for a Palex employee to have received sufficient training by the end of 1Q08 to be able independently to provide clinical support to an end-user.  3AC ¶ 97.

Also, according to CW1, Hansen sold a Sensei unit to a Canadian distributor in December 2008 and recognized the revenue from that sale, although the unit was never installed and the distributor did not obtain approval from the Canadian government to use the equipment.  3AC ¶ 108.

In sum, these allegations give rise to an inference of scienter on the part of Moll, Van Dick and Restani: (1) Defendants met weekly to go over each Sensei unit sale on an individual basis; (2) Defendants knew that Hansen's training obligations to distributors had to be met before it could recognize revenue from a sale to a distributor; and (3) at least two of the sales to distributors took place on the last day of the

quarter, when Defendants knew the distributors' personnel had not been adequately trained to install the Sensei units and to train end-users.  These allegations show that Defendants either knew or were reckless in not knowing that recognizing revenue from these sales to distributors violated Hansen's revenue recognition policy.

Defendants cite cases for the proposition that the fact that corporate officers monitor financial or sales data does not establish that they are deliberately reckless.  See e.g., In re Daou Systs, Inc., 411 F.3d 1006, 1022 (9th Cir. 2005) ("General allegations of defendants' hands-on management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient" to support an inference of scienter).  However, in Zucco Partners, 552 F.3d at 1000-01, the court stated that an inference of scienter is permitted where the information misrepresented was readily apparent to the corporation's senior management.  This is such a case.  Hansen was a small company, with less than 200 employees, focused on selling only one product, with quarterly sales derived from the sale of only three to fourteen units of that product.  3AC ¶ 2, 120, 211.  Because Hansen sold so few units and because each unit was vitally important to Hansen's revenue stream, Defendants discussed, and must have known about, each of them.  Furthermore, even though hands-on management style alone is insufficient to establish

United States District Court
For the Northern District of California

scienter, "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports." <u>Daou Systs.</u>, 411 F.3d at 1022.  Here, Van Dick, Restani and Moll made statements indicating that they were familiar with and closely monitored the revenue recognition of every transaction, <u>see</u> 3AC ¶¶ 6, 45, 46, 49, and the utilization data for the units that had been installed, <u>see</u> 3AC ¶ 163.

Taken collectively, all of the allegations add up to a strong inference of deliberate recklessness on the part of Defendants Moll, Van Dick and Restani.  Therefore, Plaintiffs' allegations are sufficient to assert that these Defendants acted with the required scienter for the Rule 10b-5(b) claim.

2. Sells' Scienter for Rule 10b-5(a) and (c) Claim

Although the Rule 10b-5(b) claim against Sells is dismissed, the Court addresses Sells' scienter under Rule 10b-5(a) and (c) because, as discussed below, Sells' motion to dismiss the Rule 10b-5(a) and (c) claims is denied and Plaintiffs rely on Sells' scienter to impute scienter to Hansen.

To plead scienter in the context of scheme liability under Rule 10b-5(a) and (c), a complaint must allege that the defendant engaged in deceptive conduct with scienter.  <u>Simpson v. AOL Time Warner Inc.</u>, 452 F.3d 1040, 1047 (9th Cir. 2006), <u>vacated on other grounds</u>, 552 U.S. 1162 (2008).  To claim a "scheme to defraud,"

the complaint must allege that the defendant engaged in a manipulative or deceptive act that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud.  Id. at 1048.  A deceptive act, in this context, is defined as "engaging in a transaction whose principal purpose and effect is to create a false appearance of revenues." Id.

Sells argues that this claim must be dismissed because Plaintiffs have failed to allege facts giving rise to a strong inference of his scienter.  The 3AC includes the same allegations as the SEC's complaint in SEC v. Sells, about Sells' actions in regard to four sales of Sensei units to Hospitals A, B, C and D. See Order Denying Defendants' Motion to Dismiss in SEC v. Sells, C 11-4941 CW. [3]  In that Order, the Court describes Sells' deceptive acts involving these transactions, the purpose of which was to cause Hansen to recognize revenue improperly, before its accounting principles and procedures would allow, so that its revenue stream would appear to be increasing each quarter.  The allegations that Sells undertook these actions to manipulate the timing of Hansen's revenue recognition are sufficient to allege that he had the required scienter.

---

[3] Scienter is not an issue in SEC v. Sells because the PSLRA does not apply to claims brought by the SEC.  See SEC v. Yuen, 221 F.R.D. 631, 636 (C.D. Cal. 2004).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

As discussed above, Plaintiffs also allege that Sells, as SVP of Commercial Operations, attended meetings with Moll, Restani and Van Dick during which the installation of each Sensei unit was discussed and Sells, Van Dick and Moll would reach a consensus on which sales of Sensei units could be recognized as revenue.  3AC ¶ 52.  Thus, for the same reasons that these allegations raise an inference of scienter on the part of Van Dick, Moll and Restani, they also raise an inference of Sells' scienter.

3. Hansen's Scienter For Rule 10b-5(b) Claim

Plaintiffs argue that they have alleged Hansen's scienter under the doctrine of respondeat superior, based upon Sells' scienter.[4]  According to Plaintiffs, even if the Court finds that Sells did not make a false statement, his scienter of improper revenue recognition, inferred from actions he took within the scope of his employment, can be imputed to Hansen.  Defendants respond that Sells' alleged knowledge of improper revenue recognition cannot be imputed to Hansen because there is no allegation that he shared this knowledge with anyone.

In the Ninth Circuit, a corporate entity can be vicariously liable under § 10(b) for the fraudulent acts of its officers, if the officers are alleged to have acted within the scope of their employment and for the benefit of the company.  In re Cylink Securs. Litig., 178 F. Supp. 2d 1077, 1088 (N.D. Cal. 2001)

_____

    [4] Plaintiffs do not argue that the scienter of Restani, Van Dick and Moll can be imputed to Hansen.

(citing Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1576-78 (9th Cir. 1990)).  In Hollinger, the Ninth Circuit overturned its previous rule that the vicarious liability provisions in certain sections of the Securities Act supplanted the common law doctrine of respondeat superior.  914 F.2d at 1578; In re Network Equipment Techs., Inc., Litig., 762 F. Supp. 1359, 1363-64 (N.D. Cal. 1991). "So long as scienter is appropriately alleged for the officers and directors of a company, then it is appropriately alleged for the company itself."  Cylink Securs., 178 F. Supp. 2d at 1088.

Because the 3AC adequately alleges Sells' scienter in regard to the scheme to recognize revenue prematurely and that Sells undertook this scheme in the scope of his employment, to benefit his employer, his scienter is imputed to Hansen through vicarious liability.

Defendants' argument that Hollinger should be limited to its facts regarding broker-dealers was addressed and rejected in Network Equipment Techs., 762 F. Supp. at 1364, where the court held that Hollinger embraced "the old traditional common law doctrine" which contains no limitation that would confine its application exclusively to broker-dealers.  Furthermore, Network Equipment Techs. addressed Defendants' second argument that Hansen cannot be liable because there is no evidence that it knew of any contradictory information at the time of the alleged misstatements.  Regarding this argument, the court explained that, "respondeat superior liability establishes a form of secondary

United States District Court
For the Northern District of California

liability which does not require actual knowledge or recklessness on the part of the vicariously liable principal."  762 F. Supp. at 1364.  Defendants' last argument is that scienter cannot be imputed to Hansen because, in Hollinger, the court dismissed the plaintiffs' claim against the corporate defendant where there was no allegation of the corporation's scienter.  914 F.2d at 1572. Defendants misread the import of Hollinger's vicarious liability analysis.  Although the court found insufficient allegations of the defendant's scienter and dismissed the claim on that ground, it found that the defendant was secondarily liable under the theory of respondeat superior.  Id. at 1577-78.  Therefore, as in Hollinger, although Hansen may not be primarily liable for securities fraud, it is secondarily liable under the theory of respondeat superior.

II. Rule 10b-5(a) and (c) Claim Against Sells

Plaintiffs assert the Rule 10b-5(a) and (c) claim against Sells only.  In the related case, SEC v. Sells, C 11-4941 CW, the Court addressed the SEC's claim against Sells pursuant to Rule 10b-5(a) and (c).  The Court held that Sells' first two arguments here--that this claim is precluded by the Supreme Court's holding in Janus, and that the claim is a Rule 10b-5(b) claim disguised as a fraudulent scheme claim--were unpersuasive.  The Court adopts that holding here.

Sells also contends that the allegations of fraud are not stated with the particularity required under Rule 9(b).  In SEC v.

Sells, the Court found that the allegations of sales transactions with Hospitals A through D were stated with sufficient particularity to allege a fraudulent scheme.   Therefore, Sells' motion to dismiss Plaintiffs' Rule 10b-5(a) and (c) claims against him is denied.

III. Loss Causation

As indicated above, loss causation is an element of the claims under Rule 10b-5(b).   Although Defendants do not contest Plaintiffs' claim that they suffered losses due to the decline in the price of Hansen's stock in October 2009 immediately after Hansen issued its Restatement, they do dispute Plaintiffs' claim that they suffered losses from declines in Hansen's stock price based on pre-October 2009 alleged false statements.   Defendants move to dismiss the claims to the extent they are based on allegations of pre-October 2009 statements and stock declines.

To plead loss causation adequately, a plaintiff must provide the defendant with fair notice of what the relevant economic loss might be and the causal connection between that loss and the misrepresentation.   Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005).   This is not subject to the heightened pleading standard of Rule 9(b) or the PSLRA; Rule 8's requirement of a short and plain statement of the claim showing that the pleader is entitled to relief is sufficient.   Id. at 346.   Nonetheless, the complaint must allege that the allegedly fraudulent practices were revealed to the market and caused the resulting losses.   Metzler

United States District Court
For the Northern District of California

Inv. v. Corinthian Colleges, Inc., 540 F.3d 1049, 1063 (9th Cir. 2008). A plaintiff is not required to show that a misrepresentation was the sole reason for the stock's decline in value; as long as the misrepresentation is one substantial cause of the investment's decline, other contributing factors will not bar recovery, but will play a role in determining recoverable damages. In re Daou Systs., 411 F.3d at 1025.

A. Loss Causation Based on 1Q08 Statements Regarding Catheter Sales

As discussed above, Plaintiffs sufficiently allege the misleading nature of Defendants' statement regarding the sale of 401 catheters in 1Q08, which created the false impression that utilization of Sensei units was increasing when Defendants knew that this number was inflated by three large orders placed at the end of 1Q08. 3AC ¶¶ 223-25. When Defendants reported Hansen's 2Q08 results, they admitted that 1Q08 catheter sales had been inflated. 3AC ¶¶ 228-29. Plaintiffs allege that analysts expressed surprise that the 1Q08 number of reported catheter sales had been inflated and, on August 1, 2008, the first day after this revelation by Defendants, Hansen's stock price declined by $2.01 per share or 13.18% and, on August 4, 2008, the second trading day following the catheter report, Hansen's stock price fell another $1.30 per share, or 9.82%. 3AC ¶¶ 316-324. These allegations are sufficient to allege loss causation due to Defendants' statements regarding catheter sales.

United States District Court
For the Northern District of California

B. Misrepresentations Concerning Demand, Utilization, Inactive Systems and Guidance about the Future

Plaintiffs allege that Defendants' statements about the actual sales of Sensei units each quarter, the utilization of Sensei units and, thus, their predictions of demand were false and that when the market realized the falsity of these statements, the price of Hansen's stock declined. The allegations supporting this claim are as follows.

At the end of FY07, due to Defendants' positive outlook for FY08, analysts were impressed with Hansen's strong past performance and promising future performance. 3AC ¶ 306-11. On the news about Hansen's 1Q08 earnings, its shares increased 5.52% to close on May 2, 2008 at $18.54 per share. 3AC ¶ 311. The following trading day, Hansen's shares increased another $.62 or 3.34%, to close at $19.16 per share. On May 13, 2008, the day after Hansen filed its quarterly report on Form 10-Q for 1Q08 with the SEC, its stock increased $1.35 per share or 7.41% to close at a Class Period high of $19.57 per share. Id.

On July 28, 2008, JP Morgan reported that Hansen's 2Q08 sales would be flat due to the timing of shipments, but that JP Morgan's checks continued to indicate that momentum was strong. 3AC ¶ 313. On July 29, 2008, the day after this report was published, Hansen's stock price declined $.88 per share, nearly 5%, to close at $17.52 per share. 3AC ¶ 315. On July 30 and 31, the price declined again and closed at $15.25 per share for a total decline

of 17.12%.  3AC ¶ 315.  Plaintiffs tie this decline in price to Defendants' improper revenue recognition for one Sensei unit in 4Q07 and for two units in 1Q08, which allowed them to portray a steady increase in revenue over the few quarters it had been selling the Sensei units.  3AC ¶ 313.

On December 5, 2008, during an analyst conference call, Moll allegedly falsely assured the market that, although the economy was tougher, the enthusiasm for Hansen's Sensei units remained, Hansen was working harder, and it would, therefore, deliver in the face of the declining economic environment.  3AC ¶ 258.  On January 8, 2009, Morgan Stanley issued a report lowering its 2009 forecast for Sensei unit sales from seventy-four to fifty-six, based on a survey of fifty hospitals, only one of which was considering purchasing a Sensei unit.  3AC ¶ 330.  The same day, Hansen issued a press release reporting lower than expected sales and 2009 guidance of fifty-three to sixty-five units.  3AC ¶ 333. The following day, Hansen's shares declined $.50 per share, or 7.99%, closing at $5.76 per share.  On the next trading day, the stock declined another $.60 to close at $5.16 per share.  3AC ¶ 337.  Moll's December 5, 2008 statement, cited as the alleged misstatement causing Hansen's stock decline, is a forward-looking statement regarding sales in the midst of a declining economy. This statement is protected by the safe harbor provision and is not actionable under the Rule 10b-5(b).  Therefore, Moll's

December 5, 2008 statement cannot be considered to be a factor in the loss causation analysis.

On July 6, 2009, Hansen issued a press release announcing that its FY09 guidance for sales was unattainable; it faced further issues delaying revenue recognition, and demand for and utilization of Sensei units were not as high as suggested in the past. 3AC ¶ 342. The press release cited Moll as saying that sales were adversely affected by "general macroeconomic conditions that continue to significantly impact our potential customers' capital spending." 3AC ¶ 342. Moll reiterated, "While sales cycles will continue to be influenced by macroeconomic trends, we are confident that our current technology and planned product development activities present a compelling value proposition to hospitals and payors." 3AC ¶ 342. On July 7, 2009, the day following Hansen's press release, its stock declined $1.58 per share, or 33.40%, to close at $3.15 per share. 3AC ¶ 351. The following day it declined another $.27, or 8.57%, to close at $2.88 per share.

On August 4, 2009, Defendants reported 2Q09 financial results which revealed that the sales cycle was longer than had been anticipated, demand for Sensei units was lower than anticipated and utilization rates were declining. 3AC ¶ 352. On August 5, 2009, Hansen's shares fell $.33 per share, more than 8%, to close at $3.71 per share. 3AC ¶ 354.

Plaintiffs allege that these disclosures regarding the true nature of Hansen's financial situation and revised demand predictions revealed previous misstatements and caused Hansen's stock price to decline. These claims of loss causation adequately allege a causal connection between Defendants' alleged previous fraudulent statements, their 2009 disclosures, and the decline in the price of Hansen's stock.

IV. Section 20(a) Claim Against all Defendants

Plaintiffs assert a § 20(a) claim against all Defendants, alleging that Hansen, Moll, Van Dick, Restani and Sells acted as control persons within the meaning of § 20(a) of the Exchange Act.

Section 20(a) provides, in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . .

15 U.S.C. § 78t(a).

To plead liability under § 20(a), a plaintiff must allege that: (1) there is a primary violation of federal securities law, and (2) the defendant exercised actual power or control over the primary violator. Howard v. Everex Systs., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000). Plaintiffs need not show that the control persons had scienter or that they culpably participated in the wrongdoing. Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996). Thus, to allege that an individual is a control person, the plaintiff does not have to

allege that the person had scienter distinct from the scienter of the controlled corporation or the controlled individual.  <u>Everex</u>, 228 F.3d at 1065.  However, the individual who is alleged to be a control person may assert a good faith defense to prove the absence of scienter and a failure directly or indirectly to induce the violations at issue.  <u>Id.</u>

Plaintiffs adequately allege that Moll, Van Dick, Restani and Sells controlled Hansen by virtue of their supervisory involvement in the day-to-day operations of Hansen.  3AC ¶ 20-24.  Therefore, this claim sufficiently alleges that these individual Defendants were control persons in regard to Hansen.

Plaintiffs also allege that Hansen controlled the individual Defendants.  3AC ¶ 388.  However, a fictitious entity cannot control those who act on its behalf.  Plaintiffs cite no authority for the proposition that a corporation can control its employees or officers.  Therefore, this claim is dismissed.  Dismissal is without leave to amend as amendment would be futile.

Plaintiffs also allege that Hansen, Moll, Van Dick and Restani exercised control over Sells through their ability to supervise, monitor and direct Sells' conduct and activities and because of their superior positions of power within the corporation.  3AC ¶ 389.  As stated above, Hansen cannot exercise control over its employee.  Therefore, this claim against Hansen is dismissed without leave to amend.  However, by virtue of their positions, Moll, Van Dick and Restani exercised control over

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Sells, who was their subordinate.  Therefore, this claim is adequately alleged against Moll, Van Dick and Restani.

Finally, Plaintiffs allege that Hansen, Moll, Van Dick, Restani and Sells exercised control over Murawski.  3AC ¶ 388. For the reasons stated previously, this claim is dismissed without leave to amend against Hansen.  This claim against the individual Defendants is dismissed because there is no allegation in the 3AC that Murawski committed a primary securities law violation and because the allegation is general, conclusory and lacking in factual support.  Because the Court did not address this claim in its previous Order, it is dismissed with leave to amend against the individual Defendants.

Therefore, Defendants' motion to dismiss the claim of control person liability is granted in part.

CONCLUSION

Based on the foregoing, the Court rules as follows: the Rule 10b-5(b) claim against Sells is dismissed with leave to amend; the Rule 10b-5(b) claim against the other Defendants is sufficiently alleged; the Rule 10b-5(a) and (c) claim against Sells is sufficiently alleged; the control person claim against all individual Defendants based on their control of Hansen is sufficiently alleged; the control person claim against Moll, Van Dick and Restani based on their control of Sells is sufficiently alleged; the control person claim against Moll, Van Dick, Restani and Sells based on their control of Murawski is dismissed with

leave to amend; the control person claim against Hansen based on its control of Sells and Murawski is dismissed without leave to amend.   The element of loss causation for the Rule 10b-5(b) claim is sufficiently alleged.

If Plaintiffs wish to file a fourth amended complaint (4AC), they must do so within fourteen days from the date of this Order, with a red-lined version showing the changes made.   Defendants' answer or motion to dismiss is due fourteen days thereafter.   If Defendants file a motion to dismiss, Plaintiffs' opposition is due two weeks thereafter and Defendants reply is due one week later. The motion will be taken under submission and decided on the papers.


IT IS SO ORDERED.


Dated:   8/10/2012

CLAUDIA WILKEN
United States District Judge